Donald J. Kula, Bar No. 144342
Nathan M. Smith, Bar No. 255212
Vilma Palma-Solana, Bar No. 267992
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA  90067-1721
Telephone:  310.788.9900
Facsimile:  310.788.3399

Attorneys for Plaintiff Global BTG LLC, a Nevada
Limited Liability Company doing business in
California, and Counterclaim-Defendant Jacob
Hodges

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| GLOBAL BTG LLC,<br><br>Plaintiff,<br><br>v.<br><br>NAC AIR CARGO, INC.,<br><br>Defendant-<br>Counterclaim Plaintiff,<br><br>v.<br><br>GLOBAL BTG LLC, JACOB HODGES and DOES 1-5,<br><br>Counterclaim Defendants. | Case No. 2:11-cv-01657-MMM-JCGx<br><br>**GLOBAL BTG LLC'S AND JACOB HODGES'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[*Supporting Declaration of Nathan Smith filed separately under seal; Declaration of Jacob Hodges; Rule 56-1 Statement of Undisputed Facts and [Proposed] Findings of Law, filed concurrently herewith*]<br><br>**Hon.  Margaret M. Morrow**<br>**Discovery Cutoff:    June 5, 2012**<br>**Pretrial Conference:  Nov. 13, 2012**<br>**Trial Date:          Dec. 4, 2012**<br><br>**Hearing Date:        December 10, 2012**<br>**Hearing Time:        10:00 am**<br>**Hearing Location:    Courtroom 780** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on December 10, 2012, at 10:00 a.m., or as soon thereafter as the Court is available, in Courtroom 780 of the U.S. District Court for the Central District of California located at 312 North Spring Street, Los Angeles, California 90012, Plaintiff and Counterclaim-Defendant Global BTG LLC will and hereby does move the Court for partial summary judgment on its Second Amended Complaint and National Air Cargo, Inc.'s Counterclaim.

This Motion is made pursuant to Federal Rule of Civil Procedure 56.  This Court should grant partial summary judgment on the following claims:

**1. Capacity to Contract**.  Judge Lew ruled that Global pleaded sufficient facts to show capacity to contract.  Each of those facts is uncontroverted after discovery.  This Court should not disturb Judge Lew's law of the case on capacity to contract.  Judge Lew's Order correctly interprets the governing legal doctrines to require the commonsense conclusion that forming a company on a Tuesday does not mean the company should be free of liability or unable to enforce a contract signed on the previous Sunday.

**2. Best Efforts**.  NAC asserts that Global breached the agreement when it did not provide an MOU as described in the late added "other" section of the LOI.  That interpretation of  the meaning of "best efforts"  is inconsistent with the plain meaning of the term, industry custom and usage, and effectively alleges a separate promise that contradicts the written agreement.  There is no material fact dispute as to whether Global breached the agreement when, although it used its best efforts, Global did not satisfy NAC's request for an "MOU."

**3. Exclusivity**.  NAC signed the agreement giving Global an exclusive right to buy and leaseback as many of the eight aircraft as it could purchase.   The parol evidence does not controvert this interpretation.  NAC did not, and  never intended to honor this promise.  There is no disputed material fact that prevents this Court

Global's and Hodges's Notice of Motion and
Motion for Partial Summary Judgment

1  from holding that the LOI was a buy-sell agreement that did not allow NAC to shop

2  for other lenders.

3      **4. Lost profits**.  NAC has alleged that it would  have been fabulously

4  wealthy from operating the 747s.  These lost profits calculations were made without

5  knowledge that NAC actually decided not to purchase the  aircraft for business

6  reasons.  These calculations are wildly speculative and uncertain.  Additionally,

7  Global never bargained for the risk of business loss from failing to purchase any

8  aircraft.  On these undisputed facts,  NAC's damages claims for lost profits should

9  be dismissed.

10      This Motion is based upon this Notice of Motion and Motion, the

11  concurrently filed Memorandum of Points and Authorities, the Declarations of

12  Nathan Smith and Jacob Hodges, the pleadings and records in this action, and such

13  other matters as the Court deems necessary and proper.

14      This motion is made following the conference of counsel pursuant to L.R. 7-

15  3.

16

17  DATED:  September 14, 2012                **PERKINS COIE LLP**

18

19                                            By: /s/Nathan M. Smith
                                                  Donald J. Kula
20                                                Nathan M. Smith

21                                            Attorneys for Plaintiff Global BTG
                                              LLC, a Nevada Limited Liability
22                                            Company doing business in California,
                                              and Counterclaim-Defendant Jacob
23                                            Hodges

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................. 1

II.   STATEMENT OF FACTS .............................................................. 3

    A.    Background ........................................................................... 3

        1.    NAC Sought to Purchase Eight 747 Aircraft to Substantially Expand and Modernize Its Fleet .......................... 3

        2.    Hodges Has Extensive Experience in the Aircraft Financing Business ................................................. 3

    B.    NAC and Global Negotiate and Enter into a Binding Letter of Intent ........................................................................... 4

    C.    The Agreement Contains Three Promises In Dispute ........................ 5

        1.    The Agreement is Exclusive ........................................ 5

        2.    Global Met its Best Efforts Obligations to Deliver an "MOU" to NAC by July 22, 2010 .................................. 5

        3.    Global Required At Least One Operating Lease ...................... 6

    D.    NAC Never Intended to Perform Under the Agreement ..................... 6

    E.    After Signing the Agreement, Global Set Out to Secure Lenders for the Deal ........................................................................ 7

    F.    Without Explanation or Excuse, NAC told Global it Would Not Complete the Sale and Leaseback to Which it had Agreed ................. 8

    G.    NAC used Goldman Sachs to Purchase the Three Air France Aircraft ................................................................................ 8

    H.    NAC's Defenses Are Not Supported by the Facts ............................ 9

        1.    Global's Official Status was not Relevant Then or Now .......... 9

        2.    Global's Pleaded Facts on Capacity Are Not in Dispute .......... 9

        3.    NAC's Pearl Allegations are Unsupported ........................... 11

        4.    NAC's Best Efforts Excuse Is Unsupportable ...................... 11

**TABLE OF CONTENTS**
(continued)

Page

III.   THE COURT SHOULD GRANT GLOBAL'S MOTION ON ALL
FOUR ISSUES ........................................................................................ 11

A.   Global is entitled to summary judgment on NAC's Capacity to
Contract Defense .......................................................................... 12

1.   NAC's Capacity Argument Was Rejected by Judge Lew ........ 12

2.   The Law of the Case is That Global's Pleaded Facts
Establish Capacity .................................................................. 13

3.   Judge Lew's Application of LLC by Estoppel Was
Correct .................................................................................... 14

a.   Courts Agree that the Short Delay in Forming
Global BTG does not Create a Free Option to
Avoid the Letter of Intent ............................................ 14

b.   The Equitable Doctrine of LLC by Estoppel
Applies ......................................................................... 15

c.   Global's Status was Never Material ............................. 15

d.   The Agreement was Adopted by Global ....................... 16

e.   Global was also a De Facto LLC .................................. 16

B.   Meaning of "Best Efforts" in the LOI Is Not Seriously Disputed ...... 17

1.   Global's Interpretation is the Only Reasonable
Interpretation ........................................................................... 17

a.   Contract Interpretation Rules Show the Best Efforts
Clause is Unambiguous ................................................ 17

b.   The UCC Limits the Admissibility of Parol
Evidence ....................................................................... 18

2.   This Best Efforts Clause is Unambiguous ............................... 19

3.   NAC's Interpretation of the Best Efforts Clause Relies on
Inadmissible Parol Evidence ................................................... 19

4.   Parol Proves Global's Interpretation ...................................... 20

C.   Global is Entitled to Summary Judgment that the LOI is an
Exclusive Buy-Sell Agreement ...................................................... 20

1.   The Plain Terms of the Agreement are Exclusive .................... 20

2.   The Parol Evidence Supports a Finding of Exclusivity .......... 22

1

2

**TABLE OF CONTENTS**
(continued)

3

**Page**

D.    NAC's Lost Profits Claims Should Be Dismissed ............................ 23

4

1.    Lost Profits Were Not In the Contemplation of the Parties ..... 23

5

2.    NAC's Lost Profits Are Too Speculative and Uncertain to Recover ....................................................................................... 24

6

IV.    CONCLUSION ............................................................................................. 25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*1550 Fifth Ave. Bay Shore, LLC v. 1550 Fifth Ave., LLC,*
    748 N.Y.S.2d 601 (N.Y.App.Div. 2002)............................................................18

*3Com Corp. v. Banco do Brasil, S.A.,* 171 F.3d 739 (2d Cir. 1999)......................18

*722 W. 43rd St. LLC v. Ali,*
    No. B211263, 2009 WL 3020001 (Cal. App. Sep. 23, 2009)............................14

*Allen v. Scott, Hewitt & Mize, LLC,*
    186 S.W. 3d 782 (Mo. App. 2006)....................................................................14

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .....................................12

*Bankers Trust Co. of W. N.Y. v. Zecher,*
    103 Misc. 2d 777 (N.Y. Sup. 1980) ..................................................................14

*BJRM, LLC v. Output Systems, Inc.,*
    917 A.2d 605 (Conn. App. 2007)......................................................................14

*Bloor v. Falstaff Brewing Corp.,*
    601 F.2d 609 (2d Cir. 1979) ..............................................................................19

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cert. denied,* 484
    U.S. 1066 (1988) ...............................................................................................12

*Christianson v. Colt Indus. Operating Corp.,*
    486 U.S. 800, 108 S. Ct. 2166 (1988) ...............................................................13

*Computer Possibilities, Unlimited, Inc. v. Mobil Oil Corp.,*
    747 N.Y.S.2d 468 (N.Y.App.Div. 2002)............................................................22

*Conservancy Holdings, Ltd. v. Perma-Treat Corp.,*
    126 A.D.2d 114, 513 N.Y.S.2d 266 (3d Dept. 1987)........................................23

*Goodman Mfg. Co., L.P. v. Raytheon Co.,*
    No. 98 Civ. 2774(LAP), 1999 WL 681382 (S.D.N.Y. Aug.31, 1999) ..............22

**TABLE OF AUTHORITIES**
(continued)

Page

*Headwell v. Sandler*,
  46 A.D.2d 584, 364 N.Y.S.2d 218 ............................................................20, 21

*Home Owners' Loan Corp. v. Gordon*,
  36 Cal. App. 2d 189 (1939) ................................................................. 15

*In re Asia Global Crossing, Ltd.*,
  332 B.R. 520 (Bkrtcy. S.D.N.Y. 2005) ........................................................22, 23

*James v. Burchell*,
  82 N.Y. 108 (1880)......................................................................... 22

*Kenford Co. v. Erie*,
  493 N.E.2d 234 (N.Y. 1986) ............................................................... 23

*Kroboth v. Brent*,
  215 A.D.2d 813 (N.Y. App. Div. 1995).......................................................... 19

*Nelson v. Pima Community College*,
  83 F.3d 1075 (9th Cir.1996) ............................................................... 12

*O2Development, LLC v. 607 South Park, LLC*,
  159 Cal. App. 4th 609 (2008)............................................................... 14

*PNC Capital Recovery v. Mechanical Parking Systems, Inc.*,
  283 A.D.2d 268, 726 N.Y.S.2d 394 (N.Y.A.D. 2001)....................................... 20

*T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n,*
  809 F.2d 626 (9th Cir. 1987)............................................................... 12

*Telerep, LLC v. U.S. Intern. Media, LLC*,
  903 N.Y.S.2d 14 (N.Y.A.D. 1 Dept. 2010)........................................................ 18

*Timberline Equipment Co., Inc. v. Davenport*,
  514 P.2d 1109 (Or. 1973)................................................................... 15

*TPTCC NY, Inc. v. Radiation Therapy Services, Inc.*,
  784 F.Supp.2d 485 (S.D.N.Y. 2011) ........................................................ 19

*Tropical Leasing, Inc. v. Fiermonte Chevrolet, Inc.*,
  439 N.Y.S.2d 566 - 568 (N.Y.A.D. 1981) ..................................................... 18

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

4

*Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*,
  63 N.Y.2d 396, 482 N.Y.S.2d 465 (1984)...........................................................20

5

6

*VGY Development, LLC v. 376 South Colony Realty Corp.*,
  No. CV065002733, 2007 WL 1675090 (Conn. Super. May 22, 2007) .............14

7

8

*Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*,
  818 F.2d 260 (2d Cir. 1987) ..............................................................................18

9

10

*Wyndham Co. v. Wyndham Hotel Co.*,
  596 N.Y.S.2d 655 (N.Y.Supp. 1992), *order aff'd.*, 202 A.D.2d 159
  (N.Y.A.D. 1994)..................................................................................................21

11

12

*Yoi–Lee Realty Corp. v. 177th Street Realty Assocs.*,
  208 A.D.2d 185, 626 N.Y.S.2d 61 (N.Y.A.D. 1995)..........................................21

13

14

**STATUTES**

15

N.Y.U. Com. Code § 2-202 ........................................................................................18

16

N.Y.U. Com. Code § 2-714 ........................................................................................23

17

18

N.Y.U. Com. Code § 2-715 ........................................................................................23

19

20

**RULES**

21

Fed. R. Civ. Proc. Rule 56 ........................................................................................12

22

Fed. R. Civ. Proc. Rule 56(c) ...................................................................................11

23

24

Fed. R. Civ. Proc. Rule 56(e) ...................................................................................12

25

26

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

**OTHER AUTHORITIES**

18-134 Moore's Federal practice – Civil § 134.22.................................................. 13

18A Am. Jur. 2d Corporations § 213 ....................................................................... 15

8 William Meade Fletcher, Fletcher Cyclopedia of the Law of corporations § 3910 (2010)........................................................................................................ 15

Edward H. Warren, *Collateral Attack on Incorporation*, 21 Harv. L. Rev. 305, 313 (1908)................................................................................................. 15

Emeka Duruigbo, *Avoiding a Limited Future for the De Facto LLC and LLC by Estoppel*, 12 U. Pa. J. Bus. L. 1013 (2010) .................................................. 15

Lawrence's Anderson On the U.C.C. § 2-715.387 (June 2012) ............................ 25

Rest. 2d of Contract § 250, cmt. c ......................................................................... 22

Rest. 2d Contracts § 250, illus. 5 (1981) .............................................................. 22

Robert A. Ragazzo & Douglas K. Moll, *Closely Held Business Organizations: Cases, Materials and Problems* at 291-292 (Thomson-West, 2006).................................................................................................... 15

# I.   INTRODUCTION

Plaintiff Global BTG, LLC, seeks and is entitled to summary judgment on four defenses asserted by Defendant National Air Cargo, Inc. ("NAC"). Specifically, Global is entitled to summary judgment on the following:  (1) that Global has the legal capacity to sue NAC, (2) that the term "best efforts" in the contract at issue is unambiguous and means precisely what it says, as opposed to NAC's contrived interpretation that failure to perform the stated task constitutes a breach even if best efforts were used, (3) that Global, and only Global, had the exclusive right to purchase and leaseback the aircraft specified in the agreement at issue, and (4) that NAC's request for lost profits as part of its counterclaim must be dismissed as such damages are highly speculative and lacking reasonable certainty.

This case is about an agreement signed by one party that never intended to honor its terms.  The agreement was titled "Letter of Intent" and was a "binding" commitment for the sale by National Air Cargo to Global BTG and lease back to National Air Cargo ("NAC") of "up to eight" 747 cargo freighters.  The deal was worth over $300 million.

In the agreement, NAC agreed to sell as many of the aircraft as Global could purchase and Global agreed to lease the aircraft back to NAC on pre-negotiated terms.  Two additional promises were written into the agreement at the final hour.  First, Global promised to use its "best efforts" to provide NAC with an "MOU" from a lender on or before July 22, 2012 — 4 business days after the agreement was signed.  Second, National agreed to lease one aircraft on an operating lease and Global committted to providing at least one operating lease.

What Global did not know when it made the agreement with NAC is that NAC never intended to honor its end of the bargain.  For example, NAC told Global it would not continue to negotiate with other financing sources but NAC received a term sheet for an engagement with Goldman Sachs on the very same day it signed the agreement with Global.  And without excuse, NAC breached the Letter of Intent five days after signing it.

NAC is now being held to the terms of its agreement with Global.  After discovery, the uncontroverted facts and the law warrant summary judgment for Global on four important claims in this lawsuit:

**1.  Capacity to Contract**.  Judge Lew ruled that Global pleaded sufficient facts to show capacity to contract.  Each of those facts is uncontroverted after discovery.  This Court should not disturb Judge Lew's Order, which correctly interprets the governing legal doctrines to require the commonsense conclusion that forming a company on a Tuesday does not mean the company should be free of liability or unable to enforce a contract signed on the previous Sunday.

**2.  Best Efforts**.  NAC asserts that Global breached the agreement when it did not provide an MOU as described in the late added "other" section.  That interpretation of the meaning of "best efforts" is inconsistent with the plain meaning of the term, industry custom and usage, and effectively alleges a separate promise that contradicts the written agreement.  Rejecting NAC's strained interpretation of "best efforts" makes it undisputed that Global did not breach the LOI when, although it used its best efforts, Global did not satisfy NAC's request for an "MOU."

**3.  Exclusivity**.  NAC signed the agreement giving Global an exclusive right to buy and leaseback as many of the eight aircraft as it could purchase.  The parol evidence does not controvert this interpretation.  NAC did not, and never intended to honor this promise.  There is no disputed material fact that prevents this Court from holding that the LOI was a buy-sell agreement that did not allow NAC to shop for other lenders.

**4.  Lost profits**.  NAC has alleged that it would have been fabulously wealthy from operating the 747s.  These lost profits calculations are wildly speculative, uncertain, and were not contemplated by the parties.  On these undisputed facts, NAC's damages claims for lost profits should be dismissed.

Global's and Hodges's Notice of Motion and Motion for Partial Summary Judgment

## II.   STATEMENT OF FACTS

### A.   Background

#### 1.   NAC Sought to Purchase Eight 747 Aircraft to Substantially Expand and Modernize Its Fleet.

The Civil Reserve Air Fleet is a fleet of commercial aircraft that are "pledged" each year by their owners to the DOD.  Congress and the DOD, concerned with the age and reliability of the CRAF, offered incentives, beginning in Fiscal Year 2011, to program participants pledging more modern aircraft with better fuel efficiency and greater cargo carrying capacity.  (Global's and Hodges's Statement of Uncontroverted Facts ("SOUF"), ¶ 1.)

NAC is a freight forwarder that relies heavily on defense contracts.  One way to increase its business was to participate in the CRAF program.  In early 2010, NAC's fleet consisted of four outdated DC-8s, two Jetstream and one 757-200.  (SOUF, ¶ 2.)  NAC decided to acquire newer, larger and more efficient aircraft to participate in CRAF and entered into a purchase agreement for three Air France 747's and entered into a "Letter of Intent" to purchase five 747's from Japan Airlines.  These eight aircraft are the subject of this dispute.  (SOUF, ¶ 3.)  Ultimately, the CRAF incentives were scaled back and National withdrew from the purchase of the five JAL aircraft.  (SOUF, ¶ 4.)

#### 2.   Hodges Has Extensive Experience in the Aircraft Financing Business.

Jacob Hodges has over seven years of experience in the aircraft financing business.  (SOUF, ¶ 5.)  In December 2004, Hodges began a six year tenure with BCI Aircraft Leasing ("BCI"), a relatively small aircraft lessor.  During Hodges's tenure, BCI grew from a company with $384 million in aircraft assets to over $1.1 billion in aircraft assets under operating lease.  (SOUF, ¶ 6.)

While employed at BCI as a Director and then Managing Director, Head of Debt Capital Markets, Hodges raised, originated, solicited, and obtained proposals and commitments from multiple lenders around the world, including lines of credit that exceeded $1 billion dollars.  (SOUF, ¶ 7.)  Hodges was "one of the

cornerstones" of BCI. (SOUF, ¶ 8.) BCI bought over 118 aircraft, and Hodges financed most of those purchases and was involved in every one. (SOUF, ¶ 9.) In the spring of 2007, BCI came under scrutiny for its principal's accounting practices. Hodges resigned from BCI in May 2010. (SOUF, ¶ 10.)

Upon leaving BCI, Hodges decided to open his own firm. Although he considered joining a new entity called Pearl Aviation being formed by former BCI principals, he ultimately declined a lucrative offer to join Pearl and instead started Global. (SOUF, ¶¶ 11, 12.)

**B.     NAC and Global Negotiate and Enter into a Binding Letter of Intent.**

NAC employed Donald Stukes as its agent to raise funds for the purchase of the eight aircraft. (SOUF, ¶ 13.) On June 17, 2010, Stukes contacted Hodges to get his "thoughts and input" on the NAC deal. (SOUF, ¶ 14.) Stukes knew Hodges from past business with BCI. Stukes knew that Hodges left BCI earlier in 2010 and that he was a "free agent." (SOUF, ¶ 15.) Knowing Hodges's reputation, Stukes asked Hodges if he was interested. Hodges told Stukes he was interested in the NAC opportunity. (SOUF, ¶ 16.)

In July, negotiations began in earnest. Stukes, Hodges and sometimes Alf, or another of NAC's board members, Glen Joerger, negotiated in detail over Global's terms. The negotiations focused on two forms of sale-leaseback transactions—operating leases and finance leases.

NAC and Global's negotiations culminated on Sunday, July 18, 2010, when Hodges received an executed copy of the Letter of Intent from NAC. The Agreement states that:

> This Letter of Intent is intended as a binding agreement between the Lessor and Lessee who will act in good faith to implement the provisions hereof, to complete the contemplated transactions and to negotiate, execute and deliver all necessary and appropriate leases and other agreements in form and substance consistent with industry standards and in a timely manner.

(SOUF, ¶ 17.)

The Agreement committed NAC to sell to and leaseback from Global as many of the eight aircraft as Global would finance.  It identified each aircraft by serial number; set out agreed price terms for each aircraft and type of lease; and provided flexibility to Global in pricing.  (SOUF, ¶¶ 18-20.)

The Agreement at Page 2 set a closing date "[a]s soon as reasonably possible and in accord with the estimated delivery schedule as provided by Lessee."  The Agreement also provides that it "will be governed by the laws of the State of New York."  (SOUF, ¶ 21.)

**C.    The Agreement Contains Three Promises In Dispute.**

First, the Letter of Intent is an agreement for the sale and leaseback of the JAL and AF planes.  Thus, National promises to sell, Global pledged to buy, and National agreed to lease back the aircraft.  (SOUF, ¶ 22.)  As a corollary, the parties agreed to act in good faith to complete the transaction.  (SOUF, ¶ 23.)

Second, the eleventh hour "Other" section contained a promise by Global to use its "best efforts" to deliver to NAC an amorphous "MOU" from a lender within four days of signing the agreement.  (SOUF, ¶ 24.)

Third, the same "other" section had a promise from National to accept an operating lease from Global on the contracted terms.  (SOUF, ¶ 25.)

**1.    The Agreement is Exclusive.**

NAC and Global rejected non-exclusive language.  NAC proposed specific language in a draft that stated the Agreement would be "non-exclusive" and NAC could continue to seek financing from sources other than Global.  (SOUF, ¶ 26.)  Global specifically rejected this language.  NAC conceded.  Stukes told NAC, that Global would "not proceed on a non-exclusive basis."  (SOUF, ¶ 27.)

**2.    Global Met its Best Efforts Obligations to Deliver an "MOU" to NAC by July 22, 2010.**

NAC knew that Global needed a minimum of 60 days to complete the sale-leaseback of the planes.  (SOUF, ¶ 28.)  Thus, the drafts (and final) Agreement

Global's and Hodges's Notice of Motion and Motion for Partial Summary Judgment

explicitly set a closing date "[a]s soon as reasonably possible and in accord with the estimated delivery schedule as provided by Lessee."  (SOUF, ¶ 29.) The delivery schedules provided at least 60 days.  JAL, for example, set staggered closing dates with the last one closing on November 26, 2010.  (SOUF, ¶ 30.)

Nonetheless, on the last day of the negotiations, NAC requested and approved the promise under "Other" that Global "use its best efforts to deliver up to [NAC] on or before Thursday July 22, 2010 an MOU from a qualified lender to provide capital to purchase Aircraft under a loan/and or finance lease."  (SOUF, ¶ 31.)  Global informed NAC that it would be virtually impossible to obtain a firm commitment from a lender by then.  (SOUF, ¶ 32.)  Stukes told NAC virtually the same thing.  (SOUF, ¶ 33.)  NAC insisted, explaining that some form of an MOU would help NAC demonstrate progress to JAL.  (SOUF, ¶ 34.)  Global understood that including this language was an accommodation for NAC.  (SOUF, ¶ 35.)  At no point did NAC suggest that the rest of the deal turned on whether Global could provide an MOU.  (SOUF, ¶ 36.)

### 3. Global Required At Least One Operating Lease.

During negotiations, NAC deleted all references to operating leases in the Agreement.  (SOUF, ¶ 37.)  Hodges responded, insisting that Global would not proceed further unless at least one aircraft lease was structured as an operating lease — as was originally discussed and agreed.  (SOUF, ¶ 38.)  Neither Stukes nor NAC told Hodges that it would not commit to at least one operating lease.  (SOUF, ¶ 39.) Global would have walked away if the Agreement did not require at least one operating lease.  (SOUF, ¶ 40.)

### D. NAC Never Intended to Perform Under the Agreement.

NAC never intended to keep its promises to Global.  NAC told Global it would not continue to negotiate with others, yet NAC held a conference call with Goldman Sachs the day after it signed the Agreement.  (SOUF, ¶ 41.)  On July 21, 2010, while Global was working, NAC met with Deutsche Bank and Goldman Sachs to discuss financing the exact same aircraft NAC agreed to sell and leaseback

from Global.  (SOUF, ¶ 42.)

Similarly, NAC always intended to terminate the Agreement four days after its execution regardless of whether Global used its best efforts to deliver up an MOU from a qualified lender in those four days.  (SOUF, ¶ 43.)  For example, on July 17 Joerger sent an internal email stating that "if they [Global] can't get it done by Thurs [July 22], we may have to go to DB [Deutsche Bank]."  (SOUF, ¶ 44.)

NAC also made other misrepresentations.  NAC told Global its prior contacts were limited to two or three lenders but contacted more than a dozen.  (SOUF, ¶¶ 45, 46.)   This caused confusion and made Global's job even harder.  (SOUF, ¶ 47.)  NAC also told Global that it was committed to the purchase of the JAL aircraft (SOUF, ¶ 48), an allegation now known to be untrue.

**E.     After Signing the Agreement, Global Set Out to Secure Lenders for the Deal.**

Before signing, Global conducted due diligence on the aircraft's technical condition, prepared marketing materials, including credit write-ups and requests for proposals, and was soliciting general lender interest to determine what pricing was achievable.  (SOUF, ¶ 49.)  Upon finalizing the Agreement, Global's effort and time commitment to the deal multiplied.  (SOUF, ¶ 50.)  In the week following the execution of the Agreement, Global contacted and distributed requests for proposals to financing sources from around the world.  (SOUF, ¶ 51.)

Expressions of interest were received within days—commentary on Global's and Hodges's skill and reputation in the industry.  By July 20, 2010, less than two days after Global received the executed Agreement, Global had received a strong expression of interest from Perot Investments to finance up to two of the 747s.  (SOUF, ¶ 52.)  Global updated NAC on this progress the morning of July 22nd, with a draft MOU showing lender interest.  (SOUF, ¶ 53.)  Global also thought Citibank was interested[1] (SOUF, ¶ 54), and that other lending committees were

---

[1]     Mr. Hodges spoke with David Silvers at Citibank.  (SOUF, ¶ 55.)  Mr. Silvers did not provide deposition testimony.  Mr. Silver's manager, Gary Rothschild, testified that Citibank was not interested in the transaction.  Mr. Rothschild did not testify to Mr. Silver's communications with Mr. Hodges.  (SOUF, ¶ 56.)

considering the proposal favorably.

Hodges updated Stukes on the morning of July 23.  Hodges told Stukes that Global expected to obtain financing from Citibank and Perot Investments and that Global was making significant progress with other lenders around the globe.  Global was "truly working around the clock on this."  (SOUF, ¶ 57.)

**F.      Without Explanation or Excuse, NAC told Global it Would Not Complete the Sale and Leaseback to Which it had Agreed.**

Within hours of Hodges's July 23rd update, NAC, through Stukes, emailed Hodges and said that although NAC appreciated Global's hard work, Global's "mandate to represent NAC has been terminated effective immediately."  (SOUF, ¶ 58.)

Hodges responded quickly to NAC's statement.  Hodges wrote that the purported "termination" was a breach the agreement.  (SOUF, ¶ 59.)  Hodges requested that NAC and Stukes discuss a reasonable resolution.  (SOUF, ¶ 60.)  Stukes and NAC denied any wrongdoing and refused to discuss any accommodations with Hodges.  (SOUF, ¶ 61.)  Notably, NAC did not assert that Global made any of the misrepresentations it now relies upon.

**G.      NAC used Goldman Sachs to Purchase the Three Air France Aircraft.**

NAC claims that it terminated the Agreement with Global because Global did not provide an "MOU" from a qualified lender on July 22, 2010, and that NAC risked losing the right to purchase the five JAL aircraft.  This allegation ignores Global's rights to lease the Air France aircraft.  (SOUF, ¶ 62.)  Instead, NAC signed an exclusive agreement with Goldman Sachs the same day it breached the LOI with Global.  (SOUF, ¶ 63.)

Ultimately, Goldman Sachs found financing for NAC from BlackRock.  The financing closed in two parts, the first on September 2, 2010, and the second October 8, 2010.  (SOUF, ¶ 64.)  It took Goldman Sachs 41 and 77 days, respectively, to close the deals on those aircraft.

Global's and Hodges's Notice of Motion and Motion for Partial Summary Judgment

**H.     NAC's Defenses Are Not Supported by the Facts.**

NAC's defense to its breach of contract and deceit has been to blame Global and its sole owner Jacob Hodges.  Among NAC's excuses, NAC alleges (1) there was no agreement because Global was formed on Tuesday after the agreement was signed on Sunday; (2) that Hodges told NAC that he and Global were affiliated with Pearl Aviation—another company related to Hodges former employment; and (3) that Global agreed, although not in writing, to provide financing commitments four days after the Agreement was signed.

**1.     Global's Official Status was not Relevant Then or Now.**

The facts on Global's capacity to contract are simple.  The LOI was signed on July 18, 2010, and Global's articles of organization were filed on July 20, 2010.  (SOUF, ¶¶ 17, 66.) Judge Lew ruled that these facts did not impact Global's enforcement of the contract:

> Although Plaintiff did not exist as a legal entity at the time the contract was entered into, Plaintiff has pled sufficient facts showing its authority to enforce the contract.  The Court finds that Plaintiff has pled sufficient facts showing its ability to enforce the contract through the doctrine of LLC by estoppel.

(SOUF, ¶ 65.)

**2.     Global's Pleaded Facts on Capacity Are Not in Dispute.**

Global pleaded the following facts regarding its capacity to contract in the Amended Complaint.  These facts are undisputed.

- Global filed its articles of organization with the Nevada Secretary of State on July 20, 2010.  *Compare* FAC Dkt No. 23 at ¶ 2 *with* SOUF ¶ 66.

- Hodges contemplated forming Global as a Nevada limited liability company as far back as December 11, 2008, when Stuart Warren reserved the name Global BTG LLC with the Nevada Secretary of State.  *Compare* FAC Dkt No. 23 at ¶ 3 *with* SOUF ¶ 67.

- On May 9, 2010, Hodges purchased and registered the domain name

www.Globalbtg.com on behalf of Global.  *Compare* FAC Dkt No. 23 at ¶ 4 *with* SOUF ¶ 68.

- Neither NAC nor NAC agent Don Stukes ever asked Hodges or anyone associated with Global any questions about Global's organizational status. Neither Stukes nor anyone from NAC showed any interest in Global's organizational status.  *Compare* FAC Dkt No. 23 at ¶ 20 *with* SOUF ¶¶ 69, 70.

- Hodges always intended that Global BTG LLC be bound and benefited by the agreement with NAC.  *Compare* FAC Dkt No. 23 at ¶ 21 *with* SOUF ¶ 71.

- Hodges acted as the sole member of Global.  *Compare* FAC Dkt No. 23 at ¶ 22 *with* SOUF ¶ 72.

- Hodges executed a lawful assignment on July 15, 2011, assigning all rights and interests retained in the LOI with NAC to Global.  *Compare* FAC Dkt No. 23 at ¶ 23 *with* SOUF ¶ 73.

- NAC dealt with Hodges as the sole member of Global, referring in writing to Global BTG LLC as the organization NAC contracted with and who NAC expected to perform.  Compare FAC Dkt No. 23 at ¶ 24 *with* SOUF ¶ 74.

- On July 8, 2010, Hodges instructed Stuart Warren to reserve the name Global BTG LLC and prepare organizational papers for registering Global as a Nevada limited liability company.  *Compare* FAC Dkt No. 23 at ¶ 25 *with* SOUF ¶ 75.

- On July 12, 2010, Hodges sent an email to a relative asking him to serve as Global's Nevada agent for service of process.  *Compare* FAC Dkt No. 23 at ¶ 26 *with* SOUF ¶ 76.

- A typographical or ministerial error caused Global BTG, Inc. to be named under Hodges's signature on the LOI.  This error was present in the first draft Global sent to NAC's agent Stukes on July 15, 2010.  Hodges did not notice the error when he signed the LOI.  *Compare* FAC Dkt No. 23 at ¶ 31 *with*

SOUF ¶ 77.

- Hodges intended that his signature on the LOI was in his capacity as the sole member of Global.  *Compare* FAC Dkt No. 23 at ¶ 32 *with* SOUF ¶ 78.
- Hodges intended that Global assumed all obligations and received all benefits from the LOI.  *Compare* FAC Dkt No. 23 at ¶ 33 *with* SOUF ¶ 79.

### 3.      NAC's Pearl Allegations are Unsupported.

NAC's next defense is that Hodges led NAC to believe it was dealing with Pearl Aviation.  But on July 15 Stukes tells NAC that Global is not affiliated with Pearl.  (SOUF, ¶ 80.)  NAC relies on two emails from Hodges to people unrelated to National identifying himself as a Pearl managing director,  emails from Stukes to NAC referring to Global as Pearl and  a login and password in the name "Pearl Aviation," provided to Global without explanation and later changed.  There is no document sent from Hodges or Global to NAC or Stukes that refers to Hodges or Global as associated with Pearl.  Stukes's references to Pearl were a surprise to Hodges learned during discovery.  (SOUF, ¶ 81.)

### 4.      NAC's Best Efforts Excuse Is Unsupportable.

NAC argues that, contrary to the express terms of the Agreement, Global was required to deliver up firm financing within four days of the agreement being signed.  But the Agreement states that Global will use its "best efforts to deliver up to NAC on or before Thursday July 22, 2010 [four days after execution of the agreement] an MOU from a qualified lender to provide capital to purchase Aircraft under a loan/and or finance lease."  (SOUF, ¶ 17.)  NAC now hangs its defense on the claim that NAC could break the deal regardless of Global's best efforts.

## III.    THE COURT SHOULD GRANT GLOBAL'S MOTION ON ALL FOUR ISSUES.

A motion for summary judgment must be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. Proc. 56(c).  The movant bears the initial burden of establishing the basis for its motion and identifying the absence of a genuine issue

of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cert. denied*, 484 U.S. 1066 (1988).  If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.Proc. 56(e).  Conclusory, speculative testimony in affidavits or moving papers is insufficient to meet this burden, or raise genuine issues of fact defeating summary judgment.  *See Nelson v. Pima Community College,* 83 F.3d 1075, 1081-82 (9th Cir.1996).  At the summary judgment stage, the court draws all inferences in the light most favorable to the nonmoving party. *See T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n,* 809 F.2d 626, 630-31 (9th Cir. 1987).

**A.    Global is entitled to summary judgment on NAC's Capacity to Contract Defense.**

NAC pleads as an affirmative defense that because Global was officially organized two days after the LOI was signed, there was no agreement because Global did not officially exist.  [Answer & Counterclaim, Dkt No. 37 at p. 7, ¶ 56.]

Make no mistake, NAC admits they did not know this until the lawsuit was filed.  (SOUF, ¶ 82.)  And there is no evidence that the two day gap between the LOI and the official filing by Global BTG made any difference to NAC.  Instead, NAC alleges that there was no agreement and therefore NAC never owed Global anything.  This simplistic gotcha defense is inconsistent with the law of this case, applicable equitable principles and against the weight of the best authority.  The undisputed facts and the applicable law warrant summary judgment for Global on NAC's capacity to contract affirmative defense.

**1.    NAC's Capacity Argument Was Rejected by Judge Lew.**

NAC tried this argument in its first motion to dismiss, arguing that the Letter of Intent is "not an enforceable agreement because Global did not exist at the time of the contract."  (SOUF, ¶ 83.)  Judge Lew ruled in NAC's favor but also

concluded that Global pleaded sufficient facts to "establish that Plaintiff has standing to bring this current Action." (SOUF, ¶ 84.) Global repleaded its allegations on the capacity issue. NAC moved to dismiss again, on the same grounds. (SOUF, ¶ 85.)

Judge Lew settled the issue, concluding that Global pleaded adequate facts which, if proven true, showed that Global had the capacity to sue – '[t]hough Plaintiff was not a validly formed LLC at the time of contracting, the Court finds that the First Amended Complaint alleges facts necessary to support a LLC by estoppel theory." (SOUF, ¶ 86.)

NAC's latest incarnation of this after-the-fact excuse is to phrase the issue as whether there was a meeting of the minds, rather than whether there was a capacity to contract. This is the same pig with different lipstick— whether NAC should be estopped from asserting that there was no agreement with Global when NAC bargained for and acted like there was a deal.

### 2.     The Law of the Case is That Global's Pleaded Facts Establish Capacity.

Judge Lew's Order should not be upset. "When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 8816, 108 S. Ct. 2166 (1988). The rule promotes finality, efficiency and protects the parties' expectations by preventing the re-litigation of settled issues in a case. *Id.* The Law of the Case rules apply more strongly to cases transferred from one District Court Judge to another in the same district. *Christianson*, 486 U.S. at 816 ("[T]ransferree courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation."); 18-134 Moore's Federal practice – Civil § 134.22.

The law of this case with respect to capacity to contract is that the pleaded facts are sufficient to establish LLC by estoppel and Global should be permitted to enforce the contract. The issue remaining to be decided on summary judgment is

not whether LLC by estoppel applies here, but whether Global can show no
material dispute as to the truth of the repleaded allegations in the Amended
Complaint.  If the pleaded facts are undisputed, the law of the case requires
summary judgment in Global's favor on capacity.

After extensive document and testimonial discovery, NAC cannot identify a
single allegation regarding capacity in the Amended Complaint that is subject to a
serious fact dispute.  *See supra* at H.2.  Because these facts are undisputed, this
Court should grant summary judgment against NAC's capacity defenses.

### 3. Judge Lew's Application of LLC by Estoppel Was Correct.

Judge Lew was correct that Global pleaded the facts necessary to prove legal
capacity and to prevent NAC from reserving the option to repudiate the LOI at any
time simply because Global was not officially formed when it was signed.

#### a. Courts Agree that the Short Delay in Forming Global BTG does not Create a Free Option to Avoid the Letter of Intent.

Judge Lew is not the first judge to recognize the inherent injustice in
permitting a party to escape a contract on a technicality – a two day delay in filing.
For example, in *O2Development, LLC v. 607 South Park, LLC*, 159 Cal. App. 4th
609, 612 (2008), the Court of Appeal called NAC's exact argument "irrelevant"
because an unformed entity could enforce a contract made on its behalf before it
was formed.  *See also 722 W. 43rd St. LLC v. Ali*, No. B211263, 2009 WL 3020001
(Cal. App. Sep. 23, 2009) (unpublished) (individual may contract on behalf of
unformed LLC).  Other courts that face this harsh result hold that even if the entity
did not yet exist, the individual is both liable on and may enforce the contract.
*BJRM, LLC v. Output Systems, Inc.*, 917 A.2d 605, 612 (Conn. App. 2007);
*Bankers Trust Co. of W. N.Y. v. Zecher*, 103 Misc. 2d 777, 780 (N.Y. Sup. 1980);
*VGY Development, LLC v. 376 South Colony Realty Corp.*, No. CV065002733,
2007 WL 1675090 (Conn. Super. May 22, 2007) (unpublished) (unformed entity
may sue to enforce a contract signed by its member); *Allen v. Scott, Hewitt & Mize,*

*LLC*, 186 S.W. 3d 782, 784 (Mo. App. 2006) (formation issues were "irrelevant" to defendant's contract).

### b.      The Equitable Doctrine of LLC by Estoppel Applies.

Because NAC bargained with Global BTG LLC as if it existed and Global BTG did actually exist to fulfill its obligations, NAC may not now avoid the agreement.  8 William Meade Fletcher, Fletcher Cyclopedia of the Law of corporations § 3910 (2010).  This principle is well established in corporation law and applied to LLC formation issues as well.  *Home Owners' Loan Corp. v. Gordon*, 36 Cal. App. 2d 189, 192 (1939); Order denying Motion to Dismiss Amended Complaint, Dkt. No. 35 at p. 4:23-5:18].  The reasons estoppel applies here are discussed fully in Global's oppositions to NAC's first and second motions to dismiss.  [Dkt. Nos. 11, 29.]

Here, the principle of LLC by estoppel ensures that the parties get what they bargained for.  *See* Robert A. Ragazzo & Douglas K. Moll, *Closely Held Business Organizations: Cases, Materials and Problems* at 291-292 (Thomson-West, 2006); Emeka Duruigbo*, Avoiding a Limited Future for the De Facto LLC and LLC by Estoppel*, 12 U. Pa. J. Bus. L. 1013, 1030 (2010).  NAC made an agreement with what it understood was an LLC—it should not be permitted to escape the benefits and burdens of that contract because of a minor defect in formation.  *Timberline Equipment Co., Inc. v. Davenport*, 514 P.2d 1109, 1112 (Or. 1973); 8 Fletcher Cyc. Corp. § 3889 ("[W]hen a defendant seeks to escape liability by contending that the plaintiff is not a lawful corporate entity, courts apply the doctrine of corporation by estoppel."); 18A Am. Jur. 2d Corporations § 213, fn4; Edward H. Warren, *Collateral Attack on Incorporation*, 21 Harv. L. Rev. 305, 313 (1908) ("[W]hen A consents to deal with the associates as a corporation, he should not be allowed thereafter to take another position logically inconsistent.").

### c.      Global's Status was Never Material.

Although NAC never knew Global's organizational status, it now alleges that it was fraudulently induced to enter the LOI by the representation that Global was

officially formed as a Nevada LLC.  But NAC admits it never bothered to find out about Global's entity status.  Further, NAC's assertion that listing Global as the lessor under the LOI was a misrepresentation is incorrect.  Global did form and act as the lessor under the LOI.  Regardless, NAC did not care if Global was officially organized when it signed the LOI and it should not now argue otherwise.  There is no admissible fact that shows materiality as alleged in the Counterclaim.  [Dkt No. 37 at p. 18, ¶ 49.]

### d.    The Agreement was Adopted by Global.

The facts and law that show that Global adopted the LOI are not subject to dispute.  The undisputed facts regarding capacity also warrant summary judgment that Global adopted the LOI.  Adoption is discussed in greater detail in Global's opposition to NAC's second motion to dismiss.  [Dkt. No. 29.]

The First Amended Complaint pleads implied adoption and discovery shows these facts to be undisputed.  First, immediately following execution of the LOI, "Global focused all its efforts on fulfilling its obligations under the Agreement." [*compare* FAC Dkt No. 23 at ¶ 38 *with* SOUF at ¶ 87.]  Global, not Hodges or any other entity, distributed requests for proposals and contacted financing sources around the world.  [*compare* FAC Dkt No. 23 at ¶ 38 *with* SOUF at ¶ 88.]  And Global updated NAC on its extraordinary progress in finding financing on short notice.  [*compare* FAC Dkt No. 23 at ¶¶ 39, 40 *with* SOUF at ¶ 89.]  Global claimed its rights under the LOI when NAC breached the agreement—sending demand letters and making efforts to save the deal.  [*compare* FAC Dkt No. 23 at ¶¶ 44-48 *with* SOUF at ¶ 90.]  In the face of NAC's excuse that the LOI was a revocable mandate, Global, not Hodges, asserted that it had entered into a binding contract. [*compare* FAC Dkt No. 23 at ¶¶ 44-48 *with* SOUF at 91.]  And finally, Global brought this suit.

### e.    Global was also a De Facto LLC.

Other courts have found a *de facto* corporation on similar facts.  Here, the *de facto* doctrine recognized by New York law and discussed in Global's opposition to

NAC's second motion to dismiss [Dkt No. 29] applies to undisputed facts to show that Global was a *de facto* LLC when the LOI was entered.

**B.     Meaning of "Best Efforts" in the LOI Is Not Seriously Disputed.**

At the eleventh hour of the parties' negotiations, Hodges wrote a separate promise in the agreement unrelated to Global's role as a lessor – headed as "Other," the "best efforts" clause.  NAC now alleges a side promise at odds with the meaning of best efforts—that Global understood that, regardless of best efforts, if it did not deliver an MOU by July 22, 2010, NAC was entitled to terminate the agreement.[2]  Global denies this understanding for three reasons.  First, this unwritten promise is inconsistent with the plain meaning of the best efforts clause.  Second, the admissible parol evidence is consistent with the plain meaning of the best efforts clause.  Third, NAC's allegation of side agreements that alter the central terms of the agreement are inadmissible and unreliable.

As a matter of law, the only admissible facts interpreting the best efforts clause are uncontroverted and prove that Global was only obligated to use best efforts to deliver an MOU by July 22, 2010.  Summary judgment is therefore warranted.

**1.     Global's Interpretation is the Only Reasonable Interpretation**

**a.     Contract Interpretation Rules Show the Best Efforts Clause is Unambiguous.**

Under New York law, the interpretation of a contract is a matter of law.  The court must first look at the four corners of the contract to determine whether an

---

[2]     NAC's counterclaim and Fourth Affirmative Defense (Non-Performance) rely on allegations that Global failed to "timely, fully, and adequately" perform.  [Answer and Counterclaim, Dkt No. 37 at p. 8 ¶ 58.]  The Counterclaim alleges that National told Hodges that it needed a "firm commitment from a bank by Thursday, July 22, to provide debt financing to fund National's purchase all of [sic] the JAL aircraft."  [Dkt No. 37 at p. 13, ¶ 27]; that the agreement "to the extent it would include exclusivity" would only be exclusive until July 22, 2010; and that National would not sign the Letter of Intent without Global's assurance that it could and would provide funding in time for the JAL purchase."  Finally, NAC alleges an oral promise that contradicts the best efforts clause, claiming that "Mr. Hodges reassured everyone . . . that he would have the financing letter from a bank by July 22, 2010. . . . [] Global failed to secure the financing as promised" and deliver an MOU.  [Dkt No. 37 at p. 18 ¶¶ 51-52; ¶ 96, ¶ 100.]

ambiguity exists.  *1550 Fifth Ave. Bay Shore, LLC v. 1550 Fifth Ave., LLC*, 748 N.Y.S.2d 601, 603 (N.Y.App.Div. 2002).  A contract is unambiguous if the language it uses has a definite and precise meaning for which there is no reasonable basis for a difference of opinion.  *Telerep, LLC v. U.S. Intern. Media, LLC*, 903 N.Y.S.2d 14, 15 (N.Y.A.D. 1 Dept. 2010) (citations omitted).   On the other hand, an "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.  *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987) (applying New York law).

　　　　If the court determines that a particular clause is unambiguous, it may grant summary judgment without considering extrinsic evidence.  *1550 Fifth Ave. Bay Shore, LLC*, 748 N.Y.S.2d at 603.  If the court determines that a certain clause is ambiguous, however, it may consider extrinsic evidence.  If the evidence is so one-sided that no reasonable person could decide to the contrary, then the court may grant summary judgment.  *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999) (internal quotations omitted).

　　　　　　　　**b.　　The UCC Limits the Admissibility of Parol Evidence.**

　　　　Section 2-202 of the New York Commercial Code states that a written agreement may not be contradicted by evidence of any prior or contemporaneous oral agreement.  Parol, however, is admissible to explain or supplement the terms of the agreement with course of dealing or usage of trade and with evidence of consistent additional terms. N.Y. U. Com. Code § 2-202.  Evidence outside of the writing should be excluded if, in the view of the court, it relates to a condition that would have been included in the writing. *Tropical Leasing, Inc. v. Fiermonte Chevrolet, Inc.*, 439 N.Y.S.2d 566, 567 - 568 (N.Y.A.D. 1981)  (citing N.Y. U. Com. Code § 2–202, Cmt. 3).

### 2.     This Best Efforts Clause is Unambiguous.

New York law defines "best efforts" as a duty greater than good faith but short of an obligation to succeed.  The leading New York case interpreting the obligation imposed by the phrase "best efforts" is *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir. 1979).  Acknowledging a party's "right to give reasonable consideration to its own interests," the *Bloor c*ourt suggested that a party under a duty to use best efforts to accomplish a given goal is not required to make every conceivable effort to do so." *Id*. at 614; *Kroboth v. Brent*, 215 A.D.2d 813, 814 (N.Y. App. Div. 1995) (best efforts requires pursuit of all reasonable methods).

Best efforts does not mean that a party must accomplish the task.  For example, in *TPTCC NY, Inc. v. Radiation Therapy Services, Inc.*, 784 F.Supp.2d 485, 507 (S.D.N.Y. 2011), the "best efforts" clause in question provided: "It is understood that [Defendant's] involvement in the Funding is strictly on a best efforts basis, and that the consummation of the funding will be subject to, among other things, market conditions." Addressing plaintiffs' breach of contract claims, the court concluded that the language of the clause "must be read as clarifying that [Defendant] was not obligated to secure financing for plaintiffs' [project], but merely to devote its 'best efforts' to doing so." *Id*.

### 3.     NAC's Interpretation of the Best Efforts Clause Relies on Inadmissible Parol Evidence.

Here, NAC's parol evidence is offered to contradict the plain meaning of "best efforts" by implying that Global would be in breach of the clause if it did not deliver an MOU *even if* it used its best efforts.  For example, Glen Joerger testified that "[w]e did not agree in any way, shape or form that he had past Thursday July 22nd to say well, I've done my best and I just need a few more days."  (SOUF, ¶ 92.)  Additionally, to the extent this side promise ever existed, one would have expected to see it expressed in the eleventh hour "other" section drafted as the final compromise between Global and NAC.  This parol is inadmissible.

### 4.  Parol Proves Global's Interpretation.

Global's interpretation of best efforts is consistent with its plain meaning and is admissible parol under the UCC.  For example, Mr. Hodges testimony about drafting the "other" section in the LOI explains that the "best efforts" promise in that section was separate and apart from the sale leaseback commitments NAC made.  (SOUF, ¶ 93.)  This is consistent with the meaning of best efforts and disproves NAC's litigation-generated contention that July 22 was more than a best efforts deadline.  Mr. Warren also testified that Global understood that this obligation was not a prerequisite to the sale and leaseback.  (SOUF, ¶ 94.)

Industry custom and practice is also admissible to explain the agreement. Here, Global has the only experts who actually acted as lessors and financiers like Global and Mr. Hodges.  Those experts, and even NAC's own expert, testified that an agreement to arrange the sale and leaseback of aircraft such as this could be expected to have an implied term of thirty to ninety days.  (SOUF, ¶ 95.)  No industry expert would expect this agreement to require a financing commitment from Global within days of signing the agreement.  (SOUF, ¶ 96.)

### C.  Global is Entitled to Summary Judgment that the LOI is an Exclusive Buy-Sell Agreement.

### 1.  The Plain Terms of the Agreement are Exclusive.

Summary judgment is appropriate where the unambiguous, plain terms, of a contract establish that an exclusive relationship existed between the parties, even when the contract does not contain an "exclusivity" clause.  *See Headwell v. Sandler*, 46 A.D.2d 584, 587, 364 N.Y.S.2d 218, 221 - 222 (N.Y.A.D. 1975). When determining exclusivity, the court must construe a contract to give effect to all of its terms, avoiding an interpretation which would render a critical portion of the document meaningless.  *PNC Capital Recovery v. Mechanical Parking Systems, Inc.*, 283 A.D.2d 268, 271, 726 N.Y.S.2d 394, 397 (N.Y.A.D. 2001); *see also Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465 (1984) ("[i]n construing a contract, one of a court's goals is to avoid

an interpretation that would leave contractual clauses meaningless"); *Yoi–Lee Realty Corp. v. 177th Street Realty Assocs.*, 208 A.D.2d 185, 190, 626 N.Y.S.2d 61 (N.Y.A.D. 1995) (same).  Here, although the Agreement does not contain the word "exclusive" the the contract forms an exclusive relationship between NAC and Global.  Simply put, the LOI was exclusive because NAC cannot sell the planes it promised to sell and lease from Global to anyone else.

This case is similar to *Headwell v. Sandler*, 46 A.D.2d 584, 587, 364 N.Y.S.2d 218, 221 - 222 (N.Y.A.D. 1975).  In *Headwell*, plaintiff was granted a license to establish 11 transceiver (fax) centers in three countries.  Due to the countries' populations only 11 centers could be established.  When defendant issued a license to a third party for the same three countries, plaintiff sued for breach of contract alleging "that as the holder of the [] licensing agreement from [defendant], he possesse[d] 'exclusive' rights to operate in the tri-county area within" defendant's transceiver system.  On appeal, the court upheld the denial of defendant's motion for summary judgment, noting that "the provision of the license agreement, noted above, restricting the number of licenses which could be issued on the basis of population in a county can be interpreted to mean that exclusive rights are vested in any licensee purchasing the maximum number of permitted licenses…Thus, defendants have not demonstrated that plaintiff's rights were non-exclusive." *Id.* at 221-22.

Likewise, NAC only had eight aircraft to sell, purchase and/or leaseback. Because NAC agreed that Global could purchase and leaseback all eight aircraft, the Agreement can only be exclusive.  To conclude otherwise would render it meaningless.  *See also Wyndham Co. v. Wyndham Hotel Co.*, 596 N.Y.S.2d 655, 661 (N.Y.Supp. 1992), *order aff'd.*, 202 A.D.2d 159 (N.Y.A.D. 1994).  NAC only had eight 747 aircraft to sell, purchase and/or leaseback and agreed that Global could purchase and leaseback all eight.  By agreeing to sell to and leaseback from Global all eight aircraft, NAC agreed to only work with Global with respect to the eight 747 aircraft.

Global's and Hodges's Notice of Motion and
Motion for Partial Summary Judgment

NAC argues that it was permitted to continue its financing discussions with Goldman Sachs and Deutsche Bank for the exact same eight aircraft.  But one cannot sell the same item to two people.  Case law does not discuss purchase and sell agreements in terms of exclusivity but in terms of anticipatory repudiation.  As stated in *In re Asia Global Crossing, Ltd.*, 332 B.R. 520, 525 (Bkrtcy. S.D.N.Y. 2005), "anticipatory repudiation occurs when the obligor commits a voluntary and affirmative act that makes it 'actually or apparently impossible for him to perform.'" (*citing* Rest. 2d of Contract § 250, cmt. c); *see James v. Burchell*, 82 N.Y. 108, 114 (1880)(seller repudiated contract to sell real property by conveying property to third party); Rest. 2d Contracts § 250, illus. 5 (1981) (seller repudiated contract to sell real property by entering into a subsequent contract to sell the same property to a third party).  Similarly, a party commits anticipatory repudiation when it "enters into a second contract before the time of performance arrives that 'puts it out of his power to keep his contract.'"  *In re Asia Global Crossing, Ltd.*  332 B.R. 520, 525 (citing *Computer Possibilities, Unlimited, Inc. v. Mobil Oil Corp.*, 747 N.Y.S.2d 468, 475 (N.Y.App.Div. 2002); *Goodman Mfg. Co., L.P. v. Raytheon Co.*, No. 98 Civ. 2774(LAP), 1999 WL 681382, at *8 (S.D.N.Y. Aug.31, 1999).)

**2.     The Parol Evidence Supports a Finding of Exclusivity.**

If the Court determines that the Agreement is ambiguous, the parol evidence explains and supplements Global's interpretation and still merits summary judgment.  On July 16, 2010, NAC proposed that Page 1 read: "If acceptable financing is not available to permit Aircraft to be purchased, leased, or financed at projected price and rates, plus or minus 10% *or if [NAC] receives a firm commitment from another financial institution*, then the number of aircraft may be reduced."  (SOUF, ¶ 97.)  That same day, Global, through Stukes, told NAC that Global would "not proceed on a non-exclusive basis.  That's a non-starter for [Global]."  (SOUF, ¶ 98.)  On July 17, 2010, Stukes again told NAC "they are not going to proceed on a non-exclusive basis and I understand why."  (SOUF, ¶ 99.)

Hence, NAC's proposed language is not contained in the executed Agreement. (SOUF, ¶ 17.)

### D.     NAC's Lost Profits Claims Should Be Dismissed.

NAC's counterclaims allege that Global caused NAC to lose the right to buy the JAL airplanes. [Answer & Counterclaim Dkt No. 37 at p. 19, ¶ 60. As a result, NAC alleges it lost "potentially hundreds of millions in lost income from the CRAF program and from other commercial sources." *Id.* at ¶ 61. NAC hired a financial advisory services expert, Kevin D. McFarlane, to explain its damage theories. McFarlane opined that NAC lost  (a) a small portion of its deposit with JAL as a result of choosing not to complete the transaction ($154,000); (b) $7.5 million because the Air France financing was purportedly worse than NAC should have obtained; (c) profits from the use of the five aircraft in NAC's fleet  ($55.3 to $75 million);  and (d) profits from the loss of economies of scale from the purchase of only three aircraft instead of all eight.  (SOUF, ¶ 100.)

The damages in categories (c) and (d) are lost profits.  New York law and the U.C.C. severely restrict the circumstances under which a party may recover lost profits. *Kenford Co. v. Erie,* 493 N.E.2d 234 (N.Y. 1986).  Lost profits may only be recovered where the loss was caused by the seller's breach, the allocation of the risk of loss was contemplated by the parties, the loss is not speculative, and the amount can be fixed with reasonable certainty. *Id.*; N.Y.U Com. Code §§ 2-714, 2-715; *Conservancy Holdings, Ltd. v. Perma-Treat Corp.*, 126 A.D.2d 114, 513 N.Y.S.2d 266 (3d Dept. 1987).  NAC's lost profits damages fail on all counts. Although the overwhelming evidence shows Global did not cause NAC's alleged loss, for the purposes of this motion, summary judgment against these claims is appropriate because there is no evidence any party contemplated that Global was at risk for this loss and because the undisputed facts show that the loss is speculative and cannot be fixed with any certainty.

### 1.     Lost Profits Were Not In the Contemplation of the Parties.

Lost profits may only be recovered where the risk of loss was contemplated

by the parties.  Here, there is no evidence that shows any discussion between NAC and Global over the risk allocation in the event the JAL aircraft were not purchased.  To the contrary, Global received assurances throughout that the JAL aircraft sale was not at risk.  (SOUF, ¶ 101.)

### 2.  NAC's Lost Profits Are Too Speculative and Uncertain to Recover.

Global's expert determined that McFarlane's report was too speculative due to unsupported or poorly supported assumptions in the twenty year projections on which NAC relies.  Stuart Weinroth, a twenty-year expert in the aviation finance field, analyzed McFarlane's damages report.  Weinroth's rebuttal identified numerous wildly optimistic and speculative assumptions on which McFarlane relies, such as:

- The assumption that U.S. DOD contracted flying will increase in the future;
- The assumption that NAC could have bid competitively against FedEx and UPS for contracts;
- The assumption that NAC captured 16% of the CRAF market and held it for the entire twenty year damages calculation;
- The assumption that NAC could profitably operate non-CRAF charter contracts, known as ACMI contracts;
- The assumption that NAC's CRAF and ACMI program revenues, costs and direct contributions would equal or exceed that of the only outside data point consulted by McFarlane, Atlas Air.

(SOUF, ¶ 102.)

McFarlane himself, when deposed about his report, conceded that the AICPA guidance he professed to follow set a limit of six years on this lost profits calculation, not twenty.  (SOUF, ¶ 103.)  That alone more than halves the damages McFarlane claimed.  Additionally, McFarlane admitted his report was unreliable because it made no assumptions about NAC mitigating damages.  (SOUF, ¶ 104.)  At face value, the report assumes NAC never again tries to purchase a 747 even

though they knew they could earn hundreds of millions of dollars by buying these planes.  A buyer may not recover lost profits if the buyer did not mitigate damages or show mitigation was not possible.  Lawrence's Anderson On the U.C.C. § 2-715.387 (June 2012).  Finally, McFarlane admitted to drawing all his conclusions about lost profits based on data spoon fed him by management and limited public data available about one potential competitor – Atlas Air.   (SOUF, ¶ 105.)  The cumulative effect of optimistic assumption after optimistic assumption is to produce unreliable and uncertain results.

## IV.   CONCLUSION

Based on the foregoing Global and Hodges respectfully request the Court grant the motion for partial summary judgment in its entirety.

DATED:  September 14, 2012

**PERKINS COIE LLP**

By: /s/Nathan M. Smith
Donald J. Kula
Nathan M. Smith

Attorneys for Plaintiff Global BTG LLC, a Nevada Limited Liability Company doing business in California, and Counterclaim-Defendant Jacob Hodges