1  Donald J. Kula, Bar No. 144342
2  Nathan M. Smith, Bar No. 255212
   Vilma Palma-Solana, Bar No. 267992
3  PERKINS COIE LLP
4  1888 Century Park E., Suite 1700
   Los Angeles, CA  90067-1721
5  Telephone:  310.788.9900
6  Facsimile:  310.788.3399

7  Attorneys for Plaintiff Global BTG LLC, a Nevada
8  Limited Liability Company doing business in
   California, and Counterclaim-Defendant Jacob
9  Hodges

10                UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13  GLOBAL BTG LLC,                    Case No. 2:11-cv-01657-MMM-JCGx

14              Plaintiff,             **GLOBAL BTG LLC'S AND JACOB
15                                     HODGES'S RULE 56-1
                                       STATEMENT OF
16         v.                          UNCONTROVERTED FACTS AND
                                       [PROPOSED] CONCLUSIONS OF
17  NAC AIR CARGO, INC.,               LAW**

18              Defendant-             [*Notice of Motion and Motion for
19              Counterclaim Plaintiff, Partial Summary Judgment and
                                       Declaration of Jacob Hodges, filed
20         v.                          concurrently herewith; Supporting
                                       Declaration of Nathan Smith filed
21  GLOBAL BTG LLC, JACOB              separately under seal*]
22  HODGES and DOES 1-5,
                                       **Hon.  Margaret M. Morrow
23              Counterclaim Defendants. Discovery Cutoff:     June 5, 2012
                                       Pretrial Conference:  Nov. 13, 2012
24                                     Trial Date:           Dec. 4, 2012**

25                                     **Hearing Date:       December 10, 2012
                                       Hearing Time:         10:00 am
26                                     Hearing Location:     Courtroom 780**

27

28

# I.    STATEMENT OF UNCONTROVERTED FACTS

Plaintiff and Counterclaim-Defendant Global BTG LLC and Counterclaim-Defendant Jacob Hodges submit this statement of uncontroverted facts pursuant to Local Rule 56-1 in support of their Motion for Partial Summary Judgment.

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| 1. . | The Civil Reserve Air Fleet is a fleet of commercial aircraft that are "pledged" each year by their owners to the DOD. Congress and the DOD, concerned with the age and reliability of the CRAF, offered incentives, beginning in Fiscal Year 2011, to program participants pledging more modern aircraft with better fuel efficiency and greater cargo carrying capacity. | Declaration of Nathan Smith ("Smith Decl."), Exh. 9 [NAC078255]. | background |
| 2. | As of early 2010, NAC's fleet consisted of four outdated DC-8s, two Jetstream, and one 757-200. | Smith Decl., Exh. 9 [NAC078255]. | background |
| 3. | NAC decided to acquire newer, larger and more efficient aircraft to participate in CRAF and entered into a purchase agreement for three Air France 747's and entered into a "Letter of Intent" to purchase five 747's from Japan Airlines. | Smith Decl., Exh. 10, [NAC021296]; Exh. 11 [NAC003652]. | background |
| 4. | Ultimately, the CRAF incentives were scaled back. | Smith Decl., Exh. 12 [NAC079735]. | lost profits |
| 5. | Jacob Hodges has over seven years of experience in the aircraft financing business. | Smith Decl., Exh. 2 [Hodges Depo. at 29:13-16]. | background |

-1-

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| **6.** | In December 2004, Hodges began a six year tenure with BCI Aircraft Leasing ("BCI"), a relatively small aircraft lessor. During Hodges's tenure, BCI grew from a company with $384 million in aircraft assets to over $1.1 billion in aircraft assets under operating lease. | Declaration of Jacob Hodges ("Hodges Decl."), at ¶ 2. | background |
| **7.** | While employed at BCI as a Director and then Managing Director, Head of Debt Capital Markets, Hodges raised, originated, solicited, and obtained proposals and commitments from multiple lenders around the world, including lines of credit that exceeded $1 billion dollars. | Smith Decl., Exh. 2 [Hodges Depo. at 40:18-41:4]. | background |
| **8.** | Hodges was "one of the cornerstones" of BCI. | Smith Decl., Exh. 5 [Shamsai Depo. at 48:18-49:1]. | background |
| **9.** | BCI bought over 118 aircraft, and during Hodges's tenure with BCI he financed most of those purchases and was involved in every one. | Hodges Decl., at ¶ 2. | background |
| **10.** | In the spring of 2007, BCI came under scrutiny for its principal's accounting practices.  Hodges resigned from BCI in May 2010. | Smith Decl., Exh. 2 [Hodges Depo. at 93:18-21; 220:25-221:16]. | background |
| **11.** | Upon leaving BCI Hodges decided to open his own firm. | Hodges Decl., at ¶ 4. | background |
| **12.** | Although Hodges considered joining a new entity called Pearl Aviation being formed by former BCI principals, he ultimately declined a lucrative offer to | Hodges Decl., at ¶ 20. | background |

-2-

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| | join Pearl, and instead started Global. | | |
| 13. | NAC employed Donald Stukes as its agent to raise funds for the purchase of the eight aircraft. | Smith Decl., Exh. 13 [NAC055187]. | Best efforts Exclusivity background |
| 14. | On June 17, 2010, Stukes contacted Hodges to get Hodges's "thoughts and input" on the NAC deal. | Smith Decl., Exh. 14 [Global010747]. | background |
| 15. | Stukes knew that Hodges left BCI earlier in 2010 and that he was a "free agent." | Smith Decl., Exh. 6 [Stukes Depo at 150:12-21]. | background |
| 16. | Knowing Hodges's reputation, Stukes asked Hodges if he was interested. Hodges told Stukes he was interested in the NAC opportunity. | Smith Decl., Exh. 14 [Global010747]. | background |
| 17. | NAC and Global's negotiations culminated on Sunday, July 18, 2010, when Hodges received an executed copy of the Letter of Intent from NAC.  The Agreement states, in relevant part, that: "This Letter of Intent is intended as a binding agreement between the Lessor and Lessee who will act in good faith to implement the provisions hereof, to complete the contemplated transactions and to negotiate, execute and deliver all necessary and appropriate leases and other agreements in form and substance consistent with industry standards and in a timely manner." | Smith Decl., Exh. 15 [Global005083]. | All claims |
| 18. | The Agreement committed NAC to sell to and leaseback from Global as many of the | Smith Decl., Exh. 15 | All claims |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| | eight aircraft that Global would finance. | [Global005083]. | |
| 19. | The Agreement identified each aircraft by serial number. | Smith Decl., Exh. 15 [Global005083]. | background |
| 20. | The Agreement set out agreed price terms for each aircraft and type of lease; and provided flexibility to Global in pricing. | Smith Decl., Exh. 15 [Global005083]. | background |
| 21. | The Agreement at Page 2 set a closing date "[a]s soon as reasonably possible and in accord with the estimated delivery schedule as provided by Lessee." The Agreement also provides that it "will be governed by the laws of the State of New York." | Smith Decl., Exh. 15 [Global005083]. | background |
| 22. | First, the Letter of Intent is an agreement for the sale and leaseback of the JAL and AF planes. Thus, NAC promises to sell, Global pledged to buy, and NAC agreed to lease back the aircraft. | Smith Decl., Exh. 15 [Global005083]. | Exclusivity Best efforts |
| 23. | As a corollary, the parties agreed to act in good faith to complete the transaction. | Smith Decl., Exh. 15 [Global005083]. | Exclusivity Best efforts |
| 24. | The eleventh hour "Other" section contained a promise by Global to use its "best efforts" to deliver to NAC a "MOU" from a lender within four days of signing the agreement. | Smith Decl., Exh. 15 [Global005083]. | Best efforts |
| 25. | Third, the same "Other" section had a promise from National to accept an operating lease from Global on the contracted terms. | Smith Decl., Exh. 15 [Global005083]. | Exclusivity background |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| **26.** | While the Agreement was being negotiated, NAC proposed specific language in a draft that stated the Agreement would be "non-exclusive" and NAC could continue to seek financing from sources other than Global. | Smith Decl., Exh. 16 [Global005093]. | Exclusivity |
| **27.** | Global told Stukes, who told NAC as late as the day before the agreement was executed, that it would" not proceed on a non-exclusive basis". | Smith Decl., Exh. 17 [NAC010340]; Exh. 18 [NAC013156]. | Exclusivity |
| **28.** | NAC knew that Global needed a minimum of 60 days to complete the sale-leaseback of the aircraft. | Smith Decl., Exh. 19 [NAC014244]. | Best efforts Exclusivity |
| **29.** | The drafts (and final) Agreement explicitly set a closing date "[a]s soon as reasonably possible and in accord with the estimated delivery schedule as provided by Lessee." | Smith Decl., Exh. 15 [Global005083]. | Best efforts |
| **30.** | JAL set staggered closing dates with the last one closing on November 26, 2010. | Smith Decl., Exh. 20 [NAC078250]. | Best efforts |
| **31.** | On the last day of the negotiations NAC requested and approved the promise under "Other" that Global "use its best efforts to deliver up to [NAC] on or before Thursday July 22, 2010 an MOU from a qualified lender to provide capital to purchase Aircraft under a loan/and or finance lease." | Smith Decl., Exh. 15 [Global005083]. | Best efforts |
| **32.** | Global informed NAC that it would be virtually impossible to obtain a firm | Hodges Decl., at ¶ 13. | Best efforts |

Global and Hodges's Rule 56-1 Statement of Uncontroverted Facts & [Proposed} Conc. of Law

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| | commitment from a lender by then. | | |
| 33. | Stukes told NAC virtually the same thing. | Smith Decl., Exh. 21 [NAC013223]. | Best efforts |
| 34. | NAC insisted, explaining that some form of an MOU would help NAC demonstrate process to JAL. | Hodges Decl., at ¶ 13. | Best efforts |
| 35. | Global understood that including the language in the "Other" section of the Agreement was an accommodation for NAC. | Smith Decl., Exh. 2 [Hodges Depo. at 266:10-267:1]. | Best efforts |
| 36. | At no point did NAC suggest that the rest of the deal turned on whether Global could provide an MOU. | Hodges Decl., at ¶ 14. | Best efforts |
| 37. | During negotiations, NAC deleted all references to operating leases in the Agreement. | Smith Decl., Exh. 22 [NAC018426]. | background |
| 38. | Hodges responded, insisting that Global would not proceed further unless at least one aircraft lease was structured as an operating lease — as was originally discussed and agreed. | Smith Decl., Exh. 23 [Global004689]. | background |
| 39. | Neither Stukes nor NAC told Hodges that it would not commit to at least one operating lease. | Hodges Decl., at ¶ 12. | background |
| 40. | Global would have walked away if the Agreement did not require at least one operating lease. | Smith Decl., Exh. 2 [Hodges Depo. at 248:6-13]. | background |
| 41. | NAC told Global it would not continue to negotiate with others, yet NAC held a | Smith Decl., Exh. 24 | Exclusivity |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| | conference call with Goldman Sachs the day after it signed the Agreement with Global. | [NAC007768]. | |
| 42. | On July 21, 2010, NAC met with Deutsche Bank and Goldman Sachs to discuss the financing of the exact same aircraft it agreed to sell and leaseback from Global. | Smith Decl., Exh. 25 [GS_BTG_10752]; Exh. 26 [NAC034756 | Exclusivity |
| 43. | NAC's discussions internally and with Stukes also show that NAC always intended to terminate the Agreement four days after its execution regardless of whether Global used its best efforts to deliver up an MOU from a qualified lender in those four days. | Smith Decl., Exh. 27 [NAC010598]. | Exclusivity Best efforts |
| 44. | On July 17, 2010, Joerger sent an internal email stating that "if they [Global] can't get it done by Thurs [July 22], we may have to go to DB [Deutsche Bank]." | Smith Decl., Exh. 28 [NAC018407]. | Exclusivity Best efforts |
| 45. | NAC told Global its prior contacts were limited to two or three lenders. | Hodges Decl., at ¶ 18. | Exclusivity |
| 46. | NAC contacted more than a dozen lenders. | Smith Decl., Exh. 29 [NAC039505]; Exh. 30 [NAC039507]. | Exclusivity |
| 47. | This caused confusion and made Global's job even harder. | Hodges Decl., at ¶ 18; Smith Decl., Exh. 31 [NAC009717]. | Exclusivity |
| 48. | NAC also told Global that it was committed to the purchase of the JAL | Hodges Decl., at ¶ 13. | Exclusivity Best efforts |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| | aircraft. | | |
| 49. | Before signing the Agreement Global conducted due diligence on the aircraft's technical condition, prepared marketing materials, including credit write-ups and requests for proposals, and was soliciting general lender interest to determine what pricing was achievable. | Hodges Decl., at ¶ 16. | Best efforts background |
| 50. | Upon finalizing the Agreement, Global's effort and time commitment to the deal multiplied. | Hodges Decl., at ¶ 17. | Best efforts |
| 51. | In the week following the execution of the Agreement, Global contacted and distributed requests for proposals to financing sources from around the world. | Hodges Decl., at ¶ 17. | Best efforts |
| 52. | By July 20, 2010, less than two days after Global received the executed Agreement, Global had received a strong expression of interest from Perot Investments to finance up to two of the 747s. | Smith Decl., Exh. 32 [Global004156]. | Best efforts |
| 53. | Global updated NAC on the morning of July 22nd with a draft MOU showing lender interest. | Smith Decl., Exh. 33 [NAC035814]. | Best efforts |
| 54. | Global also thought that Citibank was interested. | Smith Decl., Exh. 34 [Global006324]. | Best efforts |
| 55. | Hodges spoke with David Silvers at Citibank. | Smith Decl., Exh. 34 [Global006324]. | Best efforts |
| 56. | Mr. Silvers did not provide deposition testimony.  Mr. Silver's manager, Gary | Smith Decl., Exh. 4 [Rothschild | Best efforts |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
|  | Rothschild, testified that Citibank was not interested in the transaction.  Mr. Rothschild did not testify to Mr. Silver's communications with Hodges. | Depo. at 39:10-22;65: 8-14; 109:25-110:14]. |  |
| 57. | Hodges updated Stukes on the morning of July 23.  Hodges told Stukes that Global expected to obtain financing from Citibank and Perot Investments; and that Global was making significant progress with other lenders, around the globe.  Global was "truly working around the clock on this." | Smith Decl., Exh. 34 [Global006324]. | Best efforts |
| 58. | Within hours of Hodges's July 23rd update, NAC, through Stukes, emailed Hodges and said that although NAC appreciated Global's hard work, Global's "mandate to represent NAC has been terminated effective immediately." | Smith Decl., Exh. 36 [Global004219]. | Best efforts |
| 59. | Hodges quickly responded to NAC's statement.  Hodges wrote that the purported "termination" was a breach of the agreement. | Smith Decl., Exh. 36 [Global004219]. | Best efforts |
| 60. | Hodges requested that NAC and Stukes discuss a reasonable resolution. | Smith Decl., Exh. 36 [Global004219]. | background |
| 61. | Stukes and NAC denied any wrongdoing and refused to discuss any accommodations with Hodges. | Smith Decl., Exh. 37 [Global004732]. | background |
| 62. | Global had rights to lease the Air France aircraft. | Smith Decl., Exh. 15 [Global005083]. | Exclusivity |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| **63.** | NAC signed an exclusive agreement with Goldman Sachs the same day it terminated the LOI with Global. | Smith Decl., Exh. 38 [NAC052650]. | Exclusivity |
| **64.** | Ultimately, Goldman Sachs found financing for NAC from BlackRock Management LLC. The financing closed in two parts, the first on September 2, 2010, and the second October 8, 2010. | Smith Decl., Exh. 39 [NAC064003]; Exh. 40 [NAC003648]. | Exclusivity |
| **65.** | This Court ruled, on October 13, 2011, that: "Although Plaintiff did not exist as a legal entity at the time the contract was entered into, Plaintiff has pled sufficient facts showing its authority to enforce the contract. The Court finds that Plaintiff has pled sufficient facts showing its ability to enforce the contract through the doctrine of LLC by estoppel." | Order on Motion to Dismiss Amended Complaint, Dkt No. 35 at 4:23-5:1. | Capacity |
| **66.** | Global filed its articles of organization with the Nevada Secretary of State on July 20, 2010. | Smith Decl., Exh. 41. [Global011446]. | Capacity |
| **67.** | Hodges contemplated forming Global as a Nevada limited liability company as far back as December 11, 2008, when Stuart Warren reserved the name Global BTG LLC with the Nevada Secretary of State. | Hodges Decl., at ¶ 3. | Capacity |
| **68.** | On May 9, 2010, Hodges purchased and registered the domain name www. Globalbtg.com on behalf of Global. | Smith Decl., Exh. 42. [Global013047]; Hodges Decl., at ¶ 5. | Capacity |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| **69.** | Neither NAC nor NAC agent Don Stukes ever asked Hodges or anyone associated with Global any questions about Global's organizational status. | Hodges Decl., at ¶ 11. | Capacity |
| **70.** | Neither Stukes nor anyone from NAC ever showed any interest whatsoever in Global's organizational status. | Hodges Decl., at ¶ 11. | Capacity |
| **71.** | Hodges always intended that Global BTG LLC be bound and benefited by the Agreement with NAC. | Hodges Decl., at ¶ 10. | Capacity |
| **72.** | Hodges acted as the sole member of Global. | Hodges Decl., at ¶ 10. | Capacity |
| **73.** | Hodges executed a lawful assignment on July 15, 2011, assigning all rights and interests retained in the LOI with NAC to Global. | Smith Decl., Exh. 43 [Global009789]. | Capacity |
| **74.** | NAC dealt with Hodges as the sole member of Global, referring in writing to Global BTG LLC as the organization NAC contracted with and who NAC expected to perform. | Smith Decl., Exh. 44 [Joerger Depo. at 278:8-279:3]; Exh. 45 [Global004633]; Exh. 46 [NAC013273]; Exh. 47 [NAC052818]; Exh. 15 [Global005083]. | Capacity |
| **75.** | On July 8, 2010, Hodges instructed Stuart Warren to reserve the name Global BTG LLC and prepare organizational papers for registering Global as a Nevada limited | Smith Decl., Exh. 48 [Global011418]. | Capacity |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| | liability company. | | |
| 76. | On July 12, 2010, Hodges sent an email to a relative asking him to serve as Global's Nevada agent for service of process. | Smith Decl., Exh. 49 [Global005435]. | Capacity |
| 77. | A typographical or ministerial error caused Global BTG, Inc. to be named under Hodges's signature on the LOI. This error was present in the first draft Global sent to NAC's agent Stukes on July 15, 2010.  Hodges did not notice the error when he signed the LOI. | Hodges Decl., at ¶ 15; Smith Decl., Exh. 15 [Global005083]; Exh. 45 [Global004633]. | Capacity |
| 78. | Hodges intended that his signature on the LOI was in his capacity as the sole member of Global. | Hodges Decl. at, ¶ 15. | Capacity |
| 79. | Hodges intended that Global assume all obligations and received all benefits from the Agreement. | Hodges Decl. at ¶ 15. | Capacity |
| 80. | On July 15, 2010 Stukes told NAC that Global was not affiliated with Pearl. | Smith Decl., Exh. 35 [NAC014343]. | background |
| 81. | Hodges was unaware of all the internal communications between NAC executives and Stukes referring to "Pearl."  In fact, he did not learn that NAC referred to Global as Pearl until discovery. | Hodges Decl., at ¶ 20. | background |
| 82. | NAC admits it did not know that Global was officially organized two days after the LOI was signed until the lawsuit was filed. | Answer & Counterclaim, Dkt No. 37 at p. 15 ¶ 36. | Capacity |
| 83. | NAC argued in its first motion to dismiss that the Letter of Intent is "not an | Defendant's Motion to Dismiss, | Capacity |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|-----|---------------------|---------------------|----------------|
|     | enforceable agreement because Global did not exist at the time of the contract." | Dkt No. 9 at p. 9:17-19. |  |
| 84. | Judge Lew ruled in NAC's favor but also concluded that Global pleaded sufficient facts to "establish that Plaintiff has standing to bring this current Action." | Order re: Defendant's Motion to Dismiss Case, Dkt No. 19 at p. 2:25-27. | Capacity |
| 85. | Global repleaded its allegations on the capacity issue.  NAC moved to dismiss again, on the same grounds, contending that the "meagerness of the additional facts in the Amended Complaint only makes clear there is no exception in the law that will allow this plaintiff to bring a claim on a contract that was purportedly executed before it even existed and was signed on behalf of an entirely different entity that still does not exist." | Motion to Dismiss Amended Complaint, Dkt No. 27 at p. 1:11-16. | Capacity |
| 86. | Judge Lew ruled on October 13, 2010, that Global pleaded adequate facts which, if proven true, showed that Global had the capacity to sue – '[t]hough Plaintiff was not a validly formed LLC at the time of contracting, the Court finds that the First Amended Complaint alleges facts necessary to support a LLC by estoppel theory." | Order Denying Motion to Dismiss Amended Complaint, Dkt No. 35 at p. 5:21-25. | Capacity |
| 87. | Immediately following execution of the Agreement, "Global focused all its efforts on fulfilling its obligations under the Agreement." | Smith Decl., Exh. 50 [Global005131]; Exh. 51 [Global005249]; Exh. 52 [Global005523]; | Best efforts |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| | | Exh. 53 [Global005319]; Exh. 54 [Global005348]; Exh. 55 [Global005494]. | |
| **88.** | Global, not Hodges or any other entity, distributed requests for proposals and contacted financing sources around the world. | Smith Decl., Exh. 50 [Global005131]; Exh. 51 [Global005249]; Exh. 52 [Global005523]; Exh. 53 [Global005319]; Exh. 54 [Global005348]; Exh. 55 [Global005494]. | Best effots |
| **89.** | Global updated NAC on its progress in finding financing on short notice. | Smith Decl., Exh. 34 [Global006324]. | Best efforts |
| **90.** | Global claimed its rights under the Agreement when NAC terminated the agreement—sending demand letters and making efforts to save the deal. | Smith Decl., Exh. 56 [Global004721]; Exh. 57 [Global005180]; Exh. 58 [Global006629]; Exh. 59 [Global005190]. | background |
| **91.** | In the face of NAC's allegation that the Agreement was a revocable mandate, Global, not Hodges, asserted that it had | Smith Decl., Exh. 56 [Global004721]; | Capacity Best efforts Exclusivity |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| | entered into a binding contract. | Exh. 57 [Global005180]; Exh. 58 [Global006629]; Exh. 59 [Global005190]. | |
| 92. | Glen Joerger testified that "[w]e did not agree in any way, shape or form that he had past Thursday July 22nd to say well, I've done my best and I just need a few more days." | Smith Decl., Exh. 44 [Joerger Depo. at 283:14-284:11]. | Best efforts |
| 93. | Hodges's testimony about drafting the "Other" section in the LOI explains that the "best efforts" promise in that section was separate and apart from the sale leaseback commitments NAC made. | Smith Decl., Exh. 2 [Hodges Depo. at 264:2-270:22]. | Best efforts |
| 94. | Mr. Warren also testified that Global understood that this obligation was not a prerequisite to the sale and leaseback. | Smith Decl., Exh. 7 [Warren Depo. at 150:20-152:10]. | Best efforts |
| 95. | Global's experts, and even NAC's own expert, uniformly testified that an agreement to arrange the sale and leaseback of aircraft such as this could be expected to have an implied term of thirty to ninety days. | Smith Decl., Exh. 8 [Weinroth Depo at 64:13-64:23; 1]; Exh. 1 [Cox Depo at 115:9-23]. | Best efforts |
| 96. | No industry expert would expect this agreement to require a financing commitment from Global within days of signing the agreement. | Smith Decl., Exh. 3 [McFarlane Depo. at 152:16-154:19]. | Best efforts |

-15-

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| **97.** | On July 16, 2010, NAC proposed that Page 1 read: "If acceptable financing is not available to permit Aircraft to be purchased, leased, or financed at projected price and rates, plus or minus 10% *or if [NAC] receives a firm commitment from another financial institution*, then the number of aircraft may be reduced." | Smith Decl., Exh. 15 [Global005093]. | Exclusivity |
| **98.** | Global, through Stukes, told NAC that Global would "not proceed on a non-exclusive basis.  That's a non-starter for [Global]." | Smith Decl., Exh. 17 [NAC010340]. | Exclusivity |
| **99.** | On July 17, 2010, Stukes again told NAC "they are not going to proceed on a non-exclusive basis and I understand why." | Smith Decl., Exh. 18 [NAC013156]. | Exclusivity |
| **100.** | NAC's expert, Kevin McFarlane ,opined that NAC lost  (a) a small portion of its deposit with JAL as a result of choosing not to complete the transaction ($154,000); (b) $7.5 million because the Air France financing was purportedly worse than NAC should have obtained; (c) profits from the use of the five aircraft in NAC's fleet  ($55.3 to $75 million); and (d) profits from the loss of economies of scale from the purchase of only three aircraft instead of all eight. | Smith Decl., Exh. 60 [McFarlane Report at 7]. | Lost profits |
| **101.** | Global received assurances throughout that the JAL aircraft sale was not at risk. | Hodges Decl., at ¶ 13. | Lost profits Best efforts |
| **102.** | Global's expert, Stuart Weinroth, identified numerous wildly optimistic and speculative assumptions on which McFarlane relies, such as: | Smith Decl., Exh. 61 [Weinroth Rebuttal Report to | Lost profits |

| No. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE | CLAIM AT ISSUE |
|---|---|---|---|
| | • The assumption that U.S. DOD contracted flying will increase in the future;<br>• The assumption that NAC could have bid competitively against FedEx and UPS for contracts;<br>• The assumption that NAC captured 16% of the CRAF market and held it for the entire twenty year damages calculation;<br>• The assumption that NAC could profitably operate non-CRAF charter contracts, known as ACMI contracts;<br>• The assumption that NAC's CRAF and ACMI program revenues, costs and direct contributions would equal or exceed that of the only outside data point consulted by McFarlane, Atlas Air. | McFarlane, Section 5]. | |
| 103. | McFarlane himself, when deposed about his report, conceded that the AICPA guidance he professed to follow set a limit of six years on this lost profits calculation, not twenty. | Smith Decl., Exh. 3 [McFarlane Depo. at 140:2-146:11]. | Lost profits |
| 104. | McFarlane admitted his report made no assumptions about NAC mitigating damages. | Smith Decl., Exh. 3 [McFarlane Depo. at 158:6-161:2]. | Lost profits |
| 105. | McFarlane admitted to drawing all his conclusions about lost profits based on data fed him by NAC management and limited public data available about one potential competitor – Atlas Air. | Smith Decl., Exh. 3 [McFarlane Depo. at 201:25-205:16]. | Lost profits |

## II.    CONCLUSIONS OF LAW

| CONCLUSION OF LAW | CITATION | CLAIM |
| --- | --- | --- |
| When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. | *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 8816, 108 S. Ct. 2166 (1988) | Capacity |
| An unformed entity can enforce a contract made on its behalf before it was formed. | *O2 Development, LLC v. 607 South Park, LLC*, 159 Cal. App. 4th 609, 612 (2008); 722 W. 43rd St. LLC v. Ali, No. B211263, 2009 WL 3020001 (Cal. App. Sep. 23, 2009) (unpublished). | Capacity |
| The individual signing on behalf of an unformed entity is both liable on and may enforce the contract. | *BJRM, LLC v. Output Systems, Inc.*, 917 A.2d 605, 612 (Conn. App. 2007); *Banker's Trust Co. of W. N.Y. v. Zecher*, 103 Misc. 2d 777, 780 (N.Y. Sup. 1980); *VGY Development, LLC v. 376A South Colony Realty Corp.*, No. CV065002733, 2007 WL 1675090 (Conn. Super. May 22, 2007) (unpublished); *Allen v. Scott, Hewitt & Mize, LLC*, 186 S.W. 3d 782, 784 (Mo. App. 2006). | Capacity |
| A party that bargains with a counterparty as if it was officially formed is estopped to deny its | 8 William Meade Fletcher, Fletcher Cyclopedia of the Law of corporations § 3910 (2010); | Capacity |

| CONCLUSION OF LAW | CITATION | CLAIM |
|---|---|---|
| existence. | Dkt. Nos. 11, 29. | |
| Principles of corporation by estoppel apply equally to LLCs. | *Home Owners' Loan Corp. v. Gordon*, 36 Cal. App. 2d 189, 192 (1939); <br><br>Order denying Motion to Dismiss Amended Complaint, Dkt. No. 35 at p. 4:23-5:18; <br><br>Dkt. Nos. 11, 29. | Capacity |
| LLC by estoppel protects the parties bargain. | Ragazzo & Moll at 291-292; <br><br>Duruigbo, 12 U. Pa. J. Bus. L. at 1030; <br><br>*Timberline Equipment Co. v. Davenport*, 514 P.2d 1109, 1112 (Or. 1973); 8 Fletcher Cyc. Corp. § 3889; <br><br>18A Am. Jur. 2d Corporations § 213, fn4; <br><br>Edward H. Warren, *Collateral Attack on Incorporation*, 21 Harv. L. Rev. 305, 313 (1909). | Capacity |
| An LLC may adopt an agreement made on its behalf before it is formed. | Dkt. No. 29. | Capacity |
| Under New York law, the interpretation of a contract is a matter of law. The court must first look at the four corners of the contract to determine whether an ambiguity exists. | *1550 Fifth Ave. Bay Shore, LLC v. 1550 Fifth Ave., LLC*, 748 N.Y.S.2d 601, 603 (N.Y.App.Div. 2002). | Best efforts, Exclusivity |

| CONCLUSION OF LAW | CITATION | CLAIM |
|---|---|---|
| A contract is unambiguous if the language it uses has a definite and precise meaning for which there is no reasonable basis for a difference of opinion. | *Telerep, LLC v. U.S. Intern. Media, LLC*, 903 N.Y.S.2d 14, 15 (N.Y.A.D. 1 Dept. 2010); <br><br> *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987). | Best efforts, Exclusivity |
| If the court determines that a particular clause is unambiguous, it may grant summary judgment without considering extrinsic evidence. | *1550 Fifth Ave. Bay Shore, LLC*, 748 N.Y.S.2d at 603. | Best efforts, Exclusivity |
| If the court determines that a certain clause is ambiguous, however, it may consider extrinsic evidence.  If the evidence is so one-sided that no reasonable person could decide to the contrary, then the court may grant summary judgment. | *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999). | Best efforts, Exclusivity |
| A written agreement may not be contradicted by evidence of any prior or contemporaneous oral agreement.  Parol, however, is admissible to explain or supplement the terms of the agreement with course of dealing or usage of trade and with evidence of consistent additional terms. | N.Y. U. Com. Code § 2-202. | Best efforts, Exclusivity |
| Evidence outside of the writing should be excluded if, in the view of the court, it relates to a condition that would have been included in the writing. | *Tropical Leasing, Inc. v. Fiermonte Chevrolet, Inc.*, 439 N.Y.S.2d 566, 567 - 568 (N.Y.A.D. 1981). | Best efforts, Exclusivity |

| CONCLUSION OF LAW | CITATION | CLAIM |
|---|---|---|
| | | |
| New York law defines "best efforts" as a duty greater than good faith but short of an obligation to succeed. | *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir. 1979); <br><br> *Kroboth v. Brent*, 215 A.D.2d 813, 814 (N.Y. App. Div. 1995). | Best efforts, Exclusivity |
| Best efforts does not mean that a party must accomplish the task | *TPTCC NY, Inc. v. Radiation Therapy Services, Inc.*, 784 F.Supp.2d 485, 507 (S.D.N.Y. 2011). | Best efforts, Exclusivity |
| Summary judgment is appropriate where the unambiguous, plain terms, of a contract establish that an exclusive relationship existed between the parties, even when the contract does not contain an "exclusivity" clause. | *Headwell v. Sandler*, 46 A.D.2d 584, 587, 364 N.Y.S.2d 218, 221 - 222 (N.Y.A.D. 1975). | Exclusivity |
| When determining exclusivity, the court must construe a contract to give effect to all of its terms, avoiding an interpretation which would render a critical portion of the document meaningless. | *PNC Capital Recovery v. Mechanical Parking Systems, Inc.*, 283 A.D.2d 268, 271, 726 N.Y.S.2d 394, 397 (N.Y.A.D. 2001); <br><br> *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465 (1984); <br><br> *Yoi–Lee Realty Corp. v. 177th Street Realty Assocs.*, 208 A.D.2d 185, 190, 626 N.Y.S.2d 61 (N.Y.A.D. 1995); | Exclusivity |

| CONCLUSION OF LAW | CITATION | CLAIM |
|---|---|---|
| | *Wyndham Co. v. Wyndham Hotel Co.*, 596 N.Y.S.2d 655, 661 (N.Y.Supp. 1992). | |
| Anticipatory repudiation occurs when the obligor commits a voluntary and affirmative act that makes it actually or apparently impossible for him to perform. | *In re Asia Global Crossing, Ltd.*, 332 B.R. 520, 525 (Bkrtcy. S.D.N.Y. 2005); *James v. Burchell*, 82 N.Y. 108, 114 (1880); Rest. 2d Contracts § 250, illus. 5 (1981). | Exclusivity |
| A party commits anticipatory repudiation when it enters into a second contract before the time of performance arrives that 'puts it out of his power to keep his contract. | *In re Asia Global Crossing, Ltd.* 332 B.R. 520, 525; *Goodman Mfg. Co., L.P. v. Raytheon Co.*, No. 98 Civ. 2774(LAP), 1999 WL 681382, at *8 (S.D.N.Y. Aug.31, 1999). | Exclusivity |
| New York law and the U.C.C. severely restrict the circumstances under which a party may recover lost profits. | *Kenford Co. v. Erie,*,493 N.E.2d 234 (N.Y. 1986) | Lost Profits |

| CONCLUSION OF LAW | CITATION | CLAIM |
|---|---|---|
| Lost profits may only be recovered where the loss was caused by the seller's breach, the allocation of the risk of loss was contemplated by the parties, the loss is not speculative, and the amount can be fixed with reasonable certainty. | *Kenford Co. v. Erie,*,493 N.E.2d 234 (N.Y. 1986); <br><br> N.Y. U. Com. Code §§ 2-714, 2-715; <br><br> *Conservancy Holdings, Ltd. v. Perma-Treat Corp.*, 126 A.D.2d 114, 513 N.Y.S.2d 266 (3d Dept. 1987). | Lost Profits |

DATED:  September 14, 2012

**PERKINS COIE LLP**

By: /s/Nathan M. Smith
    Donald J. Kula
    Nathan M. Smith

Attorneys for Plaintiff Global BTG LLC, a Nevada Limited Liability Company doing business in California, and Counterclaim-Defendant Jacob Hodges