1
2
3
4
5

JENNER & BLOCK LLP
Rick Richmond (Cal. Bar No. 194962)
rrichmond@jenner.com
Brent Caslin (Cal. Bar No. 198682)
bcaslin@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone:   (213) 239-5100
Facsimile:    (213) 239-5199

6
7
8
9

Melissa A. Cox (*pro hac vice*)
melissacox@jenner.com
1099 New York Ave, NW, Suite 900
Washington, DC 20001
Telephone:   (202) 639-6000
Facsimile:    (202) 639-6066

10

Attorneys for Defendant and Counterclaim
Plaintiff National Air Cargo, Inc.

11

12
13
14

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| 15  GLOBAL BTG LLC, | Case No.  CV 11-01657 MMM (JCGx) |
| 16      Plaintiff, | |
| 17      v. | The Honorable Margaret M. Morrow |
| 18  NATIONAL AIR CARGO, INC., | **NATIONAL AIR CARGO, INC.'S OPPOSITION TO GLOBAL BTG LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 19      Defendant-Counterclaim Plaintiff, | |
| 20      v. | [National's Separate Statement of Genuine Disputes of Material Fact, Objections to Evidence Submitted by Global, Declaration of Christopher C. Chiou, Declaration of Glen Joerger, and Proposed Order filed concurrently herewith] |
| 21  GLOBAL BTG LLC, JACOB HODGES, and DOES 1-5, | |
| 22 | |
| 23      Counterclaim Defendants. | |
| 24 | Discovery Cutoff:      June 5, 2012<br>Pretrial Conference:  January 28, 2013<br>Trial Date:               February 19, 2013 |
| 25 | |
| 26 | Hearing Date:        December 10, 2012<br>Hearing Time:        10:00 a.m.<br>Courtroom:           780 |
| 27 | |

28

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

SUMMARY OF FACTS ........................................................................................2

    A.    National's Purchase Agreements for Eight Jumbo Jets…… ..................2

    B.    National's Efforts to Secure Funding......................................................3

    C.    Mr. Hodges' Representations that Financing Was Imminent……........3

    D.    Global BTG's Unveiling.…….................................................................4

    E.    Overview of the Letter of Intent……......................................................5

    F.    Global Fails to Deliver…… ...................................................................6

    G.    National Tries to Salvage Its Deals for JAL and Air France
        Aircraft…… ...........................................................................................6

LEGAL STANDARD ............................................................................................7

ARGUMENT ........................................................................................................7

    I.    Global Lacks the Capacity to Contract and Therefore Cannot
        Enforce the Letter of Intent .................................................................7

        A.    Global Cannot Satisfy the "LLC-by-Estoppel"
            Exception......................................................................................9

        B.    Global Cannot Satisfy the Adoption/Ratification
            Exception....................................................................................11

        C.    Global Cannot Satisfy the "*De Facto* LLC" Exception……....12

        D.    Global's Fraudulent Misrepresentations Bar Global
            From Claiming Any Equitable Exceptions…….......................13

II. The Letter of Intent Is Not "Exclusive" and Did Not Preclude National from Seeking Alternative Sources of Financing..... ...........15

    A. The Plain Language of the Letter Proves There Is No "Exclusivity.............................................................................15

    B. Extrinsic Evidence Reinforces Why the Letter Did Not Require "Exclusivity" .............................................................16

III. Global's Liability Under the Best Efforts Provision in the Letter of Intent Cannot Be Summarily Adjudicated Due to Disputed Facts .............................................................................................18

    A. Global's Interpretation of the Best Efforts Clause Is Incorrect..... ............................................................................18

    B. Whether Global Fulfilled Its Obligation to Use "Best Efforts" Cannot Be Summarily Adjudicated..... .....................21

IV. National Is Entitled to Recover Lost Profits Due to Global's Misconduct..... ..................................................................................22

    A. The Parties Fairly Contemplated that Global Would Bear Liability for National's Lost Profits When Negotiating the Letter of Intent..... ............................................................22

    B. National's Lost Profits Are Properly Calculated..... ..............23

# TABLE OF AUTHORITIES

CASES                                                                  PAGE(S)

*02Development, LLC v. 607 South Park, LLC,*
    159 Cal. App. 4th 609 (2008) ................................................................11, 12

*Abbott v. Limited Mut. Compensation Ins. Co.,*
    30 Cal. App. 2d 157 (1938) ........................................................................11

*Adler v. Federal Republic of Nigeria,*
    219 F.3d 869 (9th Cir. 2000) ......................................................................14

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986) .....................................7

*Arledge v. Stratmar Sys.,*
    948 F.2d 845 (2d. Cir. 1991) ......................................................................19

*Ashland Mgmt. v. Janien,*
    82 N.Y.2d 395, 624 N.E. 1007 (N.Y. 1993)..........................................23, 24

*Awards.com v. Kinko's, Inc.,*
    42 A.D.3d 178 (N.Y. App. 2007) ...............................................................22

*Biggart v. Lewis,*
    183 Cal. 660 (1920) ...................................................................................11

*Calistoga Civic Club v. City of Calistoga,*
    143 Cal. App. 3d 111 (1983) ......................................................................13

*Christianson v. Colt Indus. Operating Corp.,*
    486 U.S. 800, 108 S. Ct. 2166, 100 L. Ed. 811 (1988) ......................................8

*City of Colton v. City of Rialto,*
    230 Cal. App. 2d 174 (1964) ......................................................................13

*Curcio v. Comm'r,*
    689 F.3d 217 (2d Cir. 2012) .......................................................................15

*Gentry v. State Farm Mut. Auto. Ins. Co.,*
    2010 U.S. Dist. LEXIS 68800 (E.D. Cal. June 15, 2010) ...............................24

*Headwell v. Sandler,*
    46 A.D.2d 584 (N.Y. App. Div. 1975) .......................................................16

*In re Cellular Information Sys.*,
   171 B.R. 926 (Bankr. S.D.N.Y. 1994)...............................................................18

*JMR, Inc. v. Hedderly*,
   261 Cal. App. 2d 144 (1968) ............................................................................11

*Kenford Co. v. County of Erie*,
   67 N.Y.2d 257, 493 N.E.2d 234 (N.Y. 1986).....................................................22

*Law Debenture Trust Co. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ..............................................................................20

*Lusardi Constr. Co. v. Aubry*,
   1 Cal. 4th 976 (1992) ..........................................................................................9

*Manes Org., Inc. v. Standard Dyeing & Finishing Co.*,
   472 F. Supp. 687 (S.D.N.Y. 1979) .....................................................................20

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
   244 F.R.D. 204 (S.D.N.Y. 2007) ........................................................................15

*McDarren v. Marvel Ent. Grp.*,
   1995 U.S. Dist. LEXIS 4649 (S.D.N.Y. Apr. 7, 1995) ......................................19

*Monteleone v. So. Cal. Vending Corp.*,
   264 Cal. App. 2d 798 (1968) .............................................................................11

*Nissho Iwai Europe PLC v. Korea First Bank*,
   99 N.Y.2d 115, 782 N.E.2d 55 (2002)...............................................................16

*Ross v. City of Berkeley*,
   655 F. Supp. 820 (N.D. Cal. 1987).....................................................................10

*Rowe v. Great Atl. & Pac. Tea Co.*,
   46 N.Y.2d 62, 385 N.E.2d 566 (1978)................................................................16

*San Diego Gas Co. v. Frame*,
   137 Cal. 441 (1902) ...........................................................................................13

*SEC v. Koracorp Industries, Inc.*,
   575 F.2d 692 (9th Cir. 1978) ...............................................................................7

*Sedona Corp. v. Ladenburg Thalmann & Co.*,
   2011 U.S. Dist. LEXIS 105320 (S.D.N.Y. Sept. 15, 2011) ...............................19

National's Opposition to Global's Motion for Partial Summary Judgment

*Smith v. Pac. Bell Tel. Co.*,
   649 F. Supp. 2d 1073 (E.D. Cal. 2009) ..............................................24

*Stickel v. Harris*,
   196 Cal. App. 3d 575 (1987) ..............................................................11

*Timberline Equip. Co., Inc. v. Davenport*,
   267 Ore. 64, 72, 514 P.2d 1109 (Or. 1973) .........................................9

*Transcare N.Y., Inc. v. Finkelstein, Levine & Gittlesohn & Partners*,
   23 A.D.3d 250 (N.Y. App. Div. 2005) ................................................21

*Travellers Int'l, A.G. v. Trans World Airlines*,
   41 F.3d 1570 (2d Cir. 1994) ...............................................................24

*United States v. Diebold, Inc.*,
   369 U.S. 654, 82 S. Ct. 993, 8 L. Ed. 176 (1962)................................7

*V.S. Int'l, S.A. v. Boyden World Corp.*,
   1993 U.S. Dist. LEXIS 2586 (S.D.N.Y. Mar. 4, 1993)......................25

*Van Landingham v. United Tuna Packers*,
   189 Cal. 353 (1922) ...........................................................................10

*Widewaters Prop. Dev. Co., Inc. v. Katz*,
   38 A. D. 3d 1220 (N.Y. App. Div. 2007) ............................................22

**STATUTES**

Cal. Civ. Code § 1550(1) ...............................................................................8

N.Y. U.C.C. § 2-102 .....................................................................................20

N.Y. U.C.C. § 2-202 .............................................................................. 20, 21

Nev. Rev. Stat. § 86.151 ...............................................................................13

**OTHER AUTHORITIES**

8 *Fletcher Cyclopedia of the Law of Corporations* § 3905 ..........................9

Fed. R. Civ. P. 56(a)........................................................................................7

*Brief for Appellant*,
*02Development, LLC v. 607 South Park, LLC*,
   2007 WL 31697 ..................................................................................12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **INTRODUCTION**

The Court has summary judgment cross-motions before it that can fully resolve the plaintiff's case.  A letter of intent is at the heart of the plaintiff's claims.  Both parties agree that the question of whether the plaintiff had the capacity to enter into that letter of intent, or can now enforce it, is ripe for resolution as a matter of law on undisputed facts.  The undisputed facts are that the letter of intent was executed by our client National and a man named Jacob Hodges, purportedly on behalf of the plaintiff Global.  At the time of the execution, however, Global did not exist.  As a matter of law, therefore, Global had no legal capacity to contract.  None of the limited exceptions are available to relieve the requirement that a contracting party must have the capacity to contract at the time of contracting.  Summary judgment is thus warranted on the basis that the plaintiff lacked capacity to execute the letter of intent in the first place and cannot now pursue its claims.

The parties have also cross-moved for summary judgment on a second issue that raises a question of law that can be resolved on undisputed facts.  Global claims that the letter of intent's express terms gave it an exclusive right to buy and leaseback eight aircraft from our client National.  But it is undisputed that the letter of intent is silent with respect to exclusivity, *i.e.*, the letter of intent does not say that National must use Global (and no one else) to arrange financing for the eight aircraft it was trying to purchase.  As a matter of law, this silence establishes that there is no exclusivity.  Thus, even if the Court concludes that the plaintiff had the capacity to contract before it existed, the Court nevertheless has the opportunity to significantly streamline the case for trial by removing the plaintiff's "exclusivity" assertion on summary judgment.

The remaining two issues raised by Global's summary judgment motion are not ripe for resolution because they are rife with disputed questions of material fact.  Specifically, the plaintiff asks the Court to find that a "best efforts" clause in the letter of intent required it to work hard to start discussions with potential lenders from July

18 to July 22, 2010.  When the letter of intent was executed, however, the parties understood that the best efforts clause obligated Global to use this critical time to finalize financing by firming up soft commitments the plaintiff claimed already to have searched for and held in its hand, not to start looking for financing on National's behalf for the first time.  Summary judgment on this issue is therefore precluded by the numerous factual disputes about what Global was supposed to do, and what Global actually did, pursuant to its best efforts obligation.

The final issue raised in Global's motion looks at the amount of lost profits suffered by National as a result of Global's misconduct.  Summary judgment is hardly the proper time to dispute the way National calculated its damages.  The parties predictably rely on conflicting evidence on the key question of whether they contemplated lost profits when the letter of intent was being negotiated.  Global is entitled to cross-examine our damages expert at trial about his calculations and assumptions, but Global cannot expect the Court to resolve a battle of the experts as a question of law on summary judgment.

After summarizing the relevant facts and the legal standard governing this opposition below, we explain in our four-part argument section why Global's summary judgment motion should be denied in its entirety.

## SUMMARY OF FACTS

### A.    National's Purchase Agreements for Eight Jumbo Jets.

National Air Cargo is a global freight services company.  SDF 106.[1]  In late May 2010, National reached a preliminary agreement through a special purpose entity to buy three Boeing 747s from Societe Air France ("Air France") for $120.5 million.  *See* SDF 3.   National also signed a purchase agreement with Japan Air Lines ("JAL") to buy five additional 747s for $192.5 million.  *See id.*

---

[1] Citations to "SDF" refer to National's Statement of Genuine Disputes of Material Fact, filed concurrently with this opposition.

National needed to obtain financing quickly to fund the aircraft purchases. *See* SDF 28, 36, 110. The purchase agreements for the JAL and Air France aircraft contained aggressive delivery dates: for example, National was scheduled to take delivery of the first Air France aircraft on July 30, 2010. SDF 107. Similarly, JAL was in the midst of a reorganization proceeding under Japanese law, propelling the JAL bankruptcy trustee to operate under tight deadlines. SDF 108.

### B. National's Efforts to Secure Funding.

Immediately after signing the purchase agreements for these eight jumbo jets, National engaged Donald Stukes, Senior Managing Director of ASI Advisors, to help National find funding sources. SDF 13. National and Mr. Stukes reached out to several potential lenders, including Goldman Sachs Group. SDF 109.

On June 17, 2010, Mr. Stukes identified and contacted Jacob Hodges as another potential funding source. SDF 14, 110. Given the time pressures that National faced, Mr. Stukes informed Mr. Hodges that "time is of the essence," and he "must act fast." SDF 110. National was told that Mr. Hodges, with his purported connections, would be able to put together a financing deal quickly and on good terms. SDF 111.

According to Mr. Hodges, he was affiliated with Pearl Aircraft Corporation, Ltd. ("Pearl Aircraft"). For example, in this time frame, on May 13, 2010, Hodges sent an email in which he claimed to be a "managing director" of Pearl Aircraft. SDF 112, 113. After reviewing Pearl Aircraft's website — which indicated that Pearl Aircraft was a reputable company with substantial capital for airline financing projects — National added "Pearl" to its list of potential funding sources. SDF 114, 115.

### C. Mr. Hodges' Representations that Financing Was Imminent.

JAL repeatedly demanded that National obtain a firm commitment letter from a qualified lending institution for the money needed to purchase its five 747s. SDF 24, 31, 34, 36. Accordingly, National emphasized to Mr. Hodges that JAL's bankruptcy trustee was applying pressure to quickly finalize the sale of JAL's aircraft. SDF 116; *see also* SDF 34, 36. National and JAL were scheduled to meet in Japan during the

week of July 26, 2010.  SDF 117.  National therefore needed to have in its hand, before that meeting, a firm commitment letter from a qualified lender to provide debt financing for the five JAL 747s.  SDF 118, 119.

Against this backdrop, Mr. Hodges claimed that he had begun reaching out to potential financing sources right after Mr. Stukes first contacted him on June 17, 2010.  *See* SDF 24, 28.  He reported success, boasting that quality institutions were "in committee" and on the verge of committing funding to National.  SDF 24, 28.

In early July 2010, Mr. Hodges asked National to sign a letter of intent to show that National was serious about having his help on financing.  SDF 32.  Mr. Hodges claimed that if he had a letter of intent from National in hand, he would be able to convince his lending sources to "firm up these soft commitments" for financing he had already received from them.  SDF 24, 32.  In other words, he would be able to provide the kind of financing commitment letter the JAL trustee was expecting to see during the week of July 26, 2010.  *See* SDF 24, 32, 34-36.

On July 7, 2010, National was told that Mr. Hodges "had approval to do the deal" and was sent a draft Letter of Intent from "Pearl."  *See* SDF 120.  This initial draft had a place-holder for an entity "xxx Aircraft, Inc., a SPE [special purpose entity], an affiliate or assignee," through which the financing would be arranged.  SDF 121.  National believed that the placeholder was going to be either a Pearl subsidiary or a special purpose entity set up by other sophisticated financing sources.  SDF 122.

### D.   Global BTG's Unveiling.

In later drafts of the letter of intent, Mr. Hodges filled in the missing special purpose entity name with an entity named "Global BTG" and revealed the potential involvement of another entity named "GreenRock."  SDF 123.  National agreed to "take its foot off the gas" in its negotiations with other financing institutions, and give Mr. Hodges until July 22, 2010 to obtain a firm lending commitment in anticipation of the meeting scheduled with JAL in Tokyo four days later.  *See* SDF 27, 117.

The parties executed the final version of the letter of intent on July 18, 2010

(SDF 17), which we will refer to as the "Letter of Intent" for the remainder of this opposition.  Mr. Hodges signed the document purportedly on Global's behalf.  SDF 17, 71.  At the time, however, Global did not exist.  *See* SDF 66.  Global was not formed until after the Letter of Intent was signed, even though Mr. Hodges and his lawyer had been discussing the requirements for Global's formation for months.  SDF 66, 67.  Mr. Hodges never informed National that Global was not legally organized when the Letter of Intent was executed in its name.  *See* SDF 69.

Indeed, it was not until discovery in this case that National learned Mr. Hodges was not even associated with Pearl in any capacity, let alone as a "Managing Director."  SDF 124, 125.  Mr. Hodges, who was unemployed and working out of his home with no significant assets, had simply used Pearl Aircraft's name to induce National to work with him.  SDF 126-129.

### E.     Overview of the Letter of Intent.

The Letter of Intent "outlines the basic commercial terms" for National to finance "up to eight" aircraft.  SDF 130.  Many key material terms were left open for future negotiations between Global and National, including the finance terms and the contents of any future lease agreement.  SDF 131.  In fact, the entire potential arrangement between National and Global was conditioned on "satisfactory lease or financing documentation" that would be negotiated later by the parties.  SDF 132.

Silence on exclusivity.  Although the issue of exclusivity had been discussed by the parties, the Letter of Intent does not contain any provisions relating to exclusivity.  SDF 26, 27.  It does not, for instance, state that National was prohibited from dealing with financing sources aside from Global, or that National was precluded from terminating Global.  SDF 27.  This silence was consistent with the parties' agreement that National "will want a right to cancel if nothing happens within a time frame," and National's insistence that the deal "can't be exclusive[.]"  SDF 27.

"Best efforts" provision.  The Letter of Intent required "Global [to] use its best efforts to deliver up to National on or before Thursday July 22, 2010 an MOU from a

qualified lender to provide capital to purchase Aircraft under a loan/and or finance lease." SDF 31.  In light of Mr. Hodge's repeated claims that he had already arranged for financing (and the rapidly approaching delivery dates for the JAL and Air France aircraft), National understood that Global would be devoting its best efforts from July 18 to July 22, 2010 to "firm up these soft commitments."  SDF 24, 32.

### F.      Global Fails to Deliver.

On July 22, 2010, rather than provide "an MOU from a qualified lender," the best that Mr. Hodges could come up with was his own personal letter enclosing a "Memorandum of Understanding" from himself, who was unemployed with no significant assets.  SDF 133.  This "Memorandum" was a slightly revised version of the July 18, 2010 Letter of Intent signed by the parties.  SDF 134.  Additionally, the document appears to have been so sloppily drafted that it referred to itself as a "Letter of Intent."  SDF 135.  In the cover letter, Mr. Hodges tried to placate National by asserting he was working hard to come up with something. *See* SDF 133.

Predictably, neither the personal letter nor the Memorandum from Mr. Hodges satisfied JAL's demand for a firm commitment letter from a qualified lending institution.  SDF 136.  It revealed only that, contrary to Mr. Hodges' representations, he did not have any lending institutions "in committee" ready to provide funding and he had exaggerated his efforts and abilities.  SDF 137.  Rather than use the July 18 to July 22, 2010 time period to finalize "soft commitments," it looked more like Mr. Hodges had started from scratch with the hope that he could somehow miraculously put together a $300 million financing arrangement in four days. *Id.*

### G.      National Tries to Salvage Its Deals for JAL and Air France Aircraft.

Upon receiving Mr. Hodge's communication, National terminated its relationship with Global and focused its energy on salvaging the purchase agreements for the JAL and Air France aircraft.  SDF 139.  Despite National's efforts, the JAL deal could not be saved, and National lost all five JAL aircraft.  SDF 140.  National also forfeited $100,000 of its deposit to JAL because of the broken deal. *Id.*  At the

last minute, National was able to secure financing from Goldman Sachs for the three Air France aircraft.  SDF 139.  Ironically, Mr. Hodges brought this lawsuit seeking $36 million, plus punitive damages, for his failed efforts.  *See* ECF Nos. 1, 100.

## **LEGAL STANDARD**

Global's summary judgment motion must be denied unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the moving party here, Global bears the burden of demonstrating the absence of a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L. Ed. 2d 202, 217 (1986).  When evaluating the evidence, all inferences "must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 176, 177 (1962).  If the moving party's credibility is at issue, then summary judgment is "singularly inappropriate."  *SEC v. Koracorp Industries, Inc.,* 575 F.2d 692, 699 (9th Cir. 1978).

## **ARGUMENT**

## I.   **Global Lacks the Capacity to Contract and Therefore Cannot Enforce the Letter of Intent.**

Both parties have asked the Court to resolve on summary judgment the threshold issue in this case: whether Global has the capacity to proceed with its claims.  In our own summary judgment motion, we have explained that Global lacked the capacity to contract because it did not exist as a valid legal entity when the Letter of Intent was executed on July 18, 2010.  Global has likewise moved to summarily adjudicate its lack of capacity, attempting to portray the issue as a "simplistic gotcha defense."  Mot. at 12.[2]  But black letter law holds otherwise.  To be "capable of contracting," an entity — including a limited liability company — must be legally

---

[2] Citations to "Mot." refer to the Memorandum of Points and Authorities in Support of Global's Motion for Partial Summary Judgment, ECF No. 116.

organized when the contract is executed.  *See* Cal. Civ. Code § 1550(1); 6/29/2011 Order, ECF No. 19, at 4.[3]  It is undisputed that Global was not organized as any type of entity on July 18, 2010, when the Letter of Intent was executed.  *See, e.g.*, SDF 66 (admitting that Global was not formed as a limited liability company when the Letter of Intent was signed on July 18, 2010).

Global argues that "the law of this case" is that Global pleaded "sufficient [facts] to establish LLC by estoppel[.]"  Mot. at 13.  This was only true at the pleadings stage of the case, but is no longer true now that discovery has been completed.  At the dismissal stage, Judge Lew dismissed Global's original complaint because Mr. Hodges' entity lacked capacity to sue National.  6/29/2011 Order, ECF No. 19, at 3.  Global then amended its complaint, raising three equitable doctrines that might provide an excuse permitting Global to sue on the Letter of Intent.  Those three equitable excuses were: (a) the *de facto* LLC, (b) the LLC-by-estoppel, or (c) the ratification/adoption doctrine.  Judge Lew declined to dismiss Global's amended complaint because it included allegations that, if proven true during discovery, might give rise to a limited exception.  *See* 10/13/2011 Order, ECF No. 35 at 4-5.

On summary judgment, however, mere allegations in Global's pleading are insufficient.[4]  The undisputed facts at the end of discovery confirm that no equitable doctrine excuses Global's lack of capacity, as we explain further below.

_____

[3] We rely on California law to analyze Global's lack of capacity to bring this lawsuit because, in his June 29, 2011 Order, Judge Lew held that "California law applies to the determination of Plaintiff's capacity."  6/29/2011 Order, ECF No. 19 at 3, n.1.

[4]  Global overstates the substance of Judge Lew's previous orders on National's motions to dismiss.  Judge Lew, for example, did not address whether National received an unjust benefit from Global, which is an element of both the LLC-by-estoppel and adoption exceptions.  Global also exaggerates the supposed preclusive effect of the Court's orders at the dismissal stage.  "[T]he law-of-the-case doctrine merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.  A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance[.]"  *Christianson v. Colt Indus.* (Continued…)

## A.    Global Cannot Satisfy the "LLC-by-Estoppel" Exception.

Global asserts that it should be entitled to claim the LLC-by-estoppel exception "[b]ecause NAC bargained with Global BTG LLC as if it existed and Global BTG did actually exist to fulfill its obligations[.]"  Mot. at 15.  But Global's characterization of the LLC-by-estoppel doctrine as a loophole to "ensure[] that the parties get what they bargained for" (*id.*) contravenes California law.

<u>Mr. Hodges' knowledge that Global was not a valid entity</u>.  As the authority relied upon by Global makes clear, "[k]nowledge on the part of the one claiming the estoppel that there is no corporation precludes an estoppel."  8 *Fletcher Cyclopedia of the Law of Corporations* § 3905; *see* Mot. at 15.  Mr. Hodges' contemporaneous emails demonstrate that, when he signed the Letter of Intent on Global's behalf on July 18, 2010, he was fully aware that Global was not legally organized.  SDF 66-68.  Under California law, this undisputed fact alone precludes Global from claiming the LLC-by-estoppel exception.  "[F]or the doctrine of equitable estoppel to apply . . . the party asserting estoppel must be *unaware* of the true facts."  *Lusardi Constr. Co. v. Aubry*, 1 Cal. 4th 976, 994 (1992) (emphasis added).

<u>National's lack of knowledge that Global did not exist</u>.  Judge Lew previously explained that the estoppel exception also requires National to have "had actual knowledge that [Global] was not an LLC but chose to deal with [Global] as an LLC regardless."  6/29/1011 Order, ECF No. 19 at 5.  The authority cited in Global's motion confirms this requirement.  *See Timberline Equip. Co., Inc. v. Davenport*, 267 Ore. 64, 72, 514 P.2d 1109, 1112 (Or. 1973) (holding that it was "inequitable to apply the [corporation by estoppel] doctrine" when the party seeking to enforce contract "represented, expressly or impliedly, that [it] was a legal corporate entity").

---

*Operating Corp.*, 486 U.S. 800, 816-17, 108 S. Ct. 2166, 2178, 100 L. Ed. 811, 831 (1988) (internal citations omitted).

In an effort to sidestep this problem, Global asserts that National "never bothered to find out about Global's entity status." Mot. at 16. Similarly, the sole fact that Global pleaded about National's alleged knowledge of its lack of capacity is this:

> Neither NAC nor NAC agent Don Stukes ever asked Hodges or anyone associated with Global any questions about Global's organizational status. Neither Stukes nor anyone from NAC showed any interest in Global's organizational status.

Mot. at 10. Of course, whether National "ever asked . . . about Global's organizational status" is a different question than whether National *knew* that Global was not legally organized when the Letter of Intent was executed on July 18, 2010.

The facts uncovered during discovery show that National was unaware that Global was not a properly-formed legal entity. For example, Global admits that it "never informed National that it 'did not exist' when the Letter of Intent was signed." SDF 69. Nor was National independently aware of Global's lack of capacity. SDF 69. Thus, Global's claim that "the pleaded facts are sufficient to establish LLC by estoppel" is not supported by the undisputed facts. Mot. at 13.

The Letter of Intent did not benefit National. Global's summary judgment motion makes no mention of a third condition to claiming the estoppel exception: Global must show that National was unjustly enriched. *Van Landingham v. United Tuna Packers*, 189 Cal. 353, 372-373 (1922) (rejecting corporation-by-estoppel exception because "defendant has not received and retained any benefit accruing therefrom"); *accord Ross v. City of Berkeley*, 655 F. Supp. 820, 829 n.9 (N.D. Cal. 1987) (estoppel applies when defendant "received benefits of that contract"). In its complaint, Global suggests that National received a purported benefit because it "wanted to use Global to 'prime the market' by spreading the word to potential lenders that NAC was seeking to finance aircraft acquisitions." Compl. ¶ 47.

But the parties agree that, after Global failed to deliver a firm lending commitment by July 22, 2010, National ultimately arranged financing for the Air France aircraft through Goldman Sachs. SDF 139. Not surprisingly, in light of

Goldman Sachs' global reputation and reach, Mr. Hodges himself explained during his deposition:  "in terms of priming the market, Goldman Sachs doesn't need Global to prime the market to raise financing."  SDF 141.  Global therefore cannot claim the LLC-by-estoppel exception because National did not receive a material benefit under the Letter of Intent.

### B.    Global Cannot Satisfy the Adoption/Ratification Exception.

Within the general rule that "[a] corporation cannot . . . have agents enter into contractual relations until it is actually in being as a thing apart from its procreators" (*Biggart v. Lewis*, 183 Cal. 660, 665 (1920)), a corporation can only enforce a contract that was signed pre-incorporation on its behalf if it adopts and ratifies the contract after the corporation is properly formed.  *See, e.g.*, *JMR, Inc. v. Hedderly*, 261 Cal. App. 2d 144, 148 (1968).  Global argues that the "First Amended Complaint pleads implied adoption and discovery shows these facts to be undisputed."  Mot. at 16.

Global's argument overlooks two requirements that must be fulfilled to claim the adoption exception: unjust enrichment and knowledge on the part of National. Because adoption is an equitable exception, Global must prove that National received an unjust benefit.  *See Stickel v. Harris*, 196 Cal. App. 3d 575, 586 (1987) (party seeking to disavow contract "knowingly accept[ed] its benefits"); *Monteleone v. So. Cal. Vending Corp.*, 264 Cal. App. 2d 798, 807 (1968) (party seeking to disavow contract "retained the benefits and cannot now successfully urge that it is [not] bound").  Here, it is undisputed that National neither obtained financing through Global, nor needed Global to "prime the market" for Goldman Sachs.  SDF 139, 141.

In addition, National's lack of knowledge that Global was not a valid legal entity bars application of the adoption exception.  *See Abbott v. Limited Mut. Compensation Ins. Co.*, 30 Cal. App. 2d 157, 162-63 (1938) (individual disclosed beforehand that his corporation had not yet been formed).  Indeed, the sole case cited by Global involving California law on adoption illustrates the significance of the knowledge requirement.  In *02Development, LLC v. 607 South Park, LLC,* 159 Cal.

App. 4th 609 (2008), the defendant knew in advance that the plaintiff had not formed the entity executing the contract at issue, but decided to accept a $200,000 deposit from the plaintiff regardless.  *See* Brief for Appellant, *02Development, LLC v. 607 South Park, LLC*, 2007 WL 31697, at *24 (plaintiff executed assignment to unformed entity which he indicated "was an entity [he] intended to form"), *4 (defendant accepted $200,000 deposit).   Thus, the plaintiff could properly proceed with its lawsuit because the defendant knew about the plaintiff's lack of capacity and decided to accept the benefit of the contract.  *See 02Development*, 159 Cal. App. 4th at 612.

Here, by contrast, National did not know Global lacked capacity when the Letter of Intent was executed on July 18, 2010.  Mr. Hodges admits that he failed to inform National that Global did not exist, and Global likewise concedes it "never informed National that it 'did not exist' when the Letter of Intent was signed."  SDF 69.   Because Global cannot establish "unjust enrichment" or "knowledge," the adoption/ratification exception cannot excuse Global's lack of capacity.

## C. Global Cannot Satisfy the "*De Facto* LLC" Exception.

Without offering any authority, Global asserts that "[o]ther courts have found a *de facto* corporation on similar facts."  Mot. at 16.  Then, without referring to any specific facts, Global claims that "the *de facto* doctrine . . . applies to undisputed facts to show that Global was a *de facto* LLC when the LOI was entered."  *Id.* at 17.

As we have explained in our own motion for summary judgment, Global does not meet the requirements of the *de facto* LLC doctrine (which, to be clear, has not been recognized by any California court).[5]   For the Court's convenience, we summarize below how Global did not colorably comply — and did not make a good faith effort to comply — with the applicable Nevada statute to form a LLC.

---

[5] Judge Lew believed that the *de facto* LLC doctrine would mirror the requirements of the *de facto* corporation doctrine.  *See* 6/29/2011 Order, ECF No. 19, at 5.

1
2
3
4
5
6
7
8
9
10
11

Global's failure to colorably comply.  To show "colorable compliance" and justify a *de facto* existence, Global must prove that it complied with the relevant Nevada formation statute, but only fell short due to immaterial irregularities in the formation process.  *See, e.g.*, *City of Colton v. City of Rialto*, 230 Cal. App. 2d 174, 183 (1964); *see also San Diego Gas Co. v. Frame*, 137 Cal. 441, 444-45 (1902) (finding "substantial compliance" when a party properly submitted articles of incorporation to a county clerk, but those documents were mistakenly marked as "misfiled").  In this case, Nevada's LLC formation statute required Mr. Hodges only to have "sign[ed] and file[d]" articles of organization with the Nevada Secretary of State.  Nev. Rev. Stat. § 86.151.  It is undisputed, however, that Mr. Hodges did not take either step before he signed the Letter of Intent on Global's behalf.  SDF 66.

12
13
14
15
16
17

Global's failure to make a good faith attempt at compliance.  California law recognizes *de facto* corporate status only when the principals "attempt to comply in good faith with the requirements of the statute as to incorporation[.]"  *Colton*, 230 Cal. App. 2d at 183.  The principals cannot be considered to have made a good faith attempt if they *knew* that they failed to comply with the applicable requirements.  *See Calistoga Civic Club v. City of Calistoga*, 143 Cal. App. 3d 111, 113 (1983).

18
19
20
21
22
23
24

The undisputed facts demonstrate that Mr. Hodges did not have a good faith (but mistaken) belief about Global's status prior to signing the Letter of Intent on July 18, 2010.  Contemporaneous documents produced by Mr. Hodges show that he was well aware of the simple requirements to form a Nevada LLC and gained that knowledge long before the Letter of Intent was signed.  SDF 67-68.  Nevertheless, Mr. Hodges waited to file articles of organization with the Nevada Secretary of State until after he signed the Letter of Intent.  SDF 66.

25
26

**D.   Global's Fraudulent Misrepresentations Bar Global From Claiming Any Equitable Exceptions.**

27
28

Setting aside Global's inability to satisfy the elements of any limited exception, Global's fraudulent conduct further precludes Global from justifying its lack of

capacity with the LLC-by-estoppel, *de facto* LLC, or adoption/ratification exceptions. All of those exceptions are equitable in nature, which means that Global "must have acted fairly and without fraud or deceit as to the controversy in issue" in order to obtain relief. *Adler v. Federal Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000) (internal quotations omitted).

The evidence shows that Mr. Hodges fraudulently misrepresented who he worked for and what he did, in an attempt to induce National to enter into the Letter of Intent. Although the truth was that Mr. Hodges was unemployed, working out of his home, and without capital, Mr. Hodges nevertheless claimed to be a principal of Pearl Aircraft, a reputable financing company with hundreds of millions of investment capital. SDF 80, 112, 113. National, in turn, prepared a non-disclosure agreement for "Pearl Aviation Corporation" — listing Pearl Aircraft's official address in Bermuda — and provided Mr. Hodges with access to its secured electronic database, under the username "PearlAviation." SDF 80. Indeed, National's internal communications referred to Mr. Hodges and his "team" as "Pearl." SDF 15, 27, 43, 115.

If National had known the truth about Mr. Hodges, it would not have worked with him, let alone entered into the Letter of Intent. SDF 142. Mr. Hodges, however, disputes this fact, arguing that "NAC did not care if Global was officially organized when it signed the LOI and it should not now argue otherwise." Mot. at 16. Mr. Hodges also denies even hinting to National that he was affiliated with Pearl, despite the contemporaneous emails in which Mr. Hodges used "Pearl Aircraft" in his signature block and described himself as a "managing director" of Pearl. *Compare* SDF 80, 81 with SDF 112, 113. These factual disputes constitute an independently sufficient basis to deny Global summary judgment on the capacity issue.

In sum, Global was not a *de facto* LLC, did not qualify as a LLC-by-estoppel, and cannot claim the adoption exception. Even if Global could satisfy an equitable exception, the material dispute over whether Mr. Hodges defrauded National bars application of any limited exception to excuse Global's lack of capacity. As a result,

summary judgment cannot be granted to Global, but instead, should be awarded to National on this critical issue of capacity.

## II. The Letter of Intent Is Not "Exclusive" and Did Not Preclude National from Seeking Alternative Sources of Financing.

### A. The Plain Language of the Letter Proves There Is No "Exclusivity."

As with the capacity issue, National and Global agree that this Court can resolve the "exclusivity" question on summary judgment. To do so, the Court need do nothing more than review the Letter of Intent's plain language. Global contends that, as a matter of law, the "plain terms" of the Letter of Intent "are exclusive." Mot. at 20. But as explained in our own summary judgment motion, if a written agreement "makes no mention of exclusivity," then the black letter default rule under New York law is that the agreement does not support "any contractual right" to exclusivity. *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 217 (S.D.N.Y. 2007).[6] In fact, Global agrees that the Letter of Intent does not contain any terms requiring "exclusivity" whatsoever. *Compare* SDF 27 *with* Mot. at 21.

Given the Letter of Intent's silence on exclusivity, Global instead hinges its argument on its characterization of the document as "a buy-sell agreement[7] that did not allow NAC to shop for other lenders" and purportedly gave Global the exclusive

---

[6] The "Governing Law" provision in the Letter of Intent states: "This Letter of Intent and the lease documentation will be governed by the laws of the State of New York." Accordingly, in its June 29, 2011 Order granting National's motion to dismiss Global's initial complaint, the Court explained that "the alleged contract at issue contains a valid New York choice of law provision which governs the substantive claims at issue in this Action[.]" ECF No. 19 at 3, n.1.

[7] A "buy-sell agreement" is a term of art that refers to "[a]n arrangement between owners of a business by which the surviving owners agree to purchase the interest of a withdrawing or deceased owner." *Black's Law Dictionary* (9th ed. 2009); *see also Curcio v. Comm'r*, 689 F.3d 217, 221 (2d Cir. 2012). In the context of this case, Global appears to be using "buy-sell agreement" as a shorthand misnomer for a contract involving the sale of goods, rather than its actual meaning.

right to "purchase and leaseback all eight aircraft."  Mot. at 2, 21.  On its face, however, the Letter of Intent is not an agreement to "buy" or "sell" anything:  it simply outlines the basic terms for Global to provide financing for "[u]p to eight" aircraft.  SDF 130.  Nor does the Letter of Intent contain a single provision that prohibited National from terminating its relationship with Global.  SDF 27.

Global's reliance on *Headwell v. Sandler*, 46 A.D.2d 584 (N.Y. App. Div. 1975) is thus misplaced.  The contract at issue in *Headwell* was a license agreement for the plaintiff to establish eleven fax centers in a certain area.  Extrinsic evidence established that eleven licenses were "the maximum number of licenses permitted in the area[.]"  *Id.* at 585-86.  The plaintiff contended that this meant the license was exclusive, and the defendant failed to show that the plaintiff's "interpretation is improper[.]"  *Id.* at 587.

In contrast, Global cannot identify any provisions in the Letter of Intent to support its assertion that National "agree[d] to sell to and leaseback from Global all eight aircraft[.]"  Mot. at 21.  The reason is simple:  the Letter of Intent did not force National to sit on its hands, instead of making alternative arrangements in case Global blew the July 22, 2010 deadline.  *See* SDF 27.  Global's after-the-fact argument that the Letter of Intent implied an exclusive relationship thus should be rejected, as "the courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."  *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 385 N.E.2d 566, 572 (1978).

### B.    Extrinsic Evidence Reinforces Why the Letter Did Not Require "Exclusivity."

The Letter of Intent's silence on exclusivity is conclusive:  "ambiguity does not arise from silence, but from what was written so blindly and imperfectly that its meaning is doubtful."  *Nissho Iwai Europe PLC v. Korea First Bank*, 99 N.Y.2d 115, 121-22, 782 N.E.2d 55, 60 (2002) (internal quotations omitted).  Global nevertheless offers extrinsic evidence to support its assertion that "parol evidence explains and

supplements Global's interpretation" regarding exclusivity.  Mot. at 22.  According to Global, it informed National's financial advisor, Donald Stukes, that Global would not "proceed on a non-exclusive basis."  *Id.*

But this cherry-picked, simplified account omits a significant part of the parties' discussions.  On July 15, 2010, Mr. Hodges' own counsel made clear to him that National "will want a right to cancel if nothing happens within a time frame[.]"  SDF 27.  One day later, after reviewing a draft of the Letter of Intent sent by Mr. Hodges, National again informed its financial advisor (Mr. Stukes) that the agreement "can't be [] exclusive as we need to keep working goldman and db [Deutsche Bank] in case they [Global] don't come through."  *Id.*  And when Mr. Stukes explained that Global was concerned about being turned away even if it obtained firm lending commitments by July 22, 2010, National reiterated that "[a]t the end we will see where goldman db [Deutsche Bank] and pearl chips fall. . . . and if they can deliver we will kick the others to the curb."  *Id.*

Mr. Hodges' contemporaneous statements further undercut Global's characterization of the Letter of Intent as a "buy-sell agreement."  When the Letter was executed on July 18, 2010, Mr. Hodges wrote to his team members: "We got it! […] We have the mandate."  SDF 18.  Importantly, Global then clarified to potential lenders the meaning of this "mandate," with no mention of exclusivity:  National "has retained us to structure and obtain financing for the fleet."  SDF 18.  Mr. Hodges did not claim that National agreed to "buy" or "sell" any aircraft to Global, nor could he, because Global did not have more than $25,000 in capital available — much less than the hundreds of millions needed to purchase eight jumbo jets.  SDF 129.

Global's story changed after filing this lawsuit.  Instead of an agreement "to structure and obtain financing" for National's fleet, Global now claims that the Letter of Intent transformed into "an exclusive buy-sell agreement."  *Compare* SDF 18 *with* Mot. at 20.  Global's most recent interpretation of the Letter of Intent is contrary to both the document's plain language and extrinsic evidence, which do not "support[] a

finding of exclusivity."  Mot. at 22.

## III.  Global's Liability Under the Best Efforts Provision in the Letter of Intent Cannot Be Summarily Adjudicated Due to Disputed Facts.

The Letter of Intent required "Global [to] use its best efforts to deliver up to National on or before Thursday July 22, 2010 an MOU from a qualified lender to provide capital to purchase Aircraft under a loan/and or finance lease."  SDF 31. Global now argues that the best efforts requirement did not require Global to do anything more than solicit initial interest from potential lenders from July 18 to July 22, 2010.  Global's interpretation is inconsistent with the facts:  before the Letter of Intent was executed, Mr. Hodges led National to believe that he would use his best efforts to finalize financing that it already attracted in the form of soft commitments, not start the search from scratch.

### A.  Global's Interpretation of the Best Efforts Clause Is Incorrect.

Global asserts that the best efforts clause in the Letter of Intent is unambiguous because:  (1) "best efforts" constitutes "a duty greater than good faith but short of an obligation to succeed"; (2) a party under an obligation to use best efforts "is not required to make every conceivable effort to do so"; and (3) "[b]est efforts does not mean that a party must accomplish the task."  Mot. at 19.  So far as it goes, Global's generic explanation of the meaning of the phrase "best efforts" is not the ground on which this summary judgment will be fought.

A generic definition of the phrase "best efforts" is not the end of the inquiry into Global's obligations.  Under New York law, "best efforts" requires a party "to make such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations."  *In re Cellular Information Sys.*, 171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994) (internal quotations omitted).  In this case, the Letter of Intent does not set forth how Global was supposed to undertake "best efforts" from July 18 to July 22, 2010.  SDF 143.  The Letter likewise does not clarify National's "justifiable expectations" or Global's reasonable

"ability and the means at its disposal."  Indeed, Global describes the "MOU" in the best efforts clause as an "amorphous" term.  Mot. at 5.

The Letter of Intent's failure to define "best efforts" is not surprising.  "A 'best efforts' standard is necessarily contextual . . . and so the meaning of such a provision and the conditions of its breach are generally factual issues that cannot be resolved" as a matter of law.  *Sedona Corp. v. Ladenburg Thalmann & Co.*, 2011 U.S. Dist. LEXIS 105320, at *6 (S.D.N.Y. Sept. 15, 2011).  In other words, a best efforts clause must be "read in context."  *Arledge v. Stratmar Sys.*, 948 F.2d 845, 848 (2d. Cir. 1991).  When an agreement fails to properly define best efforts, then courts must consider the "standards or circumstances."  *McDarren v. Marvel Ent. Grp.*, 1995 U.S. Dist. LEXIS 4649, at *12 (S.D.N.Y. Apr. 7, 1995).  Given the Letter of Intent's silence on what obligations were imposed by the "best efforts" clause, the appropriate "standards or circumstances" here are established by: (1) Global's representations to National about what it had already done before the Letter of Intent was executed and what it was going to do over the next few days; and (2) the Letter of Intent's incorporation of aggressive delivery schedules for the Air France and JAL aircraft.

Global's representations provide context.  Global's contention that the best efforts clause allowed it to merely "set out to secure lenders" on July 18, 2010 (Mot. at 5) cannot be reconciled with the promises that Mr. Hodges made to National before the Letter of Intent was executed.  Beginning in early July 2010, Mr. Hodges repeatedly assured National that he had already made significant progress towards obtaining financing.  SDF 24, 28.  Qualified lenders were supposedly "in committee" to provide funding to National as a result of his diligent efforts to date.  *Id.*  In fact, Mr. Hodges claimed the only reason he wanted National to sign the Letter of Intent was so that he could "firm up these soft commitments."  SDF 24, 32.

Accordingly, the parties understood that Global's "best efforts" from July 18 to July 22, 2010 would be directed towards consummating — not initiating — lending

commitments.  SDF 24, 32.  Global's mischaracterization of this as "a side promise at odds with the meaning of best efforts" wholly ignores the proper context.  Mot. at 17.

The Letter of Intent corroborates National's understanding.  The best efforts clause must also be considered "in the context of the entire [written] agreement."  *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotations omitted).  The Letter of Intent reinforces why National reasonably believed that Global would be using its best efforts from July 18 to July 22, 2010 to finalize financing, not just start exploring whether financing could be accomplished in a matter of days.

When the Letter of Intent was executed on July 18, 2010, the delivery date for the first Air France aircraft was only 12 days away, on July 30, 2012.  SDF 107.  The first JAL aircraft was to be delivered soon after on August 30, 2010.  SDF 144.  Those delivery dates were incorporated by reference in the Letter of Intent, which required the parties to close any financing transactions "[a]s soon as reasonably possible and in accord with the estimated delivery schedule as provided by Lessee."  SDF 21.

This contractual provision would not make sense, however, unless the parties contemplated that Global could meet the delivery schedule by using best efforts to build upon preexisting efforts.  Indeed, Global itself states that "[n]o industry expert would expect this agreement to require a financing commitment from Global within days of signing the agreement."  Mot. at 20.  That is exactly our point:  the proximity of the delivery dates and the July 22, 2010 deadline demonstrates that the parties believed Global already had "soft commitments" in hand on July 18, 2010.

Extrinsic evidence is admissible to clarify the best efforts provision.  Global argues that Section 2-202 of the New York Commercial Code bars extrinsic evidence to contradict Global's interpretation of the best efforts clause.  *See* Mot. at 18-19.  But the UCC only applies to "transactions in goods" (N.Y. U.C.C. § 2-102), whereas the Letter of Intent's primary purpose was for Global to help National raise financing.  *See*, *e.g.*, *Manes Org., Inc. v. Standard Dyeing & Finishing Co.*, 472 F. Supp. 687,

692 n.3 (S.D.N.Y. 1979) (a contract does not fall within the UCC if "service predominates over any sale aspect").  Even if the UCC did apply to the Letter of Intent, "evidence of consistent additional terms" would be permitted to "explain[] or supplement[]" the best efforts clause, given the absence of an integration clause.  N.Y. U.C.C. § 2-202.  Here, extrinsic evidence explains the specific obligations imposed on Global by the best efforts clause.

### B.  Whether Global Fulfilled Its Obligation to Use "Best Efforts" Cannot Be Summarily Adjudicated.

Whether Global properly used its "best efforts" in accordance with the parties' understanding is also hotly disputed in this case.  On one hand, Global claims that its obligations were fulfilled because "[i]n the week following the execution" of the Letter of Intent, "Global contacted and distributed requests for proposals to financing sources from around the world."  Mot. at 7.  Global asserts that "[e]xpressions of interest" from supposed lenders constituted "commentary on Global's and Hodges' skill and reputation in the industry."  *Id.*  According to Global, it was "making significant progress with other lenders around the globe."  *Id.* at 8.

National, on the other hand, trusted Mr. Hodges when he represented that quality institutions were already "in committee" and on the verge of committing funding to National prior to July 18, 2010.  SDF 24, 28.  As explained above, Mr. Hodges agreed to spend the critical days leading up to the July 22, 2010 deadline "firm[ing] up these soft commitments," rather than merely initiating contact with lenders.  SDF 24, 32.

Even setting aside National's justifiable expectations, "[s]ignificant questions of fact exist as to the adequacy of the efforts, if any" by Global.  *Transcare N.Y., Inc. v. Finkelstein, Levine & Gittelsohn & Partners*, 23 A.D.3d 250, 251 (N.Y. App. Div. 2005).  For instance, contrary to Global's rosy depiction of a "strong expression of interest" (Mot. at 7) from Perot Investments, discovery revealed that Perot Investments was not prepared to commit to any financing on July 23, 2010.  SDF 52.

Likewise, notwithstanding Mr. Hodges' unsupported claim that he "thought Citibank was interested," Citibank's contemporaneous emails were short and to the point: "zero interest."  *Compare* Mot. at 7 *with* SDF 54 (Citibank's corporate representative confirmed that "it's fair to say on July 23, 2010 . . . Citibank did not have any interest in doing any finances for National Air Cargo's aircraft").

The upshot is that the "determination whether the obligation to use best efforts has been fulfilled will almost invariably, as here, involve an issue of fact, rendering summary judgment inappropriate." *Widewaters Prop. Dev. Co., Inc. v. Katz*, 38 A.D.3d 1220, 1221-1222 (N.Y. App. Div. 2007) (internal quotations omitted).  The disputed facts regarding what Global was supposed to do under the best efforts clause — and what Global actually did from July 18 to July 22, 2010 — render summary judgment inappropriate on the best efforts issue.

## IV.    National Is Entitled to Recover Lost Profits Due to Global's Misconduct.

Global asks this Court to summarily adjudicate National's claim for lost profits damages, arguing that "there is no evidence any party contemplated that Global was at risk for this loss" and that "the loss is speculative and cannot be fixed with any certainty."  Mot. at 23.  Disputed facts, however, preclude summary judgment on whether National is entitled to recover the lost profits and economies of scale that would have been gained from the five JAL aircraft that Global cost National.

### A.    The Parties Fairly Contemplated that Global Would Bear Liability for National's Lost Profits When Negotiating the Letter of Intent.

For National to proceed with its lost profits claim, those damages must have been "fairly within the contemplation of the parties to the contract at the time it was made." *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235 (N.Y. 1986).  At the summary judgment stage, National only needs to "raise a triable issue of fact regarding whether the parties contemplated lost profits at the time of contract negotiation." *Awards.com v. Kinko's, Inc.*, 42 A.D.3d 178, 183 (N.Y. App. 2007).  Global implies that there must have been explicit "discussion between NAC

and Global over the risk allocation in the event the JAL aircraft were not purchased." Mot. at 24.  This is not the correct legal standard:  National was not required to invoke the phrase "lost profits" as a talisman in its conversations with Global.  Rather, Global is liable for all losses that are "foreseeable and probable." *Ashland Mgmt. v. Janien*, 82 N.Y.2d 395, 403, 624 N.E. 1007, 1010 (N.Y. 1993).

With the proper legal standard in mind, Global's contention that it "received assurances throughout that the JAL aircraft sale was not at risk" (Mot. at 24) is disputed by other percipient witnesses.  During their first telephone conference, National CEO Chris Alf stressed to Mr. Hodges that "time [is] of the essence[.]"  SDF 110.  Indeed, National could not have been clearer in the parties' communications: Mr. Alf later reminded Mr. Hodges that, unless National had a firm commitment from a qualified lender by July 22, 2010, it "would not . . . be able to purchase any aircraft at all."  SDF 34-36 ("it was all understood on the call that [Mr. Hodges] had to make it happen by [July 22, 2010] or we're not going to buy the airplane").

In addition, Mr. Hodges' belated protest that he had no idea the JAL deal would be placed "at risk" by his failure to perform is refuted by his contemporaneous representations to National.  In July 2010, when Mr. Hodges was trying to induce National to sign the Letter of Intent, he claimed to understand how important the JAL aircraft were to National.  SDF 34-36, 110, 116, 118, 119.  Mr. Hodges also acknowledged that National needed to obtain financing and a firm commitment letter quickly, or else the JAL deal would be jeopardized.  *See id.*  These facts squarely contradict Global's claim that it could not have foreseen its actions would inflict significant harm on National.

### B.   National's Lost Profits Are Properly Calculated.

Relying on its own expert's opinions, Global argues that National's damages are "too speculative due to unsupported or poorly supported assumptions in the twenty year projections on which NAC relies."  Mot. at 24.  To be clear, the calculation of lost profits "does not require absolute certainty."  *Ashland*, 82 N.Y.2d at 403.  The law

recognizes that "[d]amages resulting from the loss of future profits are often an approximation." *Id.* "Any calculation of damages based on lost profits always entails a degree of uncertainty caused by the need to rely on assumptions and estimates." *Travellers Int'l, A.G. v. Trans World Airlines*, 41 F.3d 1570, 1579 (2d Cir. 1994).

Global claims that its rebuttal expert report, by Stuart Weinroth, "identified numerous wildly optimistic and speculative assumptions" in National's damages calculation. Mot. at 24. As a threshold matter, Mr. Weinroth's rebuttal report must be disregarded here because, at the summary judgment stage, a party cannot rely on expert testimony "for anything but opinion" and instead "must present specific references to the record for all facts[.]" *Gentry v. State Farm Mut. Auto. Ins. Co.*, 2010 U.S. Dist. LEXIS 68800, at * 4 (E.D. Cal. June 15, 2010). Mr. Weinroth's assertion that National's claim for lost profits is "speculative" also constitutes an improper legal conclusion. *See Smith v. Pac. Bell Tel. Co.*, 649 F. Supp. 2d 1073, 1089 (E.D. Cal. 2009) ("Testimony in the form of a legal conclusion is an inappropriate matter for expert testimony.").

Even if Global's summary judgment motion could rely on Mr. Weinroth's expert opinion as evidence, Global's critiques of National's assumptions are a textbook example of issues that would be properly raised during cross-examination, but not on summary judgment. For example, Global believes that it was unreasonable for National to assume "that NAC could have bid competitively against FedEx and UPS for contracts[.]" Mot. at 24. But National's own expert has explained that his assumptions are proper and consistent within the guidelines set by the American Institute of Certified Public Accountants. *See* SDF 103; *see also* SDF 102, 104-05.

Similarly, Global has challenged the amount of National's lost profits, asserting that National did not follow the appropriate time limit and did not account for mitigation. Mot. at 24. But summary judgment is not the appropriate time for Global to contest the details of National's calculations: so long as National "demonstrate[s] a genuine issue of fact as to the existence of actual damages resulting from the breach of

1  contract, then summary judgment in [Global's] favor is inappropriate even if the

2  precise amount or extent of the damages is still somewhat uncertain."  *V.S. Int'l, S.A.*

3  *v. Boyden World Corp.*, 1993 U.S. Dist. LEXIS 2586, at *20 (S.D.N.Y. Mar. 4, 1993).

4      At trial, Global will have a full and fair opportunity to question National's

5  damages expert on his assumptions and methods.  There is no basis for Global to force

6  the Court to prematurely adjudicate the merits of each party's expert analysis now.

7                                    *       *       *

8      National and Global have both asked the Court to determine on summary

9  judgment whether Global had the capacity enter into or enforce the Letter of Intent.

10  The parties agree that the facts underlying the capacity issue are undisputed.  Those

11  undisputed facts establish that Global was incapable of contracting when Mr. Hodges

12  signed the Letter of Intent on July 18, 2010, and demonstrate that Global cannot claim

13  an equitable exception to excuse its lack of capacity.

14      National and Global have also asked the Court to summarily resolve whether

15  the Letter of Intent created an "exclusive" relationship between them.  The parties

16  agree that the exclusivity question can be decided by looking at the Letter of Intent

17  itself, without extrinsic evidence.  On its face, the Letter of Intent does not mention

18  exclusivity, require National to deal with Global exclusively, or prohibit National

19  from seeking financing from anyone else.

20      Finally, disputed questions of material fact contradict Global's self-serving

21  interpretation of the "best efforts" provision to justify its misconduct.  Factual disputes

22  likewise prevent Global from dodging liability for National's lost profits, as a result of

23  Global's failure to fulfill its obligations.  For the reasons above, National respectfully

24  requests that the Court deny Global's motion for partial summary judgment.

25  DATED:  November 13, 2012      JENNER & BLOCK LLP

26

27                                 /s/ Brent Caslin
                                  Brent Caslin

28                                 Attorneys for National Air Cargo, Inc.