# EXHIBIT 1

Glen Joerger - May 23, 2012

1

```
1           UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
2                 WESTERN DIVISION
3    - - - - - - - - - - - - - x
     GLOBAL BTG LLC,                    :
4          Plaintiff,                   :
                vs.                     : Case No.
5    NATIONAL AIR CARGO, INC,           : 2:11-CV-01657-RSWL-JCGX
           Defendant/                   :
6          Counterclaim Plaintiff,      :
                vs.                     :
7    GLOBAL BTG LLC,                    :
     JACOB HODGES and DOES 1-5,         :
8          Counterclaim Defendants.:
     - - - - - - - - - - - - - x
9
10                              Washington, D.C.
11                              Wednesday, May 23, 2012
12          Videotaped Deposition of NATIONAL AIR
13   CARGO, INC., through its representative, GLEN JOERGER,
14   and GLEN JOERGER individually, a witness herein,
15   called for examination by counsel for Plaintiff in the
16   above-entitled matter, pursuant to notice, the witness
17   being duly sworn by KAREN YOUNG, a Notary Public in
18   and for the District of Columbia, taken at the offices
19   of Perkins Coie LLP, 700 Thirteenth Street, Northwest,
20   Washington, D.C., at 9:02 a.m. on Wednesday, May 23,
21   2012, and the proceedings being taken down by
22   stenotype and transcribed by KAREN YOUNG.
```

Certified Copy

Glen Joerger - May 23, 2012

46

1    document's an e-mail from Mr. Alf dated March 10th,

2    2010.

3                          (Exhibit 78

4                          was marked for

5                          identification.)

6          BY MR. KULA:

7      Q.    So that's Exhibit 78?  Mr. Joerger, I'm

8    just going to ask you about the cover e-mail, but you

9    can take a look at that document if you want to

10   familiarize yourself with it just so you know what I'm

11   asking about.  The date on this document is March

12   10th, 2010, and actually, let me back up.  At some

13   point did you become directly employed by National?

14     A.    Yes.

15     Q.    When was that?

16     A.    April of last year as an employee.

17     Q.    So April of --

18     A.    2010.

19     Q.    '11?

20     A.    April 2011 as an employee.  I was a board

21   member since January of 2010.

22     Q.    Okay, so in March of 2010, you were a board

Glen Joerger - May 23, 2012

47

1    member of National.

2         A.      That is correct.

3         Q.      In this e-mail, it says we are looking for

4    three or four -- three to four 747-400.  Do you recall

5    this period in the spring of 2010, the company was

6    looking to acquire 747 aircraft?

7         A.      I do not remember this particular one.  I

8    remember the JAL deal, but yes, I remember this one,

9    2010.  I was thinking 2011.  Yes, in March 2010, yes,

10   we were looking at the JAL airplanes.

11        Q.      Yeah, and I'm not necessarily asking you to

12   remember this e-mail.  I'm just using it more to set

13   the optic, which is in the spring of 2010, was the

14   company looking to expand its fleet of aircraft?

15        A.      Yes.

16        Q.      And why was that?

17        A.      We were actually looking to modernize.  At

18   the time, the company had a fleet of DC-8s, a small

19   fleet of DC-8s.  The DC-8 is a very fuel-inefficient

20   aircraft carrying about 45 tons.  It is not well

21   suited for the military market and it's not very well

22   suited for the commercial market except in very niche

Glen Joerger - May 23, 2012

48

```
1    opportunities.  The government had in late 2009, early
2    2010 come to the Civil Reserve Air Fleet carriers and
3    said we want you to modernize your fleets, as part of
4    this came from -- from language in the National
5    Defense Authorization Act from Congress saying that
6    they thought that the military should provide
7    incentives for the commercial carriers to modernize
8    their fleets.  In response, we had multiple
9    discussions inside the company on how we could now
10   change our -- our airline to respond to this and to
11   modernize.
12           We looked at DC-10s.  At one point we were
13   considering DC-10s.  We eventually settled on the
14   747-400 as the best aircraft to move forward to with
15   to both respond to being better well competitively
16   positioned in the commercial market, and to service
17   our military customers.
18       Q.    Was there some process that the company
19   went through to determine how many aircraft it would
20   seek to acquire at that time?
21       A.    There was an analysis to say what would be
22   the optimum number.  If you could just pick a number,
```

Glen Joerger - May 23, 2012

49

1  what's the optimum based on the rules that were going

2  to be proposed to be implemented under the Civil

3  Reserve Air Fleet program, under those new rules, what

4  would be the optimum number.

5      Q.    And what answer did the company come up

6  with?

7      A.    Eight.

8      Q.    And let me back up again.  So you were a

9  board member at this time in the spring of 2010.

10  That's where I'm focused on.  Did you have a role in

11  this process the company went through to determine

12  whether to expand its fleet of aircraft, and if so,

13  what type of aircraft and how many?

14      A.    Yes, I was still a consultant with the

15  company as well as a board member.

16      Q.    What was your role in that regard?

17      A.    I was a key advisor in the whole process as

18  well as, as a board member, part of the decision

19  authority.

20      Q.    Was some report made up at some point

21  indicating the conclusion as to what direction the

22  company should go?

Glen Joerger - May 23, 2012

119

1     Q.     Well, you --

2     A.     You show me a term sheet.

3     Q.     He brought you Global, right, Mr. Stukes?

4     A.     Yeah, and Global made promises they couldn't keep and Global could not ever provide a term sheet.  Global is a broker.  They're not a lender, and they were never able to meet the requirement.  They never provided us a term sheet.

9     Q.     My only point is that there were certain terms that were -- in the Global offer, correct?

11     A.     There was never a firm commitment letter from a lender out of Global, never.  There was a broker offering -- and that's why we were very skeptical, because we like to deal with lenders.  So I can deal with anybody off the street that says I'm a company and I'm going to try and go out and do this for, which is kind of nice, but if you don't have money, if you don't have a commitment letter from a lender who has money, that's not a firm commitment letter.  That's why you don't -- these people on this letter, they have money.  They're people that actually can lend.  Please don't put Global in the same

Glen Joerger - May 23, 2012

137

1    2010.  As of that point, that time, do you recall if

2    you'd communicated to Mr. Stukes that there was some

3    -- I'm not suggesting these exact words, but some

4    drop-dead date by which financing or a commitment for

5    financing was needed?

6         A.     At this point we were not communicating a

7    date other than we had to have them for the closing of

8    the airplanes, so that was -- the date we were all

9    working to was the closing of the airplanes, but we

10   are quickly drawing upon, and I don't know the exact

11   meeting of Mr. Murray in Japan, but when Mr. Murray

12   came back from Japan meeting with the JAL trustee is

13   when we knew that we had to have a firm commitment

14   letter and we had a new -- new prospective deadline

15   coming in.

16        Q.     Do you recall in regard to document, the

17   attachment to the June 19th e-mail, discussing with

18   Mr. Stukes what he references on the last -- last page

19   as Pearl Aviation, in that paragraph?

20        A.     I remember having a lot of discussions

21   about Pearl Aviation, yes.

22        Q.     Do you recall the first discussion you had

EXHIBIT 1
Page 14

Glen Joerger - May 23, 2012

138

1    with Mr. Stukes about it?

2        A.     I do not recall specifically the date and

3    time of the first discussion.

4        Q.     Do you -- you mentioned a lot of

5    discussions.  Do they all run together or can you in

6    your mind differentiate specific discussions with Mr.

7    Stukes about Pearl?

8        A.     They become much more specific as we get

9    closer into July.  Initially he's out here with a very

10   broad pool and so he's got a lot of people he's

11   throwing at, and then as he refines that list, then

12   the specificity of the discussions increases with the

13   probability of he thinking the probability of success

14   is higher.

15       Q.     Now, this document says Pearl Aviation.  At

16   some point in time, did what is referenced here as,

17   you know, potential financing through Pearl Aviation,

18   did in your mind the name change to Global at some

19   point?  In other words, start referring to it as

20   Global instead of Pearl?

21       A.     No, we actually thought Pearl Aviation was

22   kind of involved in the whole thing and we thought

Glen Joerger - May 23, 2012

139

1   Global was an entity that involved both Pearl Aviation

2   and GreenRock, so we were very shocked to find out

3   later that Mr. Hodges had no affiliation with Pearl

4   Aviation, and in essence, this was some other company

5   that may or may not have existed, so we were as

6   shocked as you are.

7       Q.    Well, what discussion do you recall with

8   Mr. Stukes about -- in which he discussed Mr. Hodges'

9   affiliation with Pearl?

10      A.    Mr. Stukes says that Hodges was affiliated

11  with Pearl, that they did have experience doing this

12  and that they were interested in doing this deal.

13      Q.    Was that in the first discussion you had

14  with him with -- the name Pearl came up?

15      A.    Yes.

16      Q.    And had you ever heard of Pearl Aviation?

17      A.    I hadn't heard of several of these people,

18  so again, this is not something -- I had heard of

19  Goldman Sachs, I had heard of DB Bank, I'd heard of

20  Credit Suisse, but -- I'd heard of Guggenheim.  I'd

21  not heard of Nord LB.  So some of these people I had.

22  I'd heard of Citibank.  ComVest Debt Fund I had not.

Glen Joerger - May 23, 2012

140

1    So some I'd heard of and some I had not.  Pearl

2    Aviation was one that I had not.

3         Q.    In that first discussion, the first time

4    you recall there being a discussion, did Mr. Hodges'

5    name come up, individual name?

6         A.    I'm not sure if it was the first, but it

7    was very in the early stages that he associated Mr.

8    Hodges with Pearl Aviation.

9         Q.    He being Mr. Stukes?

10        A.    Yes, sir.

11        Q.    And what did Mr. Stukes say about Mr.

12   Hodges the best you can recall the first time it came

13   up or the first you can recall?

14        A.    That Pearl Aviation was very interested in

15   doing this and that they wanted to propose some

16   solutions.  He kept saying they can do this very

17   quickly, they can do this very quickly, they've got

18   folks, I know we can make this happen, you know, they

19   -- they have an ability to do this very fast.  So this

20   was the initial promise, why Pearl started to rise

21   faster was because of the promises that they can do

22   this very quickly.

EXHIBIT 1
Page 17

Glen Joerger - May 23, 2012

179

1   name came up the first time that Pearl was mentioned

2   by Mr. Stukes?  Did I recall that?

3        A.     I think Pearl came up in some earlier

4   documents before Jacob Hodges is mentioned, and then

5   shortly thereafter, he was connected with Pearl

6   Aviation.

7        Q.     So whether we're using the term "Pearl" or

8   "Hodges," this is -- you understand that to be the

9   same potential source of financing, the same potential

10  deal.

11       A.     I understood that Pearl Aviation was

12  providing funding.

13       Q.     And that Jacob Hodges was a principal

14  there?

15       A.     I understood that Jacob Hodges worked for

16  Pearl Aviation and he was their point of contact in

17  doing the due diligence on this deal.

18       Q.     And that information came from Mr. Stukes?

19       A.     Yes, sir.

20       Q.     Now, did Mr. Stukes ever tell you that Mr.

21  Hodges actually is not with Pearl Aviation?

22       A.     He did at some point, but I can't tell you

Glen Joerger - May 23, 2012

180

1   exactly what that point was, and I believe it was

2   after -- actually after we terminated.

3       Q.    Well, we'll go through some documents.

4       A.    So when you say ever, ever's a long period

5   of time, and so now you run that scope from June 'til

6   present, and -- and so from the time I first heard the

7   words "Pearl Aviation" and "Jacob Hodges," did Don

8   Stukes ever tell me that Jacob doesn't work for Pearl

9   Aviation, yes, I believe in some time in that period

10  of time from June from this e-mail until today, yes,

11  he did.

12      Q.    Okay, and I'm not testing your memory

13  because we'll get to it, but just so I have an

14  understand of what -- what -- what your recollection

15  is, did not National enter into an LOI with Global, a

16  company called Global?

17      A.    We're not really sure who we entered into

18  an LOI with.  We were under the impression that it was

19  Pearl.  We were then under the impression that

20  GreenRock was involved.  We were then under the

21  impression that BTG was some conglomeration of Pearl

22  and GreenRock.  So only after the fact did I ever

EXHIBIT 1
Page 19

Glen Joerger - May 23, 2012

181

1    realize that I really was never exactly sure in that I
2    was made to believe that I was doing business with
3    some people that I wasn't really doing business with.
4    So when I went to Pearl Aviation's web site and I
5    looked, I couldn't find Jacob Hodges but -- so I
6    figured he was not a principal, he was somewhere lower
7    in the organization. And if I go on Pearl Aviation
8    today, I can't find Jacob Hodges, and if I went
9    looking for BTG's web site and finding Jacob Hodges, I
10   couldn't find that either.
11       Q.     Did you do that?
12       A.     Looked for it, wasn't there.
13       Q.     But my -- my question was simpler. Just
14   there was a written LOI that was signed by National
15   and some other party that I believe is Global. As you
16   sit here --
17       A.     It was signed by two other parties, Global,
18   LLC and Global, Inc., so which one are you referring
19   to?
20       Q.     So the name "Global" was on that agreement,
21   correct, not Pearl?
22       A.     Global Aviation Holdings, who owns World

Glen Joerger - May 23, 2012

182

1  and North American, but that's not who I was referring

2  to.  So there's a lot of aviation companies called

3  Global.  Which one are you referring to?  I don't

4  know.  That was the problem is we didn't really -- we

5  thought that this Global was part of GreenRock and

6  Pearl and some conglomeration because up until the

7  very last days, we're talking to Pearl we think the

8  whole time.  And suddenly we're talking to GreenRock,

9  and then we're suddenly see on an LOI, not the first

10  edition, a later edition of an LOI, we suddenly see

11  this Global, and then we see Global, LLC and we see

12  Global, Inc.

13      Q.    Okay.  Do you recall that through this

14  process leading up to this LOI, that at some point the

15  name "Pearl" stopped appearing on documents, whether

16  it's e-mails or other communications or actual LOI

17  drafts, and "Global" appeared as opposed to Pearl?  Do

18  you recall that?

19          MR. RICHMOND:  I'll object to the extent

20  your description of appeared on documents is too vague

21  and ambiguous for what I think you're -- you mean,

22  because I've seen the name on documents right until

Glen Joerger - May 23, 2012

199

1    same thing essentially, saying he could not get a

2    commitment letter today, he'll try to get a letter

3    stating an institution's interested in funding the

4    deal.  Do you recall having a discussion with him on

5    that?

6         A.    Yeah, Mr. Stukes would generally provide

7    other options, is this going to work, is that going to

8    work.  In the end, it was we need a financing lease,

9    we need a firm commitment letter from an institution

10   that has funds.  Would Mr. Stukes offer various

11   alternatives and various suggestions, yes, he would.

12        Q.    Okay, at this point National was unable to

13   get such a letter from Deutsche Bank, correct?

14        A.    That's correct.

15        Q.    And Mr. Stukes is saying here that Goldman

16   or GECAS or Nord LB, will not come from them, correct?

17        A.    In this particular time frame, that is

18   correct, that's what he stated.

19        Q.    So come from a different source he says by

20   doing a favor.  Did he ever explain to you what he

21   meant by that, doing a favor?  Did he ever use that on

22   the phone, that term, doing a favor?  No?

Glen Joerger - May 23, 2012

200

1    A.    Not to me.

2    Q.    You're shaking your head.

3    A.    I'm sorry, I apologize.  No, sir, not to

4    me.

5    Q.    And it says, "So if you can hold off JAL

6    until late today or early Monday."  Do you understand

7    what he means by that, hold off JAL?

8    A.    He knows that we have -- that JAL is

9    pushing hard to get some commitments.

10   Q.    And do you recall if after this, after this

11   e-mail sometime, this says Friday June 25th, if he was

12   able to get -- and I'm talking, say, in the next week

13   or so, get a letter stating an institution's

14   interested in funding the deal?

15   A.    Best of my knowledge, no.  That's why we

16   came upon -- eventually we came upon that Thursday

17   July 22nd deadline.  You're seeing all the -- the

18   actions leading up to eventually JAL having a -- what

19   they -- we believed to be a firm deadline that we had

20   to have a commitment letter for a meeting that happens

21   just after that Thursday July 22nd deadline, and so

22   Mr. Alf and I were going to have to go to Japan, so

Glen Joerger - May 23, 2012

201

1     this is all leading up to that.

2          Q.     Was there -- was there an earlier JAL

3     deadline that this is referring to, because it says

4     hold off JAL until late today or early Monday, and

5     this is dated June 25th.

6          A.     There was significant JAL pressure.  Using

7     the word "deadline," I don't recall an exact if you

8     don't have by this date, until the line -- the meeting

9     that we were going to go to would have been in the

10    July 25th, 26th time frame in Japan is where we got

11    the impression that this is go-no go.

12         Q.     Was that meeting already set, that is, of

13    this June 25th time frame?

14         A.     No, at this point they're just putting a

15    lot of pressure.

16         Q.     Would you say it's just general pressure to

17    get something without any specific date stated?

18         A.     Yes, sir.  It eventually comes to a date

19    when we're not producing that letter.

20             MR. KULA:  Okay, let's mark a series of

21    e-mails again, NAC006747, first one is -- goes

22    through, I should say, NAC006756, goes through -- or

EXHIBIT 1
Page 24

Glen Joerger - May 23, 2012

202

1    it's dated June 28th, 2010 from Mr. Stukes to Mr. Alf,

2    Mr. Joerger and others, and that's 96.

3                              (Exhibit 96

4                              was marked for

5                              identification.)

6              BY MR. KULA:

7        Q.    See this is an e-mail chain, if you will, a

8    couple e-mails from Mr. Stukes.  If you look -- if you

9    go from the back to the front sort of, actually,

10   starting at NAC006751, I need to ask you about that.

11       A.    Okay.

12       Q.    In this time frame, do you recall getting

13   some feedback from Mr. Stukes that some of the lenders

14   were -- at least had questions if not getting

15   push-back based on what he refers to in this one

16   e-mail is a legal issue with the government?

17       A.    Yes.

18       Q.    Did he ever express to you that there were

19   potential lenders who just weren't interested in doing

20   anything with the company because of that?

21       A.    He said that there could be an issue with

22   lenders.

Glen Joerger - May 23, 2012

212

1        BY MR. KULA:

2        Q.      The e-mail says, I just got a from proposal

3    from -- or I just got a GS proposal.  Did you

4    understand that to be a proposal from Goldman Sachs?

5        A.      Yes, sir.

6        Q.      And then there's a draft letter attached.

7    Is -- did -- this July 6th proposal from Goldman

8    Sachs, that was not accepted by National; is that

9    correct?

10       A.      It wasn't accepted by National on July 6th.

11       Q.      And why not was it acceptable at that time?

12       A.      Because we had concerns with the fee

13   structure.

14       Q.      It was too expensive?

15       A.      Yes, sir.

16       Q.      And you told that to Goldman Sachs?

17       A.      Yes, sir.

18       Q.      If you look at their draft letter, first

19   page, second paragraph says, "The exclusive right to

20   act."  Did you understand that Goldman was asking to

21   be the exclusive -- have an exclusive relative to

22   providing financing?

Glen Joerger - May 23, 2012

213

1    A.    We understood that they were asking for

2    that, yes.

3    Q.    And then the second, or third paragraph

4    there actually ending the first page, it says, "In the

5    event the company does not complete the financing

6    within six months from the date, the company would

7    reimburse Goldman Sachs for its reasonable

8    out-of-pocket expenses, including the fees and

9    reimbursement of its attorneys incurred in connection

10   with the proposed financing."  Was that another reason

11   that this was rejected at that time?

12   A.    We didn't go by through a detail by detail.

13   We in hand rejected it at a macro level at the time.

14   We set it to the side because we were getting a lot of

15   promises by Pearl saying that they can make this

16   happen very quickly and with a fee structure that we

17   potentially believed was lower, but we kept waiting

18   for an actual terms to see what the terms would be.

19   So this was set to the side while we tried to find out

20   if the promises that we were receiving were true and

21   what the actual details were with these promises.

22   Q.    Okay, as of this time, its says July 6th on

EXHIBIT 1
Page 27

Glen Joerger - May 23, 2012

214

1    this, what do you recall -- what promises do you
2    recall Pearl -- Pearl or Mr. Hodges would have made?
3         A.      They can make this happen, they can get it
4    done, we've got a lot of soft commitments, we can --
5    we still want to do operating leases but we can do
6    finance leases, we can make it happen.
7         Q.      Do you recall hearing that in a specific
8    call with -- when Mr. Hodges said that or is that
9    coming from Mr. Stukes?
10        A.      It came from in Mr. Stukes early, but then
11   we did clearly hear that from Mr. Hodges on the
12   Wednesday phone call of Wednesday July 14th I believe.
13        Q.      Okay, so the exhibit we were just
14   referencing, 99, that's dated July 6th, so -- and you
15   just referenced a call of July 14th.
16        A.      I referenced two things.  I said Mr. Stukes
17   was telling us previous to that, which would have been
18   this time frame, and then I referenced that Mr. Hodges
19   specifically said on July 14th, so I was representing
20   this time frame and from Mr. Hodges on the 14th.  I
21   was trying to be specific.
22        Q.      Right, and I'm just talking now about up to

EXHIBIT 1
Page 28

Glen Joerger - May 23, 2012

215

1    July 6th.   July 6th.

2        A.      Okay.

3        Q.      Do you recall having any specific

4    conversation with Mr. Hodges where he made any

5    promises?

6        A.      No.

7        Q.      And what --

8        A.      That I remember.

9        Q.      What was Mr. Stukes telling you at that

10   time if you recall as to what Mr. Hodges was promising

11   or suggesting he could do?

12       A.      Mr. Stukes was saying Pearl could do this,

13   they can make it happen fast, they've got a lot of

14   soft commitments, they want to do this.

15       Q.      When you say do this, what do you mean?

16       A.      Get us financing for the aircraft, 12

17   aircraft.

18       Q.      And did you know what terms they were

19   speaking of?

20       A.      No, we didn't, but I was going to finish.

21   Not 12.   It could have been as little as eight,

22   because we were kind of segregating the 747s from the

Glen Joerger - May 23, 2012

216

1   -- from the 75s.

2       Q.      So based on the promises you -- well, let

3   me just put it this way.  Based on what you were

4   hearing from Mr. Stukes, okay, as of July 6th, and not

5   knowing what the terms were, that is part of the

6   reason you put aside Goldman's offer from July 6th?

7       A.      Because we kept hearing you're going to see

8   average LOI any day, any day, any day, so it's kind of

9   this, you know, I'm hoping that I'll see it on July

10  7th.  I hope -- oh, no, no, you'll see it any day,

11  July 8th.  And so you keep waiting for you're about to

12  see this term sheet so you can make an educated

13  analysis of what option is best.  The problem becomes

14  when people are promising you they're going to get you

15  something and then they don't, they create this thing

16  where you start pushing a decision down the road where

17  you -- with the sense of urgency and time is of the

18  essence, you'd much rather have that decision made up

19  front.  So that's why we're continually pressing, and

20  you'll see throughout the documents, to get

21  commitments, to get term sheets, to get LOIs and get

22  them in so we can make an analysis.  We're getting a

Glen Joerger - May 23, 2012

240

1    We didn't need promises from folks.  We needed actual

2    term sheets so we can evaluate them.

3        Q.    Do you recall anything in writing going

4    back saying you don't want anything with an operating

5    lease in response to this chain of e-mails?

6        A.    I remember getting an LOI from Pearl where

7    I red-lined out the entire operating lease languages,

8    and then multiple times both verbally and in writing

9    said no operating lease.  I don't know how much more

10   clear I can be by stripping out the entirety of every

11   single word that contains operating lease language in

12   it.  To me, that clearly represents that I clearly

13   communicated that there was no operating leases to Mr.

14   Stukes, Mr. Hodges, Pearl, GreenRock, BTG and anyone

15   else involved.

16       Q.    Well, based on Mr. Stukes' response that

17   you're copied on, does it appear that he doesn't

18   understand that -- that National does not want

19   operating leases?

20       A.    It appears that he's trying to make a deal

21   happen.

22            MR. KULA:  Okay, let's go off the record.

Glen Joerger - May 23, 2012

241

1   We need to change the tape.

2          THE VIDEOGRAPHER:   This is the end of Tape

3   4 in the videotaped deposition of Glen Joerger.   We

4   are off the record at 3:49.

5              (Recessed at 3:49 p.m.)

6              (Reconvened at 3:58 p.m.)

7          THE VIDEOGRAPHER:   Here begins Tape 5 in

8   the videotaped deposition of Glen Joerger.   We are

9   back on the record at 3:58.

10          MR. RICHMOND:   Counsel, I just want to note

11   for the record we showed up seven hours ago.   We took

12   a one hour lunch break.   You've asked for all the

13   other breaks and we haven't, so I would encourage you

14   to move right along here.

15          MR. KULA:   I'll just note, I haven't asked

16   for a break so much as the videographer needs breaks

17   to change the film, so if I've asked to go off the

18   record, that's been the reason.

19          BY MR. KULA:

20      Q.    Do you recall, Mr. Joerger, having a

21   conference call involving Jacob Hodges before

22   receiving another version of the LOI, an LOI from him

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

EXHIBIT 1
Page 32

Glen Joerger - May 23, 2012

242

1   or Pearl or anybody else that you affiliate with him?

2       A.    Yes, sir, I believe you're referring to the

3   conference call we had on Wednesday July the 14th.

4       Q.    Okay.  What was said in that call?

5       A.    This is the first time that we now meet

6   GreenRock, and we talk to Steve Alexander and Rick

7   Jones and they start telling us what they collectively

8   can do.  We talk about how we don't want operating

9   leases, we want only finance leases, time is of the

10  essence, we have to get a letter.  We needed several

11  things from them.  One, no operating lease.  Two, we

12  have a JAL deal, we have to go back to Japan and we

13  have to explain to the bankruptcy trustee that we have

14  a firm commitment letter.

15          They tell us that they have soft

16  commitments, but they need a document so that they can

17  go to these institutions and firm up these soft

18  commitments that they have, and so we're talking about

19  okay, if you get this letter, then you can go up and

20  you can get firm commitment letters by next week, and

21  they're saying yes, if you give us the letter, we'll

22  go to the institutions and we'll get a firm commitment

Glen Joerger - May 23, 2012

243

1   letter.

2          Now, we get into discussions later on after

3   this conference when we actually start putting it in

4   writing, then we start, you know, well, maybe, we

5   start pausing and hemming and hawing, and so we

6   eventually get to the language that we get to, but we

7   clearly communicate what we need, which is a letter

8   from an institution that says that they can provide us

9   financing for the JAL aircraft.

10         Q.     What do you recall Mr. Hodges saying in

11   response to needing a letter from an institution?

12         A.     There was -- initially on the Wednesday, it

13   was a more positive call, and that was -- part of the

14   thing is we would seem to make advances on the calls,

15   and then we would seem to come off a call and we'd

16   seem to fall back, and then so each time it got a

17   little frustrating is that we'd have call, we'd think

18   we all understand each other.  We come off the call,

19   Mr. Stukes would talk to Mr. Hodges.  Mr. Stukes

20   report back and suddenly what we thought we had heard

21   evidently is not what we had heard, and so that's why

22   we have these series of calls, because we were getting

Glen Joerger - May 23, 2012

244

1   -- we didn't understand how -- why what we were

2   explaining on calls wasn't sinking in, although we

3   clearly on the call thought it was sinking in, but

4   wasn't.

5       Q.     What did you think you were hearing

6   directly from Mr. Hodges?  What do you recall him

7   saying?

8       A.     Initially he was communicating that they

9   wanted operating leases, they could do a combination

10  thereof, but when we pushed back on operating leases,

11  yes, we can get you finance leases.  It's going to

12  take a little bit of time.  Can you do it by next

13  week?  We have soft commitments, we'll -- if you give

14  us a letter, we'll try to make those more firm.  Yes.

15  We can do it by -- by next week.  You just need to

16  give us the letter.  We can't go to the markets.  The

17  markets won't talk to us and firm anything up unless

18  they know that we're representing you.  There's other

19  people out there talking because people know that

20  we're talking to Deutsche Bank and Goldman, so we need

21  this letter from you so people know that we have

22  credibility to go out there and talk to them to firm

EXHIBIT 1
Page 35

Glen Joerger - May 23, 2012

245

1   this up.

2       Q.      Well, did he say that he would -- if he did

3   that, he would be able to produce a firm commitment

4   letter from a lending institution?

5       A.      In the Wednesday call, he is much more

6   optimistic about being able to provide commitment

7   letters.  By the time we're getting to Friday and

8   Saturday and follow-on drafts, that becomes softer,

9   but again, like I said, we'd get through a call, we

10  thought we'd get here, and all of a sudden we're back

11  here, so we kept doing this stagger approach as we got

12  to a document.

13      Q.      What was he saying in the Friday, Saturday

14  calls that you reference about a commitment letter?

15      A.      When we get the draft, I pull out all the

16  operating lease language, and so after the call, we

17  get another LOI.  I'm yanking all this operating lease

18  language in and I put in what's called a commitment

19  block and I say we've got to do a commitment because

20  we talked about the commitment verbally.  We've talked

21  about that we need this letter, we need a firm

22  commitment letter, we need it by next Thursday July

Glen Joerger - May 23, 2012

246

1   22nd in order to do the JAL deal.  So I put in this

2   commitment block.

3           So we hear verbally that oh, we can do

4   that.  Then we see the next draft, you know, then it's

5   well, we're not really sure, and they changed the

6   language, but they put in language then eventually

7   that has language similar to what we believe is

8   exactly what we asked for, you have to by next

9   Thursday July 22nd, firm commitment letter for JAL, no

10  operating lease, because that was the other big issue,

11  operating lease.  No operating lease.

12          They come back say and they say well, you

13  might want an operating lease.  Just have the language

14  so you have the option.  You don't have to do it.  We

15  understand you don't want operating leases, but you

16  know, if we have the language in there, you can still

17  do it, but you know, you've got these conditions

18  precedent inside the LOI, and one of them is mutual

19  agreement on all of the terms and conditions, and

20  there's a variety of terms and conditions in here that

21  haven't been settled upon, and so there's still --

22  until we can present you with a deal, there's still

Glen Joerger - May 23, 2012

247

1   ways that you don't have to do this.

2        Q.     Backing up, in the conversation you

3   attributed to the July 14th, when the discussion of --

4   of going to the market, so to speak, came up, did Mr.

5   Hodges address why he needed that, why he needed a

6   letter to show that he'd been -- that he's working for

7   National?

8        A.     I have a lot of the soft commitments, I can

9   get this job done but you have other people in the

10  market, and these other people, it will confuse them.

11  They won't do it with me until I can clearly show them

12  that I'm working with you.  That's why I need this

13  letter.

14       Q.     And at some point did National request that

15  any agreement with Mr. Hodges have language that

16  indicated it was nonexclusive?

17       A.     There was -- Mr. Hodges was trying to get

18  exclusive, and we were pushing back that it is

19  nonexclusive.

20       Q.     But was there -- did National propose at

21  one point a draft that included language that said --

22  that would make the agreement nonexclusive, would say

Henderson Legal Services, Inc.

EXHIBIT 1
Page 38

Glen Joerger - May 23, 2012

251

1    Intent."

2                              (Exhibit 107

3                                was marked for

4                                identification.)

5              BY MR. KULA:

6        Q.      My question would be, Mr. Joerger, when

7    you've a chance to review that, is this the next

8    version of the letter of intent you received from Mr.

9    Hodges after that phone call that you referenced?

10       A.      The phone call was on Wednesday, and we

11   believe that this is the LOI we then received on

12   Thursday night following that call on Wednesday.

13       Q.      And Mr. Stukes' e-mail that's on page 1

14   indicates that, middle there, "Jacob and his team is

15   prepared to have a conference call with you and your

16   team upon your review of the LOI."  It's actually to

17   Mr. Alf, but you're copied there as well, so was there

18   a conference call then to discuss this draft LOI?

19       A.      We did have another call with them on

20   Friday.

21       Q.      And what was said during that call?

22       A.      There's now a series of calls.  This is the

Glen Joerger - May 23, 2012

252

1    first time on this LOI on page 9879 that the

2    requirement for any operating lease is now pulled out

3    of the document, and so to further show that what I

4    just told you happened on Wednesday, in the paragraph

5    of aircraft price when we compare document to

6    document, it's now gone.  I go back and do some more

7    work on commitment language, so we have other -- we

8    further refine the discussions as we move forward.

9    This is also the first time, interestingly enough,

10   that we see this conglomeration Global BTG working

11   with GreenRock Capital.

12       Q.      And did you talk to Mr. Stukes about that,

13   about the name Global being in the document?

14       A.      My recollection was that we all believed

15   that this was some kind of special entity working with

16   GreenRock, Pearl, and it was called Global BTG.  We

17   had just seen a similar one in our dealings with the

18   Air France aircraft.

19       Q.      But do you recall any explanation from Mr.

20   Stukes about why the name Global is there when he had

21   been using the name Pearl in his letters?

22       A.      No.

Glen Joerger - May 23, 2012

253

1    Q.    Did you ask him about it?

2    A.    I don't remember specifically asking him

3    about it.

4    Q.    Did it matter to you as long as they could

5    deliver on what they were committing to do?

6    A.    Absolutely.  If I'd known way back when a

7    month earlier that we weren't dealing with Pearl

8    Aviation and we were dealing with a person that had no

9    affiliation with a lender that could have made this

10   happen, we would have never wasted our time and we

11   would have been with Goldman several weeks earlier and

12   most likely would have made that deal happen.  So the

13   fact that what was represented to us on multiple calls

14   and multiple e-mails was untrue was a severe impact.

15   Q.    Do you recall if there was anything in

16   writing at this time from National addressing this

17   issue of it being Global versus Pearl versus somebody

18   else?

19   A.    We don't know this issue yet.  That's the

20   problem.  At this point we don't -- we still don't

21   know.  We still think Pearl is involved in this.

22   Q.    Okay; this draft LOI that we're looking at,

Glen Joerger - May 23, 2012

264

1   reference to the operating lease?

2        A.      At this point there's no exclusivity,

3   there's no operating lease, there still is not yet the

4   commitment language for the firm commitment by

5   Thursday July 22nd.

6        Q.      Did you ever discuss these calls you've

7   been referencing with Mr. Hodges, where the

8   arrangement would be exclusive between --

9        A.      The arrangement is never exclusive.  He has

10  a period of time between the time the signing of the

11  LOI to get a firm commitment letter by Thursday July

12  26th.

13       Q.      My point -- my question is it did the issue

14  of exclusivity, did that word come up in your

15  conversations with him.

16       A.      Yes, sir.

17       Q.      Okay, and what was said about that?

18       A.      They wanted exclusivity.

19       Q.      And what did National say?

20       A.      No.

21       Q.      Was any further words said or was it just a

22  one-sentence request and denial?

Glen Joerger - May 23, 2012

265

1    A.    I'm sure it was more on both sides.  I'm
2  sure they said more than we want exclusivity and I'm
3  sure we said more than no, but that was the gist of
4  the conversation.
5    Q.    Do you recall in these discussions that --
6  whether in writing or -- writing or -- or in the
7  verbal discussions, that Mr. Hodges was going to walk
8  away from the deal if he didn't have exclusivity?
9    A.    No, I never sensed that.  I sensed that Mr.
10  Hodges wanted a deal and Mr. Hodges kept making
11  various offers the same way Mr. Stukes wanted to make
12  a deal, and we kept being adamant about what we wanted
13  and they slowly came around to what we were
14  requesting.
15    Q.    But do you ever recall Mr. Stukes
16  presenting you with essentially an ultimatum from --
17  from Mr. Hodges saying he has to have -- he has to be
18  exclusive?
19    A.    I get various ultimatums and I can remember
20  various ultimatums where he has to do capital leases,
21  -- operating leases.  Not capital leases, operating
22  leases, and that he can't do it unless he has

Glen Joerger - May 23, 2012

266

1  operating leases.  It's so common for folks in

2  negotiating sessions to say if I don't get this, I'm

3  walking away.  Then you go well, I'm not doing that.

4  They go well, hmm, okay, well, what if I do this?  And

5  so running across somebody in a negotiation who

6  insinuates they're going to walk away from a deal if

7  they don't get something is so common that you almost

8  get used to it.

9           MR. KULA:  Okay, let's mark as the next

10  exhibit, 110, an e-mail from Mr. Stukes to Mr. Alf and

11  copied to Mr. Joerger.  It's NAC010340 through 44.

12                          (Exhibit 110

13                           was marked for

14                           identification.)

15           BY MR. KULA:

16      Q.      Do you recall receiving this e-mail?

17      A.      Yes, sir.

18      Q.      And the second sentence says, "One issue is

19  they will not proceed on a nonexclusive basis.  That's

20  a nonstarter for them unfortunately."  Did you have

21  any follow-up discussion with Mr. Stukes in regard to

22  that point?

Glen Joerger - May 23, 2012

267

1    A.    Yes, sir.

2    Q.    And what was that discussion?

3    A.    We're not going to do exclusive.

4    Q.    And do you know whether he ever

5    communicated that to Mr. Hodges?

6    A.    I can only assume.

7    Q.    But did he ever tell you?

8    A.    He told us that he communicated everything

9    we told him.

10   Q.    Did you ever see anything in writing where

11   it's being communicated to Mr. Hodges that the deal's

12   nonexclusive?

13   A.    The LOI.

14   Q.    Does it say it's nonexclusive?

15   A.    In my perspective, it does.

16   Q.    Do you know -- did it use those words, did

17   you ever see these words in it?

18   A.    They wanted to put it in.  They drafted it.

19   We told them we would not accept it.  They never put

20   the wording in that it was exclusive.  So they kept

21   saying we want it.  We kept saying if you put it in,

22   we're not accepting it, and they never put it in.

Glen Joerger - May 23, 2012

273

1          BY MR. KULA:

2      Q.     Do you recall this -- receiving this

3  version?

4      A.     Yes, sir.  I didn't receive it.  I sent it.

5      Q.     Excuse me, sending this version.  Well, you

6  received it from Mr. Stukes and you sent it on to Mr.

7  Alf?  Is that what happened?

8      A.     Yes, sir.

9      Q.     And you're telling Mr. Alf in your e-mail,

10 "This is what we agreed to, and we've noted there are

11 several get out clauses.  If you're comfortable,

12 recommend you sign".  And the version attached here,

13 if you look at that page, what is essentially page 2

14 of the LOI, but here it's Bates number 7821, it does

15 not include the language that was in the draft you

16 sent back, which was Exhibit 109.  Do you see that?

17     A.     I do, yes, sir.  Nor is there any language

18 that says it's exclusive, which is what they asked

19 for.  They drafted it on more than three occasions.

20 This is the third draft and there is no exclusivity

21 language inserted, so yes, I do note it both.

22     Q.     And so that -- so National was agreeable to

Glen Joerger - May 23, 2012

274

1    this version of the LOI that did not have that

2    language that you had requested be inserted in Exhibit

3    109, that is, language below the box referencing the

4    aircraft.

5        A.    This was acceptable to us because it did

6    not have operating lease requirements and it did not

7    have a requirement for exclusivity and it did have a

8    commitment that they would provide firm commitment

9    letters by Thursday July 22nd.  That's why it was

10   acceptable to us.

11       Q.    Okay, let's look at page 7826.  You

12   referenced previously that you had left a placeholder

13   in your draft for commitment, and they had instead put

14   the word "other" sort of as the subtitle and put

15   language there.  If you look at page 7826, that's

16   where you're referring to where it says "other"?

17       A.    Yes.

18       Q.    It says, "The parties agree that Global

19   will use its best efforts to deliver to National on or

20   before Thursday July 22nd, 2010 an MOU from a

21   qualified lender to provide capital to purchase

22   aircraft under a loan" slash, "and/or finance lease."

Glen Joerger - May 23, 2012

275

1    That's the language that National agreed to, correct?

2        A.    That's the language that they drafted and

3    that we agreed to.

4        Q.    And this language as written here

5    accurately reflects what you understood the parties

6    were agreeing to do.

7        A.    This language reflects that we believed

8    that prior to Thursday July 22nd, that Global would

9    deliver to us commitment letters from qualified

10   lenders to purchase aircraft under a loan or finance

11   lease.

12       Q.    It says would use best efforts to deliver.

13   What do you understand best efforts to mean?

14            MR. RICHMOND:  I'll object only to the

15   extent, Counsel, you and I both know there's a whole

16   body of law developed on what that term might or might

17   not mean.  This man's not a lawyer, but to the extent

18   he can answer, go ahead.

19       A.    And I know nothing about that body of law.

20   What I do know is that we were talking at the last

21   minute and their promises that we can do it, we can do

22   it, we can do it softened at the last in the Saturday

Glen Joerger - May 23, 2012

276

1   conversations to like well, you know, we can't do it

2   today, but if you give us this letter, we can do it

3   between now and Thursday.  So today we can't do it,

4   but we can do it by Thursday.  So this is their

5   language as they crafted it to come up with that

6   concept.

7        Q.     Well, putting aside the legal meaning,

8   because I understand you're not a lawyer and you

9   wouldn't know and I don't know all the body of law on

10   best efforts, but you hear the term "best efforts,"

11   what do you -- what do you understand that to mean?

12        A.     I understand that promises that they made,

13   and so what I was inferring to this is the promises

14   that are being made on the phone call, we can get this

15   done, we've got soft commitments, we've got all these

16   -- soft commitments already, they're ready to go.  All

17   we need -- you give us this letter and you sign this

18   and we'll have the firm commitments by Thursday of

19   next week, because we say you don't have it by

20   Thursday of next week.  Can you do it by Thursday?

21   Absolutely, we can do it by Thursday but you got to

22   sign this so we can go to the market.  The market

Henderson Legal Services, Inc.

EXHIBIT 1
Page 49

Glen Joerger - May 23, 2012

277

1   doesn't know that we're working on your behalf until

2   we get this letter, but once we get this letter, we'll

3   have those firmed up by Thursday of next week.

4        Q.    When you say this letter, you're referring

5   to what we've marked as part of Exhibit 111?

6        A.    I'm referring to this letter of intent.

7        Q.    And you understand the letter of intent to

8   be binding, correct?

9        A.    The letter of intent would be binding under

10  certain precise conditions.

11       Q.    Well, let's look at the last page of it,

12  realizing this is not a signature copy, but you know,

13  I think the record will reflect it's identical to the

14  signature copy.  The last paragraph says, "This letter

15  of intent is intended as a binding agreement between

16  the lessor and lessee, who will act in good faith to

17  implement provisions hereof to complete the

18  contemplated transactions and to negotiate, execute

19  and deliver all necessary and appropriate leases and

20  other agreements in the form or substance consistent

21  with industry standards in a timely manner," period.

22  That's language that National will agreed to, correct?

Glen Joerger - May 23, 2012

278

1      A.      It is National, that they drafted and that

2    we signed, including the other conditions precedents

3    and the other clauses throughout the rest of the

4    agreement, yes.

5      Q.      But when you signed this, you signed this

6    on behalf of National, correct?

7      A.      Yes, sir.

8      Q.      You and the company intended it to be

9    binding, correct?

10     A.      We intended that if Global, the entity,

11   consisting of whoever their partners were, if they

12   could go out by Thursday July 22nd and get a

13   commitment from a qualified lender with funds that

14   would be able to provide capital to purchase these

15   aircrafts so we could show this commitment letter to

16   JAL and if it was on mutually satisfactory terms as

17   outlined in the condition precedent, along with all

18   the other conditions precedent, along with all the

19   other clauses in the agreement because there's a lot

20   of very vague and open ended, if all of that was true,

21   then yes, this would be binding.  However, on Thursday

22   July 22nd they did not have what they promised to

Glen Joerger - May 23, 2012

279

1    provide, but had they, along with everything else, it
2    would have been binding in our opinion.  That's what
3    was represented to us.
4        Q.    Well, going back a page, isn't what they
5    agreed to was use their best efforts to do that?
6            MR. RICHMOND:  Objection.  You've asked him
7    and answered.
8        A.    What they told us they would do is they
9    would firm up their soft commitments by Thursday July
10   22nd and provide a firm commitment of funds from a
11   qualified lender under a lease or a loan so that we
12   could provide it to JAL.  This was not open ended.
13   This was not to go to July 23rd, 24th, 25th.  It was
14   put in July 22nd, not maybe, not maybe you can, maybe
15   you can't.  July 22nd, firm commitment letter, because
16   if not, we're going to go to Goldman.
17       Q.    Mr. Joerger, in internal discussions, that
18   is, at National and with Mr. Stukes, did you not
19   express that at one point you did not want a best
20   efforts contract, a best efforts agreement with --
21   with Mr. Hodges?
22       A.    We discussed that we cannot have a best

Glen Joerger - May 23, 2012

280

1    efforts letter.  We cannot have a letter that says

2    we're going to try.  We need a firm commitment letter

3    from a qualified institution that says they have

4    funds, which is what this says.

5         Q.    But then National did agree to this letter

6    of intent that has the best efforts language in it.

7         A.    No.

8              MR. RICHMOND:  Just objection.  I think

9    you've asked the question three or four times and it's

10   been answered, and Counsel, I want to ask you, it's

11   almost 5:00.  We came here eight hours ago and we took

12   a one-hour lunch, so what are your intentions?  How

13   much longer do you have, what would you like to do?

14             MR. KULA:  Well, I'd have to consult.  I

15   think we have approximately another hour of time for

16   this deposition.

17             MR. RICHMOND:  I think not.

18             MR. KULA:  I think we do.

19             MR. RICHMOND:  Is that your intention, to

20   go another hour?

21             MR. KULA:  Yes.

22             MR. RICHMOND:  Well, we're not staying an

Glen Joerger - May 23, 2012

285

1    Pearl ever presenting us a commitment letter from a

2    qualified lender to meet the requirements of the

3    purchase of this aircraft, so when you say MOU, you've

4    now introduced another term.  It is in this.  It's the

5    term they used.  It's not a term we generally use, so

6    we use term sheet, we use LOI, like you saw that many

7    other letters.  So they introduce a new term, MOU,

8    okay.  So are you asking did they ever present us a

9    term sheet, did they ever present us a firm commitment

10   lender from an institution that has capital?  I don't

11   know what you're asking me.

12       Q.    But in your -- in National's mind, Mr.

13   Hodges and Global failed to deliver a letter that they

14   believed was promised, correct?

15       A.    Yes, sir.

16       Q.    So what happened after that in regard to

17   financing?  What did National do?

18       A.    National went with Goldman.  We eventually

19   went with another institution that provided us the

20   funding for three of our 747s.  We also get funding

21   from Wells Fargo that we purchased four 757s, along

22   with company cash in both deals.

Glen Joerger - May 23, 2012

286

1    Q.    And ultimately JAL was prepared to proceed
2  with the transaction, correct?
3    A.    Ultimately National and JAL were prepared
4  to proceed at some point, but we never got consummated
5  agreements.
6    Q.    And why is that?
7    A.    There were some technical issues as well as
8  the guaranties that they wanted.  They wanted personal
9  guaranties.
10    Q.    And did National make a decision that from
11  a business standpoint, that they simply did not want
12  that many planes at that point in time?
13    A.    No, National decided that based on the
14  technical conditions of the aircraft and based on the
15  requirement for a personal guaranty, that they were
16  not going to proceed, which is not to say that there
17  weren't some people in the company that had expressed
18  concerns, but that was not the reason.
19    Q.    And when National informed JAL of that, did
20  JAL indicate that it very much wanted Global to still
21  proceed?
22    A.    Global?

Glen Joerger - May 23, 2012

288

1   what they promised to produce in a timely manner, we

2   still may have gone through with the deal because it

3   would have taken one of the variables of the deal, of

4   the two reasons why we pulled.

5        Q.    You say you may have.  You just don't know?

6        A.    I can speculate all day long, but I'm one

7   member of the board of directors, and we didn't sit

8   around as a board of directors and speculate a lot of

9   what-ifs.

10            MR. KULA:  Okay, let's mark as Exhibit 112,

11   it's an e-mail, July 22nd, 2010 from Mr. Alf to Mr.

12   Joerger.  It's forwarded -- but it's forwarded to Mr.

13   Stukes, that includes a document from Global BTG.

14                          (Exhibit 112

15                           was marked for

16                           identification.)

17            BY MR. KULA:

18        Q.    Do you recall this e-mail and the

19   attachment, Mr. Joerger?

20        A.    Yes, sir.

21        Q.    And the letter attached was presented by

22   Mr. Hodges to National?

Glen Joerger - May 23, 2012

289

1      A.      I believe it was presented by Mr. Hodges to

2  Mr. Stukes, who presented it to National.

3      Q.      And did National find this not to be

4  satisfactory relative to the LOI and the, as you said,

5  commitment language?

6      A.      Yes, sir, this is not satisfactory.

7      Q.      And why was it not satisfactory?

8      A.      Can I have a copy of the LOI back?  I have

9  it right here.  No, I don't.  You pulled it out.  You

10  pulled out the other language out of this so --

11  because it doesn't meet the wording.  Mr. Hodges is

12  not a qualified lender.  He doesn't have funds, he

13  can't provide the commitment, and he didn't do it by

14  Thursday July 22nd, so all of those conditions of what

15  he needed to provide specifically from that letter of

16  intent, he doesn't meet it.  He's not it.  He's not a

17  qualified lender, so start first thing.  It had to be

18  from a qualified lender.  He's not.  He doesn't agree

19  to provide capital for this aircraft under a loan or

20  finance lease, so no, he doesn't meet it.

21      Q.      Now, did anyone communicate back to Mr.

22  Hodges that this letter was not sufficient?

Glen Joerger - May 23, 2012

297

1          THE VIDEOGRAPHER:  This is the end of Tape

2   5 in the videotaped deposition of Glen Joerger.  We

3   are off the record at 5:17.

4               (Recessed at 5:17 p.m.)

5               (Reconvened at 5:22 p.m.)

6          THE VIDEOGRAPHER:  Here begins Tape 6 in

7   the videotaped deposition of Glen Joerger.  We are

8   back on the record at 5:22.

9          BY MR. KULA:

10     Q.     Mr. Joerger, is it your view that Mr.

11  Hodges' actions damaged National relative to the Air

12  France deal, the deal to acquire Air France airplanes?

13     A.     I think it caused us to have to go after in

14  a very short time period a hedge fund where we paid a

15  higher interest rate.

16     Q.     Was not National pursuing that in an event?

17  Wasn't that in the works?

18     A.     We had never pursued BlackRock until after

19  July 22nd.

20     Q.     Mr. -- the commitment letter that you've

21  testified to that was sought you said by JAL, that had

22  nothing to do with Air France, correct, the Air France

Glen Joerger - May 23, 2012

298

1    deal?

2        A.     No, sir.

3        Q.     And after the July 22nd date you've

4    testified to, did not Mr. Hodges, perhaps through Mr.

5    Stukes, indicate that it they would still be able to

6    provide financing or seek financing for the Air France

7    deal?

8        A.     Mr. Hodges made a lot of promises.

9        Q.     But there was no -- no further working with

10   Mr. Hodges at that point, correct?  You stopped

11   working with him?

12       A.     I don't know about working.  We continued

13   to communicate with him.

14       Q.     But --

15       A.     I don't believe he was working on our

16   behalf.  If he was, we had told him not to work on our

17   behalf.  What he actually did or did not do I am not

18   aware of.

19       Q.     But -- at least in your mind, how was the

20   company damaged by the company having to use this, as

21   you said, BlackRock for Air France based on what Mr.

22   Hodges did?

Glen Joerger - May 23, 2012

299

1     A.     If we had -- we took our foot off the gas

2   when we signed that LOI on Saturday into Sunday and he

3   started on Sunday, and we took our foot off the gas to

4   allow him the opportunity to have the best chance of

5   success, because that's what he asked us to do.  We

6   didn't give him exclusivity, but we were trying to

7   good faith give him every opportunity for success on

8   the myriad of things that he promised us.  And so in

9   taking our foot off the gas, we then shortened our

10  potential time frame that we had to work with

11  qualified lenders to get a better interest rate.

12    Q.     How many days did you take your foot off

13  the gas?

14    A.     From Saturday through Thursday July 22nd.

15    Q.     Did you stop working with Goldman during

16  that time?

17    A.     We stopped having active -- we didn't

18  actually -- Goldman didn't work on our behalf until

19  July 23rd when we signed a mandate.  Goldman will not

20  work on your behalf until you sign that mandate letter

21  with them.

22    Q.     Did you stop having discussions with

Glen Joerger - May 23, 2012

300

1  Goldman during that time?

2      A.     We had to have discussions -- we never had

3  discussions about the market.  We never had

4  discussions about qualified lenders, we never had

5  discussions on potential people that we could do

6  something.  We let our foot off the gas for that

7  period of time to allow Global to have the most

8  opportunities for success, so yes, we gave up those

9  days.

10     Q.     But you're not -- you're not saying --

11 well, did -- so you're saying that you acted -- you

12 being National acted in some fashion different than

13 you otherwise would have acted with Global -- with

14 Goldman based on the signing of the LOI with -- with

15 Global?

16     A.     We would have probably signed the Goldman a

17 week earlier.

18     Q.     No, what I meant is the discussions you had

19 with Goldman during this time, the communications you

20 had with Goldman were different than they otherwise

21 would have if you had not signed the LOI with Mr.

22 Hodges?

EXHIBIT 1
Page 59

Glen Joerger - May 23, 2012

308

1       CERTIFICATE OF DEPONENT

2           I have read and examined the foregoing 306

3   pages and find the answers contained therein with

4   changes made by me, if any, to be true and correct.

5

6                              _____

7                              Signature of the Witness

8

9           Subscribed and sworn to before me this

10  _____ day of_____, 20___.

11

12

13                          _____

14                          Notary Public in and for

15                          _____

16

17  My Commission Expires _____.

18

19

20

21

22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

EXHIBIT 1
Page 60

```
 1   UNITED STATES OF AMERICA  )

 2                               ss:

 3   DISTRICT OF COLUMBIA        )

 4          I, KAREN C. YOUNG, a Notary Public within

 5   and for the District of Columbia, do hereby certify

 6   that the witness whose deposition is hereinbefore set

 7   forth was duly sworn and that the within transcript is

 8   a true record of the testimony given by such witness.

 9          I further certify that I am not related to

10   any of the parties to this action by blood or marriage

11   and that I am in no way interested in the outcome of

12   this matter.

13          IN WITNESS WHEREOF, I have hereunto set my

14   hand this _____ day of _____, 20__.

15

16

17              Karen Young

18

19   My Commission Expires:

20   July 31, 2014

21

22
```

EXHIBIT 1
Page 61

**EXHIBIT 2**

# In The Matter Of:

*GLOBAL BTG, LLC*
*v.*
*NATIONAL AIR CARGO*

---

*HODGES, JACOB S. - Vol. 1*
*May 31, 2012*

---

**MERRILL CORPORATION**
LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

EXHIBIT 2
Page 62

JACOB S. HODGES - 5/31/2012

Page 43

| | | |
|---|---|---|
| 1 | that I raised $1 billion in debt financing, as I | 10:16:53 |
| 2 | already said, that I called upon my banks, my | 10:16:57 |
| 3 | contacts, my relationships in the market to solicit | 10:16:59 |
| 4 | from them financing either by issuing an RFP, a | 10:17:06 |
| 5 | request for proposal, or by talking to them about a | 10:17:10 |
| 6 | transaction or a scenario, be it a line of credit | 10:17:13 |
| 7 | that we were in the market for, desired to obtain a | 10:17:16 |
| 8 | line of credit to acquire credit, a warehouse line, | 10:17:20 |
| 9 | if you will. | 10:17:24 |
| 10 | It involves calling on those banks, | 10:17:25 |
| 11 | educating them on the desired structure, whichever | 10:17:27 |
| 12 | it may be, a term loan, a line of credit, finance | 10:17:30 |
| 13 | lease, operating lease; requesting that they provide | 10:17:34 |
| 14 | funds or provide or show expressions of interest -- | 10:17:37 |
| 15 | a commitment letter, a term sheet proposal -- to | 10:17:40 |
| 16 | support us in that activity.  That all encompasses | 10:17:42 |
| 17 | raising financing. | 10:17:48 |
| 18 | Q.   But let's say money never flowed.  You got | 10:17:49 |
| 19 | all these things in place that you just described, | 10:17:52 |
| 20 | but actually, then, the deal never closed and money | 10:17:55 |
| 21 | never flowed. | 10:17:58 |
| 22 | Would you still consider that raising the | 10:17:59 |
| 23 | financing? | 10:18:02 |
| 24 | A.   If commitment letters have been issued, if | 10:18:02 |
| 25 | term sheets had been provided, if proposals were | 10:18:06 |

JACOB S. HODGES - 5/31/2012

| | | |
|---|---|---|
| 1 | received, those are hard indications that that bank | 10:18:09 |
| 2 | is committed to financing that project. | 10:18:14 |
| 3 |     Q.   If the money never flowed at the end of the | 10:18:17 |
| 4 | day, do you count that in your definition of raising | 10:18:20 |
| 5 | debt financing? | 10:18:24 |
| 6 |     A.   I think raising debt financing is a process | 10:18:25 |
| 7 | of doing all of the above.  Receiving a commitment | 10:18:31 |
| 8 | letter is to have raised financing.  A term sheet, a | 10:18:34 |
| 9 | proposal, I raised that financing, yes. | 10:18:39 |
| 10 |     Q.   When you were at BCI, did you work directly | 10:18:45 |
| 11 | with legal? | 10:18:48 |
| 12 |     A.   Yes. | 10:18:48 |
| 13 |     Q.   Who was legal? | 10:18:49 |
| 14 |     A.   That was -- primarily we had in-house | 10:18:50 |
| 15 | counsel and we had outhouse -- | 10:18:52 |
| 16 |         MR. SMITH:  Yes, we have been called that | 10:18:56 |
| 17 | before. | 10:18:58 |
| 18 |         THE WITNESS:  They certainly were not that. | 10:19:00 |
| 19 | They were very, very good.  Rothgerber Johnson & | 10:19:01 |
| 20 | Lyons was outside counsel.  T.D. Butzbaugh was | 10:19:07 |
| 21 | general counsel. | 10:19:11 |
| 22 | BY MR. RICHMOND: | 10:19:12 |
| 23 |     Q.   And you worked directly with those two | 10:19:12 |
| 24 | gentlemen? | 10:19:15 |
| 25 |     A.   Yes, I did. | 10:19:15 |

EXHIBIT 2
Page 64

JACOB S. HODGES – 5/31/2012

| | | |
|---|---|---|
| 1 | Q. What did you do with them? | 10:19:16 |
| 2 | A. They were very involved. Outside counsel | 10:19:18 |
| 3 | was acting as general counsel for the company. I | 10:19:22 |
| 4 | didn't so much interact with them in that capacity. | 10:19:26 |
| 5 | I primarily interacted with them on transactions. | 10:19:28 |
| 6 | Q. In what way? | 10:19:31 |
| 7 | A. On -- primarily on two fronts: one with | 10:19:33 |
| 8 | negotiating loan documentation; secondly with | 10:19:38 |
| 9 | negotiating -- or involvement with closing the | 10:19:42 |
| 10 | transaction, which involved consummating the lease | 10:19:45 |
| 11 | agreement and so forth. | 10:19:50 |
| 12 | Q. If I told you that at the time you joined | 10:19:56 |
| 13 | BCI it had total assets of $541 million, | 10:20:00 |
| 14 | approximately, would that sound right to you? | 10:20:04 |
| 15 | A. No. | 10:20:07 |
| 16 | Q. What do you think the assets were of BCI | 10:20:09 |
| 17 | Aircraft Leasing group as of December 31, 2004? | 10:20:13 |
| 18 | MR. SMITH: If you know. | 10:20:17 |
| 19 | THE WITNESS: I don't know. I don't recall | 10:20:18 |
| 20 | exactly. I believe they were closer to 400 million. | 10:20:19 |
| 21 | BY MR. RICHMOND: | 10:20:23 |
| 22 | Q. What are you basing that on? | 10:20:23 |
| 23 | A. Just recollection of financial statements | 10:20:25 |
| 24 | at that time, but not knowing the exact number. | 10:20:30 |
| 25 | Q. And at BCI's peak, if you know -- in other | 10:20:34 |

EXHIBIT 2
Page 65

JACOB S. HODGES - 5/31/2012

Page 69

| | | |
|---|---|---|
| 1 | A.   I was unaware of Brian Hollnagel's | 10:49:31 |
| 2 | involvement in Pearl. | 10:49:34 |
| 3 | Q.   You've raised the name Pearl.  We were just | 10:49:35 |
| 4 | talking about BCI. | 10:49:38 |
| 5 | Who is Pearl? | 10:49:41 |
| 6 | A.   You asked if I had gone on a road show at | 10:49:42 |
| 7 | that point in time -- | 10:49:47 |
| 8 | Q.   Correct. | 10:49:47 |
| 9 | A.   -- with Mr. Gunnar Sachs. | 10:49:48 |
| 10 | Q.   Yes. | 10:49:50 |
| 11 | A.   I understood Mr. Gunnar Sachs to be | 10:49:51 |
| 12 | associated with Pearl. | 10:49:54 |
| 13 | Q.   Were you associated with Pearl at that | 10:49:55 |
| 14 | time? | 10:49:58 |
| 15 | A.   I was considering being associated with | 10:49:58 |
| 16 | Pearl. | 10:50:01 |
| 17 | Q.   But you were not then associated with | 10:50:03 |
| 18 | Pearl? | 10:50:05 |
| 19 | A.   No. | 10:50:05 |
| 20 | Q.   And you were not then associated with BCI? | 10:50:06 |
| 21 | A.   That's correct. | 10:50:09 |
| 22 | Q.   You were just on your own? | 10:50:09 |
| 23 | A.   Free agent. | 10:50:11 |
| 24 | Q.   What was the purpose of the road show? | 10:50:12 |

EXHIBIT 2

Page 65- A

JACOB S. HODGES - 5/31/2012

Page 81

| | | |
|---|---|---|
| 1 | litigation? | 11:02:06 |
| 2 | MR. SMITH:  Other than as directed by your | 11:02:07 |
| 3 | attorneys. | 11:02:10 |
| 4 | THE WITNESS:  I don't know that I did | 11:02:11 |
| 5 | personally.  I don't know that that was my | 11:02:12 |
| 6 | responsibility to do that.  I believe that the | 11:02:15 |
| 7 | attorneys and others were in process of obtaining | 11:02:18 |
| 8 | all that information.  I may have.  I don't recall | 11:02:23 |
| 9 | if I did specifically or not. | 11:02:25 |
| 10 | BY MR. RICHMOND: | 11:02:29 |
| 11 | Q.   Where is Global physically located? | 11:02:50 |
| 12 | A.   Global BTG is a Los Angeles-centered | 11:03:04 |
| 13 | company. | 11:03:09 |
| 14 | Q.   Where is Global physically located? | 11:03:09 |
| 15 | A.   It's a Nevada-registered LLC. | 11:03:15 |
| 16 | Q.   Where is Global physically located? | 11:03:18 |
| 17 | A.   Global BTG is here in Los Angeles.  It's | 11:03:20 |
| 18 | with me.  I live and reside in Camarillo. | 11:03:23 |
| 19 | Q.   So Global BTG is in Camarillo? | 11:03:27 |
| 20 | A.   Yes.  As it pertains to my role within that | 11:03:31 |
| 21 | company, yes. | 11:03:36 |
| 22 | Q.   Does it reside somewhere else? | 11:03:37 |
| 23 | A.   Well, Global BTG actually is like many | 11:03:39 |
| 24 | companies.  It has -- and especially in aircraft | 11:03:44 |
| 25 | finance, it has people in various different places | 11:03:48 |

JACOB S. HODGES - 5/31/2012

Page 82

| | | |
|---|---|---|
| 1 | that render services to it.  So one could answer | 11:03:51 |
| 2 | that question that it's also in various locations | 11:03:54 |
| 3 | that they are in. | 11:03:58 |
| 4 | MR. SMITH:  And I will object belatedly to | 11:04:00 |
| 5 | the extent it calls for a legal conclusion. | 11:04:02 |
| 6 | BY MR. RICHMOND: | 11:04:04 |
| 7 | Q.  Global doesn't have any facility or | 11:04:05 |
| 8 | anything at 5482 Wilshire Boulevard in Los Angeles, | 11:04:07 |
| 9 | does it? | 11:04:11 |
| 10 | A.  No.  That's a P.O. box. | 11:04:11 |
| 11 | Q.  And are you saying you considered Camarillo | 11:04:17 |
| 12 | to be part of Los Angeles? | 11:04:21 |
| 13 | A.  I don't necessarily.  I think it's part of | 11:04:23 |
| 14 | the greater Los Angeles.  It's a way to -- for | 11:04:26 |
| 15 | people outside of the area -- nobody knows where | 11:04:28 |
| 16 | Camarillo is.  They associate everything with | 11:04:31 |
| 17 | Southern California as being Los Angeles. | 11:04:35 |
| 18 | Q.  You think people associate everything with | 11:04:36 |
| 19 | Southern California as being Los Angeles? | 11:04:39 |
| 20 | A.  With the exception of San Diego. | 11:04:40 |
| 21 | Q.  Orange County? | 11:04:43 |
| 22 | A.  Yes. | 11:04:43 |
| 23 | Q.  You think -- who -- let me ask it a | 11:04:44 |
| 24 | different way. | 11:04:48 |
| 25 | Your view is that people consider Orange | 11:04:49 |

JACOB S. HODGES - 5/31/2012

Page 91

| | | | |
|---|---|---|---|
| 1 | Q. | In its own name? | 11:13:57 |
| 2 | A. | Yes. | 11:13:59 |
| 3 | Q. | Where is that bank account? | 11:13:59 |
| 4 | A. | It's here in Los Angeles. | 11:14:00 |
| 5 | Q. | Where? | 11:14:02 |
| 6 | A. | Bank of America. | 11:14:02 |
| 7 | Q. | Which branch? | 11:14:03 |
| 8 | A. | Thousand Oaks branch. | 11:14:05 |
| 9 | Q. | What street is that on?  Do you know? | 11:14:08 |

10    A.    No.  It's the branch next to the Thousand     11:14:12

11    Oaks mall, whichever street that is.     11:14:16

12    Q.    Is Global BTG, LLC, capitalized?     11:14:18

13    A.    The full name?     11:14:23

14    Q.    No.  I am sorry.  I meant in terms of     11:14:24

15    money.     11:14:27

16          Does Global BTG, LLC, have any capital     11:14:27

17    invested in it, any money?     11:14:33

18    A.    No.  Outside of what I put into it, no.     11:14:35

19    Q.    What have you put into it?     11:14:37

20    A.    I have made deposits into the accounts.     11:14:39

21    Q.    When you say you have made deposits into     11:14:41

22    the accounts, where has that money come from?     11:14:44

23    A.    Personal money.     11:14:46

24    Q.    How much?     11:14:47

25    A.    I don't recall exactly.     11:14:48

JACOB S. HODGES — 5/31/2012

Page 92

| | | |
|---|---|---|
| 1 | Q.   Less than $10,000? | 11:14:51 |
| 2 | A.   I don't recall.  I would have to look at | 11:14:53 |
| 3 | the formation agreement. | 11:14:56 |
| 4 | Q.   Less than $25,000? | 11:14:58 |
| 5 | A.   Probably. | 11:15:00 |
| 6 | Q.   Does Global BTG, LLC, have any employees? | 11:15:02 |
| 7 | A.   No. | 11:15:06 |
| 8 | Q.   When you do Global BTG, LLC's work up in | 11:15:07 |
| 9 | Camarillo, am I correct that you do that work in | 11:15:11 |
| 10 | your home? | 11:15:14 |
| 11 | A.   I have a home office. | 11:15:14 |
| 12 | Q.   And that's where the work for Global BTG, | 11:15:17 |
| 13 | LLC, is done when you are doing the work, in | 11:15:21 |
| 14 | Camarillo? | 11:15:23 |
| 15 | A.   When I am doing it in Camarillo, yes. | 11:15:24 |
| 16 | MR. SMITH:  Rick, we have been going about | 11:15:26 |
| 17 | an hour and a half, when you find a good time. | 11:15:29 |
| 18 | MR. RICHMOND:  This is perfectly fine. | 11:15:32 |
| 19 | Whenever you want. | |
| 20 | MR. SMITH:  Great. | 11:15:34 |
| 21 | THE VIDEOGRAPHER:  This marks the end of | 11:15:34 |
| 22 | Tape Number 1 in the deposition of Jacob Hodges, | 11:15:36 |
| 23 | Volume I. | 11:15:42 |
| 24 | We are off the record.  It's 11:15. | 11:15:42 |
| 25 | (Recess.) | 11:15:44 |

JACOB S. HODGES - 5/31/2012

Page 94

| | | |
|---|---|---|
| 1 | A.   He is a web designer.   Software programmer. | 11:26:57 |
| 2 | Q.   How did you know him? | 11:27:04 |
| 3 | A.   He lives in Camarillo. | 11:27:08 |
| 4 | Q.   Your E-mail to Chris, third paragraph, you | 11:27:11 |
| 5 | say (Reading): | 11:27:15 |
| 6 | "I am a managing director of the three | 11:27:15 |
| 7 | below companies." | 11:27:17 |
| 8 | Do you see that? | 11:27:18 |
| 9 | A.   I do. | 11:27:19 |
| 10 | Q.   On May 13, 2010, were you a managing | 11:27:20 |
| 11 | director of BCI Aircraft? | 11:27:23 |
| 12 | A.   Yes. | 11:27:25 |
| 13 | Q.   On May 13, 2010, were you a managing | 11:27:26 |
| 14 | director of Pearl Aircraft? | 11:27:30 |
| 15 | A.   No. | 11:27:31 |
| 16 | Q.   On May 13, 2010, were you a managing | 11:27:32 |
| 17 | director of Genesis Custom Jetliners? | 11:27:35 |
| 18 | A.   No.  I didn't hold that title there. | 11:27:41 |
| 19 | MR. RICHMOND:  Let me have marked as | 11:27:52 |
| 20 | Exhibit 353 a document with the Bates Numbers GLOBAL | 11:27:54 |
| 21 | 009837 through 009838. | 11:28:03 |
| 22 | (Deposition Exhibit 353 was marked for | |
| 23 | identification.) | 11:28:27 |
| 24 | BY MR. RICHMOND: | 11:28:27 |
| 25 | Q.   Mr. Hodges, the court reporter has handed | 11:28:28 |

JACOB S. HODGES - 5/31/2012

Page 95

| | | |
|---|---|---|
| 1 | you what has been marked as Exhibit 353.  I will ask | 11:28:30 |
| 2 | you to look at that for a minute. | 11:28:35 |
| 3 | A.   Okay. | 11:28:57 |
| 4 | Q.   Have you had a chance to look at that | 11:28:59 |
| 5 | exhibit? | 11:29:00 |
| 6 | A.   Yes.  Briefly. | 11:29:02 |
| 7 | Q.   You are having an E-mail exchange with | 11:29:04 |
| 8 | somebody named Clive Bowen. | 11:29:07 |
| 9 | Do you see that? | 11:29:11 |
| 10 | A.   I do. | 11:29:11 |
| 11 | Q.   Is Clive Bowen somebody who worked at | 11:29:11 |
| 12 | Guggenheim? | 11:29:14 |
| 13 | A.   Yes.  In the London office. | 11:29:14 |
| 14 | Q.   On the second page of the exhibit, which is | 11:29:16 |
| 15 | 009838, you sign yourself as Jacob Hodges, Pearl | 11:29:19 |
| 16 | Aircraft Corporation Limited. | 11:29:26 |
| 17 | Do you see that? | 11:29:26 |
| 18 | A.   I do. | 11:29:27 |
| 19 | Q.   At that time, which was May 27, 2010, you | 11:29:28 |
| 20 | did not hold any position at Pearl Aircraft | 11:29:34 |
| 21 | Corporation Limited; correct? | 11:29:38 |
| 22 | A.   No, I did not. | 11:29:39 |
| 23 | Q.   And am I also correct that as of May 27, | 11:29:41 |
| 24 | 2010, to your knowledge, Pearl Aircraft Corporation | 11:29:45 |
| 25 | Limited did not have a Los Angeles office? | 11:29:51 |

JACOB S. HODGES — 5/31/2012

Page 97

| | | |
|---|---|---|
| 1 | Papayanis had a role here in Thousand Oaks, which, | 11:31:06 |
| 2 | for BCI's purposes, Thousand Oaks was referred to as | 11:31:09 |
| 3 | Los Angeles.  It was referred to as the Los Angeles | 11:31:14 |
| 4 | office. | 11:31:16 |
| 5 | Q.   As of May 27, 2010, did you have any | 11:31:23 |
| 6 | relationship with Pearl Aircraft Corporation | 11:31:27 |
| 7 | Limited? | 11:31:32 |
| 8 | A.   Any relationship with them?  I did some | 11:31:35 |
| 9 | work for Pearl Aircraft at that point as directed by | 11:31:42 |
| 10 | BCI. | 11:31:45 |
| 11 | Q.   What was that work? | 11:31:46 |
| 12 | A.   As I mentioned, I was involved in assisting | 11:31:49 |
| 13 | with the creation of the business plan, strategy, | 11:31:52 |
| 14 | projections, performance.  May have had an | 11:31:55 |
| 15 | involvement in assisting with the Web site, | 11:32:00 |
| 16 | providing content for the Web site. | 11:32:04 |
| 17 | Q.   But as of May 27, 2010, you didn't have any | 11:32:07 |
| 18 | relationship with Pearl Aircraft Corporation Limited | 11:32:17 |
| 19 | such as employee or director or executive or | 11:32:20 |
| 20 | anything like that, did you? | 11:32:26 |
| 21 | A.   No.  I was not employed by the company. | 11:32:26 |
| 22 | MR. RICHMOND:  Let me have marked as | 11:32:37 |
| 23 | Exhibit 354 a document which is a printout from | 11:32:39 |
| 24 | Pearl Aircraft Corporation Limited's Web site.  And | 11:32:48 |
| 25 | this was printed from the Wayback Machine.  I don't | 11:32:54 |

JACOB S. HODGES - 5/31/2012

Page 104

| | | |
|---|---|---|
| 1 | contracted by them. | 11:41:59 |
| 2 | BY MR. RICHMOND: | 11:42:01 |
| 3 |    Q.   Did you understand Mr. Stukes to speak on | 11:42:01 |
| 4 | behalf of National Air Cargo in any way that was | 11:42:05 |
| 5 | binding on them at National Air Cargo? | 11:42:09 |
| 6 |       MR. SMITH:  Same objection. | 11:42:13 |
| 7 |       THE WITNESS:  I wasn't privileged to the | 11:42:14 |
| 8 | agreement that he had in place with National Air | 11:42:16 |
| 9 | Cargo, but I understood that he had -- I understand | 11:42:19 |
| 10 | these roles and relationships and that he was | 11:42:23 |
| 11 | seeking to obtain financing and playing a very vital | 11:42:25 |
| 12 | role within that company. | 11:42:29 |
| 13 | BY MR. RICHMOND: | 11:42:32 |
| 14 |    Q.   Did you understand that if Mr. Stukes spoke | 11:42:33 |
| 15 | purportedly on behalf of National Air Cargo, that he | 11:42:38 |
| 16 | really was speaking on behalf of National Air Cargo, | 11:42:42 |
| 17 | your point of view? | 11:42:45 |
| 18 |    A.   Yeah.  I believed that he was.  I believed | 11:42:46 |
| 19 | that what he was telling me was coming directly from | 11:42:48 |
| 20 | National Air Cargo.  I knew that ultimately National | 11:42:52 |
| 21 | Air Cargo would have to sign on any agreement.  That | 11:42:56 |
| 22 | is quite common for an advisor-arranger | 11:42:58 |
| 23 | relationship. | |
| 24 |    Q.   As of June 15, which is your E-mail to | 11:43:03 |
| 25 | Mr. Stukes, you are telling him to send E-mails to | 11:43:07 |

JACOB S. HODGES - 5/31/2012

Page 105

| | | |
|---|---|---|
| 1 | you at your personal Gmail account. | 11:43:09 |
| 2 | Do you see that? | 11:43:13 |
| 3 | A.   I do. | 11:43:13 |
| 4 | Q.   Did you ask him to do that because you were | 11:43:14 |
| 5 | at that time not employed by BCI? | 11:43:18 |
| 6 | MR. SMITH:  Foundation. | 11:43:20 |
| 7 | THE WITNESS:  This is June 15th E-mail? | 11:43:21 |
| 8 | BY MR. RICHMOND: | 11:43:23 |
| 9 | Q.   Yes. | 11:43:24 |
| 10 | A.   Yeah.  I believe that's the reason why I | 11:43:25 |
| 11 | did.  I didn't -- I believe that's why. | 11:43:28 |
| 12 | Q.   And at that time you were not then working | 11:43:31 |
| 13 | for Pearl? | 11:43:34 |
| 14 | A.   No. | 11:43:35 |
| 15 | Q.   And at that time you were not then working | 11:43:36 |
| 16 | for Global BTG? | 11:43:39 |
| 17 | A.   That's correct. | 11:43:40 |
| 18 | Q.   All right.  The E-mail just above that is | 11:43:41 |
| 19 | two days later on June 17th and Mr. Stukes is | 11:43:43 |
| 20 | writing back to you; sends you a list of aircraft to | 11:43:47 |
| 21 | be purchased by National Air Cargo. | 11:43:50 |
| 22 | Do you see that? | 11:43:54 |
| 23 | A.   Yes. | 11:43:54 |
| 24 | Q.   And then in the next sentence he said | 11:43:55 |
| 25 | (Reading): | |

JACOB S. HODGES - 5/31/2012

Page 215

| | | |
|---|---|---|
| 1 | THE WITNESS:  No, it didn't set off those | 02:56:04 |
| 2 | alarm bells.  It did make me recall that Mr. Stukes | 02:56:08 |
| 3 | had issued the user name and password or the user | 02:56:14 |
| 4 | name specifically to the data room in the name of | 02:56:16 |
| 5 | Pearl.  And I believe it was immediately upon | 02:56:17 |
| 6 | receiving this E-mail from Seva that I went back to | 02:56:20 |
| 7 | Mr. Stukes and made that correction. | 02:56:22 |
| 8 | It didn't -- I had no knowledge that | 02:56:25 |
| 9 | Mr. Stukes was referring to me internally with | 02:56:27 |
| 10 | Mr. Sawhny or anyone within National Air Cargo as | 02:56:31 |
| 11 | Pearl.  If I had been copied on any of those | 02:56:34 |
| 12 | E-mails, I would have corrected it. | 02:56:38 |
| 13 | BY MR. RICHMOND: | 02:56:39 |
| 14 | Q.  Well, on July 12 did you pick up the phone | 02:56:40 |
| 15 | or E-mail people at National Air Cargo and say, Hey, | 02:56:43 |
| 16 | whoa.  Whoa.  I have got to get something clear with | 02:56:45 |
| 17 | you on Pearl? | 02:56:47 |
| 18 | A.  I don't recall that I did.  Again, at that | 02:56:49 |
| 19 | point in time I had no knowledge that this -- that | 02:56:52 |
| 20 | Mr. Stukes was representing me or Mr. Shamsai in | 02:56:56 |
| 21 | that way. | 02:57:00 |
| 22 | Q.  But you knew as of July 12 that folks on | 02:57:01 |
| 23 | the other side of your deal certainly thought you | 02:57:05 |
| 24 | were Pearl; right? | 02:57:07 |
| 25 | A.  I didn't -- well, this is Paul Sawhny. | 02:57:08 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 2
Page 66

JACOB S. HODGES - 5/31/2012

Page 216

| | | |
|---|---|---|
| 1 | This is a technical advisor.  It's surprising to me | 02:57:13 |
| 2 | even now that he was even aware of maybe a name of | 02:57:17 |
| 3 | an entity that was bidding on this. | 02:57:21 |
| 4 | Q.   So no alarm bells went off in your head, | 02:57:26 |
| 5 | even though your user I.D. was Pearl Aviation, even | 02:57:29 |
| 6 | though Mr. Sawhny's calling you Pearl, nothing by | 02:57:33 |
| 7 | July 12 is causing you concern that, Hey, wait a | 02:57:37 |
| 8 | minute.  Maybe they think I am somebody I'm not? | 02:57:40 |
| 9 | MR. SMITH:  Form. | |
| 10 | THE WITNESS:  Well, again, I -- the alarm | 02:57:44 |
| 11 | bell that goes off is -- as it relates to their | 02:57:45 |
| 12 | issuing the user name to the database, and I did | 02:57:49 |
| 13 | make that immediate correction to it. | 02:57:50 |
| 14 | So, yes, in a way there are alarm bells | 02:57:51 |
| 15 | that are sounding and saying something to that | 02:57:55 |
| 16 | effect, but I never had the -- I never had the | 02:57:58 |
| 17 | benefit of seeing that internal communication that I | 02:58:01 |
| 18 | now have the benefit of having seen, which shows and | 02:58:06 |
| 19 | suggests that Mr. Stukes is referring to me as | 02:58:09 |
| 20 | Pearl.  I certainly never referred to myself as | 02:58:12 |
| 21 | Pearl. | 02:58:14 |
| 22 | BY MR. RICHMOND: | 02:58:14 |
| 23 | Q.   Well, at this time, July 12, did you ever | 02:58:14 |
| 24 | tell National Air Cargo that Global BTG didn't exist | 02:58:17 |
| 25 | yet? | 02:58:21 |

EXHIBIT 2
Page 67

JACOB S. HODGES - 5/31/2012

| | | |
|---|---|---|
| 1 | A.   No.  I don't recall that I did. | 02:58:24 |
| 2 | Q.   Did you ever tell anyone at National Air | 02:58:25 |
| 3 | Cargo that Global BTG was just going to have one | 02:58:29 |
| 4 | owner? | 02:58:32 |
| 5 | A.   None of those questions were ever asked of | 02:58:34 |
| 6 | me.  There was -- again, Mr. Stukes contacted me on | 02:58:36 |
| 7 | this transaction, contacted me to structure a sale | 02:58:41 |
| 8 | and leaseback. | 02:58:44 |
| 9 | Q.   Did you ever tell anyone at National Air | 02:58:45 |
| 10 | Cargo that National Air Cargo was only going to have | 02:58:47 |
| 11 | one owner? | 02:58:50 |
| 12 | A.   No. | 02:58:50 |
| 13 | Q.   Did you ever tell anyone at National Air | 02:58:51 |
| 14 | Cargo -- I may have asked the wrong question. | 02:59:00 |
| 15 | MR. SMITH:  You did, I believe. | 02:59:03 |
| 16 | MR. RICHMOND:  Let me re-ask it. | 02:59:03 |
| 17 | Q.   Did you ever tell anyone at National Air | 02:59:04 |
| 18 | Cargo that Global BTG would only have one owner and | 02:59:07 |
| 19 | it was going to be you? | 02:59:11 |
| 20 | A.   I was never asked.  If I were asked that | 02:59:12 |
| 21 | question, I would have provided that information. | 02:59:15 |
| 22 | Q.   Did you ever tell anyone at National Air | 02:59:17 |
| 23 | Cargo that Global BTG was only going to have one | 02:59:19 |
| 24 | owner and that owner was going to be you? | 02:59:22 |
| 25 | A.   No.  I think it was clear all along that | 02:59:24 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 2
Page 68

JACOB S. HODGES - 5/31/2012

Page 238

| | | |
|---|---|---|
| 1 | you define as exclusivity -- it's very important to | 03:28:42 |
| 2 | you as you've said, but when you say the you needed | 03:28:45 |
| 3 | that exclusivity with respect to the finance part of | 03:28:47 |
| 4 | it, what exactly do you mean with respect to | 03:28:52 |
| 5 | everyone else in the world?  How is it exclusive to | 03:28:56 |
| 6 | you? | 03:28:57 |
| 7 | A.   Well, exclusivity to me implies that no one | 03:28:57 |
| 8 | else is out trying to finance or purchase, whatever | 03:29:01 |
| 9 | the matter may be, these specific aircraft.  In this | 03:29:04 |
| 10 | matter, both finance and purchasing these aircraft; | 03:29:06 |
| 11 | that they have given that to us, to Global BTG, LLC. | 03:29:09 |
| 12 | That's to say that Don Stukes is not | 03:29:13 |
| 13 | continuing to try to arrange financing.  Mr. Joerger | 03:29:15 |
| 14 | or Mr. Alf or anybody within National Air Cargo or | 03:29:19 |
| 15 | any outside advisors or consultants, including | 03:29:22 |
| 16 | Goldman Sachs, that they have given that over to | 03:29:26 |
| 17 | Global BTG. | 03:29:28 |
| 18 | Q.   And you say that was a deal killer for you? | 03:29:29 |
| 19 | A.   Absolutely. | 03:29:31 |
| 20 | Q.   Is there anything in Exhibit 374 that you | 03:29:32 |
| 21 | see in terms of language that gives you that | 03:29:34 |
| 22 | exclusivity? | 03:29:37 |
| 23 | A.   Well, specifically this was a working | 03:29:39 |
| 24 | document up to this point.  There was nonexclusive | 03:29:42 |
| 25 | language that was introduced into this agreement | 03:29:47 |

JACOB S. HODGES - 5/31/2012

Page 239

| | | |
|---|---|---|
| 1 | just the day before -- I believe it was by | 03:29:51 |
| 2 | Mr. Joerger -- wherein he attempted to carve out, to | 03:29:52 |
| 3 | suggest that if we obtained financing from -- or if | 03:29:56 |
| 4 | we obtained -- I don't recall the exact language, | 03:29:58 |
| 5 | but he introduced nonexclusive language which would | 03:30:04 |
| 6 | have carved out and given him the ability to | 03:30:08 |
| 7 | continue to work with other financial institutions | 03:30:11 |
| 8 | to sell and to finance certain aircraft through | 03:30:13 |
| 9 | them. | 03:30:15 |
| 10 | I objected to the language.  We took it | 03:30:15 |
| 11 | out.  National did not object to us taking it out. | 03:30:19 |
| 12 | I believed that that was clear, that we were -- had | 03:30:23 |
| 13 | to have exclusivity and that they conceded on that | 03:30:25 |
| 14 | point.  They allowed it. | 03:30:28 |
| 15 | Q.   In Exhibit 374 itself, recognizing what | 03:30:31 |
| 16 | you've just said, is there any language you would | 03:30:35 |
| 17 | point to that gives you exclusivity? | 03:30:38 |
| 18 | A.   I think the document itself to me is an | 03:30:43 |
| 19 | exclusive document, given that it's a buy-sell | 03:30:48 |
| 20 | agreement.  It is a purchase and lease back. | 03:30:52 |
| 21 | Q.   I understand all that and I appreciate it, | 03:30:57 |
| 22 | but my question is:  Is there any particular | 03:31:00 |
| 23 | sentence or paragraph you would point to as giving | 03:31:01 |
| 24 | you exclusivity? | 03:31:04 |
| 25 | A.   The word "exclusivity" I don't believe is | 03:31:06 |

JACOB S. HODGES ~ 5/31/2012

Page 240

| | | |
|---|---|---|
| 1 | contained within the LOI. | 03:31:09 |
| 2 | Q.    Let me ask you -- I'm going to go to a | 03:31:12 |
| 3 | different topic, from exclusivity to whether the | 03:31:37 |
| 4 | final letter of intent required National Air Cargo | 03:31:41 |
| 5 | to do an operating lease or not. | 03:31:47 |
| 6 | Mr. Hodges, is there anything you would | 03:31:51 |
| 7 | point to in Exhibit 374 in terms of language in the | 03:31:54 |
| 8 | letter of intent that you believe obligates National | 03:32:01 |
| 9 | Air Cargo to do an operating lease? | 03:32:04 |
| 10 | A.    Yes. | 03:32:06 |
| 11 | Q.    Can you point that language to me? | 03:32:07 |
| 12 | A.    Yes.  Specifically it's contained in the | 03:32:10 |
| 13 | section entitled "Other." | 03:32:12 |
| 14 | Q.    Which language is that? | 03:32:17 |
| 15 | A.    The last line of that paragraph states | 03:32:20 |
| 16 | clearly that National -- it says (Reading): | 03:32:24 |
| 17 | "Global pledges to deliver up to | 03:32:29 |
| 18 | National a commitment letter to finance one | 03:32:30 |
| 19 | or more aircraft under an operating lease." | 03:32:33 |
| 20 | Q.    Is there any other language you would point | 03:32:35 |
| 21 | to in the agreement besides that language? | 03:32:37 |
| 22 | A.    I would point to every reference within the | 03:32:40 |
| 23 | LOI that says operating lease, price, rent, | 03:32:43 |
| 24 | maintenance reserves.  Every section that contains | 03:32:48 |
| 25 | the word "operating lease" and applies specifically | 03:32:51 |

JACOB S. HODGES - 5/31/2012

Page 241

| | | |
|---|---|---|
| 1 | to an operating lease is evidence that this document | 03:32:54 |
| 2 | does cover and does subject National Air Cargo to | 03:32:57 |
| 3 | lease back from us one aircraft under the terms of | 03:33:01 |
| 4 | an operating lease. | 03:33:03 |
| 5 | Q.   And on the page which is GLOBAL 005087, | 03:33:04 |
| 6 | under the terms "Rental Rate," there is discussion | 03:33:12 |
| 7 | that says (Reading): | 03:33:16 |
| 8 | "Lessee will have the option to select | 03:33:17 |
| 9 | an operating lease structure or finance | 03:33:19 |
| 10 | lease structure." | 03:33:21 |
| 11 | Do you see that language? | 03:33:23 |
| 12 | A.   Yes, I do. | 03:33:23 |
| 13 | Q.   And do you believe that that language is | 03:33:24 |
| 14 | restrictive in some way?  Meaning that, at least | 03:33:31 |
| 15 | with respect to one airplane, lessee will not have | 03:33:35 |
| 16 | the option to select a finance lease structure? | 03:33:38 |
| 17 | MR. SMITH:  Form. | 03:33:40 |
| 18 | THE WITNESS:  Yes.  I believe that it is | 03:33:42 |
| 19 | restrictive in a way that it does require that | 03:33:44 |
| 20 | they -- that one of these aircraft be an operating | 03:33:47 |
| 21 | lease. | 03:33:50 |
| 22 | BY MR. RICHMOND: | 03:33:56 |
| 23 | Q.   Outside the language -- outside the | 03:33:57 |
| 24 | language of the lease itself -- I am sorry.  Let me | 03:34:01 |
| 25 | ask it a different way. | 03:34:06 |

JACOB S. HODGES - 5/31/2012

| | | |
|---|---|---|
| 1 | Apart from actual language in the final | 03:34:06 |
| 2 | version of the letter of intent that we have just | 03:34:09 |
| 3 | been looking at, did anyone at National Air Cargo | 03:34:12 |
| 4 | ever say to you in words or effect, Jacob, we | 03:34:14 |
| 5 | promise you exclusivity? | 03:34:19 |
| 6 | A.   We talked about exclusivity on a number of | 03:34:24 |
| 7 | occasions.  Absolutely. | 03:34:26 |
| 8 | Q.   Did anyone from National Air Cargo ever say | 03:34:28 |
| 9 | to you Jacob -- in words or substance or to the | 03:34:31 |
| 10 | effect, Jacob we promise you exclusivity? | 03:34:34 |
| 11 | A.   I don't recall them saying those exact | 03:34:37 |
| 12 | words.  We discussed exclusivity on a very early | 03:34:41 |
| 13 | stage.  We knew at an early point in time that | 03:34:45 |
| 14 | Mr. Stukes was in contact with Deutsche Bank and DVB | 03:34:48 |
| 15 | and Goldman Sachs. | 03:34:52 |
| 16 | Q.   Did National Air Cargo ever say to you, | 03:34:54 |
| 17 | Mr. Hodges, we are giving you exclusivity? | 03:34:57 |
| 18 | A.   No.  I don't believe that they mentioned | 03:35:00 |
| 19 | those words. | 03:35:03 |
| 20 | Q.   Did National Air Cargo ever say to you any | 03:35:04 |
| 21 | words that were even close to that? | 03:35:07 |
| 22 | A.   Well, to me, the weighty matter here is | 03:35:11 |
| 23 | what is in the LOI and what's in writing, rather | 03:35:17 |
| 24 | than words.  I would much -- I would request that in | 03:35:21 |
| 25 | writing as opposed to a verbal statement. | 03:35:25 |

JACOB S. HODGES – 5/31/2012

Page 243

| | | |
|---|---|---|
| 1 | MR. RICHMOND:  The court reporter is asking | 03:35:40 |
| 2 | us for a little break.  His fingers are probably | 03:35:42 |
| 3 | wearing out.  And I am very sorry that I've spoken | 03:35:45 |
| 4 | so quickly and for so long, so we will take a break. | 03:35:48 |
| 5 | THE VIDEOGRAPHER:  This marks the end of | 03:35:52 |
| 6 | Tape Number 3 in the deposition of Jacob Hodges, | 03:35:55 |
| 7 | Volume I. | 03:36:00 |
| 8 | We are off the record.  It's 3:35. | 03:36:01 |
| 9 | (Recess.) | 03:36:05 |
| 10 | THE VIDEOGRAPHER:  This marks the beginning | 03:50:06 |
| 11 | of Tape Number 4, deposition of Jacob Hodges, Volume | 03:50:08 |
| 12 | I. | 03:50:12 |
| 13 | Back on the record at 3:50. | 03:50:12 |
| 14 | BY MR. RICHMOND: | 03:50:14 |
| 15 | Q.   Mr. Hodges, apart from the language of the | 03:50:16 |
| 16 | final version of the letter of intent itself, did | 03:50:20 |
| 17 | National Air Cargo ever say to you in words or | 03:50:25 |
| 18 | substance or effect, Jacob, we'll give you one | 03:50:29 |
| 19 | operating lease, at a minimum? | 03:50:33 |
| 20 | A.   Yes, they did. | 03:50:36 |
| 21 | Q.   When did they say that? | 03:50:37 |
| 22 | A.   That message was conveyed to me several | 03:50:39 |
| 23 | times over by Mr. Stukes. | 03:50:43 |
| 24 | Q.   Putting Mr. Stukes to one side, did anyone | 03:50:44 |
| 25 | from National Air Cargo ever say to you, either in | 03:50:49 |

EXHIBIT 2
Page 74

JACOB S. HODGES - 5/31/2012

Page 244

| | | |
|---|---|---|
| 1 | that first conversation or the conversations over | 03:50:52 |
| 2 | the weekend before the letter of intent was | 03:50:53 |
| 3 | finalized and executed, Jacob, we'll give you one | 03:50:57 |
| 4 | operating lease, at a minimum? | 03:51:01 |
| 5 |     A.   Yeah.   Sure.   I don't know that they used | 03:51:03 |
| 6 | those exact words.  We talked about it on every | 03:51:06 |
| 7 | single conference call.  The substance was the LOI | 03:51:09 |
| 8 | going back and forth between the markups in between | 03:51:15 |
| 9 | the calls.  I don't know that on a call they | 03:51:18 |
| 10 | actually said those exact words. | 03:51:21 |
| 11 |     Q.   Did they say words even generally like | 03:51:24 |
| 12 | that? | 03:51:30 |
| 13 |     A.   Yeah.  I would say generally they did, yes. | 03:51:30 |
| 14 |     Q.   So your testimony is that someone from | 03:51:33 |
| 15 | National Air Cargo used words generally to say to | 03:51:38 |
| 16 | you, Jacob, you can have one operating lease? | 03:51:41 |
| 17 |     A.   Yeah.  When we were talking about operating | 03:51:43 |
| 18 | lease, finance lease on a conference call and | 03:51:46 |
| 19 | talking about the importance of the operating lease | 03:51:49 |
| 20 | language remaining in the LOI because of the fact | 03:51:51 |
| 21 | that we have all along to this point been interested | 03:51:54 |
| 22 | in the operating lease side of this transaction.  We | 03:51:59 |
| 23 | didn't introduce the finance lease language; | 03:52:02 |
| 24 | National Air Cargo did.  Our purpose was always the | 03:52:06 |
| 25 | operating lease. | 03:52:08 |

JACOB S. HODGES - 5/31/2012

Page 245

1          And, yes, as we were having those          03:52:09
2     conversations, it's clear that they are in agreement          03:52:11
3     with our position that we have at least one aircraft          03:52:18
4     under an operating lease.          03:52:22
5          Q.    Who from National Air Cargo promised you          03:52:23
6     you could have one operating lease?          03:52:27
7          A.    Well, again, I don't know that a promise          03:52:28
8     was ever verbally said to me on a call.  As we are          03:52:32
9     talking about this and then as they concede to the          03:52:40
10    point and allow the language to stay in and as we          03:52:43
11    had worked with them in some level of cooperation          03:52:47
12    from going from all aircraft down to one aircraft          03:52:50
13    under an operating lease, there is some          03:52:54
14    give-and-take here.  And the one aircraft is what we          03:52:56
15    settled on, that a minimum of one would be done          03:52:58
16    under an operating lease.          03:53:01
17         Q.    Is there any one person at National Air          03:53:03
18    Cargo you can attribute that to; that is to say, an          03:53:06
19    agreement to give you one operating lease?          03:53:12
20         A.    No, not any one.  I mean, Chris Alf was          03:53:14
21    primarily the voice on all of the conference calls.          03:53:18
22         MR. RICHMOND:  Let me have marked as          03:53:37
23    Exhibit 375 a document with the Bates Numbers GLOBAL          03:53:38
24    004535 and 4536.          03:53:54
25         (Deposition Exhibit 375 was marked for

JACOB S. HODGES - 5/31/2012

Page 246

| | | |
|---|---|---|
| 1 | identification.) | 03:54:19 |
| 2 | BY MR. RICHMOND: | 03:54:19 |
| 3 | Q.   Do you have Exhibit 375? | 03:54:34 |
| 4 | A.   Yes, I do. | 03:54:35 |
| 5 | Q.   Do you recognize that to be an E-mail you | 03:54:36 |
| 6 | received from Mr. Stukes -- | 03:54:39 |
| 7 | A.   Yes. | 03:54:40 |
| 8 | Q.   -- copy Mr. Warren on July 16, 2010? | 03:54:40 |
| 9 | A.   Yes, I do. | 03:54:43 |
| 10 | Q.   Two days before the letter of intent was | 03:54:45 |
| 11 | finalized, Mr. Stukes was telling you on behalf of | 03:54:49 |
| 12 | National Air Cargo, they have no interest in any of | 03:54:53 |
| 13 | the operating leases. | 03:54:55 |
| 14 | Do you see that? | 03:54:57 |
| 15 | A.   I do. | 03:54:57 |
| 16 | Q.   They want all finance leases. | 03:54:58 |
| 17 | A.   Okay. | 03:55:00 |
| 18 | Q.   Then he says (Reading): | 03:55:01 |
| 19 | "This should be of no surprise." | 03:55:02 |
| 20 | Do you see that? | 03:55:05 |
| 21 | A.   Yes. | 03:55:05 |
| 22 | Q.   And the reason he says that is because | 03:55:05 |
| 23 | Mr. Stukes has told you all along that National Air | 03:55:08 |
| 24 | Cargo does not want operating leases; right? | 03:55:12 |
| 25 | MR. SMITH:  Foundation. | 03:55:14 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277        www.merrillcorp.com/law

EXHIBIT 2
Page 77

JACOB S. HODGES - 5/31/2012

Page 263

| | | |
|---|---|---|
| 1 | THE WITNESS:  I believe that it references | 04:15:10 |
| 2 | that the decision to finance or lease, be it an | 04:15:12 |
| 3 | operating lease or a finance lease, is contained | 04:15:18 |
| 4 | within the document. | 04:15:20 |
| 5 | BY MR. RICHMOND: | 04:15:37 |
| 6 | Q.   If you go to the page that is designated | 04:15:38 |
| 7 | the lease, which is 005091. | 04:15:43 |
| 8 | Do you see that? | 04:15:56 |
| 9 | A.   Yes, I do. | 04:15:56 |
| 10 | Q.   Earlier when I asked you whether you | 04:15:59 |
| 11 | thought this document was a lease, you said it | 04:16:01 |
| 12 | contained the foundation for a lease, but it was not | 04:16:04 |
| 13 | a lease itself because the lease would still have to | 04:16:07 |
| 14 | be created or negotiated. | 04:16:10 |
| 15 | Is that a fair characterization? | 04:16:12 |
| 16 | A.   That's correct.  Yes. | 04:16:14 |
| 17 | Q.   And the bottom -- the last line of this | 04:16:15 |
| 18 | section says (Reading): | 04:16:18 |
| 19 | "The terms of the finance lease and | 04:16:18 |
| 20 | the operating lease will be negotiated in | 04:16:20 |
| 21 | good faith by the parties as soon as | 04:16:22 |
| 22 | practicable after execution of this LOI." | 04:16:25 |
| 23 | Do you see that? | 04:16:28 |
| 24 | A.   Yes. | 04:16:28 |
| 25 | Q.   Was there ever any attempt to do that? | 04:16:29 |

EXHIBIT 2
Page 78

JACOB S. HODGES - 5/31/2012

| | | |
|---|---|---|
| 1 | A.   No.   I don't think -- no, there was not an | 04:16:34 |
| 2 | attempt to do that at that point. | 04:16:39 |
| 3 | Q.   Now, down on the Other section, we've | 04:16:43 |
| 4 | focused on the second sentence a little bit with | 04:16:46 |
| 5 | respect to providing an operating lease, in your | 04:16:49 |
| 6 | view. | 04:16:53 |
| 7 | But the first sentence says (Reading): | 04:16:54 |
| 8 | "The parties agree that Global will | 04:16:55 |
| 9 | use its best efforts to deliver up to | 04:16:56 |
| 10 | National on or before Thursday, July 22, | 04:16:58 |
| 11 | 2010, an MOU from a qualified lender to | 04:17:02 |
| 12 | provide capital to purchase aircraft under | 04:17:05 |
| 13 | a loan and/or finance lease." | 04:17:07 |
| 14 | Do you see that? | 04:17:10 |
| 15 | A.   Yes. | 04:17:10 |
| 16 | Q.   Am I correct that that sentence was written | 04:17:11 |
| 17 | by you or Stuart Warren? | 04:17:14 |
| 18 | A.   Yes. | 04:17:17 |
| 19 | Q.   And the second sentence of the Other | 04:17:17 |
| 20 | provision was also written by you or Stuart Warren? | 04:17:20 |
| 21 | A.   Yes.   This sentence came -- this paragraph, | 04:17:23 |
| 22 | this section, was the result of a conference call | 04:17:26 |
| 23 | that we had prior to releasing the final version of | 04:17:30 |
| 24 | the LOI. | 04:17:35 |
| 25 | Q.   But the actual sentences were drafted by | 04:17:36 |

EXHIBIT 2
Page 79

JACOB S. HODGES - 5/31/2012

Page 265

| | | |
|---|---|---|
| 1 | you or Mr. Warren, not somebody at National Air | 04:17:38 |
| 2 | Cargo; right? | 04:17:45 |
| 3 | A.   Well, this section was discussed on that | 04:17:45 |
| 4 | call.  This is a resolution, if you will, between | 04:17:46 |
| 5 | two open items at that point. | 04:17:49 |
| 6 | Q.   Whatever happened prior to the actual | 04:17:51 |
| 7 | writing, somebody had to write the sentences, and | 04:17:54 |
| 8 | that somebody was you or Mr. Warren; correct? | 04:17:56 |
| 9 | A.   Correct. | 04:17:58 |
| 10 | Q.   Prior to the -- let me ask it a different | 04:18:08 |
| 11 | way. | |
| 12 | Over that weekend of the 16th, 17th, and | 04:18:15 |
| 13 | 18th, did you have discussions with folks at | 04:18:18 |
| 14 | National Air Cargo about whether you would actually | 04:18:22 |
| 15 | by Thursday, July 22, be able to get a letter from a | 04:18:26 |
| 16 | bank providing some sort of a commitment to finance | 04:18:30 |
| 17 | the purchase of one or more of these 747s? | 04:18:33 |
| 18 | A.   I believe the substance of those | 04:18:38 |
| 19 | conversations happened after signing the LOI. | 04:18:40 |
| 20 | Q.   And were there any conversations prior to | 04:18:44 |
| 21 | the signing of the LOI in which National Air Cargo | 04:18:48 |
| 22 | said to you in words or substance, We have to have a | 04:18:52 |
| 23 | commitment letter from a bank by July 22, 2010, or | 04:18:57 |
| 24 | we just won't be able to buy those Japan Airlines | 04:19:02 |
| 25 | airplanes due to the bankruptcy? | 04:19:09 |

EXHIBIT 2
Page 80

JACOB S. HODGES - 5/31/2012

| | | |
|---|---|---|
| 1 | A.   No.  No. | 04:19:10 |
| 2 | Q.   Did you commit to National Air Cargo that | 04:19:10 |
| 3 | you could get such a letter by July 22? | 04:19:12 |
| 4 | A.   No. | 04:19:15 |
| 5 | Q.   Did you even discuss it with National Air | 04:19:16 |
| 6 | Cargo? | 04:19:20 |
| 7 | A.   A commit- -- no, not a commitment letter. | 04:19:20 |
| 8 | We had no discussion about obtaining a commitment | 04:19:23 |
| 9 | letter by the 22nd. | 04:19:27 |
| 10 | Q.   Did you discuss getting any kind of a | 04:19:28 |
| 11 | letter or writing or memorandum or anything else | 04:19:30 |
| 12 | from a bank by July 22? | 04:19:33 |
| 13 | A.   Yes. | 04:19:36 |
| 14 | Q.   And what was that discussion? | 04:19:36 |
| 15 | A.   It was centered around us assisting | 04:19:39 |
| 16 | National Air Cargo with providing some- -- something | 04:19:45 |
| 17 | that they could show to JAL to demonstrate that they | 04:19:48 |
| 18 | were moving forward with purchasing and financing | 04:19:53 |
| 19 | these aircraft. | 04:19:56 |
| 20 | Q.   And what was your understanding as to what | 04:19:56 |
| 21 | the something was that you needed to try to get by | 04:19:58 |
| 22 | July 22? | 04:20:01 |
| 23 | A.   Well, I wasn't clear.  I wasn't certain as | 04:20:04 |
| 24 | to what that was.  Mr. Alf and Mr. Joerger were not | 04:20:06 |
| 25 | clear on conveying that to us, what that something | 04:20:10 |

JACOB S. HODGES - 5/31/2012

Page 267

| | | |
|---|---|---|
| 1 | was. | 04:20:13 |
| 2 | Q.   Did you think it was a memorandum of | 04:20:18 |
| 3 | understanding from a qualified lender to provide | 04:20:22 |
| 4 | capital? | 04:20:25 |
| 5 | A.   Yes.   At one point I thought that that | 04:20:26 |
| 6 | might be what they would utilize to show to JAL. | 04:20:29 |
| 7 | Q.   And did you tell the folks at National Air | 04:20:32 |
| 8 | Cargo that you could indeed by Thursday, July 22, | 04:20:35 |
| 9 | 2010, obtain such an MOU? | 04:20:38 |
| 10 | A.   No.   We always said that we would use our | 04:20:41 |
| 11 | best efforts to obtain a letter, an MOU, a soft | 04:20:45 |
| 12 | commitment by that date. | 04:20:51 |
| 13 | Q.   Let's assume you used your very best | 04:20:54 |
| 14 | efforts for the five days between July 18 and | 04:20:56 |
| 15 | July 22, but in spite of working really hard at it, | 04:20:59 |
| 16 | you didn't get an MOU on that date.   Then what? | 04:21:04 |
| 17 | MR. SMITH:  Form.  Foundation. | 04:21:09 |
| 18 | What's the question? | 04:21:12 |
| 19 | THE WITNESS:  Nothing happened.  Nothing | 04:21:14 |
| 20 | happens at that point.  We continued.  I continued. | 04:21:17 |
| 21 | Business as usual.  The 22nd, the 23rd.  Continued | 04:21:19 |
| 22 | to call banks.  Continued to send E-mails. | 04:21:23 |
| 23 | Continued to work with my team.  My team continued | 04:21:26 |
| 24 | to work with National Air Cargo.  Nothing happened. | 04:21:29 |
| 25 | There was no deadline, no termination date. | 04:21:32 |

JACOB S. HODGES - 5/31/2012

```
 1    BY MR. RICHMOND:                                        04:21:36

 2         Q.   Did you know that National Air Cargo had a    04:21:36

 3    meeting with the bankruptcy trustee in Japan early      04:21:41

 4    the next week after Thursday, July 22?                  04:21:44

 5         A.   I believe that during that week of -- after   04:21:47

 6    signing the LOI, they had made reference to us that     04:21:50

 7    they were meeting with the bankruptcy trustee, yes.     04:21:53

 8         Q.   And did they not tell you that if they        04:21:56

 9    didn't get off that airplane -- let me say it a         04:21:58

10    different way.

11             You understood, didn't you, before you        04:22:05

12    signed that letter of intent, that the folks from       04:22:09

13    National Air Cargo had to get off the plane in Tokyo    04:22:13

14    early in the week after July 22 with a letter or a      04:22:19

15    memo or something from a bank committing to provide     04:22:22

16    money to buy those five airplanes or they would not     04:22:26

17    be able to buy those five airplanes?                    04:22:28

18         A.   No, I did not understand that.                04:22:30

19         Q.   No one ever told you that?                    04:22:31

20         A.   I don't know that I knew of the meeting in    04:22:32

21    Tokyo until after the LOI was signed.                   04:22:34

22         Q.   And what length of time was going to be       04:22:38

23    available to you if you did not produce a memorandum    04:22:42

24    of understanding by July 22, to provide -- to find      04:22:45

25    such a thing or to finish the financing or to do        04:22:50
```

EXHIBIT 2
Page 83

JACOB S. HODGES - 5/31/2012

Page 269

| | | |
|---|---|---|
| 1 | anything? | 04:22:54 |
| 2 | MR. SMITH:  Form and foundation. | 04:22:54 |
| 3 | THE WITNESS:  All along we had talked to | 04:22:55 |
| 4 | National Air Cargo about this being a 30- to 60-day | 04:22:58 |
| 5 | process.  In fact, it says so much in the LOI.  It | 04:23:02 |
| 6 | says it's 60 days prior to the lease commencement | 04:23:05 |
| 7 | that the lessee will select an aircraft as a finance | 04:23:09 |
| 8 | lease or an operating lease. | 04:23:13 |
| 9 | This is consistent with past E-mails that I | 04:23:14 |
| 10 | had shared with Mr. Stukes, Mr. Alf, past | 04:23:16 |
| 11 | conversation that I'd shared with him about the | 04:23:19 |
| 12 | complexity about even obtaining a commitment letter | 04:23:24 |
| 13 | or a proposal or an MOU from a lender at this point | 04:23:29 |
| 14 | in time. | 04:23:35 |
| 15 | BY MR. RICHMOND: | 04:23:37 |
| 16 | Q.   You know why July 22, 2010, was even put in | 04:23:37 |
| 17 | the document as a date? | 04:23:42 |
| 18 | A.   No, I don't. | 04:23:43 |
| 19 | Q.   Just a random date out of thin air? | 04:23:44 |
| 20 | A.   I think that they wanted to be able to show | 04:23:48 |
| 21 | progress, and they chose that date.  I don't know | 04:23:52 |
| 22 | why. | 04:23:55 |
| 23 | Q.   And at the end of the five days, on | 04:23:56 |
| 24 | July 22, 2010, what did you think you were supposed | 04:23:59 |
| 25 | to produce in the terms of a deliverable back to | 04:24:03 |

JACOB S. HODGES – 5/31/2012

Page 313

| | | |
|---|---|---|
| 1 | Q.   Do you know what that refers to? | 05:47:44 |
| 2 | A.   I believe that I am writing down what | 05:47:46 |
| 3 | Mr. Stukes is telling to me on the phone. | 05:47:50 |
| 4 | Q.   And do you remember now if he meant | 05:47:54 |
| 5 | Thursday and Friday of that week, meaning the day | 05:47:59 |
| 6 | before July 22 and this very day, July 23? | 05:48:01 |
| 7 | A.   Yes.  That's what I believe that I was | 05:48:05 |
| 8 | writing at the time. | 05:48:06 |
| 9 | Q.   Then the next bullet point says (Reading): | 05:48:07 |
| 10 | "Got to save the deal." | 05:48:09 |
| 11 | Do you know what that referred to? | 05:48:10 |
| 12 | A.   As I look at it right now, I suspect that | 05:48:12 |
| 13 | it was in reference to the JAL deal. | 05:48:15 |
| 14 | Q.   So that's not your note to yourself, "Got | 05:48:18 |
| 15 | to save the deal."  That's a reflection of National | 05:48:23 |
| 16 | Air Cargo trying to save the Japan Airlines deal, as | 05:48:28 |
| 17 | best as you remember? | 05:48:32 |
| 18 | A.   Best I can remember, that's what I am | 05:48:33 |
| 19 | interpreting Mr. Stukes to be telling me the reason | 05:48:36 |
| 20 | for terminating the agreement. | 05:48:39 |
| 21 | Q.   Then down at the bottom there is an | 05:48:40 |
| 22 | asterisk.  It says, "GS would." | 05:48:42 |
| 23 | I takes it GS stands for Goldman Sachs? | 05:48:46 |
| 24 | A.   Right. | 05:48:50 |
| 25 | Q.   And then it looks like maybe you didn't | 05:48:51 |

EXHIBIT 2
Page 85

JACOB S. HODGES - 5/31/2012

Page 314

| | | |
|---|---|---|
| 1 | finish that thought and started a new one.  It said | 05:48:54 |
| 2 | (Reading): | |
| 3 | "Looks as if this was done | 05:48:56 |
| 4 | intentionally.  Ask." | 05:48:58 |
| 5 | Do you know what that refers to? | 05:49:00 |
| 6 | A.   Well, the former question, the asterisk "GS | 05:49:08 |
| 7 | would," I don't know how to finish that beginning of | 05:49:12 |
| 8 | a sentence.  I don't know what I was about to write | 05:49:14 |
| 9 | their. | 05:49:20 |
| 10 | "Looks as if this was done intentionally," | 05:49:20 |
| 11 | that -- I am speculating, but I'm perhaps writing my | 05:49:25 |
| 12 | own thoughts at that point in time as thinking that | 05:49:29 |
| 13 | maybe they used us to go out and prime the market, | 05:49:33 |
| 14 | to go out there and get the National Air Cargo name | 05:49:37 |
| 15 | and credit out in front of all of our banks, who, up | 05:49:40 |
| 16 | to this point, the majority of which had never heard | 05:49:43 |
| 17 | of National Air Cargo. | 05:49:46 |
| 18 | Q.   In terms of priming the market, Goldman | 05:49:51 |
| 19 | Sachs doesn't need you to prime the market to raise | 05:49:57 |
| 20 | financing, does it? | 05:50:00 |
| 21 | A.   No. | 05:50:01 |
| 22 | Q.   I asked you a little while ago which | 05:50:20 |
| 23 | institutions you thought were the ones you were | 05:50:25 |
| 24 | going to focus on as of -- I think it was July 22. | 05:50:27 |
| 25 | And you named a bunch of names.  To be honest, it | 05:50:32 |

EXHIBIT 2
Page 86

JACOB S. HODGES - 5/31/2012

| | |
|---|---|
| 1    sort of took me by surprise because they were not | 05:50:35 |
| 2    the names that were listed in your disclosures or | 05:50:38 |
| 3    your interrogatories or really anywhere else.  I | 05:50:41 |
| 4    thought you were going to say Perot, Citibank, | 05:50:43 |
| 5    Guggenheim, and maybe ITC. | 05:50:47 |
| 6         But can you tell me again, to the best of | 05:50:49 |
| 7    your memory, who were the institutions as of July 22 | 05:50:51 |
| 8    you thought you were the closest to getting some | 05:50:54 |
| 9    financing lined up with? | 05:50:58 |
| 10        MR. SMITH:  Asked and answered. | 05:50:59 |
| 11        THE WITNESS:  I think I did mention | 05:51:01 |
| 12   Guggenheim. | 05:51:03 |
| 13   BY MR. RICHMOND: | 05:51:04 |
| 14        Q.   You did. | |
| 15        A.   And I think I did mention Perot. | 05:51:04 |
| 16        Q.   Okay.  I will put down Guggenheim and | 05:51:08 |
| 17   Perot. | 05:51:10 |
| 18        Were there others? | 05:51:11 |
| 19        A.   Yes.  ITC, Mr. Tomoo Nakayama. | 05:51:12 |
| 20        Q.   Were there others? | 05:51:18 |
| 21        A.   Yes. | 05:51:20 |
| 22        Q.   I had Citibank in my little stack here. | 05:51:21 |
| 23        A.   Yes.  Absolutely Citibank.  David Silvers | 05:51:24 |
| 24   with Citibank. | 05:51:28 |
| 25        Q.   Any others besides those four? | 05:51:29 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277        www.merrillcorp.com/law

EXHIBIT 2
Page 87

JACOB S. HODGES - 5/31/2012

Page 338

```
 1                        DECLARATION

 2

 3

 4

 5           I hereby declare I am the deponent in the

 6    within matter; that I have read the foregoing

 7    deposition and know the contents thereof; and I

 8    declare that the same is true of my knowledge except

 9    as to the matters which are therein stated upon my

10    information or belief, and as to those matters, I

11    believe it to be true.

12           I declare under the penalties of perjury

13    under the law of the State of California that the

14    foregoing is true and correct.

15           This declaration is executed this _____

16    day of _____, 20_____, at

17    _____, California.

18

19

20

21

22

23                        _____

24                        JACOB S. HODGES

25
```

JACOB S. HODGES - 5/31/2012

1    STATE OF CALIFORNIA    )

2                          )  ss.

3    COUNTY OF LOS ANGELES )

4

5        I, Xavier Mireles, CSR No. 5001 in and for the State

6    of California, do hereby certify:

7        That, prior to being examined, the witness named in

8    the foregoing deposition was by me placed under oath to

9    testify to the truth, the whole truth, and nothing but

10   the truth;

11       That said deposition was recorded stenographically

12   by me at the time and place therein named and thereafter

13   transcribed, and the same is a true, correct, and

14   complete transcript of said proceedings.

15       Before completion of the deposition, review of the

16   transcript [ ] was [X] was not requested.  If requested,

17   any changes made by the deponent (and provided to the

18   reporter) during the period allowed are appended hereto.

19       I further certify that I am not interested in the

20   event of this action.

21       WITNESS MY HAND this 12th day of June, 2012.

22

23

24   _____

25            XAVIER MIRELES, CSR No. 5001

EXHIBIT 2
Page 89

**EXHIBIT 3**

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

**EXHIBIT 4**

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

# EXHIBIT 5

| | |
|---|---|
| **From:** | Jacob Hodges |
| **To:** | Brian Hollnagel; Gunnar Sachs; Jan Soderberg |
| **CC:** | jfry@rothgerber.com |
| **Sent:** | 7/28/2010 10:07:01 PM |
| **Subject:** | Re: FW: Employment Agreement _PEARL |

Brian / All,

Regretfully, the attached employment agreement and shareholder agreement fall short of my expectations, and ambitions at this stage in my career. I was hopeful, and felt deserving of, seeing something more equitable and reasonable given my strong track record of consistently overachieving at BCI, the considerable amount of time I have worked on getting the company to this stage, and the full responsibility that I would carry going forward.

I do not intend to make any change requests or mark up the agreement in any way. Overall I find it offensive and written more in the form of a termination agreement rather than an employment agreement. The goals are aggressive, perhaps unobtainable for a company that has to date one employee. The salary and bonus structure is below market standards and the equity vesting period is inappropriate given that of the shareholders I would be the only one with industry experience. The exclusivity section requiring that I render 100% of my time and services to the company is unacceptable given that the other shareholders are not making similar commitments of time and talents to the company, and to lock myself in with an unproven start up company for a term of 5 years is not a reasonable request. Further more the company was originally conceived to be an entity that would not be affiliated with BCI yet the news coming out of Farnborough last week suggests otherwise. I could continue with additional concerns and comments but will refrain. Again, I regret that you do not see the value that I add to the company, or feel that I am deserving of the proper reward and recognition.

I do wish you well with this new and exciting venture.

Best Regards,
--
Jacob Hodges
Phone: 805-405-9211
Email: hodges.jacob@gmail.com

---

**From:** Fry, Joel [jfry@rothgerber.com]
**Sent:** Thursday, July 15, 2010 1:28 PM
**To:** Jacob Hodges
**Cc:** Brian Hollnagel; gunnar@sachsaspen.com; jansoderberg@comcast.net; 'Owen Jones'
**Subject:** Employment Agreement

Jacob:

Attached is a draft of your Employment Agreement with Pearl Aircraft Corporation Ltd. I have also attached a draft letter agreement re your right to become a lender/shareholder, along with the form of Loan Agreement referenced in the letter agreement.

Please note that Pearl has not reviewed the attached documents. Therefore, the attached drafts remain subject to Pearl's comments.

Please let me know if you have any questions or comments.

Thanks,

Exhibit No.: _502_
Deponent: _Lang_
Date/RPR: _6/8/12_
Hunter + Geist, Inc. _gz_

**GLOBAL 000955**

EXHIBIT 5
Page 130

Joel

**Joel C. Fry, Attorney-at-Law**
Rothgerber Johnson & Lyons LLP | One Tabor Center, Suite 3000 |
1200 Seventeenth Street | Denver, CO 80202 |
Direct 303.628.9547 | Main 303.623.9000 | Fax 303.623.9222
E-mail: jfry@rothgerber.com | Website: www.rothgerber.com

PLEASE TAKE NOTICE, the information contained in this electronic communication and any document attached hereto or transmitted herewith is attorney-client privileged, work product, private or otherwise confidential, and is intended for the exclusive use of the individual or entity named above. The information transmitted in this e-mail and any attachment is intended only for the personal and confidential use of the intended recipients and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §2510-2521. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any examination, use, dissemination, distribution, or copying of this communication or any part thereof is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or reply e-mail and delete this communication. You are further notified that all personal messages express views solely of the sender which are not to be attributed to Rothgerber Johnson & Lyons LLP and may not be copied or distributed without this disclaimer.

GLOBAL 000956

EXHIBIT 5
Page 131

**EXHIBIT 6**

1

1

2      UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA
3      WESTERN DIVISION
       - - - - - - - - - - - - - - - - - - - - - - - - - - -X
4      GLOBAL BTG LLC, a Nevada limited liability
       company with a principal place of business
5      in California,

6                                    PLAINTIFF,

7         -against-                  Index No.:
                                     2:11-cv-01657-RSWL-JCG
8

9      NATIONAL AIR CARGO, INC., a New York
       corporation registered to do business in
10     California,

11                                   DEFENDANT.
       - - - - - - - - - - - - - - - - - - - - - - - - - - -X
12     NATIONAL AIR CARGO, INC.,

13                           COUNTERCLAIM PLAINTIFF,

14        -against-

15     GLOBAL BTG LLC, JACOB HODGES and DOES 1-5,

16                           COUNTERCLAIM DEFENDANTS.
       - - - - - - - - - - - - - - - - - - - - - - - - - - -X
17                      DATE:  May 18, 2012

18                      TIME:  9:03 A.M.

19

20

21

22

23

24

25

DIAMOND REPORTING   (718) 624-7200    info@diamondreporting.com
1

EXHIBIT 6
Page 132

144

```
 1                          D. STUKES
 2    timelines they had to hit to do whatever
 3    they represented to whoever they were
 4    buying the aircraft from.
 5         Q.     And do you know if you provided
 6    them with what Mr. Alf is asking for by the
 7    Thursday date that's listed there?
 8         A.     No.  Obviously, we were unable
 9    to provide them with anything of that
10    nature by that date.
11         Q.     And why is that?
12         A.     We were still going through the
13    process, which we had already started.
14         Q.     And 14 days is not enough to
15    get --
16         A.     No.
17         Q.     -- even a commitment?
18         A.     No, not for $200 million.
19         Q.     Even the softest of the four
20    different types of agreements we talked
21    about?
22         A.     Well, softest would have been a
23    possibility of a letter, expression of
24    interest letter.  Could have been a
25    possibility.
```

EXHIBIT 6
Page 133

145

```
 1                        D. STUKES
 2        Q.     And do you know now if that
 3   would be satisfied Mr. Alf?
 4        A.     I have no idea.  Couldn't
 5   answer that.
 6                MR. SMITH:  This is another
 7        6/19.  We will label this as 31.
 8                (Whereupon, the aforementioned
 9        document was marked as Exhibit 31 for
10        identification as of this date by the
11        Reporter.)
12        Q.     I want to take a look at the
13   actual update, which begins on page
14   NAC-006514.
15        A.     Okay.
16        Q.     The Goldman Sachs paragraph,
17   LIBOR, that is also referred to as the swap
18   rate?
19        A.     Yes, mm-hmm.
20        Q.     And do you know what it was
21   running around this time?
22        A.     I don't.  I couldn't tell you
23   that.
24        Q.     If I said 19, would that
25   surprise you?
```

EXHIBIT 6
Page 134

```
 1                      D. STUKES
 2        A.    No.
 3        Q.    You look at LIBOR plus four or
 4   five here.  What does that mean to you in
 5   terms of actual interest rate?
 6        A.    It means exactly, whatever the
 7   LIBOR was plus four or five would have been
 8   the interest rate.  So, if you say around
 9   that time it was hovering around
10   two percent, then the interest rate would
11   have been around six or seven percent.
12        Q.    Did you tell Mr. Hodges when
13   you first contacted -- well, you first
14   contacted Jacob, said, "You are a free
15   agent.  If you are a free agent, get in
16   touch with me."  He got in touch with you.
17   Eventually, you got on the phone together
18   within a couple of days probably?
19        A.    Probably, yeah.
20        Q.    Did you tell him that you were
21   reaching out to Goldman Sachs at that time?
22        A.    I am sure that I did.  I would
23   be surprised if I didn't.  I assume that I
24   did, and that we were going through a
25   process talking to a number of people.  As
```

147

1                     D. STUKES
2     a matter of fact, I know I did.
3          Q.     Goldman specifically?
4          A.     I would be surprised if I
5     didn't.
6          Q.     I mean, you just said "going
7     through a process talking to people."  You
8     know you said that to him?
9          A.     Mm-hmm.
10         Q.     And, I'm sorry.  Go ahead?
11         A.     No, I am sure he would have
12    asked, "Who are you talking to?"  And I
13    said, "Hey, we are talking to these
14    parties" and da-da-da.  I would be
15    surprised if we didn't have that dialogue.
16         Q.     Same question for DTP
17    Transport?
18         A.     I don't know.  I can't, at this
19    point, say which, today, which ones we
20    specifically told them we were talking to.
21    I don't have the ability to answer that.
22         Q.     And same question for CIT.
23    Same answer?
24         A.     Same answer.
25         Q.     Same question for Guggenheim

EXHIBIT 6
Page 136

1               D. STUKES

2    Capital?

3         A.    Same answer.

4         Q.    Same question for Nord LB?

5         A.    Same answer.

6         Q.    Are you going to give me the

7    same answer for -- well, let's do it with

8    Citibank.   Same question?

9         A.    Same answer.

10        Q.    Credit Agricole?

11        A.    Agricole, yup, mm-hmm.

12        Q.    Comvest?

13        A.    Comvest, same thing.

14        Q.    Bayside, same question; same

15   answer?

16        A.    Mm-hmm.

17        Q.    Pearl Aviation?

18        A.    Mm-hmm.

19        Q.    Do you remember when you first

20   heard of Pearl Aviation?

21        A.    From Brian Hollnagel.

22        Q.    And can you place a time on

23   when that would have been?

24        A.    That's probably around when we

25   were doing Unit Pool, because he was

```
 1                    D. STUKES
 2   talking about doing the transaction via
 3   Pearl.
 4        Q.    What did you understand Pearl
 5   to be?
 6        A.    I knew Pearl.  Pearl was
 7   basically a financing arm that was going to
 8   be getting into aviation that had two
 9   fairly deep pockets as boys out in Denver,
10   and they were aggressively trying to do
11   deals.
12        Q.    And was Pearl doing different,
13   in a different type of business than BCI?
14             MR. RICHMOND:  Objection to the
15        extent it calls for him to speculate.
16        A.    Well, Pearl was basically going
17   to be doing the same thing BCI did under
18   new entity, but Brian Hollnagel was
19   purportedly not supposed to have anything
20   to doing with Pearl.  He was, as I
21   understood, consulting them, but was not a
22   principal or anything in Pearl.
23        Q.    Who were the two managing
24   directors that you were talking with, if
25   you remember?
```

EXHIBIT 6
Page 138

1                           D. STUKES

2          A.      The two foreign guys.  I can't

3    remember their names.  One is from -- the

4    two principals.  It would be the two

5    principals.

6          Q.      Craig Papayanis, was he one of

7    those people?

8          A.      I don't know if I was talking

9    to Craig.  He is not part of Pearl.  I

10   don't think if we were talking to Craig

11   about that.

12         Q.      Was Jacob Hodges one of these

13   two people you were referring to here?

14         A.      Potentially could have been.

15   Jake and I could have had a conversation

16   about Pearl, but I don't think he was

17   associated that much with Pearl either, or

18   with Brian.

19         Q.      If fact, you thought that he

20   was a free agent at this time?

21         A.      That is correct.

22         Q.      So, I mean, I guess I am trying

23   to understand, is this a reference to

24   Jacob's deal or is this a reference to a

25   contact with a different company?

EXHIBIT 6
Page 139

151

```
 1                    D. STUKES
 2        A.    No, I think we actually had
 3   some level of discussion with Pearl; I am
 4   not sure how.  But, that's the best I can
 5   answer that.
 6        Q.    So, it is not a reference to
 7   Jacob's deal, as far as you know?
 8        A.    No, I don't think it is.
 9        Q.    And do you recall if you told
10   Jacob that you were in discussions with
11   Pearl Aviation?
12        A.    No, don't recollect.
13        Q.    The next page you rank the
14   candidates?
15        A.    Yup.  I did a lot of work on
16   this here.
17        Q.    We are just getting started on
18   the amount of the work you did.
19              I want to look actually the
20   page after that, Pearl Aviation, "Strategy,
21   use the LOIs as backup."  Why is it that --
22   and I guess that's the same, similar
23   strategy comment under "Guggenheim."  Do
24   you see that?
25        A.    Okay, mm-hmm.
```

```
 1                    D. STUKES
 2        Q.    Why is it that you proposed to
 3   use the LOIs discussed in the Pearl
 4   Aviation section as backup?
 5        A.    (Perusing.)  "Backup"?  I am
 6   trying to think of what the philosophy was
 7   (perusing).  Maybe, you know, I guess to --
 8   if they were pressing for something as far
 9   as a hard LOI, if these guys were willing
10   to do some type of hard LOI, we potentially
11   would consider doing it.
12        Q.    And Pearl is proposing -- the
13   Pearl issue you discuss are operating
14   leases, correct?
15        A.    Yes, yeah.
16        Q.    And that was not a preferred
17   options for National Air Cargo, to your
18   understanding?
19        A.    No, no, it was not.
20        Q.    Same question with Guggenheim.
21   They are proposing operating leasing?
22        A.     Yeah, they definitely were
23   interested in doing operating leases, and
24   actually submitted, as I recall, something
25   in writing to us, as I recall, as far as
```

EXHIBIT 6
Page 141

D. STUKES

1

2     Q.     This one, I want to look at the

3  bottom e-mail on the first page, which

4  extends to the second one, second page.

5     A.     Okay, okay.

6     Q.     Is he talking about using

7  SkyWorks to do the same thing that you did?

8     A.     Potentially, yeah.

9     Q.     And I take the tone of, when

10  you say, "What more can I do?"  In your

11  response, which is the top here, your tone,

12  you are trying to -- what are you trying to

13  tell him?

14     A.     We have done all that we were

15  supposed to do, and I don't see what

16  SkyWorks could do anything different,

17  particularly coming in on June 20th trying

18  to do something.

19     Q.     I mean, this looks like you

20  were frustrated that they were trying to

21  pull somebody else into the deal?

22     A.     I mean, you understand my

23  position.  You see the work that we were

24  doing and all of the sudden someone comes

25  out of the blue and says, "Hey, why don't

179

                        D. STUKES

1

2    you start working with SkyWorks?"  It kind

3    of gets in the back of your hair for a

4    little while there.

5         Q.    And SkyWorks gets to use the

6    growth plan if they want to?

7         A.    The whole nine yards.

8         Q.    Do you know if they ever

9    engaged SkyWorks?

10        A.    No, to my knowledge, they

11   didn't.

12             MR. SMITH:  This will be 36,

13        please.

14             (Whereupon, the aforementioned

15        document was marked as Exhibit 36 for

16        identification as of this date by the

17        Reporter.)

18        Q.    Do you have any specific

19   recollection of Jacob Hodges telling you he

20   was with Pearl Aviation before you sent

21   this e-mail?

22        A.    No.

23        Q.    But this, where you say, "Pearl

24   Aviation is moving fast" in this e-mail,

25   that's a reference to Jacob Hodges, right?

180

1                          D. STUKES

2          A.     Yeah, this one, yeah.

3                 MR. SMITH:   37.

4                 (Whereupon, the aforementioned

5          document was marked as Exhibit 37 for

6          identification as of this date by the

7          Reporter.)

8          Q.     This is a June 21st e-mail from

9   you to Paul Sawhny and other, and then some

10  National people?

11         A.     Mm-hmm.

12         Q.     "E" in this references Pearl

13  Aviation.  Do you know if this is a

14  reference to Mr. Hodges?

15         A.     It definitely is.

16         Q.     And this doesn't reference the

17  type of financing or leasing that Pearl

18  Aviation was contemplating.  Do you know

19  what they were thinking about doing at this

20  time?

21         A.     Capital lease.

22         Q.     And is there a reason that you

23  didn't say to capital lease is the plan?

24         A.     Well, I don't think if you look

25  at it at all, I don't go through any of

DIAMOND REPORTING   (718) 624-7200    info@diamondreporting.com

181

```
 1                    D. STUKES
 2   these and say, "What is the form?"  Or
 3   whatever.  I just gave people an update on
 4   what was going on.
 5              MR. SMITH:  38.
 6              (Whereupon, the aforementioned
 7         document was marked as Exhibit 38 for
 8         identification as of this date by the
 9         Reporter.)
10       Q.    We saw the bottom of this first
11   page where it says, "Don, we need to talk
12   on Monday and discuss specifics.  I don't
13   want to make promises."  And then, this
14   appears to be your response to that.  It
15   looks like early Monday morning?
16       A.    Right.
17       Q.    (Reading):  "Your process is
18   consistent with my understanding."  So,
19   effectively, you are saying to Mr. Hodges I
20   understand that you cannot get --
21       A.    Financing in the time period
22   that was needed.
23       Q.    What about draft LOIs by Monday
24   or Tuesday morning?
25       A.    No, that's my understanding of
```

313

1                          D. STUKES

2                    C E R T I F I C A T E

3

STATE OF NEW YORK          )
4                          :  SS.:
COUNTY OF NEW YORK         )

5

6         I, JOSHUA B. EDWARDS, RPR, a Notary

7    Public for and within the State of New

8    York, do hereby certify:

9         That the witness whose examination is

10   hereinbefore set forth was duly sworn and

11   that such examination is a true record of

12   the testimony given by that witness.

13        I further certify that I am not

14   related to any of the parties to this

15   action by blood or by marriage and that I

16   am in no way interested in the outcome of

17   this matter.

18        IN WITNESS WHEREOF, I have hereunto

19   set my hand this 25th day of May 2012.

20

21              *Joshua B Edwards*

22        _____
                JOSHUA B. EDWARDS, RPR

23

24

25

**EXHIBIT 7**

**From:** Jacob Hodges <hodges.jacob@gmail.com>
**To:** dstukes <dstukes@asi-advisors.com>
**Subject:** Re: NAC Aircraft Purchases
**Date:** Sun, Jun 20, 2010 11:54 pm

Don,

We need to talk on Monday and discuss specifics. I don't want to make any promises that we won't be able to deliver on. For example, it is not possible for us to close with our funds given the timing you outlined below. Our equity will be coupled with bank debt that we will raise in the capital markets. Ideally in a scenario such as this, the airline would close with their own money and take delivery of the aircraft. All the while they will be negotiating the terms of the lease and sale and lease back (SLB) with us, the potential lessor. Once agreed we then have a certain time in which to perform and consummate the SLB. We remain interested in the opportunity and will certainly be able to get an LOI out early this week.

Best,

Jacob Hodges

On Sun, Jun 20, 2010 at 3:20 AM, <dstukes@asi-advisors.com> wrote:

Jacob:

There are three immediate deliveries. One on this week; one July 10th and one on July 30th. Can you team structure a deal for these aircraft this week. I know this is on a fire drill basis. At a min. Can you do the two deliveries this week and July 10th? I can get you all the information you need on Monday morning. Can you send me draft LOI's late Monday or Tuesday morning?

What is the company name you are doing this deal, so I can send you a NDA? We have a virtual data site with audited financials, detailed projections, LOII's and purchase agreements, Bios, contracts, etc.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.



PLAINTIFF'S EXHIBIT
34

5/7/12 10:33 PM

EXHIBIT 7
Page 147

GLOBAL 010783

http://mail.aol.com/36049-111/aol-6/en-us/mail/PrintMessage.aspx

**On Sat 19/06/10 7:06 AM , dstukes@asi-advisors.com** sent:

Jacob:

Please give me a call over the weekend, if you can, the latest Monday morning.  Need to discuss NAC. Attached please find a deck that should help you better understand who NAC is and how they will deploy the aircraft. I need to talk to you about two options:

Option#1:

Sale-leaseback on three aircraft due for immediate delivery:

B747-400BCF S/N-25328, B747-400BCF-S/N-26344, and B747-400BCF S/N-25630   (must act fast!) Term 5-7 years

Option#2:

All five JAL B747-400 BCF's  ( would need a firm LOI this week).

In both cases, I need to know how quickly you can actually move to affect a transaction.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**On Fri 18/06/10 1:07 AM , Jacob Hodges hodges.jacob@gmail.com** sent:

Don,

That is an impressive fleet by any airlines standard. I'll call you tomorrow to discuss.

Jacob

5/7/12 10:33 PM

EXHIBIT 7
Page 148                                                        GLOBAL 010784

On Thu, Jun 17, 2010 at 9:22 AM, <dstukes@asi-advisors.com> wrote:

Jacob:

Attached please find a list of aircraft to be purchased by National Air Cargo.  They have LOI's on all aircraft.  I would like your thoughts and input.  Deliveries start ASAP, so time is of the essence. Please give me a call to discuss.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548



This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.


On Tue 15/06/10 1:24 PM , Jacob Hodges hodges.jacob@gmail.com sent:

Don,

For the time being please only send email correspondence to my personal Gmail account.

Best,

--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com



--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com

EXHIBIT 7
Page 149                                                              GLOBAL 010785

Re: NAC Aircraft Purchases                    http://mail.aol.com/36049-111/aol-6/en-us/mail/PrintMessage.aspx

--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com

EXHIBIT 7
Page 150

GLOBAL 010786

**EXHIBIT 8**

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER