# EXHIBIT 9

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

# EXHIBIT 10

| From: | stevea |
|-------|--------|
| To: | jacob@globalbtg.com |
| Sent: | 7/18/2010 11:31:35 PM |
| Subject: | re: [FWD: Fw: Executed Global LOI] |

Jacob:

Great job!!

My GreenRock info is as follows:

Steve J. Alexander
Managing Director
GreenRock Capital Company
6351 Hinson Street
Suite F
Las Vegas, Nevada 89118

Office: 702-262-3993
FAX: 702-262-3997
Mobile: 702-609-5060

E-Mail: stevea@greenrockcap.com

-------- Original Message --------
> From: jacob@globalbtg.com
> Sent: Sunday, July 18, 2010 4:00 PM
> To: "Steve Alexander" <stevea@hallmarktrading.com>, "Rick Jones" <RickJones@seznam.cz>, patrick@globalbtg.com
> Subject: [FWD: Fw: Executed Global LOI]
>
> All,
>
> We got it!
> See the attached executed National Air Cargo LOI.
> Rick and I have been in touch a few times today discussing our syndication bank list and are prepared to hit the phones hard tomorrow. We will keep a report that we can present to NAC over time to show our progress. Patrick will have a final version of a bank RFP completed later today which can be sent to lenders and even lessors alike to a. source bank debt and b. sell off one of more of the positions to an aircraft lessor. I typically talk to the lender first, then follow that call with an email containing the RFP. One note, as we create a list of lessors to approach to directly invest in one or more of the aircraft that Lessor must be one that can fund with their own money, i.e. Air Lease, Sky Holdings, Bank of China, Guggenheim, Investec, etc. We have the mandate and do not want any other party (potentially interested lessor) competing for debt with us in the market.
>
> Steve and Rick I need your GreenRockCap emails so I can provide all of our contact details to Don and NAC.
>
> Thanks for all your help getting us to this point. Now lets start pushing it past the finish line one aircraft at a time.
>
> Best,
>
> Jacob Hodges
>
>
> -------- Original Message --------
> Subject: Fw: Executed Global LOI
> From: dstukes@asi-advisors.com
> Date: Sun, July 18, 2010 12:32 pm
> To: jacob@globalbtg.com
>

Exhibit 359 Pg. 1 of 2
Depo of Hodges
Date 5/31/12
Xavier Mireles, CSR 5001

GLOBAL 004137

Exhibit 359
Page 1

EXHIBIT 10
Page 162

> Jacob

>
> Here it is. Pls confirm receipt. Pls counter sign and send back. I will get to Chris. I will get a contact list out later
>
> DStukes
> Sent from my Verizon Wireless BlackBerry
>
> ------------------------------------------
>
> From: Glen Joerger <gjoerger@nationalaircargo.com>
> Date: Sun, 18 Jul 2010 14:54:39 -0400
> To: 'dstukes@asi-advisors.com'<dstukes@asi-advisors.com>
> Cc: Chris J. Alf<calf@nationalaircargo.com>
> Subject: Executed Global LOI
>
> Don,
> Attached is the signed Global LOI. Please work to get a fully executed copy and the appropriate contact info. Thanks!!
> VR Glen
>
>
> Glen G. Joerger
> (813) 532-2057 Office
> (843) 324-8355 Mobile
>
> ------------------------------------------
>
> IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of National Air Cargo may contain information that is confidential and legally privileged and must not be forwarded to other parties. If you have received this message in error, please forward it to the sender and delete it completely from your computer system.

**GLOBAL 004138**

Exhibit 359
Page 2

EXHIBIT 10
Page 163

# EXHIBIT 11

# In The Matter Of:

### GLOBAL BTG, LLC
### v.
### NATIONAL AIR CARGO, INC.

---

## WEINROTH, STUART G. - Vol. 1
### August 23, 2012

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

EXHIBIT 11
Page 164

STUART G. WEINROTH - 8/23/2012

Page 63

| | | |
|---|---|---|
| 1 | going into detail, if there was a European bank that | 10:54:19 |
| 2 | had depositories and had branch offices, one of the | 10:54:23 |
| 3 | countries of that bank that also had depository | 10:54:34 |
| 4 | branches, that country's bank was used as the equity | 10:54:39 |
| 5 | in the transaction. | 10:54:45 |
| 6 | Q.   I assume that these banks -- the two | 10:54:52 |
| 7 | banks that you talked about in Europe for these nine | 10:54:54 |
| 8 | airplanes, I assume they had strong balance sheets? | 10:54:56 |
| 9 | A.   For a period of time, yes. | 10:55:01 |
| 10 | Q.   At least as of the time they were buying | 10:55:04 |
| 11 | the airplanes, right? | 10:55:06 |
| 12 | A.   Correct. | 10:55:08 |
| 13 | Q.   And I also assume that someone like | 10:55:08 |
| 14 | Mr. Hodges would not be capable of filling the role of | 10:55:11 |
| 15 | the bank or the equity investors or anybody else in | 10:55:16 |
| 16 | the kind of deal that we're talking about with those | 10:55:20 |
| 17 | nine airplanes, right? | 10:55:22 |
| 18 | MR. SMITH:  Form. | 10:55:23 |
| 19 | A.   I can make an assumption.  It would not | 10:55:24 |
| 20 | be based on fact.  It would just be based on my | 10:55:28 |
| 21 | knowledge, but I would say no, he would not be | 10:55:31 |
| 22 | considered a lender for $330 million or any major | 10:55:34 |
| 23 | portion of that. | 10:55:39 |
| 24 | Q.   (BY MR. RICHMOND)  Indeed, you weren't | 10:55:40 |
| 25 | able to pull it off yourself either, correct? | 10:55:42 |

EXHIBIT 11
Page 165

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | A.   Correct. | 10:55:44 |
| 2 | Q.   You would love to have? | 10:55:45 |
| 3 | A.   No. | 10:55:47 |
| 4 | Q.   You were satisfied being a broker in | 10:55:48 |
| 5 | that one? | 10:55:50 |
| 6 | A.   I'm satisfied accessing low-cost debt | 10:55:51 |
| 7 | and having -- and sharing risk and mitigating my | 10:55:55 |
| 8 | losses, which is standard in the industry.  There are | 10:56:00 |
| 9 | very few lessors, whether they be finance lessors or | 10:56:16 |
| 10 | operating lessors, that will 100 percent finance an | 10:56:19 |
| 11 | aircraft long term with their own cash.  They will | 10:56:21 |
| 12 | look to the capital markets for leverage. | 10:56:26 |
| 13 | Q.   Your report talks about the length of | 10:56:29 |
| 14 | time it would take to arrange financing for these | 10:56:37 |
| 15 | eight airplanes, and in particular, Paragraph 3.5 of | 10:56:42 |
| 16 | your report, you say that consistent with industry | 10:56:48 |
| 17 | practice and your professional experience, that a | 10:56:51 |
| 18 | period of approximately 60 to 90 days from the | 10:56:54 |
| 19 | execution of the letter of intent or 60 days prior to | 10:56:58 |
| 20 | a delivery date, whichever is greater, would be a | 10:57:02 |
| 21 | reasonable amount of time. | 10:57:04 |
| 22 | Do you see that? | 10:57:06 |
| 23 | A.   Yes, I do. | 10:57:07 |
| 24 | Q.   Did you -- I'll try to shorten this, but | 10:57:08 |
| 25 | I may not be able to, so I apologize as we start down | 10:57:18 |

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | this path.  When you wrote your report, were you aware | 10:57:21 |
| 2 | of or consider in any way the discussions that took | 10:57:24 |
| 3 | place about how much time would be needed for Global | 10:57:32 |
| 4 | to come up with a commitment letter? | 10:57:37 |
| 5 | A.   Was I -- I'm sorry.  Can you repeat it? | 10:57:43 |
| 6 | Q.   Yes, I'm trying to shorten it because we | 10:57:46 |
| 7 | may have to go through the routine of looking at the | 10:57:49 |
| 8 | deposition again of Mr. Joerger, so I'm asking a more | 10:57:51 |
| 9 | broad question than Joerger right now.  So my question | 10:57:54 |
| 10 | is intended to be broader. | 10:57:56 |
| 11 | And the question is, Mr. Weinroth, when | 10:57:57 |
| 12 | you were writing your report, were you aware of or did | 10:58:00 |
| 13 | you consider any discussions or conversations or | 10:58:04 |
| 14 | understandings that were reached between Global and | 10:58:10 |
| 15 | National with respect to how much time Global needed | 10:58:12 |
| 16 | to provide a commitment letter to National? | 10:58:18 |
| 17 | A.   I don't know if it was specific to | 10:58:23 |
| 18 | drawing a conclusion about how much time Global was | 10:58:26 |
| 19 | being given, but I certainly throughout the testimony, | 10:58:28 |
| 20 | the exhibits and the deposition transcripts, | 10:58:35 |
| 21 | understood that there was a lot of discussion about | 10:58:37 |
| 22 | time and about deadlines and when certain things were | 10:58:40 |
| 23 | being asked to be delivered. | 10:58:47 |
| 24 | Q.   I know you didn't read Mr. Joerger's | 10:58:48 |
| 25 | testimony before you prepared your report -- | 10:58:52 |

EXHIBIT 11
Page 167

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | A.    Correct. | 10:58:55 |
| 2 | Q.    -- so my question is, were you aware | 10:59:00 |
| 3 | when you wrote your report that Global had indicated | 10:59:02 |
| 4 | to National in the negotiations before the letter of | 10:59:10 |
| 5 | intent was signed that it had soft commitments from | 10:59:16 |
| 6 | another -- a number of lenders that required only a | 10:59:21 |
| 7 | few days' time to turn into firm or hard commitments? | 10:59:23 |
| 8 | MR. SMITH:  Misstates the facts. | 10:59:30 |
| 9 | A.    I don't recall in what I read Global | 10:59:32 |
| 10 | saying that they had soft commitments, but I do | 10:59:37 |
| 11 | recollect there being conversations either between | 10:59:40 |
| 12 | Mr. Stukes and Mr. Hodges or Mr. Stukes and | 10:59:45 |
| 13 | representatives of National that there were | 10:59:50 |
| 14 | discussions by Global with lenders who were providing | 10:59:54 |
| 15 | soft commitments. | 11:00:08 |
| 16 | Q.    (BY MR. RICHMOND)  In any of the 60 | 11:00:10 |
| 17 | transactions in which you've been involved, were there | 11:00:12 |
| 18 | situations where the -- I apologize.  I'm going to | 11:00:19 |
| 19 | have to ask it just a little differently. | 11:00:26 |
| 20 | Mr. Weinroth, in the 60 transactions | 11:00:50 |
| 21 | you've talked about, in any of those transactions, to | 11:00:52 |
| 22 | your knowledge, did the buyer or lessor represent to | 11:00:57 |
| 23 | the seller or lessee that they had soft commitments | 11:01:04 |
| 24 | from lenders that could be turned into firm | 11:01:09 |
| 25 | commitments within a matter of days? | 11:01:22 |

EXHIBIT 11
Page 168

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | A.    The part that would be difficult to say | 11:01:22 |
| 2 | in my experience is the matter of days -- is the | 11:01:24 |
| 3 | qualifier matter of days.  I think that it is my | 11:01:27 |
| 4 | experience that prior to entering into an LOI -- and I | 11:01:32 |
| 5 | think it would be accepted in the industry -- that | 11:01:38 |
| 6 | homework would have been done to assess the | 11:01:43 |
| 7 | feasibility of ultimately achieving a bankable project | 11:01:46 |
| 8 | and that the go-forward decision for a lessor or buyer | 11:01:54 |
| 9 | is do I think I can execute given the uncertainty on | 11:01:58 |
| 10 | this transaction. | 11:02:07 |
| 11 | To say -- to turn a soft commitment, if | 11:02:09 |
| 12 | that's what you're telling me is the fact in this | 11:02:12 |
| 13 | case, to turn a soft commitment into a hard commitment | 11:02:16 |
| 14 | in a matter of days would all depend on where that | 11:02:18 |
| 15 | person was, the borrower, in the process.  Were they | 11:02:21 |
| 16 | one day out from the bank or the lender or the | 11:02:28 |
| 17 | investor going to investment committee?  Were they | 11:02:33 |
| 18 | weeks out?  So it's relative in time.  If they were | 11:02:38 |
| 19 | just starting the process, to turn a soft commitment | 11:02:45 |
| 20 | to a hard commitment, in my mind, is nearly | 11:02:47 |
| 21 | impossible. | 11:02:51 |
| 22 | Q.    Do you know when Mr. Hodges or Global | 11:02:51 |
| 23 | started the process, as you've just described it? | 11:02:54 |
| 24 | A.    I don't know the exact date. | 11:02:57 |
| 25 | Q.    Do you know approximately? | 11:03:00 |

EXHIBIT 11
Page 169

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | A.   I don't know a date.  I can make an | 11:03:01 |
| 2 | assumption, and my assumption was it started prior to | 11:03:03 |
| 3 | the negotiation of the LOI. | 11:03:07 |
| 4 | Q.   If I told you it was mid-June of 2010, | 11:03:10 |
| 5 | would that sound right to you based on what you've | 11:03:13 |
| 6 | read? | 11:03:17 |
| 7 | MR. SMITH:  Misstates the facts. | 11:03:18 |
| 8 | A.   I don't know the exact date, but it | 11:03:19 |
| 9 | would not be unreasonable for the process to have | 11:03:21 |
| 10 | started 30 days prior. | 11:03:24 |
| 11 | Q.   (BY MR. RICHMOND)  In any of the | 11:03:25 |
| 12 | materials you considered before you prepared your | 11:03:50 |
| 13 | report, did you read anything about a group called | 11:03:53 |
| 14 | GreenRock? | 11:03:59 |
| 15 | A.   Yes. | 11:04:00 |
| 16 | Q.   Do you have any understanding based on | 11:04:01 |
| 17 | what you did read before you prepared your report what | 11:04:03 |
| 18 | role GreenRock played, if any, in the creation of this | 11:04:05 |
| 19 | letter of intent? | 11:04:14 |
| 20 | MR. SMITH:  Foundation. | 11:04:14 |
| 21 | A.   I don't know what GreenRock's | 11:04:15 |
| 22 | involvement was as it relates to the creation of the | 11:04:18 |
| 23 | letter of intent, but GreenRock was certainly | 11:04:21 |
| 24 | associated in my mind -- the conclusion that I drew | 11:04:25 |
| 25 | was they were on the lessor side and affiliated with | 11:04:29 |

EXHIBIT 11
Page 170

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | Global. | 11:04:32 |
| 2 | Q.   (BY MR. RICHMOND)  With that in mind | 11:04:34 |
| 3 | then, I'll try to not do this too much, but if you | 11:04:37 |
| 4 | would turn to Mr. Joerger's deposition, Page 242, and | 11:04:40 |
| 5 | it'll go on to 243.  I'm going to be reading from | 11:04:54 |
| 6 | Page 242, line 4 through 243, line 9. | 11:05:00 |
| 7 | A.   Okay. | 11:05:08 |
| 8 | Q.   It'll be similar to the questions I've | 11:05:09 |
| 9 | asked you before.  Mr. Weinroth, before you prepared | 11:05:11 |
| 10 | your report, were you aware of or did you consider the | 11:05:16 |
| 11 | following testimony from Mr. Glen Joerger: | 11:05:19 |
| 12 | "Question:  Okay.  What was said in that | 11:05:23 |
| 13 | call? | 11:05:25 |
| 14 | Answer:  This is the first time that we | 11:05:25 |
| 15 | now meet GreenRock, and we talk to Steve Alexander and | 11:05:27 |
| 16 | Rick Jones and they start telling us what collectively | 11:05:32 |
| 17 | they can do.  We talk about how we don't want | 11:05:36 |
| 18 | operating leases, we want only finance leases, time is | 11:05:38 |
| 19 | of the essence, we have to get a letter.  We needed | 11:05:42 |
| 20 | several things from them.  One, no operating lease. | 11:05:45 |
| 21 | Two, we have a JAL deal, we have to go back to Japan | 11:05:48 |
| 22 | and we have to explain to the bankruptcy trustee that | 11:05:51 |
| 23 | we have a firm commitment letter. | 11:05:54 |
| 24 | "They tell us that they have soft | 11:05:56 |
| 25 | commitments, but they need a document so that they can | 11:05:58 |

EXHIBIT 11
Page 171

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | National's ability to maintain these airplanes, | 11:28:30 |
| 2 | National's ability to get customers, and similar | 11:28:34 |
| 3 | factors, and not really looking at Mr. Hodges or | 11:28:36 |
| 4 | Global? | 11:28:40 |
| 5 | MR. SMITH:  Form. | 11:28:40 |
| 6 | A.   Primarily, yes, you are correct.  There | 11:28:47 |
| 7 | are reasons why they would want to understand what the | 11:28:50 |
| 8 | capabilities are of Hodges and Global as it relates to | 11:28:52 |
| 9 | remarketing, as it relates to other experience in the | 11:28:56 |
| 10 | industry, but I would in general agree with exactly | 11:28:59 |
| 11 | what you said. | 11:29:03 |
| 12 | Q.   (BY MR. RICHMOND)  Having said that, | 11:29:04 |
| 13 | don't you think there's a little inconsistency in your | 11:29:30 |
| 14 | rebuttal report on damages because, quite frankly, you | 11:29:32 |
| 15 | attack everything about National; their ability to get | 11:29:37 |
| 16 | any contracts, their ability to keep contracts, their | 11:29:41 |
| 17 | ability to make money on CRAF, their ability to make | 11:29:43 |
| 18 | money on ACMI?  I mean you have so many criticisms of | 11:29:46 |
| 19 | them, it seems somewhat inconsistent with your belief | 11:29:51 |
| 20 | that Jacob Hodges was going to pull off this financing | 11:29:54 |
| 21 | all based on National, not based on him but based on | 11:29:57 |
| 22 | National.  Doesn't that seem inconsistent to you? | 11:30:00 |
| 23 | MR. SMITH:  Counsel, I'll remind you | 11:30:03 |
| 24 | nobody cares what you think, and like you told me at | 11:30:05 |
| 25 | the deposition of Mr. McFarlane, this type of question | 11:30:07 |

EXHIBIT 11
Page 172

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | is inappropriate. | 11:30:10 |
| 2 | MR. RICHMOND:  Well, if you'll accept | 11:30:12 |
| 3 | the premise that all such questions are inappropriate, | 11:30:13 |
| 4 | I'll withdraw mine and all yours will remain | 11:30:17 |
| 5 | objectionable. | 11:30:20 |
| 6 | Q.  (BY MR. RICHMOND)  So let me ask a | 11:30:21 |
| 7 | different question, Mr. Weinroth.  Having said what | 11:30:23 |
| 8 | you said about what the lenders are going to look at, | 11:30:25 |
| 9 | do you really believe the lenders would allow Jacob | 11:30:28 |
| 10 | Hodges to put this deal together based on the | 11:30:31 |
| 11 | projections that National had for its CRAF revenues | 11:30:34 |
| 12 | and its ACMI revenues and how it was going to maintain | 11:30:37 |
| 13 | the planes and its balance sheet and all that? | 11:30:41 |
| 14 | A.  To clarify -- and I certainly hope it | 11:30:44 |
| 15 | didn't come across this way in my rebuttal report, but | 11:30:49 |
| 16 | I didn't feel it was necessary to try to attack or | 11:30:56 |
| 17 | take apart National's business plan or its assumptions | 11:31:00 |
| 18 | or its projections. | 11:31:05 |
| 19 | Q.  Are you serious?  You think your | 11:31:06 |
| 20 | rebuttal report does not attack National's business | 11:31:08 |
| 21 | plan or its assumptions or projections? | 11:31:12 |
| 22 | A.  Yes. | 11:31:14 |
| 23 | Q.  Wow.  Okay. | 11:31:16 |
| 24 | A.  My rebuttal report specifically | 11:31:19 |
| 25 | addresses the process in which the expert witness | 11:31:21 |

EXHIBIT 11
Page 173

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | have criticized them or critiqued the analysis. | 11:54:12 |
| 2 | But because of the impact of the present | 11:54:16 |
| 3 | value at 22 percent or 18 percent, the most important | 11:54:19 |
| 4 | cash flows are getting the assumptions right in at | 11:54:22 |
| 5 | least your first five years. | 11:54:27 |
| 6 | Q.   But if from National's perspective, they | 11:54:29 |
| 7 | plan to use these eight airplanes for the next 20 | 11:54:32 |
| 8 | years and as the company and the management of the | 11:54:36 |
| 9 | company, they're trying to project out what's going to | 11:54:41 |
| 10 | happen over the next 20 years, they have to make | 11:54:44 |
| 11 | projections of some kind, don't they, as responsible, | 11:54:46 |
| 12 | reasonable businessmen?  Don't they have to do that? | 11:54:50 |
| 13 | They don't plan to own the planes for 100 days, 365 | 11:54:53 |
| 14 | days, five years even. | 11:54:56 |
| 15 | A.   Right. | 11:54:59 |
| 16 | Q.   The management at National wants to own | 11:54:59 |
| 17 | the airplanes and have them -- | 11:55:02 |
| 18 | A.   Right. | 11:55:04 |
| 19 | Q.   -- and they want to use them for 20 | 11:55:04 |
| 20 | years.  So isn't it reasonable for them to try to | 11:55:05 |
| 21 | project out for 20 years how the planes will be used | 11:55:08 |
| 22 | and what the CRAF program is likely to be and what | 11:55:11 |
| 23 | their ACMI revenue stream is likely to be and all | 11:55:13 |
| 24 | those kinds of things?  Isn't that reasonable? | 11:55:16 |
| 25 | A.   I'm not a member, obviously, of | 11:55:23 |

STUART G. WEINROTH − 8/23/2012

Page 100

```
1    National's board, if that's within their parameters.      11:55:25
2    To me, what I thought was the most important aspect of     11:55:30
3    this transaction was do the cash flows and the             11:55:32
4    assumptions that support the cash flows provide            11:55:36
5    adequate financing for the project itself.  The           11:55:40
6    objective wasn't to operate the planes necessarily        11:55:47
7    that I read in the LOI for 20 years.  The objective,      11:55:51
8    as I understood it from the LOI, was to own the planes    11:55:54
9    within 24 months or own the planes at least within 72     11:56:00
10   months.                                                    11:56:04
11       Q.   And then do what with them?                       11:56:05
12       A.   They've acquired them.  They can                  11:56:08
13   continue to operate them.  They can sell them.            11:56:11
14       Q.   Do you have any indication anywhere that          11:56:13
15   National and its management had any desire to obtain       11:56:15
16   these planes and flip them or sell them or do anything     11:56:20
17   else other than keep them and use them as fully            11:56:22
18   utilized as they can use them for the next 20 years?       11:56:26
19       A.   No, nothing gave me that indication.             11:56:29
20       Q.   In trying to figure out the number of            11:56:31
21   block hours, Mr. McFarlane and his team first went to     11:56:36
22   Mr. Joerger and asked him, essentially, for his           11:56:41
23   projection of what the number of block hours was           11:56:45
24   likely to be.  Was that a reasonable first step for       11:56:48
25   them to take in your view?                                 11:56:50
```

STUART G. WEINROTH - 8/23/2012

Page 101

| | | |
|---|---|---|
| 1 | A.    Yes -- | 11:56:52 |
| 2 | Q.    And was -- | 11:56:52 |
| 3 | A.    -- assuming that Mr. Joerger had the | 11:56:55 |
| 4 | day-to-day responsibility of the CRAF program. | 11:56:57 |
| 5 | Q.    And we'll assume that for purposes of | 11:57:00 |
| 6 | the question.  Would a reasonable second step be to go | 11:57:02 |
| 7 | out into the market and try to find what I'll loosely | 11:57:09 |
| 8 | call comparables to see what other industry | 11:57:12 |
| 9 | participants' experience has been with respect to | 11:57:15 |
| 10 | block hours? | 11:57:20 |
| 11 | A.    As it relates to CRAF, yes. | 11:57:20 |
| 12 | Q.    And we'll stick with CRAF.  I appreciate | 11:57:23 |
| 13 | that.  And in looking out in the market, can you | 11:57:34 |
| 14 | identify any even roughly comparable industry | 11:57:34 |
| 15 | participants whose block hours and revenue per block | 11:57:35 |
| 16 | hour could provide a second source of data in | 11:57:38 |
| 17 | projecting out what National was likely to do? | 11:57:44 |
| 18 | A.    Yes. | 11:57:47 |
| 19 | Q.    And who are those? | 11:57:48 |
| 20 | A.    Kalitta, Atlas, World, Evergreen, UPS, | 11:57:49 |
| 21 | FedEx, Omni, Polar. | 11:58:00 |
| 22 | Q.    To your knowledge, is Kalitta a public | 11:58:16 |
| 23 | or private company? | 11:58:18 |
| 24 | A.    I don't know. | 11:58:19 |
| 25 | MR. SMITH:  I'm sorry.  I do need the | 11:58:20 |

STUART G. WEINROTH - 8/23/2012

Page 102

| | | |
|---|---|---|
| 1 | record to reflect he was not finished as far as I | 11:58:23 |
| 2 | understood. | 11:58:25 |
| 3 | Q.   (BY MR. RICHMOND)  I apologize. | 11:58:26 |
| 4 | MR. SMITH:  Is that correct? | 11:58:28 |
| 5 | Q.   I'm sorry.  You paused long enough that | 11:58:29 |
| 6 | I thought you were done. | 11:58:32 |
| 7 | A.   I was trying to go alphabetical in my | 11:58:32 |
| 8 | head. | 11:58:36 |
| 9 | Q.   You started with Kalitta, so you goofed, | 11:58:37 |
| 10 | but go ahead. | 11:58:43 |
| 11 | A.   Isn't it a silent A? | 11:58:44 |
| 12 | MR. SMITH:  You were at Polar. | 11:58:47 |
| 13 | Q.   (BY MR. RICHMOND)  You said Kalitta, | 11:58:48 |
| 14 | Atlas, World, Evergreen, UPS, FedEx, Omni, Polar. | 11:57:52 |
| 15 | A.   Okay.  Got it.  I'm done.  Thank you. | 11:58:52 |
| 16 | MR. RICHMOND:  After all that.  Thanks, | 11:58:55 |
| 17 | Nate. | 11:58:58 |
| 18 | Q.   (BY MR. RICHMOND)  You don't know | 11:58:59 |
| 19 | whether Kalitta is a public or private company, so you | 11:59:00 |
| 20 | don't know whether their information about block hours | 11:59:04 |
| 21 | is even available, do you? | 11:59:06 |
| 22 | A.   Their CRAF block hours should be | 11:59:10 |
| 23 | available at the -- presumably at the federal | 11:59:11 |
| 24 | contracting level. | 11:59:14 |
| 25 | Q.   And how about revenue per block hour | 11:59:15 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277            www.merrillcorp.com/law

EXHIBIT 11
Page 177

STUART G. WEINROTH - 8/23/2012

Page 103

| | | |
|---|---|---|
| 1 | information? | 11:59:17 |
| 2 | A. That is above my experience, but I would | 11:59:20 |
| 3 | believe that the procurement records exist of how much | 11:59:26 |
| 4 | Kalitta was paid and how many block hours they flew. | 11:59:32 |
| 5 | Q. How about expenses per block hour? | 11:59:36 |
| 6 | A. No. | 11:59:40 |
| 7 | Q. How about overhead per block hour? | 11:59:43 |
| 8 | A. If there was no public record, the only | 11:59:45 |
| 9 | other place would be where all airlines on a monthly | 11:59:48 |
| 10 | basis report to the DOT their costs. | 11:59:59 |
| 11 | Q. With respect to the DOD records on the | 12:00:02 |
| 12 | CRAF program, do you have any idea how hard it is to | 12:00:07 |
| 13 | access their records? | 12:00:11 |
| 14 | A. No. | 12:00:13 |
| 15 | Q. With respect to the records kept by | 12:00:14 |
| 16 | the -- did you say it was the DOT, Department of | 12:00:17 |
| 17 | Transportation? | 12:00:19 |
| 18 | A. Yes. | 12:00:20 |
| 19 | Q. Do you have any idea how hard it is to | 12:00:21 |
| 20 | access those records? | 12:00:23 |
| 21 | A. An airline would have no problem | 12:00:25 |
| 22 | accessing those records. | 12:00:27 |
| 23 | Q. Of other airlines? | 12:00:28 |
| 24 | A. Right. | 12:00:30 |
| 25 | Q. And how would you do that? | 12:00:30 |

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | A.   I didn't have the responsibility in -- | 12:00:32 |
| 2 | either at United or Atlas for the reporting.  In | 12:00:40 |
| 3 | general, the process is by fleet and by subfleet, you | 12:00:45 |
| 4 | report to the DOT all of your hours, all of your | 12:00:53 |
| 5 | revenue, all of your cost structure. | 12:00:56 |
| 6 | Q.   I'm sorry.  I'm going to interrupt you | 12:00:59 |
| 7 | because when I say how do you do that, I meant how do | 12:01:02 |
| 8 | you go get that and access that information about a | 12:01:06 |
| 9 | competitor.  Not how you get it in there but how do | 12:01:10 |
| 10 | you get it out? | 12:01:14 |
| 11 | A.   By computer.  I remember we talked about | 12:01:15 |
| 12 | even at Republic whether or not we should buy the | 12:01:19 |
| 13 | subscription for a few thousand dollars and get access | 12:01:22 |
| 14 | ourself, and we thought that it wasn't necessary. | 12:01:25 |
| 15 | Q.   Let's turn to Atlas.  Is Atlas public or | 12:01:28 |
| 16 | private? | 12:01:31 |
| 17 | A.   It's now public. | 12:01:31 |
| 18 | Q.   So its records and information about | 12:01:33 |
| 19 | number of block hours, record of block hours, all of | 12:01:35 |
| 20 | that stuff with respect to the CRAF program would be | 12:01:41 |
| 21 | more easily available than Kalitta's records, right? | 12:01:43 |
| 22 | A.   If Kalitta had no public equity or | 12:01:46 |
| 23 | public debt, then yes, Atlas would be far more readily | 12:01:49 |
| 24 | accessible. | 12:01:54 |
| 25 | Q.   And in terms of Atlas' fleet, | 12:01:55 |

EXHIBIT 11
Page 179

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | specifically focusing on 747-400s, they're roughly | 12:01:58 |
| 2 | comparable in that respect, aren't they? | 12:02:06 |
| 3 | A.   Atlas' 747-400 fleet is roughly | 12:02:07 |
| 4 | comparable to National's potential fleet -- | 12:02:13 |
| 5 | Q.   Correct. | 12:02:17 |
| 6 | A.   -- yes. | 12:02:18 |
| 7 | Q.   How about World?  Is it public or | 12:02:19 |
| 8 | private? | 12:02:21 |
| 9 | A.   I don't think they're public. | 12:02:21 |
| 10 | Q.   And do you know whether World has a | 12:02:25 |
| 11 | comparable fleet of 747-400s? | 12:02:30 |
| 12 | A.   No. | 12:02:44 |
| 13 | Q.   I'm going to go back to Kalitta.  I | 12:02:45 |
| 14 | forgot to ask you on that one.  Do you know whether | 12:02:48 |
| 15 | Kalitta has a comparable fleet of 747-400s? | 12:02:50 |
| 16 | A.   Yes.  In fact, they own three of the | 12:02:54 |
| 17 | ones that National wanted to buy, so very comparable. | 12:02:56 |
| 18 | Q.   Did they in 2010, at the time this | 12:03:02 |
| 19 | transaction was being considered? | 12:03:04 |
| 20 | A.   At some point in 2010, they may have | 12:03:09 |
| 21 | acquired them, yes. | 12:03:12 |
| 22 | Q.   But before that? | 12:03:13 |
| 23 | A.   Before that, National was attempting to | 12:03:18 |
| 24 | acquire them. | 12:03:22 |
| 25 | Q.   I'm sorry.  I meant before the time that | 12:03:22 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 11
Page 180

STUART G. WEINROTH - 8/23/2012

| | | |
|---|---|---|
| 1 | the difference between our educational experiences, | 12:16:26 |
| 2 | between myself and the Deloitte staff, but in general, | 12:16:29 |
| 3 | the discount rate is not what is adjusted for -- to | 12:16:35 |
| 4 | balance out different risks between different | 12:16:43 |
| 5 | projects.  The adjustments go into the likelihood of | 12:16:49 |
| 6 | achieving the cash flows, and you try to spend your | 12:16:52 |
| 7 | time working on getting the best set of projected cash | 12:16:55 |
| 8 | flows that you think are the most reasonable, whether | 12:16:58 |
| 9 | it be straight-line or adjusted, and then the discount | 12:17:04 |
| 10 | rate is what the discount rate is relative to that two | 12:17:09 |
| 11 | different projects' likelihood of occurring. | 12:17:18 |
| 12 | Q.   So your preferred method of taking | 12:17:22 |
| 13 | account of uncertainty is through sensitivity | 12:17:25 |
| 14 | analysis; is that a fair way of putting it? | 12:17:30 |
| 15 | A.   I would say it's industry standard to | 12:17:31 |
| 16 | not think that you can adjust discount rate to account | 12:17:34 |
| 17 | for errors in your calculations. | 12:17:37 |
| 18 | Q.   I understand what you've said, but I | 12:17:40 |
| 19 | want to take it to the next step.  Am I right that | 12:17:43 |
| 20 | your preferred method -- let me ask it differently. | 12:17:56 |
| 21 | Mr. Weinroth, is it your belief that the | 12:17:56 |
| 22 | preferred method in the industry for accounting for | 12:17:56 |
| 23 | uncertainty is to do sensitivity analysis, especially | 12:17:56 |
| 24 | with respect to cash flows? | 12:17:57 |
| 25 | A.   Yes. | 12:18:00 |

STUART G. WEINROTH – 8/23/2012

| 1  | Q.   And that that sensitivity analysis | 12:18:01 |
| 2  | approach is preferable to an approach which adjusts | 12:18:04 |
| 3  | the discount rate? | 12:18:08 |
| 4  | MR. SMITH:   Form. | 12:18:10 |
| 5  | A.   Yes. | 12:18:11 |
| 6  | Q.   (BY MR. RICHMOND)   Do you think -- in | 12:18:12 |
| 7  | the realm of reasonable approaches, do you believe | 12:18:17 |
| 8  | that adjusting the discount rate is a reasonable | 12:18:20 |
| 9  | approach, even if it's not the preferred approach? | 12:18:22 |
| 10 | A.   It's a very pedestrian approach if that | 12:18:29 |
| 11 | is how this analysis in the report adjusts for | 12:18:32 |
| 12 | uncertainties in their numbers. | 12:18:39 |
| 13 | Q.   I understand you think it's pedestrian | 12:18:45 |
| 14 | and not the preferred method, but even with those | 12:18:47 |
| 15 | qualifications, is adjusting the discount rate | 12:18:49 |
| 16 | nevertheless a reasonable approach to addressing | 12:18:53 |
| 17 | uncertainty and projections? | 12:18:56 |
| 18 | A.   Not in my practice. | 12:18:57 |
| 19 | Q.   So you think it's unreasonable? | 12:18:59 |
| 20 | A.   It never has crossed my mind to do | 12:19:03 |
| 21 | something like that. | 12:19:06 |
| 22 | Q.   I understand for yourself, but -- | 12:19:07 |
| 23 | A.   Isn't that what you're asking? | 12:19:11 |
| 24 | Q.   No.   Well, I was asking, but you kept | 12:19:12 |
| 25 | answering about industry standards. | 12:19:15 |

Merrill  Corporation  –  Los Angeles
Los Angeles - 800-826-0277                www.merrillcorp.com/law

EXHIBIT 11
Page 182

STUART G. WEINROTH - 8/23/2012

Page 117

| | | |
|---|---|---|
| 1 | A.    Okay. | 12:19:16 |
| 2 | Q.    So I'll say that.  Within the realm of | 12:19:17 |
| 3 | the whole industry and the way people approach | 12:19:22 |
| 4 | assessing uncertainty and projections, is it | 12:19:27 |
| 5 | unreasonable to adjust the discount rate to account | 12:19:30 |
| 6 | for those uncertainties as an approach? | 12:19:33 |
| 7 | A.    If other people do it, it must not be | 12:19:45 |
| 8 | unreasonable. | 12:19:48 |
| 9 | Q.    Let me ask you in terms of coming up | 12:19:48 |
| 10 | with a discount rate.  Are you familiar with the term | 12:19:51 |
| 11 | "company-specific risk" or CSR? | 12:19:56 |
| 12 | A.    Yes. | 12:19:59 |
| 13 | Q.    What does that mean to you? | 12:19:59 |
| 14 | A.    It would be an estimate when evaluating | 12:20:01 |
| 15 | a company's performance or its beta or using its beta | 12:20:12 |
| 16 | to try to figure out a way to cost its capital, trying | 12:20:17 |
| 17 | to add some factor that would account for differences | 12:20:23 |
| 18 | between company A and company B. | 12:20:26 |
| 19 | Q.    Would your answers to my questions | 12:20:37 |
| 20 | change if I substituted the word "company-specific | 12:20:39 |
| 21 | risk" for "discount rate" in terms of that approach to | 12:20:44 |
| 22 | assessing uncertainty or projections -- | 12:20:49 |
| 23 | MR. SMITH:  Form. | 12:20:53 |
| 24 | Q.    -- or would it be the same? | 12:20:54 |
| 25 | MR. SMITH:  I apologize.  Form. | 12:20:56 |

EXHIBIT 11
Page 183

STUART G. WEINROTH - 8/23/2012

Page 118

| | | |
|---|---|---|
| 1 | Q.   (BY MR. RICHMOND)  Let me ask it a | 12:20:58 |
| 2 | different way.  I'll for once take Nate's objection. | 12:20:59 |
| 3 | MR. SMITH:  You're getting better. | 12:21:03 |
| 4 | Q.   (BY MR. RICHMOND)  We had a whole line | 12:21:08 |
| 5 | of questioning about the use of discount rate as a way | 12:21:09 |
| 6 | of assessing uncertainty in projections, and I'm | 12:21:12 |
| 7 | wondering whether you view company-specific risk in | 12:21:15 |
| 8 | any different way as an approach to -- if you adjust | 12:21:17 |
| 9 | the company-specific risk as a way of approaching | 12:21:22 |
| 10 | uncertainty in projections. | 12:21:25 |
| 11 | MR. SMITH:  Form. | 12:21:31 |
| 12 | A.   I think that there -- whoever is | 12:21:31 |
| 13 | performing the analysis has a role to pick a number of | 12:21:36 |
| 14 | the discount rate, and I could argue it, whether I | 12:21:41 |
| 15 | believe it or not, and say it should be half a point | 12:21:47 |
| 16 | more or three-quarters of a basis point less.  I'm not | 12:21:51 |
| 17 | trying to split hairs in my rebuttal. | 12:21:55 |
| 18 | I think to answer what I think is your | 12:21:59 |
| 19 | question, in selecting that discount rate to bring the | 12:22:01 |
| 20 | cash forward on a present value analysis, you are | 12:22:05 |
| 21 | trying to establish what feels like an appropriate | 12:22:09 |
| 22 | rate that reflects the project risk and the likelihood | 12:22:14 |
| 23 | of being able to execute on that project. | 12:22:19 |
| 24 | Q.   (BY MR. RICHMOND)  And -- | 12:22:26 |
| 25 | A.   So without -- it's not specific to the | 12:22:28 |

EXHIBIT 11
Page 184

STUART G. WEINROTH - 8/23/2012

Page 169

```
1                    DECLARATION
2           I hereby declare I am the deponent in the
3    within matter; that I have read the foregoing
4    deposition and know the contents thereof, and I
5    declare that the same is true of my knowledge except
6    as to the matters which are therein stated upon my
7    information or belief, and as to those matters, I
8    believe it to be true.
9           I declare under the penalties of perjury of
10   the State of Colorado that the foregoing is true and
11   correct.
12          Executed on the _____ day of _____,
13   2012, at _____, Colorado.
14
15
16
17                  _____
                    STUART G. WEINROTH
18
19
20
21
22
23
24
25
```

EXHIBIT 11
Page 185

STUART G. WEINROTH - 8/23/2012

REPORTER'S CERTIFICATE

STATE OF COLORADO            )
                            )  ss.
CITY AND COUNTY OF DENVER    )

     I, SANDRA L. BRAY, Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public, State of Colorado, do hereby certify that previous to the commencement of the examination, the said STUART G. WEINROTH was duly sworn by me to testify to the truth in relations to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

     I further certify that I am not employed by, related to, nor of counsel for any of the parties herein nor otherwise interested in the outcome of this litigation.

     IN WITNESS WHEREOF, I have affixed my signature this 31st of August, 2012.

     My commission expires January 16, 2016.

__X__   Reading and Signing was requested.

_____   Reading and Signing was waived.

_____   Reading and Signing is not required.

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277            www.merrillcorp.com/law

EXHIBIT 11
Page 186

# EXHIBIT 12

Alf, Christopher                                    May 24, 2012

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - - - - - - - - - - - - - x
GLOBAL BTG LLC,                    :
    Plaintiff,                     :
          vs.                      : Case No.
NATIONAL AIR CARGO, INC,           :
    Defendant/                     : 2:11-CV-01657-RSWL-JCGX
    Counterclaim Plaintiff,        :
          vs.                      :
GLOBAL BTG LLC,                    :
JACOB HODGES and DOES 1-5,         :
    Counterclaim Defendants.:
- - - - - - - - - - - - - - x
                          Washington, D.C.
                          Thursday, May 24, 2012
          Videotaped Deposition of NATIONAL AIR

CARGO, INC., through its representative, CHRISTOPHER

J. ALF, and CHRISTOPHER J. ALF individually, a witness

herein, called for examination by counsel for

Plaintiff in the above-entitled matter, pursuant to

notice, the witness being duly sworn by KAREN YOUNG, a

Notary Public in and for the District of Columbia,

taken at the offices of Perkins Coie LLP, 700

Thirteenth Street, Northwest, Washington, D.C., at

9:00 a.m. on Thursday, May 24, 2012, and the

proceedings being taken down by stenotype and

transcribed by KAREN YOUNG.

Henderson Legal Services, Inc.

Alf, Christopher

May 24, 2012

11

1    1991, but since -- it was founded maybe six, eight

2    months before that.  I'm not aware of the exact date.

3        Q.      And have you been the president since its

4    founding?

5        A.      Uh-huh.

6        Q.      Yes?

7        A.      Almost the whole time since the founding,

8    yeah.

9        Q.      Sometimes when I say "Yes," it's just to

10   make you give a verbal response --

11       A.      Okay.

12       Q.      -- as opposed to uh-huh.

13       A.      Okay.

14       Q.      I'm not trying to --

15       A.      Okay.

16       Q.      -- tease you.  So you've been the president

17   the entire time the company has existed?

18       A.      No, for a short period I wasn't the

19   president.

20       Q.      And when was that?

21       A.      I'm always horrible with dates.  For -- it

22   was about two years ago, it was around then, 2006, '7

Alf, Christopher                                    May 24, 2012

12

1    -- '6.  I mean, it all runs together honestly.

2    There's about a year and a half period or so that I

3    wasn't president of the company.

4        Q.      And why were you not president during that

5    time?

6        A.      I was wrongfully debarred by the DOD, by

7    the U.S. Air Force, wrongfully, later proven that I

8    should not have been debarred.

9        Q.      What is the nature of the company's

10   business?

11       A.      I'm a global air freight forwarder for the

12   most part, and also we own an airline.

13       Q.      And since the time the company was founded

14   in approximately 1991 up until the present, has the

15   nature of the business remained the same or has it

16   changed?

17       A.      Many portions of the business are almost

18   exactly the same, but of course, over time, it

19   changes.  More offices open, business develops

20   different, so yes, it's changed.

21       Q.      Prior to your founding of National -- and

22   by the way, if I use the term "National," will you

Alf, Christopher                                           May 24, 2012

13

1    understand I'm referring to National Air Cargo, Inc.?

2         A.    Okay.

3         Q.    What was your work experience prior to

4    that, prior to founding National?

5         A.    I worked for a small air freight forwarder.

6         Q.    How long did you do that?

7         A.    For five years.

8         Q.    What was the name of that company?

9         A.    Western New York Air Freight.

10        Q.    And prior to that, what was your work

11   experience?

12        A.    I was in college.  I mean, I started, so --

13   just, you know, normal jobs you work when you're in

14   college, waiter, that kind of thing.

15        Q.    In the spring of 2010, did National decide

16   to attempt to purchase some large aircrafts, some 747

17   aircrafts?

18        A.    I'm not exactly sure of the dates.  I mean,

19   if that's what you -- what you have there exactly.  I

20   mean, if you could show me -- I mean, the date is what

21   the date is.  I don't -- I don't know -- I'm not

22   exactly too sure of the date, but yes, there was a

Alf, Christopher                                    May 24, 2012

32

1    that your question started with the very beginning of

2    the process when they only were talking to Mr. Stukes.

3    By the end of the process, they had talked to Mr.

4    Hodges directly, so if your question is meant to

5    suggest -- I guess I'll say it's vague and ambiguous

6    in terms of timing.  That's my objection.

7              BY MR. KULA:

8        Q.    The company, whether from the start of the

9    process through the signing of the LOI with Global

10   BTG, is it true, didn't care whether it was Pearl or

11   Global as long as they could produce aviation

12   financing, correct?

13       **A.    At that -- at the end of it when it moved**

14   **its way to the process, no.**

15       Q.    No, you didn't -- it didn't matter?

16       **A.    It wouldn't matter if they produced**

17   **aviation financing and that they were reputable and --**

18       Q.    Now, back sort of -- sort of to the

19   beginning, I just want to understand, Pearl was

20   introduced to you, to the company, as we went over

21   Exhibit 87.  At some point in time, was Mr. Hodges

22   introduced to you, in other words, over the phone or

Alf, Christopher                                              May 24, 2012

77

1      A.      No, it was not.

2      Q.      Did they ask about it again after this --

3    after this time frame, the June 25?

4      A.      I believe so, yeah, there was more

5    discussions after this time frame with Japan Airlines.

6      Q.      And why was it never given to them?

7      A.      Because I was concerned about whether we'd

8    get the financing or not.

9      Q.      And was the personal guaranty from you one

10   of the -- one of the things throughout this process

11   where you were trying to find financing and JAL was

12   asking for some evidence of financing, some showing

13   that you would be able to provide financing, was one

14   of the things that -- that JAL was asking for was this

15   personal letter of guaranty from yourself?

16     A.      It would be one or the other.  I mean, they

17   weren't necessarily hung up on -- if I would have had

18   a bank financing guaranty letter that, you know,

19   lacked a term sheet from a -- from a reputable

20   financial institution, then they wouldn't require any

21   personal guaranty at all.

22     Q.      And if you had given your personal

Alf, Christopher                                    May 24, 2012

78

1    guaranty, they wouldn't have required the bank --

2        A.      Right.

3        Q.      -- you described?

4        A.      It necessarily -- it was we -- we didn't

5    need both.  They just want to make sure that -- they

6    had great assurance in our company, that, you know, we

7    were -- had the financial wherewithal to -- to buy the

8    aircraft and -- but it was one or the other that was

9    really required.  They're looking for a firm

10   commitment that we could actually, you know, close

11   because this guy was the trust -- working for the

12   trustee and they're under their own timetable where

13   they had to liquidate these airplanes based on a sense

14   of urgency by the -- the trustee and the banks that

15   they had owed money to in Japan.

16       Q.      And so throughout this process of trying to

17   find financing, the uncertainty of finding financing

18   is the reason you didn't want to give your personal

19   guaranty.

20       A.      That's correct, plus if I gave my personal

21   guaranty and then I had to bridge this for the

22   meantime, I'd be quite honestly flat out of funds at

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

EXHIBIT 12
Page 192

Alf, Christopher

May 24, 2012

79

1    that point, you know.

2        Q.    Let me go back to the first page.

3        A.    I'd blow through all the cash.

4        Q.    The first page of this exhibit, 118?

5        A.    Uh-huh.

6        Q.    I'm just -- for point of reference, again,

7    there's a discussion between you and Mr. Stukes about

8    a commitment letter.  At this time, do you recall

9    approaching Deutsche Bank about a commitment letter to

10   satisfy this need?

11       A.    I believe, yeah, we were always working,

12   you know, with multiple lenders throughout this entire

13   process, and I would guess that Deutsche Bank was

14   definitely in the mix, and I get a little confused of

15   the date because it's so long ago, but in that general

16   time period, yes.

17       Q.    Were you the principal point of contact for

18   National with Deutsche Bank in this process?

19       A.    I would say so, yes.

20       Q.    And who were you having contact with at

21   Deutsche Bank?

22       A.    In London, the London office, I'm not --

Alf, Christopher                                           May 24, 2012

133

1    Q.      Okay, so that's what I'm focused on.  The

2  first page, it says, "Firstly, please set up the user

3  ID for the on-line NAC data room for Global BTG as a

4  user name and related pass code ASAP."  So is this the

5  first time you recall seeing the name Global?

6    A.      Yeah, I don't even recall if I read it.  I

7  probably wasn't even focused on -- I mean, I don't

8  know when the first time I recall seeing Global was.

9    Q.      In this time period, you weren't focused on

10  the difference between Pearl and Global?

11    A.      No, no.  If anything, I thought Global was

12  a part of Pearl or related to Pearl or an entity doing

13  the deal with Pearl.

14    Q.      By the way, do you recall ever receiving or

15  seeing anything in writing, whether it's e-mail or a

16  hard document, from Mr. Hodges that referenced the

17  name Pearl or in any way referenced he was with Pearl?

18    A.      I don't recall anything at this time, no.

19    Q.      As opposed to Mr. Stukes, who did send

20  things that referenced Pearl, correct?

21    A.      Yeah, absolutely, but I mean, I'm sure

22  there was probably something in the package definitely

Alf, Christopher                                    May 24, 2012

159

1    you know, that we've seen, that they just -- Goldman

2    was -- this was more straightforward, you know,

3    finance lease that -- I believe at that time the

4    interest rates -- it was a cleaner thing, less

5    entities.  The interest rate was -- was better than

6    what Goldman was going to offer, and it just seemed

7    more -- it just seemed to be a smoother transaction

8    with Pearl at that point, so that's what -- we were

9    leaning that way.

10       Q.    Okay, and then you end this e-mail by

11   saying, "The first JAL delivery is now going be

12   delayed to August 30, and the second sometime in

13   September."  Had there been some push-back in the

14   delivery schedule with JAL at this point?

15       A.    I must have a different topic because I

16   don't see that -- what you're talking about.  Oh, here

17   it is, back here.  Okay, you flipped back.  I got you,

18   I got you.  Sorry about that.  You flipped back a page

19   number.  The -- yeah, yeah, I seem to think I was

20   going to wait for LOIs, I'm sure they're much more

21   attractive.  They -- it must have been on the phone

22   call that they gave me more attractive terms than

Alf, Christopher                                                May 24, 2012

160

1    Goldman, so that's why I wanted to go with them at

2    this point.  At least I was thinking I would like to

3    go with them for -- you know, illustrate, as I made it

4    very clear in the e-mail before, we were talking about

5    financing -- finance lease, because the e-mail

6    directly before that, we're talking about operating --

7    we're not bothering with the operating lease from the

8    Pearl team.

9        Q.    Okay, and then that e-mail, same e-mail,

10   the last sentence there --

11       A.    Uh-huh.

12       Q.    -- talks about the JAL delivery going to be

13   delayed.

14       A.    Uh-huh.

15       Q.    Did something happen where there was a

16   push-back or an agreement to push back delivery of JAL

17   aircraft?

18       A.    Yeah, because JAL had a very difficult time

19   finding the paperwork and, you know, trying to put all

20   the pieces -- as I mentioned before, JAL -- JAL never

21   intended to really sell these aircraft.  I mean, no

22   one forecasted JAL to go -- a company as powerful as

Alf, Christopher                                    May 24, 2012

161

1    JAL would one day ever go into bankruptcy.  So as I

2    mentioned before, if you can't find the documentation

3    on an aircraft, it's a major deal that you can't prove

4    it, the AP story where, you know, you can't prove an

5    APU's overhauled without getting the paperwork.  So

6    JAL was having a very difficult time finding all the

7    pieces of paper that backed up all the components and

8    the overhauls and the maintenance records on the

9    aircraft.  They had them in bits and pieces and stored

10   all over the place and they had a very difficult time

11   finding the documents, so that was pushing back the

12   deliveries, even though the trustee was pushing for a

13   quicker turnaround.

14       Q.      And would potential lenders want to see

15   those documents in order before they closed the sale?

16       A.      Oh, absolutely, they wanted to make sure

17   that -- that they're not financing a bucket of bolts,

18   that it is a real -- that their collateral is sound

19   and that it's not a bucket of bolts, that it's a good

20   airplane with those records because, you know, the

21   engine values, the components, were the life cycle,

22   all those things are value to the airplane.  And even

Alf, Christopher

May 24, 2012

162

1  if, you know, there's improvements to the airplane,

2  they call them airworthiness directives where if those

3  aren't done on the aircraft, you can't prove that they

4  were done, the airplane would instantaneously be

5  grounded until those are -- until those things get

6  done if you can't prove that there's paperwork.

7       So it gets extremely detailed and extremely

8  complicated.  Everybody that ever touched that

9  airplane, you needed to have what we call the dirty

10  fingerprints, a documentation of a guy signing off any

11  repair that's done.  And if a component gets removed

12  from an aircraft for overhaul, you have to take the --

13  you know, you have to sign out -- the maintenance

14  people have to sign the component, that it was removed

15  from the aircraft and it would have to get overhauled.

16  You have to have it tagged and approved that --

17  another signature that it was actually done and then

18  put back on the aircraft and then it would have to be

19  re -- signed off again as installed.

20       If you have paperwork saying it came off the

21  airplane, it got back on the aircraft, and you don't

22  have the paperwork that the thing got overhauled, that

Alf, Christopher                                    May 24, 2012

169

1       Q.      And then as you referenced, the body of Mr.

2    Stukes' e-mail says, "Attached please find the LOI

3    from Jacob's firm, Global BTG."

4       A.      Uh-huh.

5       Q.      And then it says, "Working with GreenRock

6    Capital."

7       A.      Yes, I see that.

8       Q.      Did you make any inquiry of Mr. Stukes at

9    this time about Pearl?

10      A.      I believe that Global BTG was part of

11   Pearl, because that's who -- what I was under

12   assumption, what I thought to believe that Mr. Hodges

13   was working for, and I figured that was part of that

14   group.

15      Q.      So you didn't raise any questions to Mr.

16   Stukes about that and Pearl?

17      A.      No, no, he was already at that point

18   explaining that they were working with GreenRock as

19   somebody that was going to help and assist them with

20   the obtaining of -- of getting bank financing.

21      Q.      All right, and then in the body of the

22   e-mail, it says, "Jake and his team" -- "his team is

Alf, Christopher                                    May 24, 2012

213

1    correct?

2         Q.      Yes.

3         A.      Okay, just make sure we're on the same

4    page.  I'm sorry, it's 7821?

5         Q.      Yes, that's correct.

6         A.      Okay.

7         Q.      Okay, and you see that language I went over

8    after the word -- after the ten percent, you see where

9    -- the symbol for ten percent there?

10        A.      Okay.

11        Q.      The language that had been inserted in Mr.

12   Joerger's draft is no longer there?

13        A.      Right.

14        Q.      So that was agreed to by -- by National; is

15   that right?

16        A.      Yeah, because it says number of aircraft

17   may be reduced or is agreed by the leaser and the

18   lessee, so we could agree to zero if we wanted to.

19        Q.      Also in the final version, if you look at

20   page 6 or --

21        A.      Yeah, it's get out of jail -- get out of --

22   whatever you want to call it, get out clauses that we

EXHIBIT 12
Page 198

Alf, Christopher                                          May 24, 2012

214

1    used.

2        Q.      And when you say get out clauses, what do

3    you mean?  How would it work as a get out clause?

4        A.      Well, if financing's not available, if

5    applicable financing is not available to permit

6    aircraft to be purchased, leased or financed at

7    protected price, plus or minus -- the number of

8    aircraft may be reduced and agreed to by the leaser

9    and lessee.  So that's something, if he can't come up

10   with acceptable financing at these rates -- this is

11   only one steppingstone to come up with acceptable

12   finance, so financing doesn't come up as it's

13   contemplated here in this paragraph, then it's done,

14   the whole thing's done.  The whole deal -- there's no

15   deal.

16       Q.      In this same -- same version here then, if

17   you go to page 6 or page NAC007826 --

18       A.      7826, there you go.

19       Q.      Look at the last paragraph there where it

20   says "Other," and then there's a colon and language

21   next to it?

22       A.      Yes.

Alf, Christopher                                May 24, 2012

215

1    Q.    This was some language that was added as

2    part of the negotiation?  Do you recall that?

3    A.    Yes.

4    Q.    In fact, you recall being on a phone call

5    with Mr. Hodges and others when this language was

6    discussed?

7    A.    Yes, I -- yes, I was, yeah.

8    Q.    And does this accurately reflect what was

9    discussed on that phone call?

10   A.    Yeah, that by -- he's got to come up with

11   an MOU from a qualified lender to provide capital to

12   purchase aircraft, so he has to come up with this

13   letter by the 22nd of July, and that was our

14   understanding between Mr. Jacob Hodges and Pearl and

15   anybody else who was associated with or anybody else

16   on that phone call, that we needed to have the

17   financing by that date or the deal is done because I

18   have to go after that to Japan Airlines, and if I

19   don't have that in my hand, there is no deal to buy

20   the airplanes.

21   Q.    Was there a discussion -- or was part of

22   the discussion to cover whether or not it would be

Alf, Christopher

May 24, 2012

216

1    possible to obtain a firm financing commitment without

2    completing due diligence and other tasks that would

3    typically go along with -- a transaction?

4        A.     No, there was -- he committed that he was

5    going to -- he was going to make it happen and get us

6    the financing, and so we took off -- our foot off the

7    gas with the other lenders and you know our -- you

8    know, pull back the throttles, whichever you want --

9    we quieted down with the other guys, let him at it,

10   and he said he would be able to get us -- because

11   otherwise we're all just wasting our time.

12           If I didn't come up with the letter, we

13   shouldn't have even been writing this.  I mean, the

14   whole intent of this whole thing, that's what the

15   letter of intent was for him to come up with financing

16   for us.  The onus on him to do that so we could go buy

17   the airplane.  If I showed up at Japan Airlines

18   without a letter in my hand, he's just moving down the

19   list.  In fact, that's exactly what they did.  Even

20   with Goldman Sachs at my side, when he couldn't come

21   up with letter, then I go back to Goldman Sachs and

22   they wasted a week because his terms were better, what

Alf, Christopher                                    May 24, 2012

217

1    he indicated that he could do for me.  He indicated

2    that he could make this happen based on these terms

3    and conditions, and then when it wasn't there, that

4    did not -- I did not get what was required for JAL, we

5    couldn't buy the airplanes, simple as that.

6        Q.     Okay, in this language that I -- I asked

7    you about, do you view any significance to the words

8    "best efforts"?  It says best efforts deliver up to

9    National?

10       A.     Alls I know, it was discussed on the phone

11   multiple times that -- and we were already on borrowed

12   time.  If you recall back before, we clearly read the

13   e-mail from Tamuro -- Tamuro, whatever his name was,

14   Takamoto, whatever his name was at Japan Airlines,

15   they clearly said that we needed to have it by this

16   date, where is the letter, where is your firm

17   commitment letter?

18           He committed to me that he was going to come

19   up with financing by this date, and we never got it,

20   and so therefore, the thing's up.  We need it by the

21   22nd of July or nothing has happened, no one gets

22   anything, we don't get airplanes, he doesn't get a --

Alf, Christopher

May 24, 2012

218

1    get his deal, there's no deal.  I mean, that -- that

2    was a requirement of the deal, and everybody knew that

3    since day -- since day one, and we were on the

4    borrowed time.  In fact, this took too long to get to

5    this point.

6        Q.    On the phone call or one of these phone

7    calls, as I know you said they kind of run together --

8        A.    Right, that's correct.

9        Q.    Do you recall though the language of using

10   best efforts was proposed actually in the call, that

11   was language that was discussed amongst the group on

12   the call?

13       A.    No, he had -- it was all understood on the

14   call that he had to make it happen by that date or

15   we're not going to buy an airplane.  There is no

16   airplane to buy with the letter.  You don't pass go,

17   you don't -- the whole thing stops at that point.

18   There's no second chances.  It's going to take

19   something -- there's some -- something -- some guy in

20   California promised he's going to get financing from

21   you, what is JAL going to say if you're sitting there

22   at JAL?  What would they say?

Alf, Christopher                                    May 24, 2012

219

1     Q.     On this call that -- these calls you

2   reference --

3     A.     Uh-huh.

4     Q.     Do you have a recollection that the

5   specific language that's -- that's written here under

6   other on this -- in the LOI was specifically discussed

7   amongst the group and agreed to?

8     A.     Yeah, that -- that on or before Thursday

9   22nd July, an MOU from a qualified lender, that's what

10  I needed, to provide capital to produce to purchase

11  aircraft under a loan and/or a finance lease.  "Or" is

12  the key word there.  So further to this, Global

13  pledges to deliver National a commitment letter to

14  finance one or more aircraft under an operating lease,

15  which we don't want, which at our discretion we don't

16  have to take, so --

17    Q.     So my question, just to be clear is from

18  the first word "the" through the end of that paragraph

19  --

20    A.     Uh-huh.

21    Q.     -- the lease, do you recall that that

22  specific language was discussed and agreed to on a

Alf, Christopher                                                    May 24, 2012

220

1    call?

2        A.      Yeah, that he was going to make it happen

3    by that date, and he let me down, couldn't come up

4    with the money.  He couldn't come up with the

5    commitment for the money.  Not necessarily the money

6    per se wired that day, and JAL wasn't looking for a

7    wire that day, but they wanted something on a bank

8    letterhead saying that you can get funding to buy my

9    five airplanes, case -- you know, serial number, you

10   know, date of manufacture, that's what they're looking

11   for, that I have financing to purchase -- National Air

12   Cargo has the proper financing to purchase -- you

13   know, is -- is going to be financed, it's on Bank of

14   America's letterhead, Chase's letterhead, Pearl's

15   letterhead stating that this is what you're going to

16   have.

17           And that's -- without that letter and

18   without a letter, I would not -- specifically would be

19   able to purchase any aircraft at all.  This -- this

20   isn't a promise deal.  I mean -- I mean -- how do I

21   say it?  This is -- I can't promise Japan Airlines

22   something in the future.  They'll all get -- that was

Alf, Christopher

May 24, 2012

221

1   it.  It's done.  It's not a promise for the future

2   that we're going to get something down the road or

3   something's happen later on.  This -- this 22nd date

4   was hard and fast for them, and they all knew that.

5            They absolutely knew that it was -- that --

6   that you turned into a pumpkin at midnight, you know.

7   Remember the story when you were young?  You turn into

8   a pumpkin at midnight.  It didn't matter that, you

9   know, what happened to Cinderella at midnight.

10  Midnight was the drop-dead date.  July 22nd was the

11  drop-dead date.  23rd didn't help me.  25th didn't

12  help me.  30th didn't help me.  I had to have it by

13  that night because I had to go to Japan.  I'm already

14  on borrowed time with Japan Airlines, so the way I

15  look at it, you know, he didn't come up with the

16  financing.  I lost the deal.

17      Q.    My question really is just -- I just want

18  to confirm that the actual words here under "other" as

19  stated was agreed to by the parties in a phone call.

20      A.    Absolutely, that he was going to come up

21  with -- with the letter that was required for us to

22  purchase the JAL airplane by the 22nd, which was a

Alf, Christopher

May 24, 2012

222

1    date that was not put in place by Chris Alf.  It was

2    driven by the requirements of Japan Airlines.

3         Q.    Now, if you look at the next page of that

4    document, you get to the -- the last -- the last

5    paragraph there, you had talked about -- in reference

6    to the conditions precedent earlier.

7         A.    Uh-huh.

8         Q.    But prior to that, there's language that

9    says a letter of intent, intent is intended as a

10   binding agreement, and it goes on and so forth, but it

11   references --

12        A.    Uh-huh.

13        Q.    Well, I'll just read it so -- so it's not

14   -- "This letter of intent is intended as a binding

15   agreement" --

16        A.    Uh-huh.

17        Q.    -- "between a lessor and lessee, who will

18   act in good faith to implement the provisions hereof,

19   complete the contemplated transactions, to negotiate

20   and execute and deliver all necessary and appropriate

21   leases and other agreements in a form and substance

22   consistent with industry standards in a timely

Alf, Christopher

May 24, 2012

229

1   particular day.

2      Q.    In your answer, you said he started making

3   phone calls and committed with Pearl.  In -- I guess

4   maybe I misheard or misrecollect.  Did Mr. Hodges use

5   the term "Pearl" in any conversation you had with him?

6           MR. RICHMOND:  Let me just object.  That's

7   a really vague question in terms of time.  Are you

8   talking about right at this particular period or

9   through the whole course of --

10          BY MR. KULA:

11     Q.    At any point in time.  At any point in

12  time.

13     A.    Yes, in initial phone calls, he was

14  introduced as being with Pearl and he had a team with

15  Pearl, yeah, from what I remember, yes.

16     Q.    Do you recall him stop using that term at

17  that point?

18     A.    I -- after a while, we just -- you know,

19  you didn't repeat your name and what company you're

20  with every time.  It was my assumption that he was

21  still affiliated with Pearl all the way through this

22  thing, I mean, that it never -- you know, it never

Alf, Christopher                                              May 24, 2012

230

1    stopped.  After a while, you start -- you don't say

2    hey, this is Chris from National Air Cargo every time

3    you're on the phone, you know?  Eventually it just

4    became this is Jacob on the phone.  How you doing?

5    You know, this is -- don't even say your name.  You

6    just say hey, Jacob here, you know, this is where

7    we're at with this thing, doing well, getting stuff

8    moving.

9         Q.       During this process after the LOI is

10   signed, are you having -- did you have a conversation

11   with Mr. Stukes about this happening, do you recall?

12        A.       Yeah, yes.

13             MR. KULA:  Let's mark as 128 e-mail from --

14   again, the top e-mail's from Mr. Alf to Mr. Joerger.

15   It's NAC7969 and 7970.

16                          (Exhibit No. 128

17                          was marked for

18                          identification.)

19             THE WITNESS:  Okay.

20             BY MR. KULA:

21        Q.       Okay, so do you recall continuing to talk

22   to Mr. Stukes about Goldman and DB at the time the LOI

Alf, Christopher                                           May 24, 2012

257

1   Global came in with something in the next 30 days,

2   that you still had the door open for them?

3       A.      I never gave any type of time period at

4   all.  I mean, sure, if somebody were to come out with

5   something out of the blue and gave us a full-blown

6   thing and it was better than any other deal, but after

7   the 22nd, I mean, everybody knew that date.  So if

8   something showed up, it showed up, but there was no

9   commitment anymore after the 22nd to -- to them

10  anymore.

11      Q.      But at that point, if you're going

12  exclusive with Goldman, even if -- even if National --

13  or excuse me, if you were going exclusive with Goldman

14  Sachs, even if Global came in with something, could

15  you deal with them?

16      A.      No, if I had to sign an exclusive with

17  Goldman at that point, if they were to pop up with

18  something, I would have to say Goldman, talk to these

19  guys to see if it's -- if it's -- but nothing -- we're

20  talking about nothing because it never happened, so

21  you're talking about is the sky going to be purple

22  tomorrow.  I mean, it's not going to be purple

Alf, Christopher

May 24, 2012

258

1  tomorrow.  We never got anything, so it's kind of a

2  rhetorical question.  It is a rhetorical question.  I

3  guess that's the right word I think, rhetorical.

4      Q.    So at some point Goldman is brought on,

5  correct, after -- after Goldman -- Global is

6  terminated?

7            MR. RICHMOND:  It's been asked and

8  answered, Counsel.

9            MR. KULA:  I'm just trying to lay some

10  foundation, Counsel.

11            MR. RICHMOND:  It's late in the day.  You

12  were doing pretty good for a good part of the day, but

13  you've gotten back to the bad habit of yesterday of

14  pawing through documents, kind of learning the case as

15  go during the deposition.  It's 4:38, so when 5:00

16  comes, I'm going to ask you how much more do you have

17  and we're not going to stay much past that, so --

18            MR. KULA:  It's good to see counsel's back

19  in form too.

20            MR. RICHMOND:  What's that?

21            BY MR. KULA:

22      Q.    It's good to see counsel's back in form

EXHIBIT 12
Page 209

Alf, Christopher                                    May 24, 2012

259

1    too.  So with Goldman in the fold, what happens in

2    terms of dealing with JAL in terms of trying to meet

3    the commitment, meet the requirement that JAL has?

4        A.      Well, because, you know, I never gave them

5    a firm commitment at Goldman to go ahead, they never

6    got any firm financing, and at this point, I got let

7    down by Mr. Hodges when he committed to make this deal

8    happen for me and it never happened, and I never had

9    what I needed or what was the requirements of our

10   agreement to produce, I pretty much -- not pretty

11   much.  I kind of went with my hat in my hand to JAL

12   and I had to tell, you know, JAL I don't have what

13   you're looking for, but Gold -- I have to guy here,

14   the Japanese -- Goldman sent their Japanese

15   representative, you know, to stand next to me in Japan

16   with the trustee, who was under tremendous pressure by

17   the Japanese government, and the trustee, this was a

18   huge political thing in Japan, that their -- their

19   pride carrier has gone into bankruptcy, and he had --

20   he had -- he had a huge responsibility as trustee to

21   testify to -- before the court that he had a bona fide

22   buyer.

Alf, Christopher                                    May 24, 2012

260

1        So alls I do is I showed up with the Goldman

2    Sachs guy because it was so late because I didn't -- I

3    -- you know, we had this date by the 22nd.  Mr. Hodges

4    committed to make things happen for me and he never

5    made it happen, and I showed up and said listen, this

6    is the best I got, and respectfully, the guy -- the

7    trustee, not just the guy.  He was a very, very

8    powerful guy, trustee of the entire Japan -- the

9    trustee working the deal for the Japanese government

10   and the court with a multi-billion restructuring and

11   he had ultimate authority and ultimate wherewithal to

12   make any decisions on behalf, very powerful guy in

13   Japan.

14        He just slipped down and said well, I have

15   to move on with somebody else then if you can't, you

16   know, guarantee me a letter.  Let's put it this way.

17   It was a waste -- it was pretty much a wasted trip,

18   but out of respect, I went over there and told him you

19   know, it's just not going to happen because we

20   couldn't get the financing as required by our

21   agreement, which Mr. Hodges had plenty of time to work

22   and it was portrayed that yes, we're definitely going

Alf, Christopher                                    May 24, 2012

261

1    to make it happen and it never happened.  So indeed,

2    the pumpkin -- it turned into a pumpkin at that point,

3    no deal, no money.

4        Q.    In fact, when -- when you brought on

5    Goldman, didn't you tout that as great news to the

6    Japanese -- to the JAL representatives?

7        A.    I thought so, yeah, but it wasn't -- it was

8    too -- it was too little.  That -- that even having

9    Goldman there, as powerful as Goldman is, global

10   financial institution didn't matter.  They were

11   looking for Goldman to have where's your letter saying

12   that you're going to finance, and at that point they

13   -- they didn't have enough time to put it together

14   because I didn't start with them until after, you

15   know, we got -- we were done on the 22nd.

16       Q.    How much time was Goldman said -- said they

17   needed to put a letter together like that?

18       A.    They -- they felt very positive they could

19   do it, you know, if we would have started with them a

20   lot earlier.  They didn't give me a set time line, but

21   it happened in -- when we did wanted to move, it

22   happened quite quickly, a matter of weeks they could

Alf, Christopher                                                                 May 24, 2012

262

1   do it, but it still wasn't fast enough.  They had a

2   hard -- I was already on borrowed time, as I mentioned

3   more than once, based on, you know, as of June 25th,

4   where is this?  This is correct, the date?

5               Yeah, as of June 25th, that was my date.  I

6   already bought a month, or nearly a month to July 22nd

7   just for JAL, so by the time -- I had to leave on July

8   -- I forget what date I actually had -- my exact

9   drop-dead date, but it was sometime around the 25th,

10  ball park, of July, that I had to have a firm letter

11  in my hand.  Otherwise there was no deal.  So just

12  having Goldman there, that didn't help me at all

13  either.

14     Q.     So the company National had been seeking

15  finance for this purchase for a couple of months at

16  this point?

17     A.     Yes.

18     Q.     And --

19     A.     And working with them for a couple of

20  months.  Sorry to interrupt you, but yeah.

21     Q.     And had retained -- well, Global was

22  retained, signed the LOI July 18th, correct?

EXHIBIT 12
Page 213

Alf, Christopher

May 24, 2012

263

1    A.    I believe that was the date, yeah.  It's --
2    the date is what the date is, yeah.

3    Q.    And then they had until July 22nd to
4    produce.

5    A.    Correct.

6    Q.    Correct?  And they were terminated a day or
7    two after that.

8    A.    Correct.

9    Q.    So -- and for those four or five days,
10   you've said that -- that the company National took its
11   foot off the pedal relative to other financing.

12   A.    That's correct.

13   Q.    And now you're saying so afterwards,
14   because of that, the -- National could not proceed
15   with the JAL air purchases.

16   A.    That's correct.

17   Q.    And so those four or five days that the
18   company took its foot off the pedal was the reason
19   that it couldn't proceed with the JAL aircraft finance
20   purchases?

21   A.    Well, the reason it couldn't is Mr. Hodges
22   guaranteed it, said yeah, we're going to make it

Alf, Christopher                                           May 24, 2012

264

1   happen for you guys, no problem, you know.  Because

2   again, remember, it just didn't -- he didn't start

3   working the banks on that day.  We had e-mails and we

4   talked about.  He was working, making phone calls, had

5   guy in the Czech Republic on weeks and weeks before

6   the date of the sign -- so that was supposed to be --

7   you know, just putting ice -- icing on the cake.  At

8   that point he had already made -- baked his cake

9   already and he was supposed to do the final finishing

10  touches during that -- those few days and get the deal

11  done and make stuff happen.  At least that's what's

12  portrayed to us and that's what we believed.

13      Q.     And how did the JAL transaction end?  What

14  happened that the deal didn't proceed?

15      A.     We never got the letter required to their

16  satisfaction.

17      Q.     And they walked away from the deal?

18      A.     They walked -- they had to walk away from

19  the deal because they were on their own time line with

20  their own trustee.

21      Q.     And they looked for other source -- other

22  buyers?

Henderson Legal Services, Inc.

EXHIBIT 12
Page 215

Alf, Christopher                                    May 24, 2012

265

1      A.      Yeah, they just moved down the list to
2  other buyers.
3      Q.      Do you recall that it was actually National
4  that walked away from the JAL transaction?
5      A.      Do I recall National?  We couldn't do it.
6      Q.      You couldn't do it in the sense you didn't
7  have financing for it?
8      A.      Absolutely.
9      Q.      Is that what you told JAL?
10     A.      I don't recall what I told JAL.
11     Q.      Was there any other reason that --
12     A.      We definitely didn't have the financing.
13  That was a requirement of making it happen.
14     Q.      Was there any other reason that the JAL
15  transaction did not proceed, that is, the transaction
16  between National and JAL?
17     A.      Yeah, we were having difficulty with the
18  engines on the aircraft, finding -- get the exact
19  state of the readiness of the engines, so there could
20  have very well been another reason for JAL's
21  termination, or not -- not -- the deal not happening
22  or not moving forward.

Alf, Christopher

May 24, 2012

297

1                 CERTIFICATE OF DEPONENT

2         I have read and examined the foregoing 296

3 pages and find the answers contained therein with

4 changes made by me, if any, to be true and correct.

5

6                              _____

7                          Signature of the Witness

8

9         Subscribed and sworn to before me this

10 _____ day of_____, 20___.

11

12

13                             _____

14                        Notary Public in and for

15                            _____

16

17 My Commission Expires _____.

18

19

20

21

22

EXHIBIT 12
Page 217

Alf, Christopher                                    May 24, 2012

298

1     UNITED STATES OF AMERICA   )

2                                          ss:

3     DISTRICT OF COLUMBIA       )

4           I, KAREN C. YOUNG, a Notary Public within

5     and for the District of Columbia, do hereby certify

6     that the witness whose deposition is hereinbefore set

7     forth was duly sworn and that the within transcript is

8     a true record of the testimony given by such witness.

9           I further certify that I am not related to

10    any of the parties to this action by blood or marriage

11    and that I am in no way interested in the outcome of

12    this matter.

13          IN WITNESS WHEREOF, I have hereunto set my

14    hand this _____day of_____, 20___.

15

16

17                    _____

18

19    My Commission Expires:

20    July 31, 2014

21

22

**EXHIBIT 13**

| From: | Stuart Warren |
|---|---|
| To: | jacob@globalbtg.com |
| CC: | patrick@globalbtg.com |
| Sent: | 7/15/2010 3:37:13 PM |
| Subject: | RE: National Air Cargo LOI |

Jacob,

I think they will want a right to cancel if nothing happens within a time frame, but we can just end the letter by replacing the ";" with a period after transactions in the third line after iv in Conditions Precedent. It would be even stronger if we changed Conditions Precedent to

Binding Nature of LOI. This LOI is intended as a binding agreement between the Lessor and Lessee who will act in good faith to implement the provisions hereof, to complete the contemplated transactions and to negotiate, execute and deliver all necessary and appropriate leases and other agreements in form and substance consistent with industry standards in a timely manner.

Really the only thing being given up as a condition precedent is inspection of the aircraft and records and in a sense the onus is on them since they have to operate the equipment for 6 years and return it in an acceptable agreement and they are paying for a D check prior to delivery. So from our perspective we can make it binding. If we don't perform, based on the LOI there is not really a penalty and we have outs to adjust the lease rates. I suspect they are the ones more likely to want a time limit and an out.

Thanks.

Best regards,

Stuart

**From:** jacob@globalbtg.com [mailto:jacob@globalbtg.com]
**Sent:** Thursday, July 15, 2010 12:05 AM
**To:** Stuart Warren
**Cc:** patrick@globalbtg.com
**Subject:** RE: National Air Cargo LOI

Stuart,

See the attached updated LOI. I need comments from Seva on the Return condition language which I will have in the morning. The last line which is highlighted is still open for you to fill. Any way we can eliminate the right to cancel?

Jacob

-------- Original Message --------
Subject: Re: National Air Cargo LOI
From: Stuart Warren <Stuart@Warren-Sklar.com>
Date: Wed, July 14, 2010 3:33 pm
To: "jacob@globalbtg.com" <jacob@globalbtg.com>
Cc: "patrick@globalbtg.com" <patrick@globalbtg.com>

```
EXHIBIT

7
UP
```

GLOBAL 004441

EXHIBIT 13
Page 219

When I get home I will look at it.
For term loan maybe it would be good to phrase it as a finance lease which is functionally equivalent to a term loan.

Sent from my iPhone

On Jul 14, 2010, at 3:14 PM, jacob@globalbtg.com wrote:

I made some comments. More to come later. NAC does not fully realize that a finance lease is in essance a term loan, fully amortizing, they own the aircraft, take depreciation, etc. For that purpose I included language about the "term loan".

-------- Original Message --------
Subject: RE: National Air Cargo LOI
From: "Stuart Warren" <stuart@warren-sklar.com>
Date: Wed, July 14, 2010 2:14 pm
To: <jacob@globalbtg.com>
Cc: <patrick@globalbtg.com>

You will see I pulled out as much as possible about other people and financing terms since I think that is our business.

From: jacob@globalbtg.com [mailto:jacob@globalbtg.com]
Sent: Wednesday, July 14, 2010 2:06 PM
To: Stuart Warren
Cc: patrick@globalbtg.com
Subject: RE: National Air Cargo LOI

GreenRock is Steve Alexanders group in Las Vegas which I brought in to aid in sourcing debt financing for the "finance lease / term loan", and debt and equity for the operating lease.

The finance lease terms do include 26 bps for us as a fee, in addition we will collect the first months rent. In essence we will sell off to a bank 71 payments rather than the 72.

NAC at this point won't agree to operating lease only terms. They think they can obtain term loan debt financing and own 100% of all aircraft. The fact is they are not that big of a credit. A general rule of thumb in banking is that the loan cannot exceed 3x TNW (tangible net worth). Chris over the last year pulled a lot of cash/equity out of the company. They like the idea of allowing them to choose between an operating lease and a finance lease but we will withhold the detail of the bank terms from them as is customary. We only referenced the base rate in the event we need to adjust the pricing.

Jacob

-------- Original Message --------
Subject: RE: National Air Cargo LOI
From: "Stuart Warren" <stuart@warren-sklar.com>
Date: Wed, July 14, 2010 1:01 pm
To: <jacob@globalbtg.com>
Cc: <patrick@globalbtg.com>

Jacob,
A couple of initial questions:
        Who is GreenRock?
        If they are not a party to the LOI why are they mentioned?

GLOBAL 004442

EXHIBIT 13
Page 220

Why would we put terms of our financing in the LOI?  It reads like a combination of a document you would give to potential lenders and an LOI.  Lease terms I think we want to tie down but not necessarily that we will do the finance lease as a term loan and what the terms would be.  For example, we could do a finance lease, finance with a loan and keep a spread for ourselves.  Even if we have no residual interest it gets assets on the books or on some entity's books.

In any event, I will start reading through it shortly.

Best regards,

Stuart

---

**From:** jacob@globalbtg.com [mailto:jacob@globalbtg.com]
**Sent:** Wednesday, July 14, 2010 12:44 PM
**To:** stuart@warren-sklar.com
**Cc:** patrick@globalbtg.com
**Subject:** National Air Cargo LOI

Stuart,

As discussed, see the attached LOI.

If you can add or suggest language that we discussed:
1. make clear that we can assign the operating lease - we may have buyers, and would like to flip some aircraft for an immediate profit.
2. Include best efforts basis language to allow for some variation on obtainment of the purchase price and rents payments that we have presented in the LOI. I would not want the deal to be concealable if we come a few thousand dollars short of a purchase price for example.

We hope to present this to them tomorrow morning. Thanks

Jacob
<National%20Air%20Cargo%20747-400%20LOI%20%282%29[1].doc>

GLOBAL 004443

EXHIBIT 13
Page 221

**EXHIBIT 14**

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

# EXHIBIT 15

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

**EXHIBIT 16**

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

**EXHIBIT 17**

| From: | Stuart Warren |
| To: | jacob@globalbtg.com |
| Sent: | 7/21/2010 10:30:09 PM |
| Subject: | RE: [FWD: Fw: Executed Global LOI] |

Jacob,

A couple of quick thoughts:

1. Rather than re-do the LOI why don't we do a follow up to the LOI as a letter to them from Global.

2. We can refer to the LOI being signed on 18 July and then say that in the last 3 days we have brought in Greenrock as an equity partner, initiated contact with other equity partners and operating lessors, survey the debt and equity sources we deal with on a regular basis and can report back that

    a. Subject to due diligence and negotiation of final documentation, we can commit to x aircraft on operating lease which could be closed in next -- days.

    b. We have more than 10 financial institutions with capital in excess of $ -- Billions who have expressed strong interest in financing 1 or more aircraft each so we are confident that we will have more than enough financing for balance of aircraft.

3. Obviously they will need to review latest financials, go to finance committees and issue term sheets but we expect to have these within – business days from sufficient number of lenders to fund at least 5 aircraft (or perhaps all of the aircraft).

4. Timing of closing will depend on negotiation of final terms and documentation and due diligence but should be able to move forward and complete all within 3 months or whatever is an appropriate time table.

It seems to me that this may be the quickest way and cleanest way to go. JAL is looking for as close to a commitment as we can make and so we don't need an LOI and we don't need deal details, unless they come back and ask for it but they can always attach the LOI. We describe the financial institutions but don't have to name them unless there are some you want to or need to do as examples. I take it with Guggenheim and others having interest we can commit to 2-4 operating leases and perhaps should do that. The critical thing is that even if we had term sheets from all the banks it would still take 45-60 days to put the thing together and any commitment is going to require a certain amount of due diligence and bank internal approval process.

What do you think?

Best regards,

Stuart

EXHIBIT 17
Page 251

GLOBAL 018646

**From:** jacob@globalbtg.com [mailto:jacob@globalbtg.com]
**Sent:** Sunday, July 18, 2010 1:59 PM
**To:** Steve Alexander; Rick Jones; patrick@globalbtg.com
**Cc:** Stuart Warren
**Subject:** [FWD: Fw: Executed Global LOI]

All,

We got it!
See the attached executed National Air Cargo LOI.
Rick and I have been in touch a few times today discussing our syndication bank list and are prepared to hit the phones hard tomorrow. We will keep a report that we can present to NAC over time to show our progress. Patrick will have a final version of a bank RFP completed later today which can be sent to lenders and even lessors alike to a. source bank debt and b. sell off one of more of the positions to an aircraft lessor. I typically talk to the lender first, then follow that call with an email containing the RFP. One note, as we create a list of lessors to approach to directly invest in one or more of the aircraft that Lessor must be one that can fund with their own money, i.e. Air Lease, Sky Holdings, Bank of China, Guggenheim, Investec, etc. We have the mandate and do not want any other party (potentially interested lessor) competing for debt with us in the market.

Steve and Rick I need your GreenRockCap emails so I can provide all of our contact details to Don and NAC.

Thanks for all your help getting us to this point. Now lets start pushing it past the finish line one aircraft at a time.

Best,

Jacob Hodges

-------- Original Message --------
Subject: Fw: Executed Global LOI
From: dstukes@asi-advisors.com
Date: Sun, July 18, 2010 12:32 pm
To: jacob@globalbtg.com

Jacob

Here it is. Pls confirm receipt. Pls counter sign and send back. I will get to Chris. I will get a contact list out later

DStukes
Sent from my Verizon Wireless BlackBerry
_____
**From:** Glen Joerger <gjoerger@nationalaircargo.com>
**Date:** Sun, 18 Jul 2010 14:54:39 -0400
**To:** 'dstukes@asi-advisors.com'<dstukes@asi-advisors.com>
**Cc:** Chris J. Alf<calf@nationalaircargo.com>
**Subject:** Executed Global LOI

Don,
Attached is the signed Global LOI.  Please work to get a fully executed copy and the appropriate contact info.  Thanks!!
VR Glen

Glen G. Joerger
(813) 532-2057  Office
(843) 324-8355  Mobile
_____
IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of National Air Cargo may contain information that is confidential and legally privileged and must not be forwarded to other parties. If you have received this message in error, please forward it to the sender and delete it completely from your computer system.

EXHIBIT 17
Page 252

GLOBAL 018647

# EXHIBIT 18

| | |
|---|---|
| **From:** | Mr. Rick Jones |
| **To:** | jacob@globalbtg.com |
| **CC:** | Steve Alexander |
| **Sent:** | 7/17/2010 9:27:57 AM |
| **Subject:** | Re: RE: National Air Cargo 747-400BCF LOI |

Dear Jacob,

1. NAC objective is to secure the five 747s from JAL.

2. NAC's second objective is to obtain a finance lease.

3. NAC needs some sort of commitment to satisfy JAL by next Thursday.

I would propose the following:

1. They sign an LOI that permits us to deliver both a Op Leae and Fin Lease.

2. We line up our investor (Gugenheim) with an MOU to us for an Op Lease.

3. We go out and try to shake the trees for a lender for the fin-lease.

4. Worse case,  NAC has a commitment for an op lease that they can waive in front of JAL.

5. We then proceed with the bank to obtain an fin lease.

We will need to charge NAC $50 000 for the op lease commitment.  We might have to give some of that money to our funder to issue the MOU.  I don't know.

This solution would obtain for NAC the hold on the JAL planes and the time to complete purchase agreements.  This would give us time to place the debt with a bank for at least the first two planes.

This is a little underhanded but seems like a win-win.

Cheers,

------------ Původní zpráva ------------
**Od:** <jacob@globalbtg.com>
**Předmět:** RE: National Air Cargo 747-400BCF LOI
**Datum:** 17.7.2010 01:04:25
--------------------------------------------------
Don,

EXHIBIT 18
Page 253

GLOBAL 004527

The proposed changes are so materially different than when we very first talked that I must say that I don't know what the solution is at this point. We initially came in of the understanding that we could bid an op lease on 3-5 of the 747s, and that many of the aircraft were being acquired with cash.

If we are to play the sole role of an arranger, then perhaps we structure this as they do where we collect a small upfront fee, fully refundable less reasonable expenses, to put all of our resources into organizing all docs, creating an RFP etc. that can then be put out to our bank contacts to give them a look at the opportunity. Given the now short time window it will take our full combined resources.

Lessors willingly do this work for free for an airline under an op lease because if successful they buy the aircraft and enjoy the full benefit of ownership (and the risk). We support our original LOI because it provides the opportunity for us to participate in the transaction as a lessor along side the banks that we bring in to fund the finance leases.

We will continue to noodle on this over the next few hours. Please let me know if you have any additional thoughts. Please convey this message to NAC so that everyone can be of the same understanding.

Best Regards,

Jacob Hodges

-------- Original Message --------
Subject: National Air Cargo 747-400BCF LOI
From: dstukes@asi-advisors.com
Date: Fri, July 16, 2010 2:28 pm
To: <jacob@globalbtg.com>

Jacob:
Got it!   They are waiting for the clean LOI to sign.


Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548



This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.


**On Fri 16/07/10 4:20 PM , jacob@globalbtg.com sent:**

Don,

No problem. We are working down the list right now based on priority. 1. being the amortization schedules, and 2. the proposed changes to the LOI. You can always see www.greenrockcap.com for bios on Steve and Rick.

EXHIBIT 18
Page 254

GLOBAL 004528

Jacob

-------- Original Message --------
Subject: National Air Cargo 747-400BCF LOI
From: dstukes@asi-advisors.com
Date: Fri, July 16, 2010 1:58 pm
To: <jacob@globalbtg.com>
Cc: "Stuart Warren" <stuart@warren-sklar.com>

Jacob:
Can you please send some of the information on your bank and airline references. Chris has asked for them again. You may want to send something on Rick or Steve as I know they have referecnes as well. This is not required but would be helpful.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**On Fri 16/07/10 3:43 PM , dstukes@asi-advisors.com sent:**

Jacob:
Attached please find a marked-up LOi that incorporates NAC comments. I am available all evening via my cell. Call my with any question or issues. Let's try to get this document executed tonight.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

EXHIBIT 18
Page 255

GLOBAL 004529

Rick Jones MBA
Tel/Fax: (420) 2206 10 197
Mobile: (420) 721 369 120
Prague, Czech Republic

EXHIBIT 18
Page 256

GLOBAL 004530

**EXHIBIT 19**

Exhibit 375 Pg. 1 of 2
Depo of Hodges
Date 5/31/12

Xavier Mireles, CSR 5001

From:       dstukes@asi-advisors.com
To:         jacob@globalbtg.com
CC:         Stuart Warren
Sent:       7/16/2010 3:26:22 PM
Subject:    National Air Cargo 747-400BCF LOI

Jacob:

Here is my feedback from the LOI. You can give me a call to discuss prior to the noon EST call, if you wish. Generally, they are positive about proceeding with the proposal.

a) They have no interest in any of the operating leases. They want all finance leases. (This should be of no surprise)

b) They want to know realisitically how many of the 8 aircraft can you secure finance leases for?

c) They want a better handle on timing to close on the first leases. They want to know when they could have firm commitmemtns on the finance leases.

d) They would like to have some references from banks and airlines.

e) They have a question on the logisitics for the "D" check.

f) They want to know what,  if any, other fees need to be paid for this deal.

g) They want to confirm that you will in fact be able to purchase the aircraft with the debt you secure and your equity contribution.

Now be prepared for Chris to try to negotiate terms and conditions furtehr. He will never stop. I told him until you get firmer numbers from the banks, you are in no position to negotiate rental rates and such right now. There may be some room later in the process.

Botton line, they want to know how quickly can you move to commit to close on the transactions. They will press you on this matter.


Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548


This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other

GLOBAL 004535

EXHIBIT 19
Page 257

person. Thank you for your cooperation.

GLOBAL 004536

EXHIBIT 19
Page 258

**EXHIBIT 20**

| From: | dstukes@asi-advisors.com |
|---|---|
| To: | jacob@globalbtg.com |
| Sent: | 7/17/2010 12:21:47 AM |
| Subject: | Re: National Air Cargo 747-400BCF LOI |

Jacob

Before I send to NAC perhaps we should talk. They made it clear they did not want an op lease on the phone and your team was fine with arranging cap leases. What happened? Your team was going to make money on the spread. They will not consider. Op lease at this time. It may change later but for now no

DStukes

Sent from my Verizon Wireless BlackBerry

---

**From:** <jacob@globalbtg.com>
**Date:** Fri, 16 Jul 2010 16:04:18 -0700
**To:** <dstukes@asi-advisors.com>
**Cc:** Rick Jones<RickJones@seznam.cz>
**Subject:** RE: National Air Cargo 747-400BCF LOI

Don,

The proposed changes are so materially different than when we very first talked that I must say that I don't know what the solution is at this point. We initially came in of the understanding that we could bid an op lease on 3-5 of the 747s, and that many of the aircraft were being acquired with cash.

If we are to play the sole role of an arranger, then perhaps we structure this as they do where we collect a small upfront fee, fully refundable less reasonable expenses, to put all of our resources into organizing all docs, creating an RFP etc. that can then be put out to our bank contacts to give them a look at the opportunity. Given the now short time window it will take our full combined resources.

Lessors willingly do this work for free for an airline under an op lease because if successful they buy the aircraft and enjoy the full benefit of ownership (and the risk). We support our original LOI because it provides the opportunity for us to participate in the transaction as a lessor along side the banks that we bring in to fund the finance leases.

We will continue to noodle on this over the next few hours. Please let me know if you have any additional thoughts. Please convey this message to NAC so that everyone can be of the same understanding.

Best Regards,

Jacob Hodges

-------- Original Message --------
Subject: National Air Cargo 747-400BCF LOI
From: dstukes@asi-advisors.com
Date: Fri, July 16, 2010 2:28 pm
To: <jacob@globalbtg.com>

Jacob:
Got it!   They are waiting for the clean LOI to sign.

Sincerely,



EXHIBIT 20
Page 259

GLOBAL 004628

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**On Fri 16/07/10 4:20 PM , jacob@globalbtg.com sent:**

Don,

No problem. We are working down the list right now based on priority. 1. being the amortization schedules, and 2. the proposed changes to the LOI. You can always see www.greenrockcap.com for bios on Steve and Rick.

Jacob

-------- Original Message --------
Subject: National Air Cargo 747-400BCF LOI
From: dstukes@asi-advisors.com
Date: Fri, July 16, 2010 1:58 pm
To: <jacob@globalbtg.com>
Cc: "Stuart Warren" <stuart@warren-sklar.com>

Jacob:
Can you please send some of the information on your bank and airline references. Chris has asked for them again.  You may want to send something on Rick or Steve as I know they have referecnes as well.  This is not required but would be helpful.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

EXHIBIT 20
Page 260

GLOBAL 004629

**On Fri 16/07/10 3:43 PM , dstukes@asi-advisors.com sent:**

Jacob:
Attached please find a marked-up LOi that incorporates NAC comments.  I am available all evening via my cell.  Call my with any question or issues.  Let's try to get this document executed tonight.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

EXHIBIT 20
Page 261

GLOBAL 004630

**EXHIBIT 21**

| From: | Schoultz, Walter |
|---|---|
| To: | jacob@globalbtg.com |
| Sent: | 7/23/2010 11:48:02 PM |
| Subject: | Re: NAC updated memo |

Jacob,

thanks for the kind words. since the chart showing cost information is out on the data site, lenders doing their due diligence will be able to run their own calculations and determine the differential. I will go either way you want, however, for new lenders, we might just add a comment re the addition of those amounts in the financing. They are probably not a make or break on anyone's decision. Other option is to show it in the cost chart and gross that up. Let me know.

On final completion, I will prepare two memos for distribution as you describe. I have completed the section re the legal suite and the one major section I have to complete is the financial analysis. Due to time constraints, I will have to keep that rather simple and will be working on it this evening and tomorrow.

I will be sending out a list of open items to Brian Conaway shortly. Brian has given me contact info for over the weekend, however, he is relying on Glen Joerger for completion of some items (I know he has been busy). I will be copying you Rick and Steve on the email. Feel free to give any appropriate party a gentle prod.

Regards,

Walt


On Fri, Jul 23, 2010 at 4:01 PM, <jacob@globalbtg.com> wrote:
Walt,

The write up is exceptional and will be a tremendous value to us once it is complete and formatted such that we can send it out to our lenders.

Due to the urgency of the project we were not afforded the luxury of delaying our RFP and we had to go with what we had. All of the lenders we have talked with have that original RFP therefor it is my recommendation that your document be a stand alone NAC Transaction Summary / Credit overview document. This could be done by taking out the first several pages which were merged from that RFP. Or we have 2 versions; the first as you have it with all the terms etc. - to be distributed to all new lenders we talk to from this point forward, and the second as I described above - to be distributed to all lenders that already have the RFP.

I would advise that we pull all reference to price paid as well. This will allow us to distribute the doc to a broader audience including the investors that want to buy one or more of the lease encumbered 747s subject to the operating lease. FYI; the difference between price paid and loan amount request is $2.5MM per aircraft which is part of the $3.5MM cost of the "D" check. On a finance lease we are attempting to get some of the cost back for NAC. On the operating lease we will get all of it back plus a mark up of $1MM + per aircraft.

Overall it's great work - thank you and see my contact details below. I simpy did not have time to responded to your earlier email because I have literally been on the phone night and day like Rick.

Best,

Jacob Hodges
Managing Director
Global BTG (Big Ticket Group)
Los Angeles, CA

EXHIBIT 21
Page 262

GLOBAL 004208

Phone: +1 805-405-9211
Email: jacob@globalbtg.com

-------- Original Message --------
Subject: NAC updated memo
From: "Schoultz, Walter" <walt.schoultz@greenrockcap.com>
Date: Fri, July 23, 2010 10:24 am
To: Steve Alexander <stevea@greenrockcap.com>, Rick Jones
<rick.jones@greenrockcap.com>, jacob@globalbtg.com

I have edited the sections I previously sent to you. toss the last version.

EXHIBIT 21
Page 263

GLOBAL 004209

# EXHIBIT 22

| From: | jacob@globalbtg.com |
|---|---|
| To: | Schoultz, Walter |
| CC: | Rick Jones; Steve Alexander |
| Sent: | 7/27/2010 6:23:37 AM |
| Subject: | RE: NAC memo |

Walt,

Perfect write up. I have have two requests on the doc titled: National Air Cargo Descriptive.memo.pdf
Page 1: replace Request for Proposal with Transaction Summary, and delete "Financing of up to" and simply
leave the following: 8 Boeing 747-400BCF Aircraft.
Page 20: Appendix III: Can you delete the Loan amount section on the 747s and the entire 757 section.
This write is will primarily be going out to the investors that we are in discussions with about acquiring the
aircraft (Lessor has assignment rights) and the lenders that already have the original RFP. The investors are
paying an amount above the loan amount so to include it would create a problem that would have to be
explained. We hope to be able to do a SLB on the 757s at a future point in time as well so I would not want to
inform the full aviation community of the financial detail of the 757s. The airline may object as well.
thanks.

Jacob
-------- Original Message --------
Subject: NAC memo
From: "Schoultz, Walter" <walt.schoultz@greenrockcap.com>
Date: Mon, July 26, 2010 7:00 pm
To: Rick Jones <rick.jones@greenrockcap.com>, Jacob Hodges
<jacob@globalbtg.com>, Steve Alexander <stevea@greenrockcap.com>

Attached are two versions of the memo.The one with "Descriptive" in the title does not have a term sheet.
Rather than walk through all the shortfalls of the memo, please simply note:

Page 3 of the full memo: Listed National Leasing LLC as borrower.
Removed all references to the price of the aircraft. In the Appendix III page 23 substituted the
loan amount for the price.
Please read prior to distribution as I would appreciate one last check

EXHIBIT 22
Page 264

GLOBAL 006193

**EXHIBIT 23**

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

# EXHIBIT 24

**From:** Stuart Warren <stuart@warren-sklar.com>
**To:** globalbtg <globalbtg@aol.com>
**Subject:** RE: Global BTG
**Date:** Mon, Jul 19, 2010 6:41 pm
**Attachments:** Redacted



Redacted

Thanks.

Best regards,

Stuart

PS I have alerted Sklar's office about filing the organization papers for Global BTG and we should get it done tomorrow or Wednesday at the latest.

**From:** globalbtg@aol.com [mailto:globalbtg@aol.com]
**Sent:** Thursday, July 08, 2010 11:53 PM
**To:** stuart@warren-sklar.com
**Subject:** Global BTG

Stuart,

Redacted

2. I need to reserve the name Global BTG, LLC and set up the single member LLC with me as the owner/managing director. Can you tell me cost wise what I should expect to pay. I will have the details for you tomorrow for the NV registered agent.

Best,

Jacob Hodges

EXHIBIT 24
Page 292

5/7/2012 1:14 PM

GLOBAL 011438

**EXHIBIT 25**

**FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER**

**EXHIBIT 26**

**From:** Stuart Warren <stuart@warren-sklar.com>
**To:** globalbtg <globalbtg@aol.com>
**Subject:** RE: NDA
**Date:** Tue, Jul 20, 2010 11:34 am



Also, the Nevada filing should be made today and Global BTG LLC should be in
existence as of today or the latest tomorrow.



EXHIBIT 26
Page 294

5/5/2012 3:51 PM

GLOBAL 011442

# EXHIBIT 27

# FILED UNDER SEAL PURSUANT TO
# PROTECIVE ORDER

**EXHIBIT 28**

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

**EXHIBIT 29**

| From: | CJ Lorio |
| To: | 'jacob@globalbtg.com' |
| Sent: | 7/27/2010 9:05:35 AM |
| Subject: | Re: 747-400F Lease terms |

The terms proposed in the RFP do not work for us economically. Let me know if the company wants to revisit.
CJ Lorio
---------------------------
Sent from my BlackBerry Wireless Handheld

**From:** jacob@globalbtg.com <jacob@globalbtg.com>
**To:** CJ Lorio
**Cc:** tcorley@aerolease.com <tcorley@aerolease.com>; jep@aerolease.com <jep@aerolease.com>
**Sent:** Tue Jul 27 01:42:40 2010
**Subject:** RE: 747-400F Lease terms

CJ,

The terms that you have provided below do fall outside of the terms and conditions that National has agreed upon in our LOI executed on July 18th which are summarized in the RFP for the sale of the aircraft. The two major differences are the rent and subsequent LRF and the deposit. Our LRF is on average 1.34%, whereas your LRF is 1.56%. As a result, National has said that the terms are not acceptable to them at this time.

A proposal based on the terms of the RFP would conform to the LOI completely and as such would be found acceptable. Please re-consider your pricing. I'm available anytime you would like to discuss in more detail.

Best Regards,

Jacob Hodges

-------- Original Message --------
Subject: Re: 747-400F Lease terms
From: CJ Lorio <CJ.Lorio@pgrp.net>
Date: Fri, July 23, 2010 7:08 pm
To: "'jacob@globalbtg.com'" <jacob@globalbtg.com>

Ok. Thanks
CJ Lorio
---------------------------
Sent from my BlackBerry Wireless Handheld

**From:** jacob@globalbtg.com <jacob@globalbtg.com>
**To:** CJ Lorio
**Cc:** 'tcorley@aerolease.com' <tcorley@aerolease.com>; Jep Thornton <jep@aerolease.com>
**Sent:** Fri Jul 23 20:45:39 2010
**Subject:** RE: 747-400F Lease terms

CJ,

I have forwarded your proposal to National for consideration including to Don Stukes their adviser and Chris Alf the Chairman/sole owner. Chris just came back into town today from the Farnbourough airshow but I am certain they will give it their full and undivided attention.

Sincerely,

EXHIBIT
407
Lorio 5-30-12
PENGAD 800-631-6989

GLOBAL 004169

EXHIBIT 29
Page 310

Jacob Hodges
Managing Director
Global BTG (Big Ticket Group)
Los Angeles, CA
Phone: +1 805-405-9211
Email: jacob@globalbtg.com

-------- Original Message --------
Subject: 747-400F Lease terms
From: CJ Lorio <CJ.Lorio@pgrp.net>
Date: Fri, July 23, 2010 3:23 pm
To: "jacob@globalbtg.com" <jacob@globalbtg.com>
Cc: "'tcorley@aerolease.com'" <tcorley@aerolease.com>, Jep Thornton <jep@aerolease.com>

Jacob,

In response to your request, PEPI Capital would consider the following general terms on acquiring a Boeing 747-400F aircraft and initiating an operating lease with National Air Cargo. This is based solel on the information you have provided me regarding National's solicitation of financing on the eight 747-400F aircraft, and not any detailed due diligence on the assets or National. The terms would basically be along the lines of the operating lease terms described, except as follows:

- Based on lessor investment of actual contracted purchase price plus necessary aircraft and engine maintenance to place into service, up to $45 million. We can either step into National's contract, do a separate contract, or acquire from National after its acquisition
- Term – 72 months, however 84 months if an aircraft has a near term D check scheduled, such as MSN 26344
- Deposit – 3 months rent, reducing to two months rent with on-time payment performance over the first twelve months of lease
- Monthly Rent - $700,000 (can be adjusted if lessor investment is greater than or less than $45 million)
- Lessee purchase option – none
- Subject to financing – no, but if we do two or more aircraft we may want additional venture partners.
- Due diligence – acquisition and lease would be subject to due diligence on National and aircraft/engines to our satisfaction, including its business plan, ownership/management, financial condition (including review of audited financials), participation in CRAF, certification to operate subject aircraft, maintenance processes and agreements, engine borescopes, review of all engine and aircraft records, inspections, and other due diligence typical of this type transaction

If these general terms are acceptable to National, we can follow up with a letter National can use to demonstrate to JAL that it has identified resources for an aircraft transaction to close and then move quickly to a lease and purchase agreements, inspections, detailed due diligence, etc.

As stated to you before, we and Aerolease are experienced freighter lessors, have capital to close the transaction in timely fashion, and also have an interest in any 757 aircraft for which National may wish to explore a leasing transaction. We have closed on nine aircraft in the last few months alone and have experience in dealing with distressed assets and managing conversions.

Feel free to contact me with questions. I am out of country, but available, next week.

Regards,

C.J. Lorio
Perot Investments
972-535-1972
972-535-1991 (fax)

GLOBAL 004170

EXHIBIT 29
Page 311

**EXHIBIT 30**

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

GLOBAL BTG, LLC,                    )
                                    )
            Plaintiff,              )      **CERTIFIED COPY**
                                    )
VS.                                 )      CASE NO. 2:11-CV-0167
                                    )
NATIONAL AIR CARGO,                 )      **CONFIDENTIAL**
                                    )
            Defendant.              )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

- CONFIDENTIAL -

VIDEOTAPED ORAL DEPOSITION OF

CHARLES JOSEPH LORIO

MAY 30, 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        On the 30th day of May, 2012, at 9:00 a.m., the

videotaped oral deposition of the above-named witness

was taken at the instance of the Defendant, National Air

Cargo, before Michelle L. Munroe, Certified Shorthand

Reporter in and for the State of Texas, at Haynes and

Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas,

Texas, pursuant to Notice and the agreement hereinafter

set forth.

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 65

| | | |
|---|---|---|
| 1 | timing involved with presenting a letter to JAL? | 10:31:19 |
| 2 | A.   He may have.   I don't have any specific | 10:31:23 |
| 3 | recollection on it, though. | 10:31:28 |
| 4 | Q.   Is it fair to say that as a part of this | 10:31:31 |
| 5 | proposed transaction, Mr. Hodges was seeking to get a | 10:31:44 |
| 6 | letter from Perot to present to National? | 10:31:46 |
| 7 | A.   Well, yes -- | 10:31:50 |
| 8 | MR. SMITH:   Objection; form. | 10:31:51 |
| 9 | A.   -- it's evident in the e-mails that, you know, | 10:31:52 |
| 10 | they were looking to see if we could provide some sort | 10:31:53 |
| 11 | of commitment letter with the indication being that if | 10:31:55 |
| 12 | we could do that quickly, you know, we would be able to | 10:31:58 |
| 13 | perhaps get these lease terms that we were interested | 10:32:01 |
| 14 | in. | 10:32:03 |
| 15 | Q.   And it's fair -- | 10:32:04 |
| 16 | MR. SMITH:   Foundation. | 10:32:04 |
| 17 | I apologize. | 10:32:06 |
| 18 | Q.   And it's fair to say that on July 23rd, you | 10:32:06 |
| 19 | were not willing to write that type of commitment | 10:32:09 |
| 20 | letter? | 10:32:11 |
| 21 | A.   I wasn't going to write any kind of commitment | 10:32:13 |
| 22 | letter unless the terms were agreed to between us and | 10:32:18 |
| 23 | National, and any commitment letter that we did would | 10:32:21 |
| 24 | have a lot of subjects to it. | 10:32:23 |
| 25 | Q.   And so the answer to my question -- my | 10:32:26 |

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 66

| | | |
|---|---|---|
| 1 | question is whether it's fair to say that on July 23rd, | 10:32:30 |
| 2 | Perot was not in a position to write any such commitment | 10:32:33 |
| 3 | letter; is that correct? | 10:32:37 |
| 4 | A.   That's correct, we were not in a position to | 10:32:38 |
| 5 | write the commitment letter at that time. | 10:32:40 |
| 6 | Q.   Is it fair to say that if you were going to | 10:32:44 |
| 7 | write a commitment letter, the commitment letter would | 10:32:46 |
| 8 | be based on the terms set forth here in this proposal? | 10:32:49 |
| 9 | A.   Yes. | 10:32:52 |
| 10 | Q.   Is it your testimony that you would not be | 10:32:53 |
| 11 | willing to write a commitment letter which would have | 10:32:55 |
| 12 | included a -- lease rates that are set forth in the RFP | 10:32:58 |
| 13 | issued to you on July 23rd that we just looked at that's | 10:33:04 |
| 14 | Exhibit 404? | 10:33:09 |
| 15 | MR. SMITH:   I think it's asked and | 10:33:13 |
| 16 | answered.   He said he wasn't ready to write a commitment | 10:33:15 |
| 17 | letter. | 10:33:17 |
| 18 | A.   Let me make sure I understand the question. | 10:33:18 |
| 19 | If we wrote a commitment letter, would it have the lease | 10:33:20 |
| 20 | rates -- I think it would -- it would have the language | 10:33:25 |
| 21 | as I outlined in the this proposal, which was $700,000 a | 10:33:28 |
| 22 | month, you know, adjusted, you know, up or down, you | 10:33:32 |
| 23 | know, with respect to the $45 million assumed investment | 10:33:37 |
| 24 | in the plane. | 10:33:40 |
| 25 | Q.   So it's fair to say you didn't contemplate | 10:33:42 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277         www.merrillcorp.com/law

EXHIBIT 30
Page 314

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 67

| | | |
|---|---|---|
| 1 | writing a commitment letter which would specify the | 10:33:45 |
| 2 | rental rates set forth in the RFP; is that correct? | 10:33:48 |
| 3 | A.    No, not tied to those rental rates. | 10:33:51 |
| 4 | Q.    And it's fair to say that you didn't | 10:33:54 |
| 5 | contemplate writing a commitment letter which would | 10:33:55 |
| 6 | include a purchase option for an operating lease as set | 10:33:58 |
| 7 | forward in the July 23rd RFP? | 10:34:01 |
| 8 | A.    That's correct. | 10:34:03 |
| 9 | Q.    And is it fair to say that you're -- you would | 10:34:03 |
| 10 | not consider writing a commitment letter for a pure | 10:34:06 |
| 11 | finance lease rather than an operating lease for the | 10:34:14 |
| 12 | aircraft the subject of the July 23rd RFP? | 10:34:17 |
| 13 | A.    That's correct. | 10:34:20 |
| 14 | (Exhibit 407 marked.) | 10:35:11 |
| 15 | Q.    I'm going to give you now what has been marked | 10:35:14 |
| 16 | as -- we'll mark as Exhibit 407. | 10:35:18 |
| 17 | Mr. Lorio, do you have any recollection of how | 10:35:27 |
| 18 | Mr. Hodges responded to your July 23rd proposal? | 10:35:33 |
| 19 | A.    Well, I'll -- I mean, you know, looking at | 10:35:39 |
| 20 | this e-mail, I mean, I think he presented our proposal | 10:35:42 |
| 21 | to National for their consideration and that, you know, | 10:35:46 |
| 22 | National came back and said that, you know, they didn't | 10:35:54 |
| 23 | want to -- they were not interested in those terms. | 10:35:56 |
| 24 | Q.    And just so the record is clear, you're | 10:35:59 |
| 25 | referring to the -- Exhibit 407? | 10:36:02 |

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 74

| | | |
|---|---|---|
| 1 | this was the spring of 2011 when Jacob Hodges talked to | 10:51:44 |
| 2 | you about this case. | 10:51:49 |
| 3 | Do you remember whether there were multiple | 10:51:50 |
| 4 | conversations or just one? | 10:51:52 |
| 5 | A.   I don't recall specifically, you know.   I | 10:51:54 |
| 6 | think looking back the documents, we probably had a | 10:51:57 |
| 7 | conversation at a conference and then he followed it up | 10:52:00 |
| 8 | with sending me an e-mail with an affidavit. | 10:52:04 |
| 9 | Q.   And do you -- do you remember reviewing the | 10:52:07 |
| 10 | affidavit -- draft affidavit? | 10:52:12 |
| 11 | A.   Yes, I remember, you know, looking at it. | 10:52:15 |
| 12 | Q.   Do you remember what your view was of the -- | 10:52:20 |
| 13 | the declaration?   Sorry. | 10:52:23 |
| 14 | A.   Yeah.   I didn't look at it very specifically. | 10:52:27 |
| 15 | I talked to my general counsel, Dave Radunsky, about it | 10:52:29 |
| 16 | as to whether we wanted to get into that, you know, | 10:52:34 |
| 17 | affidavit or not, the specifics of it. | 10:52:37 |
| 18 | MR. GOLD:   I want to caution the witness | 10:52:39 |
| 19 | not to disclose the content of your communications | 10:52:41 |
| 20 | with -- | 10:52:45 |
| 21 | THE WITNESS:   Right. | 10:52:45 |
| 22 | MR. GOLD:   -- with your -- with your | 10:52:46 |
| 23 | counsel. | 10:52:47 |
| 24 | Q.   Just so the record is clear, I -- I was not | 10:52:47 |
| 25 | asking for any -- any kind of communication you had with | 10:52:51 |

EXHIBIT 30
Page 316

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 75

| | | |
|---|---|---|
| 1 | your counsel about whether you should or shouldn't sign | 10:52:55 |
| 2 | this declaration. | 10:52:58 |
| 3 | I'm going to show you what we'll mark as | 10:53:14 |
| 4 | Exhibit 409.  I'll represent for the record that this is | 10:53:17 |
| 5 | a cover e-mail attaching what appears to be a draft | 10:53:39 |
| 6 | declaration of C.J. Lorio.  The cover page is Bates | 10:53:42 |
| 7 | labeled Petrus 000144.  It runs through 00147. | 10:53:46 |
| 8 | Mr. Lorio, if you could just take a minute and | 10:53:57 |
| 9 | look through the cover e-mail and the document and let | 10:53:59 |
| 10 | me know if this looks familiar to you. | 10:54:02 |
| 11 | (Exhibit 409 marked.) | 10:53:11 |
| 12 | A.   (Reviewed document.)  Yes. | 10:54:05 |
| 13 | Q.   And what is it? | 10:54:11 |
| 14 | A.   Well, it's an e-mail from Jacob Hodges asking | 10:54:14 |
| 15 | me to review a draft of an affidavit he was interested | 10:54:18 |
| 16 | in having us execute or at least review and -- to put it | 10:54:23 |
| 17 | in the form that we would be willing to execute.  And it | 10:54:31 |
| 18 | includes the draft affidavit -- or declaration. | 10:54:34 |
| 19 | Q.   Do you know who drafted this declaration? | 10:54:42 |
| 20 | A.   I do not specifically no.  It was provided to | 10:54:45 |
| 21 | me by Jacob Hodges. | 10:54:48 |
| 22 | Q.   The cover e-mail mentions a conversation | 10:54:50 |
| 23 | between you and Jacob Hodges at ISTAT? | 10:55:01 |
| 24 | A.   Uh-huh. | 10:55:04 |
| 25 | Q.   Can you tell me what ISTAT is? | 10:55:06 |

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 76

| | | |
|---|---|---|
| 1 | A.    ISTAT is an industry trading group.  It's | 10:55:08 |
| 2 | International Society of Transport Aircraft and Trading | 10:55:12 |
| 3 | I think is what it stands for.  And they hold several | 10:55:16 |
| 4 | conferences during the year, and we met at one of those | 10:55:19 |
| 5 | conferences. | 10:55:23 |
| 6 | Q.    When Mr. Hodges talked to you about -- at | 10:55:23 |
| 7 | ISTAT about completing a declaration, did he say why he | 10:55:28 |
| 8 | wanted a declaration? | 10:55:34 |
| 9 | A.    I don't -- I don't recall the specific | 10:55:37 |
| 10 | conversation we had at ISTAT.  If we talked about it, I | 10:55:43 |
| 11 | don't recall exactly what we talked about at ISTAT. | 10:55:48 |
| 12 | Q.    So you -- you don't have any recollection of | 10:55:52 |
| 13 | Mr. Hodges specifically asking you, you know, hey, will | 10:55:56 |
| 14 | you complete a declaration if I send it over? | 10:56:00 |
| 15 | A.    Right.  I don't -- I don't recall.  Apparently | 10:56:03 |
| 16 | maybe -- maybe we did, but I don't specifically recall | 10:56:06 |
| 17 | that conversation. | 10:56:08 |
| 18 | Q.    The cover e-mail, Mr. Hodges says he's asking | 10:56:10 |
| 19 | for you to tell your version of those events.  Do you | 10:56:18 |
| 20 | see that?  It's line 3 of the second paragraph. | 10:56:22 |
| 21 | A.    Okay. | 10:56:26 |
| 22 | Q.    So I'll just have you turn the page to the | 10:56:27 |
| 23 | declaration, and we'll go through it and see if it's | 10:56:31 |
| 24 | consistent with your -- your view of what -- if the | 10:56:33 |
| 25 | facts are consistent with what transpired in the summer | 10:56:38 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 30
Page 318

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 77

| | | |
|---|---|---|
| 1 | of 2010. | 10:56:42 |
| 2 | The first paragraph, do you have any reason to | 10:56:44 |
| 3 | believe that this is not an accurate reflection of -- or | 10:56:50 |
| 4 | accurate statement of the facts? | 10:56:55 |
| 5 | A. Well, I am C.J. Lorio and I'm a private | 10:56:58 |
| 6 | investment analyst. I mean, with respect to the | 10:57:01 |
| 7 | statement about the facts set forth herein, you know, I | 10:57:03 |
| 8 | can't attest to that. | 10:57:07 |
| 9 | Q. Is it true that Perot Investments is an | 10:57:12 |
| 10 | open-end investment funds company with a principal place | 10:57:15 |
| 11 | of business in Plano, Texas? | 10:57:18 |
| 12 | A. No. | 10:57:19 |
| 13 | Q. Why -- | 10:57:20 |
| 14 | A. I don't -- I don't know what an open-end | 10:57:22 |
| 15 | investment fund is or an open-end investment fund | 10:57:25 |
| 16 | company. I'm not sure exactly what that means. I mean, | 10:57:28 |
| 17 | we -- as I said, we're an investment adviser to the | 10:57:32 |
| 18 | Perot family, and we do office in Plano, Texas. | 10:57:36 |
| 19 | Q. Do you have unlimited funds? | 10:57:40 |
| 20 | A. No, we don't. | 10:57:42 |
| 21 | Q. Is it true that in your role at Perot | 10:57:47 |
| 22 | Investments, you source, analyze, close and monitor | 10:58:09 |
| 23 | private investment opportunities, focusing on private | 10:57:52 |
| 24 | finance and special situations, including bankruptcy, | 10:57:54 |
| 25 | debtor-in-possession financing, bridge financing and | 10:57:57 |

EXHIBIT 30
Page 319

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 78

| | | |
|---|---|---|
| 1 | other distressed opportunities? | 10:57:59 |
| 2 | A.   Yeah, that's -- that's correct.   It includes | 10:58:02 |
| 3 | those opportunities and others. | 10:58:07 |
| 4 | Q.   Is it true that you focus on the financing of | 10:58:10 |
| 5 | commercial aviation assets, including equipment trading, | 10:58:15 |
| 6 | part-out and aircraft leasing? | 10:58:18 |
| 7 | A.   Yes. | 10:58:20 |
| 8 | Q.   Paragraph 4, is it accurate that you and | 10:58:33 |
| 9 | Mr. Hodges had worked together in the past and he | 10:58:40 |
| 10 | routinely presented you with commercial aircraft to be | 10:58:43 |
| 11 | acquired or financed? | 10:58:46 |
| 12 | A.   I don't know what he means -- what this means | 10:58:48 |
| 13 | by saying we have worked together in the past and we | 10:58:53 |
| 14 | haven't worked together.   He had shown me some | 10:58:56 |
| 15 | investment opportunities or aircraft opportunities in | 10:58:59 |
| 16 | the past, but I wouldn't say we worked together. | 10:59:00 |
| 17 | Q.   And -- and you testified earlier that those | 10:59:04 |
| 18 | opportunities he presented to you, none of them you | 10:59:09 |
| 19 | accepted? | 10:59:13 |
| 20 | A.   Yeah.   Prior to this, I only recall one other | 10:59:13 |
| 21 | opportunity that he showed us. | 10:59:17 |
| 22 | Q.   And you declined that opportunity? | 10:59:20 |
| 23 | A.   Yes. | 10:59:21 |
| 24 | Q.   Is paragraph 5 accurate? | 10:59:22 |
| 25 | A.   Well, I can't speak for Aerolease.   Aerolease | 10:59:38 |

EXHIBIT 30
Page 320

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 79

| | | |
|---|---|---|
| 1 | is a partner of ours.  You know, I -- I knew that | 10:59:52 |
| 2 | National Air is -- is an airline that operated out | 10:59:58 |
| 3 | there.  And I think my partners told me that they had -- | 11:00:05 |
| 4 | you know, they knew Preston Murray, you know, from | 11:00:08 |
| 5 | some -- from some prior, you know, transaction. | 11:00:11 |
| 6 | Q.   So let's look at paragraph 6.  This says in | 11:00:21 |
| 7 | July 2010 you were contacted by Global BTG and Jacob | 11:00:27 |
| 8 | Hodges concerning an opportunity for Perot Investments | 11:00:30 |
| 9 | to purchase from Global BTG up to five 747 aircraft | 11:00:33 |
| 10 | subject to operating leases to National Air Cargo. | 11:00:42 |
| 11 | Does that seem accurate to you? | 11:00:46 |
| 12 | A.   Not specifically.  I mean, I'm not sure if -- | 11:00:49 |
| 13 | you know, I think the discussions of the transaction | 11:00:53 |
| 14 | were somewhat fluid in how they exactly would be | 11:00:59 |
| 15 | structured as to whether we'd be acquiring from -- you | 11:01:02 |
| 16 | know, the aircraft from the sellers or from National or | 11:01:04 |
| 17 | from Global. | 11:01:08 |
| 18 | You know, I think some of the traffic | 11:01:10 |
| 19 | indicates that they were still a little bit up in the | 11:01:12 |
| 20 | air as to exactly how the transaction would be | 11:01:15 |
| 21 | structured. | 11:01:18 |
| 22 | Q.   And what about the number of aircraft listed | 11:01:19 |
| 23 | in -- paragraph 6 mentions up to five aircraft. | 11:01:22 |
| 24 | Does that seem consistent with your | 11:01:25 |
| 25 | recollection of -- | 11:01:26 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 30
Page 321

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 80

```
 1        A.    No.                                        11:01:27

 2        Q.    -- the events?                             11:01:27

 3              Why not?                                   11:01:28

 4        A.    Because we always indicated that we were   11:01:29

 5   interested in, you know, one, maybe two aircraft.     11:01:32

 6        Q.    And this -- paragraph 6 says up to five    11:01:37

 7   aircraft.                                             11:01:42

 8              Do you remember -- if we look back at the  11:01:46

 9   RFP's, I guess, it's Exhibit 401 and 404, did those   11:01:47

10   RFP's mention up to five aircraft?                    11:01:52

11        A.    I don't recall that they did.  I think one 11:01:56

12   mentioned eight and the other one mentioned seven.    11:01:59

13        Q.    Do you know why Mr. Hodges would say five --11:02:02

14   up to five aircraft?                                  11:02:10

15              MR. SMITH:  Foundation.                    11:02:11

16        A.    No.                                        11:02:12

17        Q.    And paragraph 6 says that Mr. Hodges       11:02:13

18   transmitted to you a request for proposal that described 11:02:19

19   the proposed transaction, including purchase prices for 11:02:22

20   each aircraft and rental rates for each aircraft.     11:02:27

21              Did Mr. Hodges transmit to you any RFP's other 11:02:31

22   than the ones we have looked at here today?           11:02:36

23              MR. SMITH:  Foundation.                    11:02:39

24        A.    I don't know.  These are the ones that I have 11:02:42

25   that were -- that were transmitted to me.  If there were 11:02:45
```

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 81

| | | |
|---|---|---|
| 1 | others, I don't have them. | 11:02:47 |
| 2 | Q.   Okay.   And just to remind you, you're here | 11:02:48 |
| 3 | testifying on behalf of Perot Investments? | 11:02:52 |
| 4 | A.   Yes. | 11:02:54 |
| 5 | Q.   Is there any reason you could imagine why you | 11:02:54 |
| 6 | wouldn't be aware of proposals that had been transmitted | 11:02:58 |
| 7 | to Perot by Jacob Hodges specific to the National Air | 11:03:02 |
| 8 | Cargo deal? | 11:03:05 |
| 9 | A.   No, they would have gone to me. | 11:03:05 |
| 10 | Q.   Let's look at paragraph 7.   The first sentence | 11:03:07 |
| 11 | says that you reviewed the request for proposal and | 11:03:19 |
| 12 | determined that the proposal presented a good | 11:03:23 |
| 13 | opportunity for Perot Investments and one of your | 11:03:25 |
| 14 | partners, Aerolease Aviation. | 11:03:28 |
| 15 | Is that accurate? | 11:03:30 |
| 16 | A.   I wouldn't say that's accurate. | 11:03:32 |
| 17 | Q.   And why not? | 11:03:35 |
| 18 | A.   The -- well, as we have discussed, the | 11:03:36 |
| 19 | proposals, the lease structures, you know, that were in | 11:03:41 |
| 20 | here, you know, were -- had -- had deal terms that we | 11:03:44 |
| 21 | weren't interested in.   We thought there might be an | 11:03:49 |
| 22 | opportunity to create, you know, an opportunity we would | 11:03:51 |
| 23 | be interested in though. | 11:03:55 |
| 24 | Q.   Is this description of Aerolease in the second | 11:03:56 |
| 25 | paragraph accurate?   It reads, Aerolease Aviation is | 11:04:06 |

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 82

| | | |
|---|---|---|
| 1 | known to you as an experienced and successful buyer, | 11:04:08 |
| 2 | seller and lessor of commercial aircraft worldwide? | 11:04:13 |
| 3 | A.   Yes. | 11:04:15 |
| 4 | Q.   Let's move to paragraph 8.  Paragraph 8 refers | 11:04:16 |
| 5 | to an attachment as Exhibit A, a copy of an informal, | 11:04:25 |
| 6 | nonbinding term sheet that you sent as an e-mail to | 11:04:31 |
| 7 | Jacob Hodges on Friday July 23, 2010.  The exhibit as -- | 11:04:35 |
| 8 | or this document as it was produced to us didn't include | 11:04:42 |
| 9 | an Exhibit A. | 11:04:45 |
| 10 | Do you remember seeing an Exhibit A? | 11:04:47 |
| 11 | A.   I don't remember seeing an Exhibit A, you | 11:04:48 |
| 12 | know, with this. | 11:04:55 |
| 13 | Q.   Did you -- did you draft a nonbinding term | 11:04:56 |
| 14 | sheet to Jacob Hodges and transmit it on July 23, 2010? | 11:05:03 |
| 15 | A.   No, we did not do a term sheet. | 11:05:07 |
| 16 | Q.   We saw earlier that you submitted an e-mail to | 11:05:09 |
| 17 | him on July 23rd.  It's Exhibit 404 -- no, sorry.  It's | 11:05:12 |
| 18 | Exhibit 406. | 11:05:23 |
| 19 | Do you have that in front of you? | 11:05:24 |
| 20 | A.   Yes. | 11:05:25 |
| 21 | Q.   Does -- does this look like a term sheet to | 11:05:25 |
| 22 | you? | 11:05:30 |
| 23 | A.   No, it's not a term sheet. | 11:05:31 |
| 24 | Q.   Do you remember submitting any other kind of | 11:05:32 |
| 25 | proposal to Mr. Hodges on the 23rd of July? | 11:05:40 |

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 83

```
 1        A.    No.                                          11:05:42
 2        Q.    Were you authorized by Perot to kind of      11:05:43
 3   transmit the proposal that's listed in 406 to           11:05:52
 4   Mr. Hodges?                                             11:05:57
 5        A.    Yes.                                          11:05:57
 6        Q.    At the time you submitted this sheet that's   11:06:01
 7   marked as Exhibit 406 -- this e-mail that has been      11:06:06
 8   marked as 406 to Mr. Hodges, did Perot Investments and  11:06:09
 9   Aerolease Aviation have enough capital to close the     11:06:16
10   transaction on or before November 30th?                 11:06:19
11        A.    We could have closed a transaction for one   11:06:24
12   airplane in that timeframe.                             11:06:30
13        Q.    It's your -- your testimony today that you -- 11:06:37
14   Perot Investments would only be willing to close an     11:06:42
15   airplane subject to the terms set forth in Exhibit 406? 11:06:45
16        A.    Yes.  Exhibit 406 has the general outlines of 11:06:50
17   terms that we would be interested in.                   11:06:56
18        Q.    Do you have a view as to the accuracy of     11:06:58
19   paragraph 10 of the declaration that's on page          11:07:12
20   Petrus 00146?                                           11:07:17
21        A.    Well, first, you know, we did not have a term 11:07:20
22   sheet.  And I can't say that it was more likely than not 11:07:23
23   that -- that, you know, we would have come to binding   11:07:31
24   terms.                                                  11:07:33
25        Q.    Why not?                                      11:07:36
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277         www.merrillcorp.com/law

EXHIBIT 30
Page 325

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 84

| | | |
|---|---|---|
| 1 | A.   Well, because I don't -- I don't know that, | 11:07:37 |
| 2 | you know, National, you know, would have agreed to what | 11:07:41 |
| 3 | we would have agreed to.  And even if they had, I'm not | 11:07:44 |
| 4 | sure that all the due diligence, you know, would have | 11:07:47 |
| 5 | worked out in such a way that we would actually, you | 11:07:49 |
| 6 | know, come to binding terms. | 11:07:53 |
| 7 | Q.   Do you think it's unlikely that you would have | 11:07:55 |
| 8 | reached binding terms? | 11:07:57 |
| 9 | A.   You know, that's subject to what National | 11:08:00 |
| 10 | wanted to do.  I mean, I can't say whether it's likely | 11:08:06 |
| 11 | or not. | 11:08:09 |
| 12 | Q.   If National had decided to stick with the | 11:08:09 |
| 13 | terms as set forth in the RFP transmitted to you on | 11:08:14 |
| 14 | July 20th and then again on July 23rd, is it fair to say | 11:08:18 |
| 15 | that it's unlikely you would have reached binding terms? | 11:08:23 |
| 16 | A.   Can you restate that again? | 11:08:27 |
| 17 | Q.   Sure. | 11:08:28 |
| 18 | Let's assume that National was not willing to | 11:08:30 |
| 19 | change any of the terms set forth in the RFP transmitted | 11:08:35 |
| 20 | to you on July 23rd, 2010. | 11:08:40 |
| 21 | A.   If they were not willing to. | 11:08:42 |
| 22 | Q.   If National was not willing to alter those | 11:08:45 |
| 23 | terms, is it unlikely you would have reached a | 11:08:47 |
| 24 | binding -- | 11:08:50 |
| 25 | A.   It is unlikely that we would have reached any | 11:08:50 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 30
Page 326

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 85

| | | |
|---|---|---|
| 1 | terms if they were not willing to accept what we had | 11:08:53 |
| 2 | proposed. | 11:08:55 |
| 3 | MS. COX:  Let's go off the record. | 11:09:00 |
| 4 | THE VIDEOGRAPHER:  This marks the end of | 11:09:00 |
| 5 | tape number one.  We're going off the record.  The time | 11:09:01 |
| 6 | now is 11:09 a.m. | 11:09:04 |
| 7 | (Off the record.) | 11:09:07 |
| 8 | THE VIDEOGRAPHER:  Here begins tape | 11:10:54 |
| 9 | number two of the videotaped deposition of Charles | 11:11:35 |
| 10 | Lorio.  On the record.  Time now is 11:12 a.m. | 11:11:45 |
| 11 | Q.   Mr. Lorio, I'll just direct you to the last | 11:11:41 |
| 12 | page of Exhibit -- that is the declaration -- it's the | 11:11:44 |
| 13 | Bates number Petrus 000147 -- and ask you your view of | 11:11:51 |
| 14 | the accuracy of paragraph number 11.  If you could go | 11:11:57 |
| 15 | through it sentence by sentence, that would be helpful. | 11:12:01 |
| 16 | A.   So, you know, we did not issue a nonbinding | 11:12:04 |
| 17 | term sheet.  We, you know, were considering purchasing a | 11:12:12 |
| 18 | 747, you know, subject to a lease to National Air Cargo | 11:12:24 |
| 19 | under terms that, you know, we had proposed but not | 11:12:27 |
| 20 | under a term sheet.  But I can't say that it was more | 11:12:31 |
| 21 | likely than not that we proposed to purchase one or an | 11:12:34 |
| 22 | additional one. | 11:12:40 |
| 23 | Q.   Is one of the reasons -- without getting into | 11:12:45 |
| 24 | any privileged area, is one of the reasons you decided | 11:12:49 |
| 25 | not to sign the declaration is because it was. | 11:12:52 |

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 86

| | | |
|---|---|---|
| 1 | inaccurate? | 11:12:54 |
| 2 | A.   You know, at the time, I don't recall, you | 11:12:56 |
| 3 | know, getting into the declaration and how accurate it | 11:13:01 |
| 4 | was.  You know, it was -- we kind of looked at it | 11:13:04 |
| 5 | originally as do I, you know, want to provide and get | 11:13:10 |
| 6 | into the middle of a dispute in the first place. | 11:13:13 |
| 7 | Q.   I just want to back up and -- and talk | 11:13:16 |
| 8 | globally just for a minute. | 11:13:22 |
| 9 | This case -- have you read the complaint in | 11:13:24 |
| 10 | this case? | 11:13:27 |
| 11 | A.   I, yeah, read through the complaint. | 11:13:27 |
| 12 | Q.   What is your understanding of the gist of the | 11:13:29 |
| 13 | case? | 11:13:32 |
| 14 | A.   That Global BTG and Jacob Hodges believe they | 11:13:34 |
| 15 | had a deal with National Air Cargo to provide financing | 11:13:38 |
| 16 | for several, you know, 747 aircraft.  And shortly after | 11:13:44 |
| 17 | they were signed up on that agreement and they started | 11:13:51 |
| 18 | pursuing, you know, investors or financiers for those -- | 11:13:54 |
| 19 | for those aircraft for National, that National then, you | 11:13:59 |
| 20 | know, terminated that agreement and pursued financing | 11:14:04 |
| 21 | from elsewhere. | 11:14:11 |
| 22 | Q.   And do you remember seeing Perot Investments | 11:14:12 |
| 23 | mentioned in the complaint? | 11:14:16 |
| 24 | A.   Yes, I believe we were mentioned in the | 11:14:19 |
| 25 | complaint. | 11:14:22 |

CONFIDENTIAL
CHARLES JOSEPH LORIO - 5/30/2012

Page 106

```
 1

 2

 3

 4                        _____
                         (Signature of the Witness)
 5

 6

 7

 8     THE STATE OF _____

 9     COUNTY OF _____

10

11          Subscribed and sworn to before me by the said

12     witness, CHARLES JOSEPH LORIO, on this the _____

13     day of _____, 2012.

14

15

16                        _____
                         Notary Public in and for the
                         State of _____
17                       County of _____

18     My commission expires:  _____

19

20

21

22

23

24

25
```

```
 1    STATE OF TEXAS    )

 2    COUNTY OF DALLAS  )

 3

 4         I, Michelle L. Munroe, Certified Shorthand Reporter

 5    in and for the State of Texas, certify that the

 6    foregoing deposition of CHARLES JOSEPH LORIO was

 7    reported stenographically by me at the time and place

 8    indicated, said witness having been placed under oath by

 9    me, and that the deposition is a true record of the

10    testimony given by the witness.

11         I further certify that I am neither counsel for nor

12    related to any party in this cause and am not

13    financially interested in its outcome.

14         Given under my hand on this the ___12th___ day of

15    ___June_____, 2012.

16

17

18

19

20         ___Michelle Munroe___
           Michelle L. Munroe, CSR No. 6011

21         Commission expires 12-31-13
           MERRILL LEGAL SOLUTIONS

22         Registration # 191
           4144 N. Central Expwy., #850

23         Dallas, Texas 75204
           800.966.4567

24

25    Original deposition sent to Mr. Daniel Gold on
      ___June 12_____, 2012 for signature.
```

EXHIBIT 30
Page 330