# EXHIBIT 31

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

# EXHIBIT 32

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

**EXHIBIT 33**

# In The Matter Of:

## *GLOBAL BTG LLC*
*v.*
## *NATIONAL AIR CARGO, INC.*

---

## *ROTHSCHILD, GARY A., (PMK) - Vol. 1*
### *June 11, 2012*

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

EXHIBIT 33
Page 336

GARY A. ROTHSCHILD, (PMK) - 6/11/2012

Page 66

| | | |
|---|---|---|
| 11:27:25 | 1 | you, sir? |
| 11:27:26 | 2 | A.    Yes. |
| 11:27:27 | 3 | Q.    I want to direct your attention -- feel |
| 11:27:30 | 4 | free to skim through this as much as you want -- |
| 11:27:32 | 5 | I'm going to ask you questions about the first |
| 11:27:34 | 6 | paragraph. |
| 11:27:36 | 7 | This is what appears to be an e-mail |
| 11:27:38 | 8 | from Jacob Hodges to Donald Stukes of ASI |
| 11:27:42 | 9 | Advisors.  It's dated July 23rd, 2010. |
| 11:27:46 | 10 | Do you see that? |
| 11:27:48 | 11 | (Witness looks at document.) |
| 11:27:51 | 12 | A.    Uh-huh. |
| 11:27:56 | 13 | Q.    And the cc here on the top of the |
| 11:27:57 | 14 | e-mail says Rick Jones, do you know Rick Jones? |
| 11:28:01 | 15 | A.    No. |
| 11:28:01 | 16 | Q.    It also mentioned Steve Alexander, do |
| 11:28:04 | 17 | you know who Steve Alexander is? |
| 11:28:06 | 18 | A.    No. |
| 11:28:07 | 19 | Q.    And I'll represent, just so you'll |
| 11:28:09 | 20 | know, Chris Alf and Glen Joerger are with National |
| 11:28:13 | 21 | Air Cargo. |
| 11:28:14 | 22 | A.    Yes. |
| 11:28:15 | 23 | Q.    This e-mail Jacob Hodges is reporting |
| 11:28:20 | 24 | to Don Stukes and he says that he had -- I'm in |
| 11:28:23 | 25 | the first paragraph -- he says he has asked |

EXHIBIT 33
Page 337

GARY A. ROTHSCHILD, (PMK) - 6/11/2012

Page 67

| 11:28:26 | 1 | Dave Silvers with Citi to send National an e-mail |
| 11:28:29 | 2 | with an update on the progress to date. |
| 11:28:33 | 3 | Do you see that? |
| 11:28:34 | 4 | A.   Yes. |
| 11:28:34 | 5 | Q.   And further down Mr. Hodges says |
| 11:28:36 | 6 | "They" -- I believe referring to Citibank -- "They |
| 11:28:40 | 7 | were warm, then cold, now closer to hot.  I expect |
| 11:28:43 | 8 | terms from them next week to finance 4 aircraft." |
| 11:28:47 | 9 | Do you see that? |
| 11:28:48 | 10 | A.   Yes. |
| 11:28:49 | 11 | Q.   Do you know why -- |
| 11:28:52 | 12 | Do you know if Mr. Silvers ever created |
| 11:28:54 | 13 | any kind of term sheet? |
| 11:28:56 | 14 | A.   Not to my knowledge. |
| 11:28:57 | 15 | Q.   Do you know if Citibank created a term |
| 11:29:01 | 16 | sheet? |
| 11:29:02 | 17 | A.   Not to my knowledge. |
| 11:29:02 | 18 | Q.   Would it surprise you if they created a |
| 11:29:04 | 19 | term sheet? |
| 11:29:05 | 20 | A.   Yes. |
| 11:29:06 | 21 | Q.   Why? |
| 11:29:06 | 22 | A.   Because we didn't want to do the |
| 11:29:08 | 23 | transaction. |
| 11:29:24 | 24 | Q.   So it's fair to say that in June |
| 11:29:30 | 25 | 2000 -- or in early July 2010 when -- withdrawn. |

EXHIBIT 33
Page 338

GARY A. ROTHSCHILD, (PMK) - 6/11/2012

Page 68

11:29:35  1        It's fair to say that in June 2010,

11:29:39  2   which is when Mr. Stukes first approached you, and

11:29:42  3   again in July when Mr. Hodges approached you, and

11:29:46  4   then again later in July, on July 23rd, at none of

11:29:52  5   those points in time did Citi have any interest in

11:29:55  6   financing aircraft for National Air Cargo?

11:29:59  7        MR. SMITH:  Form.

11:30:00  8        MS. COX:  Withdrawn.

11:30:01  9        I'll clarify.  We'll come back to it.

11:30:05  10   Q.    But for now it's fair to say that on

11:30:07  11  July 23rd, 2010, which is the date of Exhibit 527,

11:30:13  12  Citibank did not have any interest in doing any

11:30:15  13  financing for National Air Cargo's aircraft?

11:30:19  14   A.    Yes.

11:30:47  15   Q.    I'm going to give you what's previously

11:30:50  16  been marked as Exhibit 410.  It's the complaint in

11:30:53  17  this action.  This document doesn't have the

11:30:55  18  official exhibit sticker on it, but I'll represent

11:30:59  19  that it's been previously introduced at a prior

11:31:01  20  deposition as Exhibit 410.

11:31:07  21        Do you have Exhibit 410 in front of

11:31:10  22  you, sir?

11:31:11  23   A.    Yes.

11:31:20  24   Q.    I'm going to direct your attention to

11:31:22  25  page 7.  I'm looking at the page numbers at the

GARY A. ROTHSCHILD, (PMK) - 6/11/2012

Page 69

| | | |
|---|---|---|
| 11:31:25 | 1 | bottom of the page. |
| 11:31:26 | 2 | A.    Yes. |
| 11:31:27 | 3 | Q.    Page 7, the first paragraph -- oh, |
| 11:31:41 | 4 | sorry, could you turn to page 8. |
| 11:31:44 | 5 | A.    Yes. |
| 11:31:46 | 6 | Q.    I'm looking at paragraph 37 which says, |
| 11:31:50 | 7 | "Before the Agreement was finalized, Global was |
| 11:31:54 | 8 | soliciting lender interest in anticipation of |
| 11:31:59 | 9 | reaching an agreement with NAC." |
| 11:32:01 | 10 | A.    Uh-huh. |
| 11:32:01 | 11 | Q.    "Upon finalizing the Agreement, |
| 11:32:04 | 12 | Global's effort and time commitment to the deal |
| 11:32:07 | 13 | increased." |
| 11:32:08 | 14 | Do you see that? |
| 11:32:09 | 15 | A.    Yes. |
| 11:32:10 | 16 | Q.    My question has to do with the first |
| 11:32:11 | 17 | sentence. |
| 11:32:11 | 18 | And I'll represent for the record -- |
| 11:32:13 | 19 | and opposing counsel can correct me if this is in |
| 11:32:16 | 20 | any way confusing -- I'll represent that the |
| 11:32:19 | 21 | agreement they're referring to here is a letter of |
| 11:32:21 | 22 | intent signed by Jacob Hodges and National Air |
| 11:32:26 | 23 | Cargo.  And the date that they executed that LOI |
| 11:32:29 | 24 | was July 18th, 2010. |
| 11:32:33 | 25 | A.    Okay. |

EXHIBIT 33
Page 340

GARY A. ROTHSCHILD, (PMK) - 6/11/2012

Page 140

```
 1                          * * *

 2              ACKNOWLEDGMENT OF DEPONENT

 3      I, _____, do hereby

 4  acknowledge that I have read and examined the

 5  foregoing testimony, and the same is a true,

 6  correct and complete transcription of the

 7  testimony given by me, and any corrections appear

 8  on the attached Errata sheet signed by me.

 9

10

11

12

13  _____      _____

14  (DATE)                (SIGNATURE)

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 33
Page 341

GARY A. ROTHSCHILD, (PMK) - 6/11/2012

```
 1              C E R T I F I C A T E

 2    STATE OF NEW YORK  )

 3                       : ss.

 4    COUNTY OF NEW YORK )

 5

 6            I, DONALD R. DePEW, a Registered

 7    Professional Reporter, Certified Realtime Reporter

 8    and Notary Public within and for the State of

 9    New York, do hereby certify:

10            That GARY A. ROTHSCHILD, the witness

11    whose deposition is hereinbefore set forth, was

12    duly sworn by me and that such deposition is a

13    true record of the testimony given by the witness.

14            I further certify that I am not related

15    to any of the parties to this action by blood or

16    marriage, and that I am in no way interested in

17    the outcome of this matter.

18            IN WITNESS WHEREOF, I have hereunto set

19    my hand this 22nd day of June, 2012.

20            _____

21            DONALD R. DePEW, RPR, CRR

22

23

24

25
```

**EXHIBIT 34**

| | |
|---|---|
| **From:** | Hallmark Trading |
| **To:** | Chris Alf |
| **CC:** | walt Schoultz; Stuart Warren; Jacob Hodges; Rick Jones; Glen Joerger |
| **Sent:** | 7/27/2010 8:09:17 PM |
| **Subject:** | |
| **Attachments:** | 20090731113537881.pdf |

Chris,

For your review please see attached.

Sincerely,

Steve J. alexander

EXHIBIT

309
30 (8)(6)
05 30 2012

GLOBAL 002732

EXHIBIT 34
Page 343



**GREENROCK**
Capital Company

July 27, 2010

Mr. Chris Alf
National Air Cargo
350 Winward Drive
Orchard Park, New York  14127

Dear Chris,

I am following up with a letter since you have not returned my calls, or responded to our emails. We are concerned because after signing the LOI a little over a week ago, Jacob and I and our colleagues have been working almost non-stop to put leases and related financing in place for all eight of the Aircraft, but we have been getting strange messages from Don Stukes. In addition, after our conversation last week concerning a working capital line and possible bridge financing for NAC, I have been following up with leading banks with international name recognition that I think would have responded very favorably to filling that role. We have allocated enormous resources to this transaction and we have passed on other transactions, which would have generated substantial profits for us. We have begun to get commitments in from a variety of sources, including at least one Japanese financial institution. More responses are expected today and tomorrow this week. These are exceptional results for this stage of the process.

Nevertheless, we received a communication from Don asking us to stop our process and no communication from you to clarify matters and to be available to discuss our progress, which is important so we can move forward on the indications of interest and commitments we have received so far and to know how hard to push others who have shown interest. If we are going to change directions we do not want to get people charged up and then pull the rug out from under them, as this would hurt all our reputations even more than would otherwise be the case.

Chris, we are all adults and experienced business people. We are going to continue to move forward with our existing agreement until you and I speak and we come to an understanding about, if, and how, our existing agreement is going to be modified. We can work with Goldman, we can do some one or more of the aircraft on an operating lease as was originally agreed, you can pay us a breakage fee (and we would expect to be compensated if any of the financial institutions we have contacted participate in a Goldman structured transaction) or we can continue under the existing LOI, in which case we need someone in your organization to be available to help us work through the proposals we are receiving, which include operating and finance leases as per the terms of the LOI.

We have been told you feel you are under some time pressure with JAL. Again, if you share with us what is going on we may be able to help based on the proposals we have received by joining in your communications to JAL.

6351 Hinson Street, Suite F, Las Vegas, NV 89118  Phone: 702-262-3993  Fax: 702-262-3997
www.greenrockcap.com

GLOBAL 002733

EXHIBIT 34
Page 344

In the meantime, as I indicated we are moving forward on all fronts. If you do wish us to stop, we feel a minimum breakage fee would be $1.5 million plus a fee with respect to any financial institutions contacted by us who participates in a transaction structured by Goldman or anyone else in the next year. Or, we can settle on our doing a smaller group of Aircraft subject to the operating lease terms in the LOI, if you need to tell JAL that Goldman is for instance say doing the first two deliveries.

Please call me to discuss the above such that we can all move forward in acquiring, owning and investing in these aircraft. At this stage a timely response is critical. and to tell me who in your organization will be the point person for reviewing proposals as they come in and providing information requested by the financial institutions.

Thank you.

Sincerely,

Steve J. Alexander
Managing Director

6351 Hinson Street, Suite F, Las Vegas, NV 89118  Phone: 702-262-3993  Fax: 702-262-3997
www.greenrockcap.com

GLOBAL 002734

EXHIBIT 34
Page 345

# EXHIBIT 35

| From: | jacob@globalbtg.com |
|---|---|
| To: | calf@nationalaircargo.com; gjoerger@nationalaircargo.com |
| CC: | stevea@greenrockcap.com; Rick Jones; Stuart Warren |
| Sent: | 7/30/2010 5:00:10 PM |
| Subject: | NAC July 30 Legal Letter |
| Attachments: | NAC 30 July 2010_Legal Letter.pdf |

Exhibit 432 Pg. 1 of 2
Depo of WARREN
Date 6/5/12

Xavier Mireles, CSR 5001

Dear Chris,

On July 18, 2010, National Air Cargo, Inc. ("NAC") and Global BTG LLC ("Global") entered into a binding Letter of Intent pursuant to which Global was to purchase a group of eight (8) 747-400BCF aircraft and lease them to NAC. The LOI is very specific. The last paragraph states that it is intended as "a binding agreement between Lessor and Lessee who will act in good faith to implement the provisions hereof, to complete the contemplated transactions....consistent with industry standards."

Over the course of the last week we have received several emails and some calls from your financial advisor Don Stukes with ASI Advisors notifying us that you and NAC have "no interest to pursue a relationship with Global", that we have been "terminated", and that "meetings have already occurred with JAL and a process for funding all aircraft has already commenced with Goldman". You have been copied on every email and presented Don as your company advisor. These statements and actions are an anticipatory breach of our legally binding LOI, and clearly indicate that NAC is no longer acting in good faith.

We, in coordination with our colleagues on this project, Greenrock Capital, continue to live up to the LOI, which has never been repudiated by us, but NAC and Don's actions and messages as they make their way into the debt capital market disparages us and directly interferes with our ability to perform under the terms of the LOI, and the parties responsible for this interference and disparagement shall be held accountable.

Despite the many obstacles that Don and NAC have placed in our path, Global continues in discussion with its lenders, acting as a principal and not as an agent. We do not represent to enter into agreements for NAC. Global is representing Global with its lenders. Substantial progress has been made and we remain confident that we can fully meet our obligations in the Letter of Intent if given the opportunity to do so.

The proper way to proceed if NAC truly wishes to have Goldman do a bond offering (which may well be a more lengthy and costly process than the sale and leaseback agreed to in the Letter of Intent) is to treat the Letter of Intent as the binding agreement it is and to mutually amend the agreement by:

1. Providing for appropriate compensation to Global and its team. We feel a minimum breakage fee would be $1.5 million plus a fee with respect to any financial institutions contacted by us who participates in a transaction structured by Goldman or anyone else in the next year.
2. NAC should honor its original agreement and lease a minimum of one aircraft from Global on an operating lease basis on the operating lease terms of the LOI.

Global and the rest of its team rightly anticipated substantial profits from completion of the transaction contemplated by the LOI including full ownership of those aircraft acquired on an operating lease basis.
a.    Personnel were pulled from other projects and deployed on the LOI transaction and other firm business, which would have generated several hundred thousand dollars in fees, was declined so as not to divert resources from implementing the Letter of Intent.
b.    We have called on over 100 of our lenders and obtained proposals and interest from various financial institutions some of whom have undertaken intensive analysis and prepared presentations to their own internal committees seeking approval. To pull the transaction with the idea that NAC has unilaterally decided to move in a different direction, substantially damages the reputation of Global and its team and damages their relationships with these institutions. Punitive damages could be received.
c.    Indeed, it will also inevitably damage the reputation of NAC and of Goldman Sachs,  since it puts in question

EXHIBIT 35
Page 346

GLOBAL 007651

how NAC honors agreements and how NAC treats people with whom it does business. As for Goldman, it would make them look like someone who would interfere in an ongoing business relationship.

Global believes it is a party to a binding Letter of Intent and it is prepared to defend itself to the fullest extent of the law to recover all of the damages it has suffered as well as all lost profits.

We write again to you in good faith, hopeful that a resolution can be reached. We have offered to work with Goldman. We are willing to accept a breakage fee and one or more aircraft under an operating lease to NAC, which would then allow NAC to finance the balance of the 7 aircraft under the bond financing arranged by Goldman or any other party. We will not allow for NAC to unilaterally terminate the legally binding LOI, even to the extent that we are forced to file a claim to protect our rights. We again request a conference call with you and the NAC team to amicably and equitably resolve this matter.

Best Regards,

Jacob S. Hodges
Managing Director
Global BTG (Big Ticket Group)
Los Angeles, CA
Phone: +1 805-405-9211
Email: jacob@globalbtg.com

EXHIBIT 35
Page 347

GLOBAL 007652

# EXHIBIT 36

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

**EXHIBIT 37**

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

# EXHIBIT 38

1   Steven G. Polard, Bar No. 90319
    SPolard@perkinscoie.com
2   Donald J. Kula, Bar No. 144342
    DKula@perkinscoie.com
3   Nathan M. Smith, Bar No. 255212
    NSmith@perkinscoie.com
4
5   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
6   Los Angeles, CA 90067-1721
    Telephone: 310.788.9900
7   Facsimile: 310.788.3399

8   Attorneys for Plaintiff
    Global BTG LLC, a Nevada Limited Liability
9   Company with a principal place of business in
    California

10                  UNITED STATES DISTRICT COURT

11                 CENTRAL DISTRICT OF CALIFORNIA

12                       WESTERN DIVISION

13

14  Global BTG LLC, a Nevada limited      Case No. 2:11-cv-01657-RSWL-JCGx
15  liability company with a principal place
    of business in California,             **GLOBAL BTG LLC'S**
16                                         **OBJECTIONS AND RESPONSES**
                                           **TO NATIONAL AIR CARGO,**
17          Plaintiff,                     **INC.'S INTERROGATORIES**

18      v.                                 **[SET ONE]**

19  National Air Cargo, Inc., a New York
    corporation registered to do business in
20  California,

21          Defendant.

22

23      **GLOBAL BTG LLC'S OBJECTIONS AND RESPONSES TO NATIONAL**

24          **AIR CARGO, INC.'S FIRST SET OF INTERROGATORIES**

25      Plaintiff Global BTG LLC ("Global") hereby objects and responds to

26  Defendant National air Cargo, Inc.'s ("National") First Set of Interrogatories (the

27  "Interrogatories") as follows:

28

EXHIBIT 38
Page 353

## PRELIMINARY STATEMENT

Investigation and discovery on behalf of Global is not complete. These responses are based upon the investigation and discovery conducted to date. These responses are based on current, accessible, available information and belief. Facts and evidence now known may be imperfectly understood and, in good faith, may not be included in these responses. Global expressly reserves the right to supplement the following responses or to offer at trial or other proceedings in this action further or different information or evidence concerning matters inquired into by these Interrogatories which is subsequently discovered. Global also reserves all rights to conduct discovery with reference to, or offer into evidence at trial or other proceedings in this action, all witnesses, facts, and evidence, notwithstanding the absence of references to such witnesses, facts and evidence in these responses.

Global makes these responses subject to and without waiver of:

(1)    all questions as to the admissibility as evidence at trial of the responses, any documents produced or referred to, or the subject matter of any such documents;

(2)    the right to conduct discovery with reference to, or offer as evidence at trial, any and all witnesses, facts, documents and evidence, notwithstanding the absence of references to certain witnesses, facts, documents and evidence in these responses;

(3)    the right to make additional objections or seek protective orders in the event additional review of files and pretrial preparation results in further information with respect to the Interrogatories;

(4)    the right to object to other discovery directed to the subject matter of the Interrogatories; and

(5)    the right to revise, correct, supplement or clarify these responses.

## GENERAL OBJECTIONS

1.      1.     Global objects to each Interrogatory to the extent that it calls for

2. information protected from discovery or disclosure by any privilege or doctrine,

3. including the attorney-client privilege or work-product doctrine, and any privilege

4. or doctrine that protects information from discovery or disclosure because it reflects

5. the impressions, conclusions, opinions, legal research, litigation plans or theories of

6. Global's attorneys. By providing information requested in the Interrogatories,

7. Global does not waive any privilege or protection that is, or may be, applicable to

8. such information.

9.    2.     Global objects to each Interrogatory that imposes obligations beyond

10. those of the Federal Rules of Civil Procedure.

11.    3.     Global objects to each Interrogatory that calls for information

12. protected from discovery or disclosure by the rights of privacy guaranteed by state

13. and federal law, the California Constitution and the United States Constitutions.

14. Global does not waive any privilege or protection for such private information.

15.    4.     Global objects to each Interrogatory that calls for confidential,

16. proprietary and trade secret information, the disclosure of which will cause Global

17. irreparable harm. Global does not waive any privilege or protection for such

18. private information. Global will not produce confidential, proprietary and trade

19. secret information until an appropriate attorney's eyes only protective order is

20. entered by the Court in this matter.

21.    5.     Global objects to each Interrogatory that seeks information in the

22. custody or control of National.

23.    6.     Global objects to each Interrogatory that seeks information in the

24. custody or control of non-parties.

25.    7.     Global objects to each Interrogatory that seeks publicly available

26. information, or information that National could obtain without Global's response.

27.    8.     Global objects to each Interrogatory that calls for contentions, claims

3           Global's Responses to Interrogatories

EXHIBIT 38
Page 355

1  or legal conclusions regarding issues or potential issues in this litigation.  Because

2  discovery is only beginning in this lawsuit, such interrogatories are premature and

3  improper at this stage of the proceedings.

4

5  **SPECIFIC OBJECTIONS AND RESPONSES**

6  **INTERROGATORY NO. 1:**

7       Please describe in detail all of the efforts made by anyone to organize Global

8  BTG LLC as a legal entity.

9  **RESPONSE TO INTERROGATORY NO. 1:**

10       In addition to the General Objections, Global objects that this Interrogatory is

11  vague and ambiguous because "legal entity" is undefined.  Global further objects

12  that this Interrogatory seeks information that is neither relevant nor likely to lead to

13  the discovery of admissible evidence.  Global also objects that this Interrogatory

14  seeks information that may be protected by the attorney-client privilege and the

15  attorney work product protections.  Subject to and without waiving the foregoing

16  objections, Global responds that, in addition to the facts alleged in the complaint

17  and the documents responsive to this Interrogatory that Global will produce, the

18  following efforts were made to organize Global as a legal entity:

19      • Although Global's articles of organization were filed on July 20, 2010,

20        Hodges had contemplated the formation of Global as a Nevada limited

21        liability company as far back as December 11, 2008, when Stuart Warren,

22        now counsel to Global, reserved the name "Global BTG LLC" with the

23        Nevada Secretary of State.  That name reservation expired on March 11,

24        2009;

25      • On May 9, 2010, Hodges purchased and registered the domain name

26        www.globalbtg.com.  The domain name was purchased on behalf of Global;

27      • On July 8, 2010, Hodges instructed Stuart Warren, counsel for Global, to

28        reserve the name Global BTG LLC and prepare organizational papers for

4         Global's Responses to Interrogatories

EXHIBIT 38
Page 356

1     registering Global as a Nevada limited liability company;

2     • On July 12, 2010, Hodges sent an email to a relative asking him to serve as

3        Global's Nevada agent for service of process;

4     • Hodges executed the documents necessary to file articles of organization

5        with the Nevada Secretary of State establishing Global;

6     • On July 20, 2010, Hodges and Global's attorneys filed the documents

7        currently on record with the Nevada Secretary of State establishing Global.

8     **INTERROGATORY NO. 2:**

9     Please describe in detail any assignment of legal rights of any kind among

10   Global BTG LLC, Jacob Hodges, and Global BTG, Inc.

11   **RESPONSE TO INTERROGATORY NO. 2:**

12     In addition to the General Objections, Global objects to this Interrogatory

13   because it seeks information that may be protected by the attorney-client privilege

14   and the attorney work product protections.  Subject to and without waiving the

15   foregoing objections, Global responds that Hodges executed a lawful assignment on

16   July 15, 2011, assigning all rights and interests he retains in the Letter of Intent

17   with NATIONAL to Global.  Global further responds that it will produce

18   documents responsive to this Interrogatory.

19   **INTERROGATORY NO. 3:**

20     Please identify any ongoing business of any kind which was being conducted

21   by Global BTG LLC on July 22, 2010, other than the relationship with National Air

22   Cargo, Inc.

23   **RESPONSE TO INTERROGATORY NO. 3:**

24     In addition to the General Objections, Global objects to this Interrogatory

25   because the phrase "ongoing business" is vague and ambiguous.  Global further

26   objects that this Interrogatory calls for confidential, proprietary and trade secret

27   information.  Global will not provide its confidential, proprietary and trade secret

28   information until and unless an appropriate attorney's eyes only protective order is

1  entered by this Court.  Subject to and without waiving these objections, Global

2  responds that it has continued to pursue opportunities to locate and procure

3  financing for the lease or sale of aircraft for which it would earn commissions and

4  fees and/or other financial remuneration.  Global further responds that it will

5  produce documents responsive to this Interrogatory.

6  **INTERROGATORY NO. 4:**

7       Please describe in detail Global BTG LLC's relationship(s) with

8  GREENROCK and PEARL.

9  **RESPONSE TO INTERROGATORY NO. 4:**

10      In addition to the General Objections, Global objects to this Interrogatory

11  because it is compound.  Global further objects that the Interrogatory is vague and

12  ambiguous as to the time period for which the request is made.  Global will

13  interpret the Interrogatory to request information concerning Global's relationships

14  on or about July 18, 2010.  Global also objects that this Interrogatory calls for

15  confidential, proprietary and trade secret information.  Global will not provide its

16  confidential, proprietary and trade secret information until and unless an

17  appropriate attorney's eyes only protective order is entered by this Court.  Subject to

18  and without waiving these objections, in addition to the facts alleged in the first

19  amended complaint and the responsive documents that will be produced, Global

20  responds as follows:

21  • Global did not have any business agreement or other relationship with

22      PEARL at any time;

23  • Global and GREENROCK agreed to work together to source financing and

24      lessors for the National sale and lease transactions described in the Letter of

25      Intent;

26  • Global and GREENROCK agreed to work together on other transactions

27      where their interests were aligned.

28

6                    Global's Responses to Interrogatories

EXHIBIT 38
Page 358

1 **INTERROGATORY NO. 5:**

2      Please describe in detail everything done by Global BTG LLC to "employ[]

3 its best efforts to deliver a lender's commitment on or before July 22, 2010." First

4 Am. Compl. ¶ 38.

5 **RESPONSE TO INTERROGATORY NO. 5:**

6      In addition to the General Objections, Global objects to this Interrogatory

7 because it is vague and ambiguous in the use of the term "everything." Global will

8 apply a reasonable interpretation of the term "everything" in its response. Global

9 further objects that this Interrogatory calls for confidential, proprietary and trade

10 secret information. Global will not provide its confidential, proprietary and trade

11 secret information until and unless an appropriate attorney's eyes only protective

12 order is entered by this Court. Subject to and without waiving these objections, in

13 addition to the facts alleged in the first amended complaint, Global responds it will

14 produce documents responsive to this Interrogatory. Global further responds as

15 follows:

16     •  Before the Letter of Intent with NATIONAL was finalized, Global was

17        organizing NATIONAL's financial information and other documents,

18        performing a credit analysis, preparing a detailed write-up, preparing

19        requests for proposals and soliciting lender interest in anticipation of

20        reaching an agreement with NATIONAL;

21     •  Approximately 10 people's efforts were dedicated to the project;

22     •  Upon finalizing the Agreement, Global's effort and time commitment to the

23        deal increased;

24     •  In the first week following the execution of the Letter of Intent with

25        NATIONAL, Global focused all its efforts on fulfilling its obligations under

26        the Letter of Intent;

27     •  Global distributed requests for proposals to approximately 100 financial

28        institutions around the world;

1   • Follow-up contact was made with all financial institutions contacted, and
2      levels of interest and deal points were ascertained;
3   • Other business opportunities were declined so as to maintain the resources
4      allocated to the project.

5   **INTERROGATORY NO. 6:**

6      Please describe in detail every effort made by Global BTG LLC to
7   "perform[]" its "obligations under the Agreement."  First Am. Compl. ¶ 51.

8   **RESPONSE TO INTERROGATORY NO. 6:**

9      In addition to the General Objections, Global objects to this Interrogatory
10  because it is vague and ambiguous in the use of the term "every."  Global will apply
11  a reasonable interpretation of the term "every" in its response.  Global further
12  objects that this Interrogatory calls for confidential, proprietary and trade secret
13  information.  Global will not provide its confidential, proprietary and trade secret
14  information until and unless an appropriate attorney's eyes only protective order is
15  entered by this Court.  Subject to and without waiving these objections, in addition
16  to the facts alleged in the first amended complaint, Global responds that it will
17  produce documents responsive to this Interrogatory.  Global further responds as
18  follows:

19  • Before the Letter of Intent with NATIONAL was finalized, Global was
20     soliciting lender interest in anticipation of reaching an agreement with
21     NATIONAL;
22  • Upon finalizing the Agreement, Global's effort and time commitment to the
23     deal increased;
24  • In the first week following the execution of the Letter of Intent with
25     NATIONAL, Global focused all its efforts on fulfilling its obligations under
26     the Letter of Intent;
27  • Global distributed requests for proposals to approximately 100 financing
28     sources from around the world.

8      Global's Responses to Interrogatories

EXHIBIT 38
Page 360

**INTERROGATORY NO. 7:**

Please state all facts supporting the claim in the First Amended Complaint that National Air Cargo, Inc. breached the LETTER OF INTENT.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the General Objections, Global objects to this Interrogatory because it calls for a legal conclusion.  Subject to and without waiving these objections, in addition to the facts alleged in the first amended complaint, Global responds that it will produce documents responsive to this Interrogatory.  Global further responds as follows:

- The Letter of Intent with National required that Global use its "best efforts" to deliver a lender's commitment on or before July 22, 2010;
- Global employed its "best efforts" to deliver a lender's commitment on or before July 22, 2010;
- NATIONAL failed to provide Global with audited 2009 financial statements as agreed to in the LETTER OF INTENT;
- By July 20, 2010, less than two days after Global received and executed the Letter of Intent, Global had received a strong expression of interest from Perot Investments to finance up to two of the 747s.  Global updated NATIONAL on this progress, transmitting a draft memorandum of understanding demonstrating lender commitments to National on the morning of July 22nd;
- In addition to Perot Investments' interest, Global also received word that other lending committees were considering the proposal and favorably inclined to lend to Global for the deal;
- On the morning of July 23, 2010, Hodges wrote Stukes and told him that Global expected to obtain financing from Citibank for four airplanes, from Perot Investments for at least two aircraft and that Global was making significant progress with other lenders, including lenders located in Europe

1    and Asia.  Hodges noted that Global was "truly working around the clock on
2    this;"
3    • Despite signing a binding agreement with Global, NATIONAL continued to
4      contact and pursue other sources of financing without making its efforts
5      known to Global.  In effect, NATIONAL used Global to "prime the market"
6      by spreading the word to potential lenders that NATIONAL was seeking to
7      finance aircraft acquisitions.  NATIONAL was trying to obtain better terms
8      than those it had agreement upon with Global;
9    • Within hours of Hodges's July 23rd update and less than one week after
10     signing the Letter of Intent, National, through Stukes, emailed Hodges and
11     told him that Global's "mandate to represent NATIONAL has been
12     terminated effective immediately;"
13   • NATIONAL refused to perform, under the LETTER OF INTENT, its
14     obligations to sell and lease the AIR FRANCE AIRCRAFT even after
15     National claimed that the JAPAN AIRLINES AIRCRAFT could not be
16     purchased;
17   • NATIONAL refused to perform, under the LETTER OF INTENT, its
18     obligation to lease from Global at least one aircraft under an operating lease;
19   • Hodges told Stukes and National that its purported "termination" was a
20     breach of their agreement;
21   • National refused to engage in substantive discussions with Global about a
22     resolution of the breach of contract or Global's ability to continue to act as a
23     lease financier for National, despite four written attempts by Global.
24   **INTERROGATORY NO. 8:**
25       Please explain in detail the calculations supporting the allegation in the First
26   Amended Complaint that "Global's worst case profit from the Agreement would
27   have been $36,643,816."
28

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the General Objections, Global objects to this Interrogatory to the extent it may call for information protected by the attorney-client privilege and attorney work product protections. Subject to and without waiving these objections, Global responds that its calculations are detailed in Global's Initial Disclosures, the First Amended Complaint and the responsive documents Global will produce. Global further responds as follows:

- Damages from the loss of the operating lease on Aircraft MSN 25238:
  - Money at closing. Global would have realized a $2,865,240 profit at closing as a result of over-financing the purchase and lease of this aircraft.
  - As a result of the favorable purchase price Global negotiated in the LETTER OF INTENT, the sale of MSN 25238 during or at the end of the lease term would have resulted in profit to Global of $26,758,980.
- Damages from the loss of finance leases on the remaining seven aircraft:
  - Global lost its profit of one month's rent. Because National did not pay a fee for organizing financing for the finance leases, Global used the typical structure of discounting the payments by one month. National agreed to a 72-month lease term, while Global would have discounted only 71 payments to its bank and obtained financing on a 71-month term. The one month's difference was lost and is worth $5,005,621.
- Global would have profited from the interest rate difference between what National agreed to pay and what Global could obtain for itself. National agreed to a specific price and monthly lease payment in the Letter of Intent, which equated to a 7% interest rate. Global would have secured financing at 6.75% interest per annum. This interest rate spread, discounted to present value, would have produced $2,013,975.

**INTERROGATORY NO. 9:**

In light of Global BTG LLC's contention that its "worst case profit from the Agreement would have been $36,643,816," please identify what Global BTG LLC's best case profit would have been.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the General Objections, Global objects to this Interrogatory to the extent it may call for information protected by the attorney-client privilege and attorney work product protections.  Subject to and without waiving these objections, Global responds that its calculations are detailed in Global's Initial Disclosures, the First Amended Complaint and the responsive documents Global will produce.  Global further responds that it has not yet calculated its best case profit and will supplement this Interrogatory as appropriate.  Global further responds that it anticipates presenting expert testimony to support its best case profit calculations.  Subject to and without waiving these objections, Global responds that, among other factors, its best case profit scenarios derive from Global taking ownership of more than one aircraft by leasing to National more than one aircraft under an operating lease, by obtaining better financing terms than those projected in the worst case scenario and by ultimately selling, re-marketing, or re-leasing the aircraft in a market superior to that projected in the worst case scenario.

**INTERROGATORY NO. 10:**

In light of Global BTG LLC's contention that its "worst case profit from the Agreement would have been $36,643,816," please identify what Global BTG LLC's reasonably expected profit would have been.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the General Objections, Global objects to this Interrogatory to the extent it may call for information protected by the attorney-client privilege and attorney work product protections.  Subject to and without waiving these objections, Global responds that its calculations are detailed in Global's Initial

Global's Responses to Interrogatories

EXHIBIT 38
Page 364

1  Disclosures, the First Amended Complaint and the responsive documents Global

2  will produce.  Global further responds that it has not yet calculated its best case

3  profit and will supplement this Interrogatory as appropriate.  Global further

4  responds that it anticipates presenting expert testimony to support its reasonably

5  expected profit.

6  **INTERROGATORY NO. 11:**

7      Please state all oral promises that anyone from National Air Cargo, Inc.

8  allegedly made to Global BTG LLC which in any way relate to the LETTER OF

9  INTENT.

10  **RESPONSE TO INTERROGATORY NO. 11:**

11      In addition to the General Objections, Global objects to this Interrogatory

12  because "oral promises" may call for a legal conclusion.  Global further objects

13  because the phrase "any way relate to" is vague and ambiguous.  Global will apply

14  a reasonable interpretation of that phrase to its response.  Global also objects

15  because the Interrogatory seeks information that is neither relevant nor likely to

16  lead to the discovery of admissible evidence.  Subject to and without waiving these

17  objections, Global responds that it does not allege in its First Amended Complaint

18  the breach of any oral promise by National other than any oral promise coextensive

19  with the promises National made in the Letter of Intent.  Global further responds

20  that, among other oral promises, National orally promised:  that it would sell to and

21  lease back from Global one or more of the AIR FRANCE AIRCRAFT or JAL

22  AIRCRAFT and become the lessee under an operating lease; that it had entered

23  government contracts financially sufficient to support the extension of credit for the

24  acquisition of all eight aircraft; and that it had hired and was prepared to deploy

25  pilots and ground servicing equipment and personnel sufficient to operate all eight

26  aircraft.

27  **INTERROGATORY NO. 12:**

28      Please identify each person who has knowledge of the facts alleged in the

13      Global's Responses to Interrogatories

EXHIBIT 38
Page 365

1   First Amended Complaint.

2   **<u>RESPONSE TO INTERROGATORY NO. 12:</u>**

3     Subject to and without waiving the objections, Global responds that, with the

4   exception of counsel for each party, this information is stated in Global's Initial

5   Disclosures.  Global further responds as follows:

6   - Steve J. Alexander, President, GreenRock Capital;

7   - Dan Allen, Partner, Anchorage Illiquid Opportunities Offshore Master,
8     L.P.;

9   - Farhood Azima, Principal, NexGen Aviation Capital;

10  - George Dimitroff, Senior Analyst, Ascend Aviation Insight;

11  - Aziz Hassanali, Anchorage Illiquid Opportunities Offshore Master, L.P.;

12  - Jacob Hodges;

13  - Patrick "Rick" Jones, Managing Director, International Debt
14    Syndications, GreenRock Capital Company;

15  - Perot Investments;

16  - Principals and agents of National;

17  - Perpetum Finance, Inc., as Director of Banyon Limited;

18  - Jake Reppert, Aviation Analyst, Ascend Aviation Insight;

19  - Paul Sawney, Clipper Aviation;

20  - Takehisa Sekiya, Senior Director Head of Airframe Group, Purchasing,
21    Japan Airlines;

22  - Steve Shamsai;

23  - Walter Schoultz, GreenRock Capital;

24  - David Silvers, Citibank;

25  - Donald Stukes, Senior Managing Director, ASI Advisors, LLC;

26  - Stuart Warren, counsel to Global;

27  - Patrick Yip, Analyst;

28  - Confidential names and addresses of lenders contacted by Global;

14   Global's Responses to Interrogatories

EXHIBIT 38
Page 366

1       • Confidential names and addresses of lessors contacted by Global;

2       • All Witnesses Listed by National in its disclosures.

3  **INTERROGATORY NO. 13:**

4       Please identify the first time that anyone from Global BTG LLC informed

5  National Air Cargo, Inc. that Global BTG LLC did not exist when the LETTER OF

6  INTENT was executed.

7  **RESPONSE TO INTERROGATORY NO. 13:**

8       In addition to the General Objections, Global objects to this Interrogatory

9  because "did not exist" is vague and ambiguous or may call for a legal conclusion.

10  Global further objects because the Interrogatory relies on the erroneous premise that

11  Global "did not exist" when the Letter of Intent was executed. Subject to and

12  without waiving these objections, Global responds that, prior to initiating this

13  lawsuit, Global never informed National that it "did not exist" when the Letter of

14  Intent was signed.

15  **INTERROGATORY NO. 14:**

16       Please identify each person or entity who owns any capital or membership

17  interest in Global BTG LLC.

18  **RESPONSE TO INTERROGATORY NO. 14:**

19       In addition to the General Objections, Global objects to this Interrogatory

20  because it invades the privacy of third parties and seeks the disclosure of third party

21  confidential, proprietary and trade secret information. Subject to and without

22  waiving these objections, Global responds that Jacob Hodges is the only person or

23  entity who owns any capital or membership interest in Global.

24  **INTERROGATORY NO. 15:**

25       Please state all facts supporting your Third Affirmative Defense (Failure to

26  Mitigate) in the Answer filed with the District Court on November 21, 2011.

27  **RESPONSE TO INTERROGATORY NO. 15:**

28       In addition to the General Objections, Global objects to this Interrogatory

15      Global's Responses to Interrogatories

EXHIBIT 38
Page 367

1   because it calls for legal conclusions.  Global further objects to the phrase "all

2   facts" as vague and ambiguous.  Global will apply a reasonably limited

3   interpretation of that phrase.  Subject to and without waiving these objections,

4   Global responds that the necessary facts supporting the Third Affirmative Defense

5   are stated in the Complaint, Counterclaim, Initial Disclosures and documents

6   Global will produce.  Global further responds that much of the information in

7   support of this affirmative defense is in the possession of National and third parties

8   who Global expects will respond to discovery.  Global also responds that the facts

9   in support of National's failure to mitigate include:

10   • National refused to allow Global the opportunity to continue performing after

11       July 22, 2010, including the opportunity to finance and lease the AIR

12       FRANCE AIRCRAFT, including the aircraft purportedly already purchased

13       with cash;

14   • National failed to communicate facts about timing to the parties in the JAL

15       AIRCRAFT transaction and the AIR FRANCE AIRCRAFT transaction;

16   • National failed to secure acceptable financing after refusing Global's efforts;

17   • National failed to negotiate a realistic timetable for completing the

18       transactions at issue;

19   • National failed to pursue opportunities other than the JAL AIRCRAFT and

20       the AIR FRANCE AIRCRAFT, that could have provided a similar benefit.

21   **INTERROGATORY NO. 16:**

22       Please state all facts supporting your Sixth Affirmative Defense

23   (Waiver/Estoppel) in the Answer filed with the District Court on November 21,

24   2011.

25   **RESPONSE TO INTERROGATORY NO. 16:**

26       In addition to the General Objections, Global objects to this Interrogatory

27   because it calls for legal conclusions.  Global further objects to the phrase "all

28   facts" as vague and ambiguous.  Global will apply a reasonably limited

16          Global's Responses to Interrogatories

EXHIBIT 38
Page 368

1  interpretation of that phrase.  Subject to and without waiving these objections,

2  Global responds that the necessary facts supporting the Sixth Affirmative Defense

3  are stated in the Complaint, Counterclaim, Initial Disclosures and documents

4  Global will produce.  Global further responds that much of the information in

5  support of this affirmative defense is in the possession of National and third parties

6  who Global expects will respond to discovery.  Global further responds as follows:

7  • National refused to allow Global the opportunity to continue performing after

8     July 22, 2010, including the opportunity to finance and lease the AIR

9     FRANCE AIRCRAFT, including the aircraft purportedly already purchased

10    with cash;

11 • National failed to communicate facts about timing to the parties in the JAL

12    AIRCRAFT transaction and the AIR FRANCE AIRCRAFT transaction;

13 • National failed to secure acceptable financing after refusing Global's efforts;

14 • National failed to negotiate a realistic timetable for completing the

15    transactions at issue;

16 • National failed to pursue opportunities, other than the JAL AIRCRAFT and

17    the AIR FRANCE AIRCRAFT, that could have provided a similar benefit.

18

19 DATED:  January 5, 2012                    **PERKINS COIE LLP**

20

21                                            By: /s/Nathan M. Smith
                                                Steven G. Polard
22                                              Donald J. Kula
                                                Nathan M. Smith
23
                                             Attorneys for Plaintiff
24                                           Global BTG LLC, a Nevada Limited
                                             Liability Company doing business in
25                                           California

26

27

28

17                    Global's Responses to Interrogatories

EXHIBIT 38
Page 369

1  DATED:  January 5, 2012

2                                                    **GLOBAL BTG LLC**

3

4                                                    By: _____
                                                     Jacob Hodges for Plaintiff and
5                                                    Counterclaim Defendant Global
                                                     BTG LLC
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        18        Global's Responses to Interrogatories

EXHIBIT 38
Page 370

1       I, Jacob Hodges, affirm under oath that I am the person responsible for
2   Global BTG LLC's responses to National's First Set of Interrogatories to Global
    BTG LLC. I also affirm under oath that the responses were true and correct to the
3   best of my knowledge at the time I signed those responses on behalf of Global
    BTG, LLC.

4   DATED: June _&ecirc;2_, 2012

5   _____
    Jacob Hodges

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 38**
**Page 371**

Hodges's Verification of Global's Responses
to National's First Interrogatories

**EXHIBIT 39**

# FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER

**EXHIBIT 40**

1  JENNER & BLOCK LLP
   Brent Caslin (Cal. Bar No. 198682)
2  bcaslin@jenner.com
   Kate T. Spelman (Cal. Bar No. 269109)
3  kspelman@jenner.com
   Kirsten C. Jackson (Cal. Bar No. 265952)
4  kjackson@jenner.com
   633 West 5th Street, Suite 3600
5  Los Angeles, CA 90071
   Telephone:  (213) 239-5100
6  Facsimile:   (213) 239-5199

7  JENNER & BLOCK LLP
   Melissa A. Cox (*pro hac vice*)
8  melissacox@jenner.com
   1099 New York Ave, NW, Suite 900
9  Washington, DC 20001
   Telephone:  (202) 639-6000
10 Facsimile:   (202) 639-6066

11 *Attorneys for Defendant and Counterclaim*
   *Plaintiff National Air Cargo, Inc.*
12

13

14

15                    UNITED STATES DISTRICT COURT

16                    CENTRAL DISTRICT OF CALIFORNIA

17 GLOBAL BTG LLC,                    )  Case No.  CV 11-01657 RSWL (JCGx)
                                      )
18      Plaintiff,                    )  The Honorable Ronald S.W. Lew
                                      )
19      v.                            )  **NATIONAL AIR CARGO, INC.'S**
                                      )  **OBJECTIONS AND**
20 NATIONAL AIR CARGO, INC.,          )  **SUPPLEMENTAL RESPONSES TO**
                                      )  **FIRST SET OF**
21      Defendant-Counterclaim Plaintiff, ) **INTERROGATORIES FROM**
                                      )  **JACOB HODGES**
22      v.                            )
                                      )
23 GLOBAL BTG LLC, JACOB HODGES       )
   and DOES 1-5,                      )
24                                    )
25      Counterclaim Defendants.      )
                                      )
26

27

28

EXHIBIT 40
Page 382 National Air Cargo, Inc.'s Supplemental Responses to First Set of Interrogatories from Jacob Hodges

1    Defendant and Counter-Plaintiff National Air Cargo, Inc. ("National") responds

2    to Counter-Defendant Jacob Hodges' (Hodges) First Set of Interrogatories as follows:

3                              **PRELIMINARY STATEMENT**

4         Investigation and discovery on behalf of National is not complete.  These

5    responses are based on current, accessible, available information and belief.  Facts and

6    evidence now known may be imperfectly understood and, in good faith, may not be

7    included in these responses.  National expressly reserves the right to modify or

8    supplement the following responses with any information that may be subsequently

9    discovered while this case is pending.  National also reserves all rights to conduct

10   discovery with reference to, and to offer into evidence at trial or other proceedings in

11   this action, all witnesses, facts, and evidence, notwithstanding the absence of

12   references to such witnesses, facts, and evidence in these responses.

13        National is responding to Hodges' interrogatories as National reasonably

14   interprets and understands the language of the interrogatories.  If Hodges subsequently

15   asserts an interpretation of any individual interrogatory that differs from National's

16   reasonable understanding, National reserves its right to supplement the responses

17   and/or objections herein.

18        National's responses to Hodges' interrogatories shall not be construed in any

19   way as an admission that any definition provided by Hodges or any assertion made is

20   either factually correct or legally binding upon National, or a waiver of any of

21   National's objections, including but not limited to objections regarding privilege,

22   confidentiality, and discoverability.

23                              **GENERAL OBJECTIONS**

24        1.    National objects to each interrogatory to the extent that it calls for

25   information protected from discovery or disclosure by any privilege or doctrine,

26   including the attorney-client privilege or work-product doctrine, and any privilege or

27   doctrine that protects information from discovery or disclosure because it reflects the

28   impressions, conclusions, opinions, legal research, litigation plans or theories of

1

National's attorneys.  By providing information requested in the interrogatories, National does not waive any privilege or protection that is or may be applicable to such information.

  2. National objects to each interrogatory that imposes obligations beyond those of the Federal Rules of Civil Procedure.

  3. National objects to each interrogatory that calls for information protected from discovery or disclosure by the rights of privacy guaranteed by state and federal law, the California Constitution and the United States Constitution.  National does not waive any privilege or protection for such private information.  National objects to each interrogatory that seeks information in the custody or control of Hodges and/or Global.

  4. National objects to each interrogatory that seeks information in the custody or control of non-parties.

  5. National objects to each interrogatory that seeks publicly available information, or information that Hodges could obtain without National's response.

EXHIBIT 40
Page 384
National Air Cargo, Inc.'s Supplemental Responses to First Set of Interrogatories from Jacob Hodges

## SPECIFIC RESPONSES AND OBJECTIONS

**INTERROGATORY NO. 1**

Describe in detail each expenditure in cash made to fund the aircraft acquisitions that is described generally in Paragraph 14 of the Counterclaim, including who made each payment, to whom each payment was made, the date of each payment, the amount of each payment and the purpose of the payment.

**RESPONSE TO INTERROGATORY NO. 1**

In addition to the general objections, National also objects to this interrogatory as vague and ambiguous in its use of the phrase "each expenditure." National also objects that the use of the word "cash" makes it unclear if the question literally calls for identification of only cash transactions or all expenditures. National will use a reasonable interpretation to this phrase in its response. National objects to this interrogatory to the extent it may call for information protected by the attorney-client privilege and attorney work product protections. Subject to and without waiving these objections, National responds that it has produced documents relevant to this interrogatory. National further responds that the "more than $66 million in cash" stated in Paragraph 16 refers to the "current acquisition outlays already paid by the company," as of July 8, 2010, as set forth in NAC078237.

**INTERROGATORY NO. 2**

Describe in sufficient detail to permit contact by phone or electronic communication the identity of each entity or person whom NATIONAL "diligently pursued" for funding the JAL and AIR FRANCE acquisitions as alleged in Paragraph 20 of the Counterclaim.

**RESPONSE TO INTERROGATORY NO. 2**

In addition to the general objections, National objects to this interrogatory as vague and ambiguous. National will give a reasonable interpretation to this interrogatory in its response. Subject to and without waiving the general objections, National responds that it incorporates herein by reference the information in its prior

3

EXHIBIT 40
Page 385
National Air Cargo, Inc.'s Supplemental Responses to First Set of Interrogatories from Jacob Hodges

pleadings and Counterclaim.  National further responds:

- Amunra Ventures – Guido Lenherr, +971-50-457-4148
- Aviation Capital Partners – Scott Holland, scott.holland@aviationcapitalpartners.com
- Citibank – Gary Rothschild, (212) 723-3774
- Credit Agricole – via Donald Stukes
- CIT Capital – via Donald Stukes
- ComVest Debt Fund – via Donald Stukes
- Deutsche Bank – Lucia Cebotaru, +44(20)754-57518
- DVB Bank – via Donald Stukes
- Goldman Sachs – Thomas Baker, (212) 902-5632
- Guggenheim Capital – via Donald Stukes
- Nord LB – via Donald Stukes
- RBS Capital – via Donald Stukes
- Reggie Fowler – via Donald Stukes
- Skyworks –Jeffrey S. Craine, (203) 983-6686
- Wells Fargo – Thomas Grys, (716) 630-4101
- Hummingbird – Bert Peters, +97 1 55 9136175
- JPMorgan Chase – Michael Wolfram, (716) 858-1439
- Morgan Stanley – Michael Markland, +971 4363 4842

**INTERROGATORY NO. 3**

Describe in detail each fact known to YOU that supports YOUR allegation in Paragraph 44 of the Counterclaim that "[A]ll of the parties understood that more formal documents and a lot of contingencies and further negotiations were necessary before a final deal would be put in place."

**RESPONSE TO INTERROGATORY NO. 3**

In addition to the general objections, National objects to this interrogatory because the phrase "each fact" is vague and ambiguous.  National will apply a

4

1 | reasonably limiting interpretation of that phrase in its response.  National further
2 | objects to this interrogatory to the extent it may call for information protected by the
3 | attorney-client privilege and attorney work product protections.  National also objects to
4 | this interrogatory to the extent is calls for expert testimony as to the industry standard
5 | regarding finalized sale-leaseback agreements.  Subject to and without waiving these
6 | objections, National responds that it has produced documents responsive to this
7 | interrogatory and incorporates herein by reference the information in its prior
8 | pleadings, Answer and Counterclaim.  National further responds that National
9 | representatives, including Glen Joerger, Preston Murray, and Christopher Alf,
10 | understood that further negotiations were to occur and contingencies were to be met
11 | before a final deal for the lease of any aircraft involving Global or Hodges or Pearl or
12 | GreenRock or any other entity would be put in place.  Mr. Hodges' conduct was
13 | consistent with that understanding and Mr. Hodges did not contradict it at any point in
14 | time.  Further, the standard approach to leases in the industry is that letters of intent
15 | such as the Letter of Intent at issue here do not constitute fully-executed sale-
16 | leaseback agreements.  To the contrary, finalized sale-leaseback agreements require
17 | substantial paperwork and attorney involvement, following due diligence, technical
18 | evaluations, cost evaluations, and other work.  The language of the Letter of Intent
19 | and the status of National's potential deal with Japan Airlines also evidence the
20 | parties' understanding that further negotiations were to occur and contingencies were
21 | to be met before a final deal could be put in place.  For example, the Letter of Intent
22 | leaves the following terms open:

23 |     a. The exact finance terms.  Compl. Ex. A at 6 ("The terms of the finance
24 |        lease and the operating lease will be negotiated in good faith by the
25 |        parties as soon as practicable after execution of this LOI.").
26 |     b. Whether any future lease would be an operating lease or a financing
27 |        lease.  *Id.* at 2 (providing that "Lessee [*i.e.*, National] will have the option
28 |        to select an operating lease structure or a finance lease structure").

EXHIBIT 40
Page 387 National Air Cargo, Inc.'s Supplemental Responses to First Set of Interrogatories from Jacob Hodges

     c. The contents of any future lease agreement, including representations and warranties, return conditions, and insurance. *See id.* at 4-6; *see also id.* at 7 ("the Lessor and Lessee . . . will act in good faith . . . to negotiate, execute and deliver all necessary and appropriate leases").

The Letter of Intent ends by making clear that any future lease agreement would be subject to various conditions precedent, any of which may or may not occur, including securing Global's Board of Directors' approvals, satisfactory lease and finance documentation, tax and legal opinions, and inspections of aircraft and records. *See id.* at 7 ("Conditions Precedent" section). National also incorporates herein by reference all of the legal arguments it has made regarding the legal invalidity of the plaintiff's claims in this matter, including but not limited to the plaintiff's implausible interpretation of the terms of the Letter of Intent. National also incorporates herein by reference, rather than repeating them again, the responses and updated responses to interrogatories served by Global, the documents marked as exhibits at the depositions taken in this matter, and the deposition testimony in the record in this case.

**INTERROGATORY NO. 4**

     List each person known to YOU who has information that supports or refutes the allegation in Paragraph 59 of the Counterclaim that "[h]ad NATIONAL chosen to go with Goldman Sachs or another source in early July, there is a strong chance that Goldman would have been able to finance the potential JAL acquisition in a timely manner."

**RESPONSE TO INTERROGATORY NO. 4**

     In addition to the general objections, National objects to this interrogatory to the extent it may call for information protected by the attorney-client privilege and attorney work product protections. Subject to and without waiving the general objections, National responds that, with the exception of counsel of each party, this information is stated in National's Amended Initial Disclosures. National also responds that it has produced documents responsive to this interrogatory. National further responds:

6

EXHIBIT 4
Page 388 National Air Cargo, Inc.'s Supplemental Responses to First Set of Interrogatories from Jacob Hodges

1    • Christopher Alf
2    • Brian Conaway
3    • Glen Joerger
4    • Jacob Matthew
5    • Preston Murray
6    • The witnesses listed in Global's and Hodges' disclosures in this matter.
7  **INTERROGATORY NO. 5**
8         List each person known to YOU who YOU expect to provide testimony that
9  supports the allegation in Paragraph 59 of the Counterclaim that "National also likely
10  could have obtained more favorable financing with respect to the Air France aircraft."
11  **RESPONSE TO INTERROGATORY NO. 5**
12         In addition to the general objections, National objects to this interrogatory to the
13  extent it may call for information protected by the attorney-client privilege and attorney
14  work product protections.  Subject to and without waiving the general objections,
15  National responds that this information is stated in National's initial disclosures and that
16  National has produced documents responsive to this interrogatory.  National further
17  responds as follows:
18    • Christopher Alf
19    • Brian Conaway
20    • Glen Joerger
21    • Jacob Matthew
22    • Preston Murray
23    • The witnesses listed in Global's and Hodges' disclosures in this matter.
24  **INTERROGATORY NO. 6**
25         List with sufficient detail to permit identification and contact with the source each
26  source of potential income YOU allege in Paragraph 61 of the Counterclaim YOU lost as
27  a result of the "lost chance to complete the JAL deal."
28

7

**RESPONSE TO INTERROGATORY NO. 6**

In addition to the general objections, National objects that this interrogatory is vague and ambiguous.  National will give reasonable interpretations to ambiguous phrases in its response.  National further objects to this interrogatory to the extent that it presumes that it is possible to "contact" each source of potential income.  National further objects to this interrogatory to the extent it may call for information protected by the attorney-client privilege and attorney work product protections.  National further objects to the extent this interrogatory seeks information that would be the subject of expert testimony.  Subject to and without waiving those objections, National responds that, as a result of the lost JAL deal, National lost millions of dollars of lost income from government contracts and commercial sources, including the Civil Reserve Air Fleet program, and arrangements akin to those National entered with Air Iceland Icelandic Air, and additional sources identified in documents produced by National.  National further responds that this response is given before the completion of expert discovery.  National expects that its expert reports will provide further information relevant to this interrogatory.

**INTERROGATORY NO. 7**

Describe in detail each fact YOU contend supports the allegation in Paragraph 69 of the Counterclaim that  "'Global' did not have immediate access to viable lending sources as it claimed."

**RESPONSE TO INTERROGATORY NO. 7**

In addition to the general objections, National objects to this interrogatory because "each fact" is vague and ambiguous.  National will give a reasonably limiting interpretation of this phrase in its response.  National further objects to this interrogatory to the extent it may call for information protected by the attorney-client privilege and attorney work product protections.  Subject to and without waiving these objections, National responds that much of the information in support of the allegation that "'Global' did not have immediate access to viable lending sources as it claimed"

EXHIBIT 40
Page 390 National Air Cargo, Inc.'s Supplemental Responses to First Set of Interrogatories from Jacob Hodges

1   is in the possession of Global and/or Hodges and non-parties who National expects

2   will respond during discovery. National also responds that it has produced documents

3   responsive to this interrogatory and incorporates herein by reference the information

4   in its Counterclaim and Answer. National further responds as follows: Hodges

5   represented to National and Mr. Stukes through email correspondence and telephone

6   calls that Global had contacts with many lending sources that would be able and

7   willing to participate immediately in the financing of the subject aircraft. Hodges

8   further represented to National and Mr. Stukes through email correspondence and

9   telephone calls that Global could and would provide firm lender commitments by July

10   22, 2010. Mr. Hodges represented he was working with Pearl and directed National to

11   Pearl's website, which indicated that Pearl was an excellent source for funding. Mr.

12   Hodges also represented that he was already working on the National project and had

13   lenders ready and willing to work with Hodges and National but just needed the Letter

14   of Intent to finalize his funding sources. Discovery has revealed that Mr. Hodges was

15   not in fact lining up funding as he has represented and was not working closely with

16   financial institutions. He was also not affiliated with Pearl as he had represented and

17   did not have any financial institutions ready for funding as he represented.  Mr.

18   Hodges and subsequently his sham entity Global failed to obtain the firm commitment

19   that Mr. Hodges promised could be obtained. That failure itself speaks to Global's

20   failures. Further, Hodges represented that Perot Investments was close to providing a

21   commitment letter expressing its strong interest in financing the purchase of at least

22   two aircraft, whereas Perot Investments has testified that this is not true. Hodges also

23   represented that he was close to reaching agreement with Citibank regarding the

24   financing of the aircraft, whereas Citibank has testified that it had no interest in the

25   deal. National incorporates herein by reference the deposition testimony of the

26   corporate representatives of Citibank, Greenrock, Pearl, Perot, National, and also the

27   testimony of Mr. Hodges himself as evidence of Mr. Hodges' misrepresentations

28   about Mr. Hodges' alleged access to capital and lending institutions and his ability to

1  perform in the time period discussed with National and identified in the Letter of

2  Intent.

3  **INTERROGATORY NO. 8**

4       Describe in detail each fact YOU contend supports the allegation in Paragraph 74

5  of the Counterclaim that the "failure to secure lending increased substantially the cost of

6  financing the acquisition of three Boeing 747 aircraft from Air France."

7  **RESPONSE TO INTERROGATORY NO. 8**

8       In addition to the general objections, National objects to this interrogatory

9  because "each fact" is vague and ambiguous.  National will give a reasonably limiting

10 interpretation of this phrase in its response.  National further objects to this

11 interrogatory to the extent it may call for information protected by the attorney-client

12 privilege and attorney work product protections.  Subject to and without waiving those

13 objections, National responds that it has produced documents that are relevant to this

14 interrogatory.  National further responds that, as Global and Hodges were aware,

15 National was on tight deadline to obtain funding for the subject aircraft.  National relied

16 on Hodges' representations regarding Hodges' and Global's ability to secure financing

17 for both the JAL and Air France deals and forwent other financing options.  When

18 Global and Hodges were unable to secure a firm lender commitment by July 22, 2010,

19 however, National was forced to scramble to obtain financing in an even shorter time

20 period than anticipated.  National ultimately was able to secure financing as to the Air

21 France planes.  But, given the paucity of financing options available in the particularly

22 tight time frame created by Global's inability to perform, National was forced to accept

23 less than favorable terms than that it previously had been offered by other lenders—

24 including an increased interest rate and other onerous terms, which resulted in millions

25 of dollars of increased costs associated with the interest payments and the loss of

26 liquidity associated with those extra interest payments and significant additional

27 burdens.  National further responds that this response has been made prior to the

28 completion of expert discovery.  National expects to that its expert reports will provide

10

1    further information relevant to this interrogatory.

2    **INTERROGATORY NO. 9**

3        Describe in detail each fact YOU contend supports the allegation in Paragraph 96

4    of the Counterclaim that GLOBAL breached the LETTER OF INTENT by failing to use

5    "best efforts" to secure a Memorandum of Understanding from a qualified lender to

6    provide capital to purchase aircraft under a loan or finance lease by July 22, 2010.

7    **RESPONSE TO INTERROGATORY NO. 9**

8        In addition to the general objections, National objects to this interrogatory because

9    "each fact" is vague and ambiguous.  National will give a reasonably limiting

10    interpretation of this phrase in its response.  National also objects to this interrogatory

11    to the extent it may call for information protected by the attorney-client privilege and

12    attorney work product protections.  Subject to and without waving the objections,

13    National responds that the facts supporting the allegation that Global failed to use its

14    "best efforts" as required by the Letter of Intent are stated in National's prior

15    pleadings, and its Counterclaim and Answer, which are incorporated herein by

16    reference.  National has also produced documents that are relevant to this

17    interrogatory.  National further responds as follows:  Hodges represented to National

18    that Global could and would secure firm lender commitments National needed for the

19    Japan Airlines Aircraft and Air France Aircraft by July 22, 2010.  The representation was

20    based in part on the false statements by Mr. Hodges that he already had lenders lined up

21    for the deal and soft commitments in place and that he just needed the Letter of Intent to

22    finalize those lender commitments in the course of a few days.  Discovery has revealed

23    that Mr. Hodges had not already undertaken all the efforts he claimed to have undertaken

24    before the Letter of Intent was signed and he did not in fact have lenders ready and willing

25    to commit to financing the subject aircraft if a Letter of Intent was signed by National.

26    Mr. Hodges instead effectively started from scratch after the Letter of Intent was signed,

27    knowing full well that his "best efforts" could not possibly result in a firm commitment

28    from a quality lender in a few short days.  Global failed to obtain the commitment letter

1   by the agreed-upon deadline. Mr. Hodges and Global were misrepresenting their
2   capabilities to secure the funding National needed and also failed to use their best efforts
3   because they were preoccupied with managing their false statements. Global's promise to
4   use its "best efforts" necessarily included a commitment to focus its attention and energy
5   on securing funding as it claimed it would and could do. Yet Global spent the short
6   period of time it had to secure funding focused on securing its own legal entity status, as it
7   did not file its Articles of Organization until July 20, 2010. Instead of focusing its best
8   efforts on securing funding for National, Global used the important short period of time
9   available to cover up its misrepresentations to National regarding its entity status and
10  evaluating the most basic and fundamental of issues that a new entity must face, such as
11  where to incorporate, what type of entity to become, who would control the company,
12  what ownership options existed and might look like, who might hold what key positions
13  within the new company, who the company's agent would be, etc.. Mr. Hodges also had
14  to develop stories to cover his series of misrepresentations about the status of his work,
15  who he was working with, etc.. National also incorporates herein by reference, rather
16  than repeating them again, the responses to previous interrogatories and also the
17  updated interrogatory responses of National to Global's interrogatories, the
18  documents marked as exhibits at the depositions taken in this matter, and the
19  deposition testimony in the record in this case.

20  **INTERROGATORY NO. 10**

21        Describe in detail each action taken by the Counter-Defendants to "mask their
22  misconduct" and to mislead NATIONAL into believing that the Counter-Defendants
23  "were performing to their best efforts to secure the appropriate financing."

24  **RESPONSE TO INTERROGATORY NO. 10**

25        In addition to the general objections, National objects to this interrogatory because
26  "each action" is vague and ambiguous. National will give a reasonably limiting
27  interpretation of this phrase in its response. National also objects to this interrogatory
28  to the extent it may call for information protected by the attorney-client privilege and

12

1   attorney work product protections. Subject to and without waving the objections,

2   National responds that the facts supporting the allegation that Global and Hodges

3   failed to use their "best efforts" as required by the Letter of Intent are stated in

4   National's prior pleadings, Counterclaim and Answer, which are incorporated herein

5   by reference. National has also produced documents relevant to this interrogatory.

6   National further responds as follows: Global and Hodges masked their misconduct by

7   making misrepresentations and false promises to National and affirmatively mislead

8   National about Global's and Hodges' inability to secure the financing it sought. Global

9   and Hodges failed to inform National that Global was not an incorporated entity, or any

10  business entity at all, and that Hodges was in fact spending at least the first three days after

11  signing the Letter of Intent attempting to secure Global's entity status and address

12  fundamental issues related to the formation of a new business. Global used "LLC" and

13  "Inc." interchangeably on the Letter of Intent because, at that time, Global does not appear

14  to have known what kind of business entity it intended to become and appears to have

15  identified two different kinds for the purpose of maintaining flexibility. Global also failed

16  to inform National that Global did not have sufficient contacts to secure the funding

17  National needed, and that Global would not be able to deliver the memorandum of

18  understanding required by the Letter of Intent. Global and Hodges represented to National

19  on numerous occasions — both before and after the parties signed the Letter of Intent –

20  that Global could and would provide firm lender commitments by the July 22, 2010

21  deadline. Prior to signing the Letter of Intent, Global and Hodges stated that Global had

22  soft commitments and had made successful efforts with several quality lending institutions

23  that would be immediately strengthened once National signed the Letter of Intent. Global

24  and Hodges claimed that Citibank and Perot Investments were close to committing finance

25  for the purchase of aircraft, when in fact neither Citibank or Perot Investments had any

26  interest in the deal. Mr. Hodges also had to redo work and carefully avoid questions

27  caused by Mr. Hodges' misrepresentations regarding the involvement of Pearl and his

28  relationship with Pearl. Global and Hodges' representations served to mask Global's and

1 | Hodges' misconduct and to mislead National into believing that Global and Hodges
2 | were using their "best efforts" to secure the financing National needed for the subject
3 | aircraft and working with a credible network of financial firms.  National also
4 | incorporates herein by reference, rather than repeating them again, the responses to
5 | previous interrogatories and also the updated interrogatory responses of National to
6 | Global's interrogatories, the documents marked as exhibits at the depositions taken in
7 | this matter, and the deposition testimony in the record in this case.

8 | **INTERROGATORY NO. 11**

9 |      Is it YOUR contention that HODGES verbally told NATIONAL and STUKES
10 | that GLOBAL BTG, Inc. was a validly formed corporation?  If so, identify each
11 | person to whom such a verbal statement was made, when the representation was
12 | made and, as specifically as possible, the exact statement.

13 | **RESPONSE TO INTERROGATORY NO. 11**

14 |      In addition to the general objections, National objects to this interrogatory as
15 | compound.  National also objects to this interrogatory to the extent it may call for
16 | information protected by the attorney-client privilege and attorney work product
17 | protections.  Subject to and without waving the objections, National responds that
18 | facts in that are responsive to this interrogatory are stated in National's prior
19 | pleadings, Counterclaim and Answer, which are incorporated herein by reference.
20 | National has also produced documents that are relevant to this interrogatory.  National
21 | further responds as follows:  Hodges affirmatively represented Global was a legal entity
22 | by using the monikers "Global BTG, Inc." and "Global BTG, LLC" on the Letter of Intent,
23 | without informing National that such a corporation did not exist.  Throughout the course of
24 | the parties' dealings, Hodges withheld information about the true entity status of Global
25 | (the truth that Global did not even exist) while he used a web of false statements to
26 | create an image of credibility and sophistication – relationships with Pearl (in reality
27 | apparently none), a business office in Los Angeles (in reality a home business in
28 | Camarillo), billions in financing (in reality not close to that amount), etc..  Even when

1  National requested information regarding Global's experience and references, Hodges

2  was not forthcoming in references and instead represented that Greenrock was part of

3  or affiliated with Hodges' validly established company.  Hodges represented that he

4  would be focused on the aircraft financing project while knowing he needed to focus

5  on creating a new legal business entity because it did not exist when the Letter of

6  Intent was executed.

7  **INTERROGATORY NO. 12**

8       Is it YOUR contention that HODGES verbally told NATIONAL and STUKES that,

9  prior to July 20,2010, GLOBAL BTG, LLC. was a validly formed limited liability

10  company?  If so, identify each person to whom such a verbal statement was made, when

11  the representation was made and, as specifically as possible, the exact statement.

12  **RESPONSE TO INTERROGATORY NO. 12**

13  In addition to the general objections, National objects to this interrogatory as compound.

14  National also objects to this interrogatory to the extent it may call for information

15  protected by the attorney-client privilege and attorney work product protections.

16  Subject to and without waving the objections, National responds that facts that are

17  responsive to this interrogatory are stated in National's prior pleadings, Counterclaim

18  and Answer, which are incorporated herein by reference.  National has also produced

19  documents that are relevant to this interrogatory.  National further responds as

20  follows:  Hodges affirmatively represented Global was a legal entity by using the

21  monikers "Global BTG, Inc." and "Global BTG, LLC" on the Letter of Intent, without

22  informing National that such a corporation did not exist.  Throughout the course of the

23  parties' dealings, Hodges withheld information about the true entity status of Global

24  (the truth that Global did not even exist) while he used a web of false statements to

25  create an image of credibility and sophistication – relationships with Pearl (in reality

26  apparently none), a business office in Los Angeles (in reality a home business in

27  Camarillo), billions in financing (in reality not close to that amount), etc..  Even when

28  National requested information regarding Global's experience and references, Hodges

was not forthcoming in references and instead represented that Greenrock was part of or affiliated with Hodges' valid established company.  Hodges represented that he would be focused on the aircraft financing project while knowing he needed to focus on creating a new legal business entity because it did not exist when the Letter of Intent was executed.

DATED:  June 19, 2012

JENNER & BLOCK LLP

*Brent Caslin*

Brent Caslin

Attorney for National Air Cargo, Inc.

EXHIBIT 40
Page 398 National Air Cargo, Inc.'s Supplemental Responses to First Set of Interrogatories from Jacob Hodges

## **VERIFICATION**

No one person knows all of the information requested by Counter Defendant Jacob Hodges' First Set of Interrogatories to Defendant National Air Cargo, Inc., but I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and belief, the foregoing responses to Counter Defendant Jacob Hodges' First Set of Interrogatories to Defendant National Air Cargo, Inc. are true and correct.  I further declare that I am authorized to sign and execute this verification on behalf of National Air Cargo, Inc.

By: Glen Joerger

For National Air Cargo, Inc.

National Air Cargo, Inc.'s Supplemental Responses to First Set of Interrogatories from Jacob Hodges

EXHIBIT 40
Page 399

## PROOF OF SERVICE

I, Jessica Salazar Garcia, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Jenner & Block LLP, 633 West 5th Street, Suite 3600, Los Angeles, California 90071.

On June 19, 2012, I served the documents described below on the interested parties in this case:

**NATIONAL AIR CARGO, INC.'S OBJECTIONS AND SUPPLEMENTAL RESPONSES TO FIRST SET OF INTERROGATORIES FROM JACOB HODGES**

on the interested parties in this action as follows:

**[X]   (BY FIRST CLASS MAIL)**  By placing the documents listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below.  I am familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited in the United States Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.

Donald J. Kula
Nathan M. Smith
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 19, 2012 at Los Angeles, California.

Jessica Salazar Garcia

18

# EXHIBIT 41

**FILED UNDER SEAL PURSUANT TO PROTECIVE ORDER**

**EXHIBIT 42**

Re: web site                                                    http://mail.aol.com/36049-111/aol-6/en-us/mail/PrintMessage.aspx

**From:** Jacob Hodges <hodges.jacob@gmail.com>
**To:** Christopher McKee <chris@chrismckee.com>
**Subject:** Re: web site
**Date:** Mon, Jun 7, 2010 3:36 pm

Chris,

Thanks for the reply. Something the level of the Pearl site or in between the Pearl and BCI site would do. What about email. How quickly could email accounts be set up and administered (2-5 accounts). I get back in town tomorrow night.

Jacob

On Mon, Jun 7, 2010 at 3:18 PM, Christopher McKee <chris@chrismckee.com> wrote:
Hey Jacob.

Really what you have with the sites you displayed is 3 different levels of design.

Lowest and Easiest to implement would be pearlaircraft.com
It represents a basic informatics website. Real basic pages. informative. I can do something like this - to get it up and represented for about $1,500 - 2k

http://bciaircraft.com is like a level 2 website, more bells and whistles and features. a very elegant very classy site. The marquee area is custom and visually appealing. Flash design or Possibly another technology to push imagery. 3.5  to 5 k

http://genesiscustomjetliners.com Major bells and whistles, very emotionally and visual based. The pages are served by ASP or .php technology. Means all pages are being put together by a database. Design is amazing. Photography and quicktime VR stuff... Video...etc.. Results are amazing. Just requires more programming on back end, more planning and design. Definitely a high end site. Obviously more money and manpower on my side - in 8k- 10k range -

I can design sites for all purposes. I know where I think you need to be with web representation, its between BCI and Genesis. - Good news is that it can be done in phases - or all at once. We can review again when you get home... I am flexible. I would probably need 40% up front 60% on delivery. Its up to you guys. see www. digitalimagination.com and www.chrismckee.com for my most recent work. Remember I am flexible with price and design features. All work is guaranteed and am able to be retained for fixes additions, etc. Also able to be written off on business as advertising costs. FYI. I am also available for print materials, video work, fine art...etc.

Thanks,

Chris
805-750-5714

Exhibit 352 Pg. 1 of 4
Depo of Hodges
Date 5/31/12
Xavier Mireles, CSR 5001

1 of 4                                                              5/9/12 9:31 PM

GLOBAL 010702

EXHIBIT 42
Page 403

Re: web site                                    http://mail.aol.com/36049-111/aol-6/en-us/mail/PrintMessage.aspx

On Jun 2, 2010, at 3:43 PM, Jacob Hodges wrote:

I'm still out of town, currently in London where it's a quarter to midnight. I'll be back home Tuesday next week. Any general idea on the design and price would be helpful as my partner has in the interim been looking at a some sources as well.

Jacob

On Wed, Jun 2, 2010 at 3:30 PM, Christopher McKee <chris@chrismckee.com> wrote:

sorry, I knew you were out of town. I'm ready to address the site with you.

chris

On Jun 2, 2010, at 3:26 PM, Jacob Hodges wrote:

Chris,

I never heard back from you on this.

Jacob

---------- Forwarded message ----------
From: **Jacob Hodges** <hodges.jacob@gmail.com>
Date: Thu, May 13, 2010 at 3:09 PM
Subject: web site
To: Chris Mckee <chris@chrismckee.com>

Chris,

I own the domain name: www.globalbtg.com and www.globalbigticketgroup.com

Globalbtg.com will be the primary site but I bought globalbigticketgroup.com as well so I could link it to the primary site if someone were to mistype, as well as to ensure that no one else uses it. I intend to create a web page and have email accounts such as jacob@globalbtg.com. Initially only 2-5 email accounts.

I am a managing director of the three below companies and I have included their respective web sites to give you an idea of the industry that I'm in so you can visualize what the globalbtg site may include:

https://bciaircraft.com
https://pearlaircraft.com
https://genesiscustomjetliners.com

2 of 4                                                           5/9/12 9:31 PM

GLOBAL 010703

EXHIBIT 42
Page 404

I may incorporate some elements of the below sites into mine as well:

http://www.marathonfund.com/
I like the intro with the specialties streaming across the page, i.e. aerospace, commercial aviation, emerging markets, real estate.... followed by the cities which they are in; Chicago, Los Angeles...

http://www.varde.com
Example of a simple site with some content and a few pages, then a secure password protected page with future content to be added for say investors only.

https://www.dkpartners.com
Example of "Secure Site, user name and password required" Globalbtg.com not be completely protected but will be more like the varde.com with some content then a protected section.

Can you give me a ballpark idea on the cost associated with building the site, and hosting fees, including email service, as well as the possible timing to complete.

Thanks.

—
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com


—
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com


—
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com

3 of 4

5/9/12 9:31 PM

GLOBAL 010704

EXHIBIT 42
Page 405

Re: web site                                                    http://mail.aol.com/36049-111/aol-6/en-us/mail/PrintMessage.aspx

--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com

4 of 4                                                                              5/9/12 9:31 PM

GLOBAL 010705

EXHIBIT 42
Page 406

# EXHIBIT 43

Exhibit _355_ Pg. _1_ of _8_
Depo of _Hodges_
Date _5/31/12_

Xavier Mireles, CSR 5001

| | |
|---|---|
| From: | dstukes@asi-advisors.com |
| To: | Jacob Hodges |
| Sent: | 6/26/2010 2:02:16 PM |
| Subject: | NAC Data Site |

Jacob:

Please access NAC's data room where you will find company information, aircraft information, financial infformation, and management information. To access the data room perform the following:

a) Log on to -http://www.pkkcpa.com

b) Once you access ite click on- 'Client Login"

c) Your Login ID: PearlAviation        Password: (case sensitive) dm5{0rvf609

 d) Once accessed application- click on file exchange  and you will see NAC files

If you have any problems accessing the site, please let me know. Please feel free to call me if you have any furtyher questions.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**On Fri 25/06/10 8:12 AM , dstukes@asi-advisors.com sent:**

Jacob:

We are all confirmed for 9:30am ( in about 15 mins) for the call. The participants on our side will be:

GLOBAL 001316

EXHIBIT 43
Page 407

Myself, Chris Alf-Chairman, Preston Murray-CEO, Glen Joerger-Director, and Payl Sawhny-Head of Maintenence.

See you then!

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**On Fri 25/06/10 12:44 AM , Jacob Hodges hodges.jacob@gmail.com sent:**

Don,

We can use the following conference line for the call Friday morning at 09:30 Eastern.

Conference Call in Number: 712-432-1600
Pass Code: 255795

Regards,

Jacob

---------- Forwarded message ----------
From: **Jacob Hodges** <hodges.jacob@gmail.com>
Date: Thu, Jun 24, 2010 at 2:31 PM
Subject: Re: NAC-Conf Call
To: "dstukes@asi-advisors.com" < dstukes@asi-advisors.com>

That will be fine. Will you be circulating a call in number?

Jacob Hodges

On Jun 24, 2010, at 11:35 AM, dstukes@asi-advisors.com wrote:

Jacob

GLOBAL 001317

EXHIBIT 43
Page 408

I cpould do 9:30 am. I have a 10am. Does that work

DStukes

Sent from my Verizon Wireless BlackBerry

**From:** Jacob Hodges <hodges.jacob@gmail.com>
**Date:** Thu, 24 Jun 2010 11:20:35 -0600
**To:** dstukes@asi-advisors.com<dstukes@asi-advisors.com>
**Subject:** Re: NAC-Conf Call

Don,

Would it be possible to schedule the call Friday morning at either 9:30 or 10:00 am Eastern time.

Jacob Hodges
Mobile: 805-405-9211


On Jun 24, 2010, at 4:45 AM, dstukes@asi-advisors.com wrote:


Jacob:

Busy day for me as well.   Just email me with a time.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548



This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.



On Thu 24/06/10 2:21 AM , Jacob Hodges hodges.jacob@gmail.com sent:

Don,

I have asked my technical director Steve Shamsai to be available for a call as early as tomorrow afternoon or on Friday. Unfortunately the wedding that I have traveled to attend and the family functions around the wedding are Thursday night and Friday. I will confirm with Steve's schedule in the morning then get in touch with you and

**GLOBAL 001318**

EXHIBIT 43
Page 409

propose a time for the call. It will have to be in the afternoon or on Friday. I do apologize and I hope this works for NAL and yourself.

Jacob

On Wed, Jun 23, 2010 at 3:30 PM, <dstukes@asi-advisors.com> wrote:

Jacob:

What time or times would be good for a conf call tomorrow with NAC's CEO and Head of Maintenence?

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548


This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.


**On Tue 22/06/10 1:05 AM , Jacob Hodges hodges.jacob@gmail.com sent:**

Don,

Five of the eight 747's are in need of a D Check which generally takes 60 days to complete and carries an average cost of $4.5MM. Please ask the airline for a spec sheet for each aircraft and to define their maintenance program, including where the checks will be completed. You also mentioned that NAC may have negotiated with the sellers, JAL or AF, to swap run out engines with fresh engines. We will need engine serial numbers and spec sheet as well as this changes the value of the aircraft. My technical advisor will likely have some follow on questions tomorrow.

Jacob


On Mon, Jun 21, 2010 at 4:35 PM, <dstukes@asi-advisors.com> wrote:

Jacob:

Please send your list of questions.

Sincerely,

GLOBAL 001319

EXHIBIT 43
Page 410

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**On Mon 21/06/10 1:54 AM , Jacob Hodges hodges.jacob@gmail.com sent:**

Don,

We need to talk on Monday and discuss specifics. I don't want to make any promises that we won't be able to deliver on. For example, it is not possible for us to close with our funds given the timing you outlined below. Our equity will be coupled with bank debt that we will raise in the capital markets. Ideally in a scenario such as this, the airline would close with their own money and take delivery of the aircraft. All the while they will be negotiating the terms of the lease and sale and lease back (SLB) with us, the potential lessor. Once agreed we then have a certain time in which to perform and consummate the SLB. We remain interested in the opportunity and will certainly be able to get an LOI out early this week.

Best,

Jacob Hodges

On Sun, Jun 20, 2010 at 3:20 AM, <dstukes@asi-advisors.com> wrote:

Jacob:

There are three immediate deliveries. One on this week; one July 10th and one on July 30th. Can you team structure a deal for these aircraft this week.  I know this is on a fire drill basis.  At a min. Can you do the two deliveries this week and July 10th?  I can get you all the information you need on Monday morning.   Can you send me draft LOI's late Monday or Tuesday morning?

What is the company name you are doing this deal, so I can send you a NDA?   We have a virtual data site with audited financials, detailed projections, LOII's and purchase agreements, Bios, contracts, etc.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC

GLOBAL 001320

EXHIBIT 43
Page 411

445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**On Sat 19/06/10 7:06 AM , dstukes@asi-advisors.com sent:**

Jacob:

Please give me a call over the weekend, if you can, the latest Monday morning.  Need to discuss NAC. Attached please find a deck that should help you better understand who NAC is and how they will deploy the aircraft. I need to talk to you about two options:

Option#1:

Sale-leaeback on three aircraft due for immediate delivery:

B747-400BCF S/N-25328, B747-400BCF-S/N-26344, and B747-400BCF S/N-25630   (must act fast!)    Term 5-7 years

Option#2:

All five JAL B747-400 BCF's  ( would need a firm LOI this week).

In both cases, I need to know how quickly you can actually move to affect a transaction.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

GLOBAL 001321

EXHIBIT 43
Page 412

**On Fri 18/06/10 1:07 AM , Jacob Hodges** hodges.jacob@gmail.com **sent:**

Don,

That is an impressive fleet by any airlines standard. I'll call you tomorrow to discuss.

Jacob

On Thu, Jun 17, 2010 at 9:22 AM, <dstukes@asi-advisors.com> wrote:

Jacob:

Attached please find a list of aircraft to be purchased by National Air Cargo.  They have LOI's on all aircraft.  I would like your thoughts and input.  Deliveries start ASAP, so time is of the essence. Please give me a call to discuss.

Sincerely,

Donald A. Stukes
Senior Managing Director
ASI Advisors, LLC
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Tel-(914)-358-0032
Fax-(914)-358-0033
Cell-(914)-715-1548

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**On Tue 15/06/10 1:24 PM , Jacob Hodges** hodges.jacob@gmail.com **sent:**

Don,

For the time being please only send email correspondence to my personal Gmail account.

Best,

--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com

GLOBAL 001322

EXHIBIT 43
Page 413

--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com


--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com


--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com


--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com


--
Jacob Hodges
Office: +1 805-374-1235
Mobile: +1 805-405-9211
Email: hodges.jacob@gmail.com

GLOBAL 001323

EXHIBIT 43
Page 414

# EXHIBIT 44



**PRACTICE AID 06-4**

Business Valuation and
Forensic & Litigation Services Section



# Calculating Lost Profits

Written by
**Richard A. Pollack**
**Scott M. Bouchner**
**Craig M. Enos**
**Colin A. Johns**
and
**John D. Moyl**

Exhibit 578  Pg. 1 of 75
Depo of McFARLANE
Date 8/17/12
Xavier Mireles, CSR 5001

KDM000123

EXHIBIT 44
Page 415

*Copyright © 2006 by*
*American Institute of Certified Public Accountants, Inc.*
*New York, NY 10036-8775*

*All rights reserved. For information about the procedure for requesting permission to make copies of any part of this work, please visit www.copyright.com or call (978) 750-8400.*

*1 2 3 4 5 6 7 8 9 0 BVFLS 0 9 8 7 6*

KDM000124

EXHIBIT 44
Page 416

**AICPA Forensic and Litigation Services Committee (2005–2006)**

| | |
|---|---|
| Thomas Burrage, *Chair* | Gregory Lawson |
| Yvonne Craver | Richard Pollack |
| Michelle Gallagher | Patrice Schiano |
| David Kast | Ruby Sharma |
| Jeffrey Kinrich | Ralph Summerford |

**AICPA Staff**

Anat Kendal
*Director*
*Financial Planning*

Janice Fredericks
*Business Valuation and Forensic & Litigation Services Manager*
*Financial Planning*

KDM000125

EXHIBIT 44
Page 417

KDM000126

EXHIBIT 44
Page 418

# Table of Contents

Chapter 1:   Introduction...........................................................................................1
Limitations of This Practice Aid ...............................................................1
Scope of This Practice Aid ........................................................................1

Chapter 2:   Overview of the Lost Profits Analysis...............................................3

Chapter 3:   Overview of Applicable Professional Standards..............................5
The AICPA Code of Professional Conduct ................................................5
The Consulting Standards...........................................................................8
Other Guidance...........................................................................................8

Chapter 4:   Overview of Case Law and Evidentiary Standards........................11
State Law ..................................................................................................11
Federal Law ..............................................................................................11

Chapter 5:   Role Of the Practitioner in Lost Profits Analysis .........................13
Practitioner as Expert ...............................................................................13
Practitioner as Consultant .........................................................................13
Practitioner in Other Roles .......................................................................14

Chapter 6:   Qualifications and Skills...................................................................15
Training and Experience............................................................................15
Other Skills ...............................................................................................15
Use of Other Experts ................................................................................16

Chapter 7:   Lost Profits Claims ...........................................................................17
Damages and Damage Types .....................................................................17
Contract Disputes ......................................................................................17
Tort ...........................................................................................................17

Chapter 8:   Legal Principles of Proving Damages .............................................19
Causation ..................................................................................................19
Foreseeability (Contract Damages Only)...................................................20
Certainty ...................................................................................................20

*v*

KDM000127

EXHIBIT 44
Page 419

**Chapter 9:   Loss Period** ..................................................................................**23**

   Breach of Contract.............................................................................................23

   Torts..................................................................................................................23

**Chapter 10:   Calculating Lost Revenues**...............................................**25**

   The "Before and After" Method .........................................................................25

   The "Yardstick" (or "Benchmark") Method ........................................................26

   Calculation Based on the Terms of the Contract..............................................26

   An Accounting of Defendant's Profits ..............................................................26

   Other ................................................................................................................27

   Past and Future Lost Revenues.........................................................................27

   Do the Calculated Lost Revenues Make Sense? ..............................................27

**Chapter 11:   Cost Estimation**...............................................................**29**

   Concept of Avoided Costs ................................................................................29

   Analysis of the Plaintiff's Cost Structure ..........................................................29

   Fixed Versus Variable Costs .............................................................................29

   Nonstatistical Methods of Cost Estimation .......................................................30

   Statistical Methods of Cost Estimation .............................................................31

   Do the Calculated Avoided Costs Make Sense? ..............................................32

**Chapter 12:   Prejudgment Interest on Past Losses** ...........................**33**

**Chapter 13:   Financial Discounting of Future Lost Profits to Present Value** ................................................................................**35**

   The Time Value of Money .................................................................................35

   Ex Post Methodology Versus Ex Ante Methodology ........................................36

   Methods of Determining Discount Rate.............................................................36

   Mid-Year Versus End-of-Year Discounting .......................................................41

   Adjusting for Risk in Projected Profits Versus Accounting for Risk in the Discount Rate ........................................................................................41

**Chapter 14:   Taxes and Damages** ........................................................**43**

**Chapter 15:   Mitigation of Damages** .....................................................**45**

*vi*

KDM000128

EXHIBIT 44
Page 420

**Chapter 16:   Other Issues Affecting Lost Profits Analyses** ...........................................47

    Distinguishing Between Violative and Nonviolative Acts ................................................47

    Distinguishing Various Violative Acts ...........................................................................47

    Impact of Subsequent Events ........................................................................................47

    Changes in the Economic Environment ..........................................................................48

**Chapter 17:   Alternative Damage Measures Other Than Lost Profits** ....................................49

    Out-of-Pocket Costs .....................................................................................................49

    Decrease in Value Caused by the Defendant's Misconduct ..............................................49

**Chapter 18:   Specialized Damages Areas** ........................................................................51

    Newly Established Businesses .......................................................................................51

    Intellectual Property Infringement Damages ....................................................................52

    Antitrust Violation Damages .........................................................................................53

    Securities Fraud Damages .............................................................................................53

    E-Business Impact on Damages .....................................................................................54

**Appendix A: Comparison of AICPA Professional Standards and Federal Rule of Evidence 702** ...........................................................................................55

**Appendix B: Testimony Pyramid** ...................................................................................57

**Appendix C: Typical Litigation Services** .......................................................................59

**Appendix D: Ex Ante Versus Ex Post** ...........................................................................61

**Appendix E: List of Cases Cited** ...................................................................................63

**Appendix F: Lost Profits Resources (Nonexhaustive List)** ...............................................65

*vii*

KDM000129

EXHIBIT 44
Page 421

KDM000130

EXHIBIT 44
Page 422

# CHAPTER 1: INTRODUCTION

## LIMITATIONS OF THIS PRACTICE AID

1.   The purpose of this Practice Aid is to provide nonauthoritative guidance to practitioners engaged to prepare an analysis of lost profits. Often, these services are in a litigated environment. Although this publication discusses legal concepts and requirements, it is not intended to provide legal advice. Practitioners are advised to discuss legal concepts and requirements with counsel.

## SCOPE OF THIS PRACTICE AID

2.   This Practice Aid discusses roles the practitioner may be asked to take in a lost profits damage analysis, the professional standards applicable to those services, and the basic principles and guidelines for preparing lost profit damages analyses. As each engagement is unique, these principles and guidelines must be evaluated and adapted to the facts and circumstances that affect the engagement.

KDM000131

EXHIBIT 44
Page 423

KDM000132

EXHIBIT 44
Page 424

# CHAPTER 2: OVERVIEW OF THE LOST PROFITS ANALYSIS

3.   Lost profits are typically claimed as an element of economic damages in a litigation setting. Damage analyses are prepared to provide an estimate of the detriment suffered by the plaintiff as a result of a wrongful act of the defendant. In order to prove damages the plaintiff must show that

The wrongful act of the defendant caused a loss  and

The amount of the loss can be estimated with reasonable certainty.

In addition, for contract claims, the plaintiff must show that the loss incurred was foreseeable at the time the contract was entered into by the parties.

4.   Only lost "net" profits are allowed as damages. Lost "net" profit is computed, in general, by estimating the gross revenue that would have been earned but for the wrongful act reduced by avoided costs. *Avoided costs* are defined as those incremental costs that were not incurred because of the loss of the revenue. After the net lost profits are determined, any actual profits earned are deducted to compute the damages.

5.   Lost profits can only be claimed over the loss period. This period normally begins no earlier than the date of the wrongful act  however, the date the loss begins may be subsequent to that date. The end of the loss period can vary. In a contract breach, the loss will be computed through the earlier of the return of the business to customary levels or the end of the term of the contract (which, in some cases, may include renewal periods). In other situations, such as tort claims or franchise contracts, the term may extend to the return to customary levels or the end of a "foreseeable" period.

KDM000133

EXHIBIT 44
Page 425

KDM000134

EXHIBIT 44
Page 426

# CHAPTER 3: OVERVIEW OF APPLICABLE PROFESSIONAL STANDARDS

**6.** Computing lost profits is a consulting engagement and the standards for consulting engagements are contained in Statement on Standards for Consulting Services (SSCS) No. 1, *Consulting Services, Definitions and Standards* (AICPA, *Professional Standards*, vol. 2, CS sec. 100), issued by the American Institute of Certified Public Accountants (AICPA). Additionally, the practitioner must also comply with the general standards of the accounting profession contained in the AICPA Code of Professional Conduct, as well as the relevant standards established by state boards of accountancy or other licensing agencies and other professional organi ations to which the practitioner may belong.

**7.** The following sections provide an overview of the professional standards established by the AICPA. For a more detailed discussion of these requirements, the practitioner should refer to AICPA Consulting Services Special Report 03-1, *Litigation Services and Applicable Professional Standards*.

## THE AICPA CODE OF PROFESSIONAL CONDUCT

**8.** The AICPA *Code of Professional Conduct and Bylaws* (the Code) apply to all services rendered by AICPA members. The following sections of the Code have particular applicability to the practice of litigation services

Rule 102, *Integrity and b ectivity* (AICPA, *Professional Standards*, vol. 2, ET sec. 102.01)

Rule 201, *eneral Standards* (AICPA, *Professional Standards*, vol. 2, ET sec. 201.01)

Rule 202, *Compliance ith Standards* (AICPA, *Professional Standards*, vol. 2, ET sec. 202.01)

Rule 301, *Confidential Client Information* (AICPA, *Professional Standards*, vol. 2, ET sec. 301.01)

Rule 302, *Contingent Fees* (AICPA, *Professional Standards*, vol. 2, ET sec. 302.01)

Rule 501, *Acts Discreditable* (AICPA, *Professional Standards*, vol. 2, ET sec. 501.01)

In some instances, the following also apply

Rule 101, *Independence* (AICPA, *Professional Standards*, vol. 2, ET sec. 101.01)

Rule 203, *Accounting Principles* (AICPA, *Professional Standards*, vol. 2, ET sec. 203.01)

KDM000135

EXHIBIT 44
Page 427

An understanding and appreciation of the importance of all rules contained in the Code will assist the practitioner in their efforts to provide opinions that are relevant and reliable, and will assist the trier of fact.

## Rule 101, *Independence*

**9.** Independence, as set forth in the Code, is ordinarily not required when performing litigation services. However, the practitioner should be aware that the lack of independence may be used to question the practitioner's credibility and objectivity when providing expert testimony. Additionally, the practitioner should be aware that the Sarbanes-Oxley Act of 2002 (Sarbanes-Oxley) may preclude the practitioner from providing expert services to attest clients.

## Rule 102, *Integrity and Objectivity*

**10.** Integrity is adherence to an ethical code and freedom from corrupting influences and motives. In litigation, it is the attorney's role to act as the advocate of the client. The role of the practitioner, however, is to apply their speciali ed knowledge, skills, training, and experience in order to present conclusions and judgments to the trier of fact on complex or unfamiliar concepts. To fulfill this role, the practitioner must be objective.

## Rule 201, *General Standards*

**11.** The general standards apply to litigation services as well as all other services rendered by practitioners to their clients. The general standards cover professional competence, due professional care, and sufficient relevant data, as follows

*a. Professional Competence.* Practitioners should undertake only those engagements that they can reasonably expect to complete with professional competence. Professional competence includes factors such as being able to identify client needs, applying an analytical approach, and being knowledgeable about the technical areas involved in the engagement. To comply with this requirement, the practitioner may need to consider that the assistance of other individuals with the requisite experience and education may be required. The practitioner also should consider that, as a result of legal requirements noted later in this Practice Aid, the reliability and relevance of expected testimony is likely to be subjected to careful judicial scrutiny.

*b. Due Professional Care.* The practitioner should exercise due professional care in the performance of any professional service. In complying with this requirement, the practitioner should be diligent and analy e critically all of the work performed and ensure that the work conforms to any other applicable professional standards.

KDM000136

EXHIBIT 44
Page 428

c. *Planning and Supervision.* The practitioner should adequately plan and supervise the performance of the professional services performed. As the facts and circumstances of each litigation engagement are unique, planning is an essential part of the engagement. Due to the dynamic process of litigation, however, plans may often change and engagement plans are typically not in written form. As with any professional service, the supervision of work performed by others is necessary to ensure quality performance of the services. The extent of the supervision will vary depending on the nature of the engagement. The practitioner should remember that, ultimately, the work is his or her responsibility and, as the expert, is subject to scrutiny in the litigation process.

d. *Sufficient   elevant Data.* The practitioner needs to be able to support conclusions and opinions with sufficient relevant data. The practitioner is responsible for gathering enough sufficient relevant data to provide a reasonable basis for the opinions offered. It is up to the individual practitioner to decide the type, nature, and quantity of data that will satisfy this requirement. In litigation, the data can be in the form of legal evidence, assumptions, or other documentation.

## Rule 202, *Compliance With Standards*

**12.** The practitioner is required to comply with standards promulgated by the AICPA Council. For practitioners performing litigation services, that body is the Consulting Services Executive Committee, which issued SSCS No. 1, *Consulting Services   Definitions and Standards.*

## Rule 203, *Accounting Principles*

**13.** To the extent that generally accepted accounting principles (GAAP) may apply to the litigation services engagement, the practitioner shall apply the appropriate accounting principles.

## Rule 301, *Confidential Client Information*

**14.** The practitioner may not disclose confidential client information without the client's consent. Practitioners should be aware that, in a litigated environment, they may be confronted with the risk of breaching client confidentiality. Practitioners often gain knowledge and experience from other clients that are nonparties to the litigation, which may be considered in reaching conclusions or opinions. If the practitioner utili es specific information obtained from other clients, the practitioner may be required to disclose the source of that information. The practitioner, in the absence of obtaining consent from the other client, may be precluded from utili ing this information.

KDM000137

EXHIBIT 44
Page 429

*Calculating Lost Profits*

## THE CONSULTING STANDARDS

**15.** In addition to the general standards, the Consulting Standards, as noted above, apply to consulting engagements and require compliance under Rule 202, *Compliance ith Standards.* These standards include serving the client's interest, establishing an understanding with the client, and communicating with the client.

### Rule 102, *Client Interest*

**16.** This rule of the Code states

In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others.

Practitioners should be cogni ant, however, that they do not act as advocates for the client. The practitioner should be an advocate for his or her opinions and conclusions, and must maintain objectivity in his or her analysis.

### Understanding With the Client

**17.** The practitioner should establish an understanding with the client, who may be the attorney for one of the litigants, about the responsibilities of the parties and the nature of the services to be performed. This understanding may be either written or oral. Practitioners should refer to the AICPA Business Valuation and Forensic and Litigation Services Section Practice Aid 04-1, *n-gagement Letters for Litigation Services,* for a more detailed discussion.

### Communication With the Client

**18.** The practitioner is required to inform the client of (*a*) any conflicts of interest that may occur under Rule 102 and the Interpretations issued pursuant to Rule 102, (*b*) any significant reservations the practitioner has concerning the scope or benefits of the engagement, and (*c*) significant engagement findings or events. In litigation engagements, these communications are usually oral. Many practitioners' engagement letters include language that states that the practitioner's communications with counsel will satisfy the requirement to communicate with the client.

## OTHER GUIDANCE

**19.** In addition to the professional standards, and the Practice Aids and Special Reports identified in other sections, the following nonauthoritative AICPA Practice Aids may be useful to the practitioner in preparing lost profits analyses

KDM000138

EXHIBIT 44
Page 430

Practice Aid No. 06-1, *Calculating Intellectual Property Infringement Damages*

Practice Aid No. 02-1, *Business Valuation in Bankruptcy*

Practice Aid No. 98-2, *Calculation of Damages from Personal In ury,    rongful Death, and  mployment Discrimination*

Practice Aid No. 98-1, *Providing Bankruptcy and  eorgani ation Services*

Practice Aid No. 96-3, *Communicating in Litigation Services    eports, a Non-Authoritative  uide*

Practice Aid No. 93-4, *Providing Litigation Services*

KDM000139

EXHIBIT 44
Page 431

KDM000140

EXHIBIT 44
Page 432

# CHAPTER 4: OVERVIEW OF CASE LAW AND EVIDENTIARY STANDARDS

20.   In addition to professional standards, the practitioner must also be aware of and comply with applicable case law and evidentiary standards regarding the admissibility of expert testimony. The law and standards will be dependent upon the venue of the litigation  state law and standards may be different from federal standards and law, and state law and standards will vary from jurisdiction to jurisdiction. The practitioner should discuss the case law and evidentiary standards applicable to the engagement with counsel to ensure compliance with these requirements.

## STATE LAW

21.   Although laws and evidentiary standards vary from state to state, they generally provide for common requirements for expert testimony to be admitted as evidence. Generally, experts will be required to establish the following

They have the requisite training, skill, knowledge, and or experience in their field.

They must show the facts, data, assumptions, and other documentation that were relied upon in reaching their conclusions and opinions.

They must show the basis upon which they reached their conclusions and opinions, including the methodology used.

## FEDERAL LAW

22.   The U.S. Supreme Court has ruled that the federal judge is to serve as gatekeeper for the admissibility of expert scientific testimony and may look to several factors to ensure that the testimony is reliable and relevant to the matter at issue. See *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This ruling was extended to include testimony of nonscientific experts, including financial experts in  *umho  ire Company, Ltd. v. Carmichael*, 526 U.S. 137 (1999).

23.   The Federal Rules of Evidence provide the basis upon which a federal judge may (*a*) determine whether expert testimony meets the minimum standards, and (*b*) identify the bases of opinion testimony by experts. The rules relevant to practitioners providing litigation services include the following

KDM000141

EXHIBIT 44
Page 433

Rule 702, "Testimony by Experts" states

> If scientific, technical, or other speciali ed knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 703, "Bases of Opinion Testimony by Experts" states

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular in forming opinions or inferences upon the subject, the facts or data need not·be admissible in evidence in order for the opinion or inference to be admitted. The proponent of the opinion or inference shall not disclose facts or data that are otherwise inadmissible to the jury unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion outweighs their prejudicial effect.

See Appendix A, "Comparison of AICPA Professional Standards and Federal Rule of Evidence 702," included herein. Appendix B, "Testimony Pyramid," shows the requirements for admissible opinions.

KDM000142

EXHIBIT 44
Page 434

# CHAPTER 5: ROLE OF THE PRACTITIONER IN LOST PROFITS ANALYSIS

24.   The practitioner may be engaged to provide services as a consultant, an expert witness, or in some other capacity, including acting as a trier of fact, special master, court-appointed expert, referee, arbitrator, or mediator. The practitioner should establish a specific understanding of the services to be performed at the inception of the engagement. This understanding, whether expressed in writing or orally, should be documented. The services the practitioner may be asked to perform may be varied in scope and breadth. Refer to Appendix C, "Typical Litigation Services."

## PRACTITIONER AS EXPERT

25.   The practitioner engaged as an expert is expected to provide testimony before a trier of fact regarding their conclusions and opinions. This testimony may be presented at a deposition, in court, or in arbitration. Generally, in these settings, all work of the expert is discoverable. The practitioner is normally required to provide all records relating to the engagement, including correspondence, notes of meetings, reports, analyses, research, and documents or data that were reviewed or relied upon in reaching their conclusions or opinions. The practitioner may also be required to provide any drafts of reports, analyses, and other documents prepared. The practitioner should seek the advice of counsel regarding the discoverability of such information at the inception of the engagement and should remain cogni ant of the requirements during the course of the engagement.

26.   The practitioner may also be asked to participate in and or provide reports or analyses for mediations and other forms of settlement negotiations. Most states have rules regarding the later discoverability of the discussions, reports, and or analyses provided in these forums. Practitioners should seek advice of counsel on how to maintain the confidentiality of this information.

## PRACTITIONER AS CONSULTANT

27.   Alternatively, the practitioner may be engaged as a consultant. As a consultant, the practitioner is usually not expected to provide expert testimony. The functions that may be performed include identification of issues, assisting in developing strategies, fact-finding, analysis, locating other experts, and assisting and managing discovery.

KDM000143

EXHIBIT 44
Page 435

*Calculating Lost Profits*

**28.**   The practitioner should keep in mind, however, that should the role be subsequently expanded to include expert testimony, all work performed, even work performed as a consultant, may be discoverable.

## PRACTITIONER IN OTHER ROLES

**29.**     hen engaged to perform other services, the practitioner should establish a clear understanding of the expected services. In a number of instances, the services more closely resemble expert witness services, such as an engagement to serve as a court-appointed expert or special master. In other services, the role may be more like that of a consultant.

KDM000144

EXHIBIT 44
Page 436

# CHAPTER 6: QUALIFICATIONS AND SKILLS

**30.**     hether the practitioner is engaged as an expert or as a consultant, the practitioner needs to have the qualifications and skills necessary to comply with the requirement that only those engagements that can reasonably be expected to be completed are undertaken, as required by Rule 201 of the Code of Professional Conduct. Additionally, practitioners need to be cogni ant of the fact that their qualifications may be challenged in litigation.

**31.**     Practitioners often possess a variety of education, training, experience, and skills that are relevant to a lost-profits analysis. Although there is no formula for the proper mix of qualifications and skills, the practitioner should, however, consider a number of factors in deciding whether their qualifications are sufficient to perform lost-profits analyses.

## TRAINING AND EXPERIENCE

**32.**   As a CPA, the practitioner typically has an educational background in accounting and financial matters, and some experience in providing other kinds of accounting services to clients. The practitioner may need to consider whether he or she possesses or can acquire additional training and experience that may be applicable to the lost-profits analysis. The training and or experience may include knowledge of the following

Speciali ed industries or fields of study

Different clients and industries

Accounting and tax rules and regulations

Financial analysis and modeling

Application of statistical methods and concepts such as regression and trend analysis

## OTHER SKILLS

**33.**   The practitioner may also need to consider whether he or she possesses or can acquire other skills that may be relevant to the lost-profits analysis. Those skills could include the ability to

Present complex information or concepts, either orally or in writing, in a clear and concise manner.

Reconstruct financial data.

uantify the impact of events.

KDM000145

EXHIBIT 44
Page 437

*Calculating Lost Profits*

Obtain, review, and appropriately apply industry or other statistical information.

Understand and apply applicable legal and evidentiary standards.

## USE OF OTHER EXPERTS

**34.**  In a number of instances, the practitioner may need to consider whether the use of other individuals with applicable training and experience is necessary. The practitioner should, however, discuss the need for the use of other experts with counsel. Examples of other individuals who may be necessary to appropriately determine lost profits include those with speciali ed knowledge or experience in the following

Specific scientific fields such as engineering or other technological areas

Speciali ed industries such as construction, oil and gas, or banking

Market data such as market share or market demand

KDM000146

EXHIBIT 44
Page 438

# CHAPTER 7: LOST PROFITS CLAIMS

## DAMAGES AND DAMAGE TYPES

In general, damages are ". . . the sum of money which a person wronged is entitled to receive from the wrongdoer as compensation for the wrong."[1]

35.   Damages can be broken down into three main types actual or compensatory, nominal, and punitive.

*Actual or Compensatory Damages* are those damages awarded to a Plaintiff to compensate for a proven injury or loss. They are the compensation to repay actual losses incurred.

*Nominal Damages* represent a sum awarded if a legal injury has been suffered but there is no substantial loss or injury to be compensated.

*Punitive Damages* are those damages awarded in addition to actual damages if the defendant acted with recklessness, malice, or deceit. Punitive damages, which are intended to punish and thereby deter blameworthy conduct, are generally not recoverable in a breach of contract action.

36.   The focus of this Practice Aid is on actual or compensatory damages related to a claim for lost profits. Lost profits cases usually involve either a breach of contract or a tort.

## CONTRACT DISPUTES

37.   Contract disputes arise if one party does not fulfill the obligations of the contract (a *breach*). Lost profits may be recoverable if damages can be demonstrated to be caused by the breach.

## TORT

38.   Tort cases arise as a result of a civil wrong including personal injury, property damage, unfair competition, unlawful misappropriation, negligence, or fraud. If damages can be proven with reasonable certainty and shown to have been caused by the wrongful act, damages for lost profits may be recoverable.

---

[1]   Frank Gahan, "The Law of Damages," 1 (1936), as noted in *Black s Law Dictionary*.

KDM000147

EXHIBIT 44
Page 439

KDM000148

EXHIBIT 44
Page 440

# CHAPTER 8: LEGAL PRINCIPLES OF PROVING DAMAGES

## CAUSATION

**39.**   Damages for lost profits are recoverable only if the breach or wrongful act by the defendant was the proximate cause of the loss. *Pro imate cause* is an act from which an injury results as a natural, direct, uninterrupted consequence and without which the injury would not have occurred. In other words, there must be a link between the wrongful act and the resulting damages.

### Transaction Causation

**40.**   Transaction causation relies on the concept that "but for" the breach or wrongful act, no damages would have been incurred. Transaction causation alone is inadequate to demonstrate proximate cause, however. In addition to transaction causation, the plaintiff must demonstrate "loss causation."

### Loss Causation

**41.**   The plaintiff must prove that their loss *is related* to the breach or wrongful act. The fact that the defendant breached a contract or performed a wrongful act does not alone support damages.

**42.**   For example, in *niversal Commodities, Inc. v.  eed*, 449 S.  . 2d 106 (Tex. Civ. App. 1969), plaintiff leased a seafood processing plant from defendant, who was obligated to supply the seafood to be processed. Defendant breached the contract, but the court denied lost profits damages because plaintiff had been unable to secure financing for the business and would not have had sufficient capital to operate and make a profit even if defendant had performed as required by the contract.

**43.**   The practitioner should also be aware of the distinction between the legal requirement of causation and the proof of the amount of damages. In order to recover damages for lost profits, it is necessary to show that the damages were proximately caused by the wrongful conduct of the defendant.

**44.**   The fact of damage is required to be proven with reasonable certainty. The fact of damage relates to whether the plaintiff can prove that the acts of the defendant caused damage to the plaintiff. Once the fact of damage has been established, the amount of damage can be calculated.

**45.**   Although the defendant's acts need not be the sole cause of the plaintiff's lost profits, they must be a significant or material factor in the cause of that loss.

KDM000149

EXHIBIT 44
Page 441

**46.** Although other factors may also be partially responsible for the plaintiff's lost profits, in some cases, it may not be practicable, or possible, to eliminate the effect of all other possible causes of loss. However, it is necessary to show that these other factors have been considered and, to the extent possible, have been taken into account.

**47.** Sufficient evidence must be presented to the trier of fact to allow a determination to be made as to what portion of the plaintiff's damages may be properly assigned to the defendant.

**48.** As discussed in a later section, the practitioner may want to present calculations in a manner that shows how the various factors causing the plaintiff's losses contributed to that loss.

## FORESEEABILITY (CONTRACT DAMAGES ONLY)

**49.** Damages for lost profits are recoverable only if they are reasonably foreseeable by the breaching party at the time of contracting. The reasonably foreseeable rule dates back to the famous English decision *adley v. Ba endale* (156 Eng. Rep. 145, 151 (Ex. 1854)) and is still law today.

**50.** In *adley v. Ba endale*, the Court set out that damages are recoverable only if they were reasonably foreseeable by both parties at the time of the contract and that they arose naturally from the breach.

**51.** For example, in *ampton v. Federal press Corp.*, 917 F. 2d 1119, 1125-26 (8th Cir. 1990), the Court found that damages resulting from the failure to deliver blood samples of cancer patients in need of bone marrow transplants were not recoverable if the Defendant had no knowledge of the package's contents and therefore could not reasonably foresee any injury to patients.

## CERTAINTY

**52.** Damages for lost profits are recoverable only if the plaintiff can prove that the damages related to lost profits are reasonable and that they have been calculated using reliable factors without undue speculation. The practitioner should discuss with counsel the applicable federal or state laws regarding the required degree of certainty.

**53.** The calculation of lost profits does not require precision, and an estimate of damages can be made. However, the loss cannot be based on speculation. Lost profits that are speculative, such as those calculated using unreasonable growth rates, are not recoverable.

**54.** For example, in *DSC Communications v. Ne t Level Communications*, 107 F.3d 322, 329 (5th Cir. 1997), the Court upheld recovery of lost profits because plaintiff's damage expert presented a damage model that included an assumption of future market share based on data ob-

KDM000150

EXHIBIT 44
Page 442

tained from respected sources in the telecommunications market and upon a showing that the plaintiff's history of strong performance in the field was indicative of likely success.

**55.**   However, in   *olt Atherton Ind., Inc. v.   eine*, 835 S.   .2d 80 (Tex. 1992), defendants sold a bulldo er to plaintiffs that defendants subsequently refused to repair because they did not rec-ogni e the warranty. The court held lost profits were *not* recoverable because the plaintiffs failed to show they had enough work to fully utili e the bulldo er.

KDM000151

EXHIBIT 44
Page 443

KDM000152

EXHIBIT 44
Page 444

# CHAPTER 9: LOSS PERIOD

56.  The length of the loss period can vary depending on the underlying cause of action and upon the underlying facts of the case.

## BREACH OF CONTRACT

57.  In a breach of contract action, the loss period will generally be projected over the remaining term of the contract. Although this may sound straightforward, the issue can become complicated if the length of the contract is one of the issues in dispute. In the case of long-term contracts, a number of courts have been reluctant to award damages for the full length of the loss period (i.e., the full term of the contract) because of uncertainty. Additionally, although a franchise is a contract, the contract is usually for an unspecified period of time, and the courts may therefore be reluctant to award damages for extended periods of time. The longer the term of the damage projection, typically, the greater the level of uncertainty, which decreases the likelihood that the certainty and foreseeability tests can be met.

58.  Although damages typically do not extend beyond the term of the contract, an issue could conceivably arise if an extension of the contract term was being negotiated when the breach occurred. Arguably, had the breach not occurred, the contract would have been extended for an additional term. Conversely, if the parties have had a history of renewals and such an extension was provided for in the contract, a loss period which considers contract renewals may be warranted.

## TORTS

59.  In the case of tort actions, the loss period is usually from the date of the wrongful act until the date operations return to "normal." The date that operations return to "normal" is the period during which the business either restores itself to an equivalent position prior to the dispute or to a position that takes into consideration the changes that would have otherwise occurred during the damage period absent the tort. In a number of situations, as a result of the wrongful act, the plaintiff's operations are permanently affected and may never return to "normal."

KDM000153

EXHIBIT 44
Page 445

KDM000154

EXHIBIT 44
Page 446

# CHAPTER 10: CALCULATING LOST REVENUES

60.   The first element in the determination of lost profits is the calculation of lost revenues.

61.   This section discusses the calculation of lost revenues in terms of the normal methods used in lost profit calculations. The normal methods of calculating lost revenues include

The "Before and After" method

The "Yardstick" (or "Benchmark") method

An approach based on the terms of the underlying contract

An accounting of the defendant's profits

Others

62.   In certain speciali ed damages areas, different methods may be used that are based on applicable statutes or case law. Although this Practice Aid is not intended to address these other areas, a brief overview of some of the issues involved in those areas is contained in Chapter 17, "Alternative Damage Measures Other Than Lost Profits."

63.   Additionally, other factors may need to be considered when the subject of the lost profits calculation is a newly established business or a business lacking an historical track record of revenue generation. A brief discussion of the issues specific to such businesses is also included in Chapter 17.

## THE "BEFORE AND AFTER" METHOD

64.   This method compares the plaintiff's performance before the event or action causing lost profits to the plaintiff's performance after that event or action. The underlying theory is that, "but for" the defendant's action, the plaintiff would have experienced the same level of revenues and profits after the event or action as the plaintiff did before that event or action.

65.   The plaintiff's prior experience, which can be determined from the plaintiff's historical accounting records, is generally subject to dispute less than other components of the calculation. In addition, the plaintiff's experience subsequent to the defendant's acts can be determined, at least up through a date near to the date at which the calculation is made, from the plaintiff's historical accounting records.

66.   The practitioner, however, should consider other factors that could have affected the plaintiff's level of revenues and demonstrate how those factors have been taken into consideration.

KDM000155

EXHIBIT 44
Page 447

*Calculating Lost Profits*

## THE "YARDSTICK" (OR "BENCHMARK") METHOD

**67.** This method utili es a "yardstick" that is used to estimate what the revenues and profits of the affected business would have been. Examples of possible yardsticks that might be employed in the calculation include the following

The performance of the plaintiff at a different location

The plaintiff's actual experience versus past budgeted results

The actual experience of a similar business unaffected by the defendant's actions

Comparable experience and projections by nonparties

Industry averages

Pre-litigation projections

**68.** hen using this method, the practitioner will need to demonstrate that the plaintiff's operations are sufficiently comparable to the "yardstick" used. This could require that the yardstick company be in the same geographic area and or operates under similar conditions.

**69.** In addition, as with the "before and after" method, the practitioner may need to consider other factors that could have caused the plaintiff's performance to differ from the yardstick selected and show how those factors have been taken into consideration.

## CALCULATION BASED ON THE TERMS OF THE CONTRACT

**70.** In some instances, the lost profits calculation is made in relation to a specific contract. In that instance, many of the elements of the calculation may be set forth in the contract document, i.e., the number of units to be sold, unit prices, etc. In this situation, a model might be developed that calculates the revenues anticipated under the terms of the contract.

## AN ACCOUNTING OF DEFENDANT'S PROFITS

**71.** In certain situations, such as cases involving unfair competition or the misappropriation of trade secrets, an accounting of the profits reali ed by the defendant may be used as the measure of the plaintiff's lost profits. In obtaining an accounting of the defendant's profits, the plaintiff is only entitled to receive value of the unjust enrichment of the defendant through disgorgement, i.e., the defendant is required to surrender profits attributable to the misappropriation or bad act to the plaintiff. To the extent that profits are attributable to other factors, the defendant would not have to disgorge those amounts. In some jurisdictions (and for some causes of action), the plaintiff only has the burden to identify the revenues associated with the misappropriation,

KDM000156

EXHIBIT 44
Page 448

whereas the defendant has the burden to prove both the costs incurred in generating the revenues as well as apportioning the profits between the misappropriation and other profit generators.

## OTHER

**72.** Other approaches may also be appropriate depending on the particular facts and circumstances involved in the matter for which lost profits are being calculated. Although other models may be developed using information specific to the particular case, the general principles underlying the methods discussed above should be considered in the development of those models.

## PAST AND FUTURE LOST REVENUES

**73.** In many cases, the plaintiff's lost revenues may include both past and future lost revenues. If there are future losses, i.e., the loss period extends beyond the date of trial, the practitioner will need to estimate both those future revenues that will be reali ed by the plaintiff and those revenues that the plaintiff would have reali ed but for the wrongful act of the defendant. Only the incremental difference between the "but for" revenue and the projected actual revenue should be included as lost revenues.

**74.** Although the attestation standards for financial forecasts and projections do not apply to litigation services, practitioners may want to refer to the guidance codified in AT Section 301, *Financial Forecasts and Pro ections* (AICPA, *Professional Standards*, vol. 1, AT sec. 301).

## DO THE CALCULATED LOST REVENUES MAKE SENSE

**75.** hatever method is used to calculate the amount of lost revenues, once the practitioner has performed the initial calculations, it is important to consider the reasonableness of the computed lost revenues.

**76.** For instance, the practitioner should consider factors such as

Capacity considerations

Market share

Industry knowledge and working with industry experts

KDM000157

EXHIBIT 44
Page 449

KDM000158

EXHIBIT 44
Page 450

# CHAPTER 11: COST ESTIMATION

77.    After establishing the amount of lost revenues, the practitioner will need to calculate the costs associated with the generation of those revenues.

## CONCEPT OF AVOIDED COSTS

78.    The costs that should be deducted from lost revenues in order to calculate lost profits are generally referred to as avoided costs. *Avoided costs* are those costs that would have been incurred in connection with the generation of the lost revenues but were not incurred.

79.    To the extent that the plaintiff has incurred costs that would not have been incurred in the absence of the defendant's misconduct, those costs should be offset against the avoided costs.

## ANALYSIS OF THE PLAINTIFF'S COST STRUCTURE

80.    In order to determine the amount of avoided costs, the practitioner needs to understand the plaintiff's cost structure.

81.    Depending on the nature and or si e of the plaintiff, the degree of detail contained in the plaintiff's accounting records regarding the costs associated with particular products or services may vary considerably.

82.    Also, depending on the nature of the dispute, different degrees of specificity may be required in estimating the extent of avoided costs.

83.    The practitioner should analy e the plaintiff's cost structure in order to determine the relationship between individual cost elements categories and sales.

84.    The performance of this analysis also will normally require the practitioner to understand the cost environment in which the plaintiff operates in order to identify the cost drivers or factors that affect particular costs.

## FIXED VERSUS VARIABLE COSTS

85.    The starting point for the cost structure analysis may be the determination of fixed versus variable costs. Unless the loss period at issue is very short, however, it is unlikely that all costs will be purely fixed or variable.

KDM000159

EXHIBIT 44
Page 451

86. Some costs, such as cost of goods sold, may vary directly with sales. These costs, however, may not be entirely avoided. For instance, costs may have been incurred to produce product prior to the wrongful act in anticipation of sales that did not occur as a result of the wrongful act. In addition, some manufacturing costs may be fixed in nature rather than variable.

87. Other costs, such as rent, are normally considered to be fixed. The practitioner should, however, consider whether the fixed or variable nature of such costs might change dependent on factors such as the length of the loss period or the level of production and or sales. The results of this analysis may be the identification of certain costs that are semivariable or fixed only within a limited period of time.

88. The nature of costs relevant to the analysis of avoided costs, and the terms used to refer to them, may include all, or some, of the following

*Cost of goods sold.* The costs generally captured under this heading would often be expected to vary directly with revenues, but there may be some distortion of that relationship depending on the inventory costing method used by the plaintiff.

*Direct costs.* The costs specific to a particular product or activity, these costs are usually, but not always, variable.

*verhead costs.* The costs not specific to a particular product or activity  overhead costs may, however, be apportioned to specific products or activities as allocated or absorbed overhead. Some of these costs, such as marketing and advertising costs, may be avoided as a result of the lost revenue.

*Indirect costs.* The costs that are not specific to a particular product or activity.

*Short-term and long-term costs.* The costs that may be fixed or variable depending on the duration of the loss period.

89. As indicated above, the duration of the loss period can affect the extent to which costs are avoided. If the loss period is relatively short, it may not be possible to avoid certain costs. If the loss period is longer in duration, some costs that in the short-term would be fixed may be variable or semivariable.

## NONSTATISTICAL METHODS OF COST ESTIMATION

90. Various nonstatistical methods can be employed by the practitioner to estimate costs. hich methods or combination of methods is appropriate will depend on the particular situation with which the practitioner is dealing. These methods include the following

*Account analysis.* This method involves the review of the detailed general ledger or chart of accounts. The practitioner uses judgment to assess whether costs are fixed or variable. The

KDM000160

EXHIBIT 44
Page 452

subjective nature of this process can have drawbacks as some costs are semivariable, in that they are neither entirely fixed nor entirely variable.

*Direct assignment.* This method involves the identification by the practitioner of the direct costs of an activity. These costs would include direct labor and materials.

*Accounting estimates.* This method estimates the cost of a product using the plaintiff's experience with similar or related products. Standard costs might also be available for some elements of the product cost.

*Cost accounting allocations.* This method apportions costs that are not specific to a particular product or activity based on some objective measure, including revenue, labor hours, or units sold.

*atio analysis.* This method is used to allocate the cost of a particular product or activity in proportion to some other measure such as labor hours or units of production.

*raphical approaches.* This method involves the plotting of the cost of a particular product or activity over time or against some other measure.

*Industrial engineering.* This method may be used if an industrial engineering study may be available that addresses the costs associated with the various processes involved in the production of the product at issue.

91.   The practitioner is typically attempting to quantify the amount of incremental costs associated with the lost revenues. Caution is required when using these methods, as many of them tend to understate incremental costs. Although not always possible, the practitioner may wish to consider using historical data as a means of validating the reasonableness of results achieved.

## STATISTICAL METHODS OF COST ESTIMATION

92.   In addition to the nonstatistical methods discussed above, various statistical methods of estimating costs may be employed by the practitioner. These statistical methods include

*egression analysis.* This is a technique for identifying relationships between a cost and one or more variables, such as sales or production levels.

*Survey data.* In some situations, the practitioner may use a survey to measure a factor.

*Attribute sampling.* This is used to estimate a characteristic of a population.

93.   Although the scope of this Practice Aid is insufficient to include a full discussion of these statistical methods, the practitioner should be aware that specific rules and considerations apply

KDM000161

EXHIBIT 44
Page 453

*Calculating Lost Profits*

to the use of these techniques. Familiarity with those rules is essential if the practitioner is to rely on the results of these techniques.

## DO THE CALCULATED AVOIDED COSTS MAKE SENSE?

**94.**   As with the calculation of the lost revenues, the practitioner will need to consider the results of the calculation of avoided costs to evaluate whether the results appear reasonable.

KDM000162

EXHIBIT 44
Page 454

# CHAPTER 12: PREJUDGMENT INTEREST
# ON PAST LOSSES

**95.**  Generally, prejudgment interest is used to compensate the plaintiff for the interest not earned on lost profits from the date of the incident to the date of trial. Awarding prejudgment interest converts time-of-incident damages into time-of-judgment damages, allowing the plaintiff to be fully compensated for the loss of use of those funds.

**96.**  Courts have considerable discretion in the calculation of prejudgment interest, including the interest rates to be applied and the manner of computing interest. If the law does not prescribe the rate or form of interest for past losses, practitioners will normally apply a reasonable interest rate to bring those losses forward. Rates that might be used for the calculation of prejudgment interest include but are not limited to the prime rate, the defendant's after-tax borrowing rate, the plaintiff's cost of capital, a Treasury bill or bond rate, a state statutory rate, or a stated rate pursuant to a contract between the parties.

**97.**  Many states calculate prejudgment interest utilizing a statutory rate that is set annually. State law may exclude prejudgment interest, limit prejudgment interest to a statutory rate, or exclude compounding. The practitioner should check the appropriate state's annotated statutes, which contain legislative history and current case law. For federal cases, the prejudgment interest rate will depend on the statute under which the plaintiff brings suit. Generally, federal courts have the discretion to grant prejudgment interest and to choose a reasonable interest rate and method of computation.

**98.**  In some jurisdictions, all past and future damages are discounted to their present value as of the date of the wrongful act, and then that amount may or may not be subject to prejudgment interest to the trial date. In other jurisdictions, damages projected to be incurred subsequent to the trial date are discounted to the trial date, and damages related to prior periods may or may not be subject to prejudgment interest.

**99.**  Some states allow prejudgment interest to be compounded while other states only allow simple interest to be computed. As mentioned above, federal courts have the discretion to choose between simple interest and compound interest.

**100.**  An Ex Ante (date of breach) or Ex Post (trial date) approach may be used to apply prejudgment interest. It is suggested that the decision be made as to which method is to be used after counsel has advised the practitioner regarding applicable statutory and case law. Damages may be computed under both approaches and presented as alternatives to be decided upon by the trier-of-fact. (See paragraphs 106 to 109 for a discussion of these approaches.)

KDM000163

EXHIBIT 44
Page 455

*Calculating Lost Profits*

**101.** Claims may be liquidated or unliquidated. A claim is liquidated if its specific dollar amount is known. A claim is unliquidated if the exact amount owed has not been determined. Unliquidated damages are identified only after a judgment is rendered by the court setting the amount of damages and, most often, occur in tort actions. In many states, prejudgment interest on otherwise unliquidated damages do not begin at the time of the incident, but can begin from the date of a settlement offer or a particular court filing.

**102.** Prejudgment interest accrues between the time of the incident and the time of trial or judgment, whereas post-judgment interest accrues only after judgment is entered.

KDM000164

EXHIBIT 44
Page 456

# CHAPTER 13: FINANCIAL DISCOUNTING OF FUTURE LOST PROFITS TO PRESENT VALUE

103.    hen calculating lost profits, there is often both an historical component and a future component. The historical component would include lost profits that have been incurred from the date of breach to the date of trial and the future component would include lost profits that will be incurred from the date of trial to some date in the future.

## THE TIME VALUE OF MONEY

104.    It is necessary to state the future component of lost profits in terms of their present value. The formula for present value is

$$\frac{LFP_1}{(1+DR)^1} + \frac{LFP_2}{(1+DR)^2} + \frac{LFP_3}{(1+DR)^3} + \frac{LFP_4}{(1+DR)^4} + \quad \cdots \quad + \frac{LFP_n}{(1+DR)^n}$$

LFP = Lost Future Profits calculated in each period
DR = Discount Rate
n   = year or period

105.    Because the damage award is intended to make the plaintiff whole, failing to discount future lost profits would result in an award that would produce a windfall to the plaintiff, as the award can be invested with a return earned on that investment. The challenge for the practitioner is to determine an appropriate discount rate that takes into consideration the following factors

  *he time value of money.* Most individuals would prefer to have a dollar to spend today rather than having to wait until some point in the future. For those individuals, if money payable in the future is suddenly available today, there may be a willingness to accept a discount in order to eliminate the waiting period. Assuming an annual interest rate of 3 percent,  10,000 today would be worth  11,592.74 in five years. Conversely, five years from now,  10,000 would only be worth  8,626.09 today. As such, an investor would rather receive funds today instead of having to wait until some time in the future.

  *isk.* For most investments, there is a tradeoff between risk and reward. The greater the level of risk inherent in a projected stream of cash flows, the greater the discount rate required to compensate an investor for accepting that risk. Conversely, the risk averse investor would generally be willing to accept a lesser return in exchange for a reduced level of risk.

KDM000165

EXHIBIT 44
Page 457

## Ex Post Methodology Versus Ex Ante Methodology

**106.** In discounting future lost profits to their present value, the expert must select between the ex ante methodology and the ex post methodology, or apply a hybrid of the two approaches. Appendix D, "Ex Ante Versus Ex Post," contains a chart that illustrates the ex ante and the ex post methodologies.

**107.** The ex ante methodology assumes that all lost profits are future lost profits and must be discounted back to the date of the breach. There is no historical component. In an ex ante calculation, the practitioner relies only on information that was known or knowable as of the date of the breach. Once the present value of all future lost profits is determined, the resulting damage amount is brought forward to the date of the award by applying prejudgment interest (if permitted).

**108.** The ex post methodology, conversely, relies on all information that is known or knowable up to the date of trial in order to calculate lost profits. There is no discounting of the historical lost profits that were incurred between the date of the breach and the date of trial. If permitted, prejudgment interest would be applied to the historical lost profits based on the timing of the cash flows determined by the practitioner. Future lost profits consist of those profits that extend beyond the date of trial, and would be discounted back to the date of trial.

**109.** Some practitioners have chosen to apply a hybrid methodology, in which all lost profits are discounted back to the date of the breach, but the practitioner would rely on all information that was available up to the date of trial. To the extent that the discount rate is greater than the prejudgment interest rate, the ex ante methodology would result in a lower damage amount than the ex post methodology. In those instances in which the discount rate is equal to or less than the prejudgment interest rate, the ex ante methodology would typically produce an equivalent or higher damage amount, respectively.

## Methods of Determining Discount Rate

**110.** In business valuation engagements, discount rates are typically based on either the subject company's weighted average cost of capital ( ACC) or its cost of equity. It is not uncommon for a company's cost of equity to exceed 20 percent, especially among smaller, less mature companies. Although some practitioners have argued the appropriateness of applying equity rates of return to lost profit calculations, the courts have generally been reluctant to accept discount rates based on a company's cost of equity.

**111.** The courts have provided minimal guidance as to what constitutes an appropriate discount rate. Among those few jurisdictions that have published written opinions, some courts have ruled that the discount rate used to calculate lost profits should incorporate both an inflationary com-

KDM000166

EXHIBIT 44
Page 458

ponent and a risk component while others have required the use of a risk-free rate. Additionally, there are conflicting opinions on this point within a jurisdiction. Further complicating this issue, for those courts accepting an adjustment to the discount rate for risk, there is considerable disagreement as to how the risk component should be addressed. The diversity of the rulings are reflected in the following opinions

*American List Corp v.  .S. News &  orld  eport, Inc.*, 75 N.Y.2d 38, 550 N.Y.2d 590 (1989). In a contract dispute, defendant's proposed discount rate of 18 percent was accepted by the trial court, reflecting risk of nonperformance. The plaintiff argued that a 10-percent discount rate was appropriate. On appeal, the 18-percent rate was rejected and remanded, with the court finding that it "does violence to the settled principles of the doctrine of anticipatory breach because it would require the nonrepudiating party to prove ability to perform in the future."

*Burger  ing Corp. v. Barnes*, 1 F. Supp.2d 1367 (S.D. Fla 1998). In a breach of franchise agreement case, plaintiff was entitled to lost royalty fees to be earned over a 210-month period. The projected lost royalties were discounted to present value using a discount rate of 9 percent. No basis for the 9-percent rate was provided in the opinion.

*Diesel Machinery, Inc. v. B.  . Lee Industries, Inc.*, 418 F.3d 820 (Fed. 8th Cir., 2005). In a dealership dispute, defendant's expert argued for a 17.5-percent discount rate, which accounted for risks inherent in plaintiff's projected cash flow. The district court struck the portion of the expert's testimony addressing the discount rate, indicating that South Dakota law required the use of a risk-free rate. Although the U.S. Court of Appeals acknowledged that the proposed discount rate employed a sound methodology, it nonetheless ruled that the district court did not abuse its discretion.

*  nergy Capital v.  nited States*, 302 F.3d 1314 (Fed. Cir. 2002). A risk-free rate of 5.9 percent was initially rejected and remanded as not reflecting the inherent risks in the cash flows. The court accepted plaintiff's rate of 10.5 percent, based on an 8.5-percent benchmark yield for mortgage real estate investment trusts, plus an additional 2-percent adjustment for debt and profit. Defendant's suggested discount rate of 25 percent was not accepted by the court.

*Fairmont Supply Company v.  ooks Industrial, Inc.*, No. 01-03-01129-CV (Tex. App. 1 Dist  Houston  2005). In a breach of contract case, the trial court awarded plaintiffs lost profit damages. The defendant's expert testified that a discount rate of 33 percent was appropriate and plaintiff's expert testified that a discount rate of 36 percent was appropriate. The court accepted this range in calculating damages.

*  no  v.  aylor*, 992 S.  .2d 40, 50 (Tex. App.  Houston 14th Dist.  1999). In a libel claim, lost profits were awarded in connection with the termination of the agent's contracts. The court accepted a risk-free discount rate of 7 percent.

KDM000167

EXHIBIT 44
Page 459

*ool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340 (3d Cir. 2002). In a dispute over the sale of a marina and houseboat rental business, plaintiff claimed that the defendant failed to pay an agreed-upon purchase price, whereas the defendant argued misrepresentations on the part of the plaintiff. The court determined that the remaining balance of the purchase price would be calculated, in part, by growing adjusted cash flows by 7.5 per year for 15 years and discounting these cash flows to their present value using a discount rate of 18.5 percent. The 18.5-percent rate was offered by the plaintiff and was not disputed by the defendant.

*Ison v. Nieman s*, 579 N. .2d 299 (Iowa 1998). In a misappropriation of trade secrets case involving lost royalty income, the court accepted a discount rate of 19.4 percent, equal to an equity rate of return of 14.4 percent and a product specific risk premium of 5 percent.

*Schonfeld v. illiard*, 62 F. Supp 2d 1062, 1074 n. 6 (S.D.N.Y. 1999). In a dispute over the funding of a closely held cable television station, included in lost asset value was an agreement to pay programming rights equal to 100,000 per year for 10 years. The court accepted a discount rate of 8 percent, approximately equal to the 10-year Treasury bond rate.

112.   As can be seen above, many of these cases reflect an acceptance of a proposed discount rate by the court resulting from the lack of any challenge on the record. Given the disparate treatment reflected in these cases, the practitioner is advised to develop a supportable discount rate, based on sound methodology, and apply the specific facts and circumstances of the engagement to the analysis. It is further suggested that the practitioner consult with counsel to understand the relevant case law in his or her jurisdiction.

113.   In that regard, the practitioner may wish to consider the approaches typically used to develop a discount rate. These include the cost of equity, the cost of debt, and the ACC approaches.

## Cost of Equity

114.   The company's cost of equity is typically calculated using either a build-up approach or the capital asset pricing model (CAPM) approach.

### Build-Up Approach

115.   The *build-up approach* calculates a company's cost of equity, considering various components that are added to the risk-free rate. This approach is expressed using the following formula

$$K_E = r_f + ERP + SP + IRP + CSP$$

KDM000168

EXHIBIT 44
Page 460

Risk-free rate $(r_f)$ [2]

Systematic risk [3]

   o  Equity risk premium (ERP)

   o  Si e premium (SP)

   o  Industry risk premium discount (IRP)

   Unsystematic company specific risk premium discount (CSP)

**116.**   In addition to the si e premium and industry risk premium, the practitioner may wish to consider other adjustments, such as international risk premia discounts, where appropriate.

**117.**   Although the first four factors can often be quantified using market data, the unsystematic company specific risk premium discount is based on specific factors affecting the subject company. In evaluating the appropriateness of this premium discount, the practitioner may wish to consider such factors as (*a*) the company's financial condition  (*b*) its quality and depth of management  (*c*) the company's products, customers and suppliers  (*d*) the competitive environment in which the company operates  and (*e*) other factors impacting the company's projected cash flows. Given the lack of empirical market data available to quantify a company specific adjustment, the practitioner should develop support and be prepared to justify any such premium discount.

### Capital Asset Pricing Model (CAPM) Approach

**118.**   Like the build-up approach, the CAPM approach estimates a company's cost of equity by adding systematic and unsystematic elements of risk to the risk-free rate. This approach is reflected in the following formula

$$K_E = r_f + \beta(ERP) + SP + CSP$$

Risk-free rate $(r_f)$

Systematic risk

   o  Beta $(\beta)$

   o  Equity risk premium (ERP)

   o  Si e premium (SP)

   Unsystematic company specific risk premium discount (CSP)

---

[2] U.S. Treasury rates are generally the most common measure of the risk-free rate, as these securities are considered free from default risk. Many experts use the Treasury bond rate equivalent to the future recovery period as the yardstick measure for purposes of discounting (i.e., 5-year Treasury Bond for a 5-year projection versus 10-year Treasury Bond for a 10-year projection).

[3] Ibbotson Associates provides many systematic risk data sources in its *Stocks, Bonds, Bills, and Inflation (SBBI) Yearbook*, produced annually, and its *Cost of Capital  uarterly.*

KDM000169

EXHIBIT 44
Page 461

119.   Unlike the build-up approach, CAPM captures much of the systematic risk inherent in the company through the use of beta (β). Beta is a measure of the volatility of a security relative to that of the broader equity markets.

### Other Methods to Calculate the Cost of Equity

120.   Although they are outside the scope of this practice aid, other methodologies have been developed to estimate a company's cost of equity. These methods include the arbitrage pricing theory and the Fama-French three factor model.

## Cost of Debt

121.   Some practitioners have used a variation of the subject company's borrowing rate as the basis for determining an appropriate discount rate to apply to projected lost profits. These include but are not limited to

Average cost of the subject company's total interest-bearing debt

Marginal cost of the subject company's long-term debt

Market bank yields for comparable companies

## Weighted Average Cost of Capital

122.   ACC is the cost of incremental capital to a firm considering its blended cost of debt, equity and other capital.   ACC is calculated using the following formula

$$WAAC = \left( K_D \times (1-t) \times \frac{D}{TIC} \right) + \left( K_E + \frac{E}{TIC} \right)$$

$K_D$  = Cost of Interest Bearing Debt
$K_E$  = Cost of Equity
$t$    = tax rate
$D$    = Interest Bearing Debt
$E$    = Common Equity
$TIC$  = Total Invested Capital (Total Debt + Total Equity)

123.   As reflected above, the    ACC is calculated by multiplying a company's after-tax cost of debt by its debt as a percentage of total invested capital and adding the resulting number to its cost of equity multiplied by its equity as a percentage of its total invested capital.

124.   In order to determine the    ACC, it is necessary to determine the capital structure of the entity (i.e., the level of debt, equity and other securities). The capital structure may include the following

KDM000170

EXHIBIT 44
Page 462

- Actual capital structure of the entity

- Industry capital structure

- Hypothetical capital structure to support cash flows

125.   If the WACC is calculated using a fixed amount of debt, the practitioner may need to estimate the appropriate weightings. An increase in the weighting of the company's equity will increase the WACC and reduce the value of the company's equity. Conversely, a reduction in the weighting of a company's equity will reduce the WACC and increase the value of the company's equity. The weightings will need to be adjusted using an iterative process until assumed debt and equity weightings are equal to the calculated debt and equity weightings.

## Mid-Year Versus End-of-Year Discounting

126.   When discounting lost future profits (LFP), the practitioner may wish to consider modifying the calculation to apply a mid-year convention. The mid-year convention for LFP is reflected in the following formula:

$$\frac{LFP_1}{(1+DR)^{0.5}} + \frac{LFP_2}{(1+DR)^{1.5}} + \frac{LFP_3}{(1+DR)^{2.5}} + \frac{LFP_4}{(1+DR)^{3.5}} + \quad \cdots \quad + \frac{LFP_n}{(1+DR)^{n-0.5}}$$

127.   The discounted future profits formula reflected in paragraph 104 presumes that all profits are earned and/or distributed on the last day of the year. For many businesses, this may not be a reasonable assumption. The application of mid-year assumption instead presumes that lost profits will be earned and/or distributed evenly throughout the year. The above formula can be further modified to more specifically reflect the seasonality or timing of profits in the subject company.

## Adjusting for Risk in Projected Profits Versus Accounting for Risk in the Discount Rate

128.   Many practitioners have addressed the concept of risk through the application of discount rates that reflect the level of risk inherent in the projected profits. Other practitioners, alternatively, have suggested that the profit projections themselves be modified downward to adjust for risk, allowing the expert to incorporate a risk-reduced, relatively low discount rate.[4]

129.   The use of the latter approach does not eliminate the need to substantiate the reasonableness of the selected discount rate and the projected, risk-adjusted, profits. Its proponents, however, do believe that this approach is easier for judges and juries to understand. Although either

---

[4] Dunn, Robert and Everett P. Harry, "Modeling and Discounting Future Damages," *Journal of Accountancy*, January 2002, pages 49-55.

*41*

KDM000171

EXHIBIT 44
Page 463

*Calculating Lost Profits*

methodology must ultimately be left to the discretion of the expert, such alternative approaches do highlight the challenges that present themselves to the practitioner who is often forced to balance accepted financial theory against legal reality when preparing a defensible lost profits calculation.

*42*

KDM000172

EXHIBIT 44
Page 464

# CHAPTER 14: TAXES AND DAMAGES

130.    In general, lost profits damages are taxable as ordinary income to the party to which damages are paid. Also, generally, whether received as a result of legal judgment or settlement, tax treatment is the same for lost profits damages. As such, lost profit calculations are typically prepared on a pretax basis. To the extent that the plaintiff received tax benefits as a result of losses caused by the purported bad act, such benefits are generally not considered.

131.    Typically, the appropriate discount rate is the after-tax rate as any lost profits in the past could have been invested at the assumed pretax rate, and income taxes would have been paid on the interest earned. Thus, by applying an after-tax rate, the plaintiff's accumulated value net of taxes is reflected. The reason an after-tax rate rather than a pretax rate is used goes back to the goal of making the plaintiff whole. This can be demonstrated in the following example.

132.    Assume that defendant in a suit for lost profits is liable to plaintiff for the loss of $1,000 in pretax cash flow. Further assume that plaintiff's after-tax discount rate is 12 percent and tax rate is 35 percent. The first method uses three steps to calculate plaintiff's damage award:

- Adjust the pretax cash flow to an after-tax cash flow.

- Discount the after-tax cash flow at plaintiff's after-tax discount rate.

- Gross-up the after-tax amount for the amount of taxes plaintiff will pay on the award to get the taxable damage award.

Assuming stable tax rates over the projection period, the second method arrives at the same taxable damage award by discounting the pretax cash flow amount using plaintiff's after-tax discount rate. This is illustrated in the following table.

| *Pretax Cash Flow* | $   1,000 | | | |
|---|---|---|---|---|
| x (1–Tax Rate) | (1–35%) | = | $  650.00 | |
| / (1+After-Tax Discount Rate) | (1+12%) | = | $  580.36 | |
| / (1–Tax Rate) | (1–35%) | = | $ 892.86 | Taxable Damage Award |
| | | | | |
| Pretax Cash Flow | $   1,000 | | | |
| / (1+After-Tax Discount Rate) | (1+12%) | = | $ 892.86 | Taxable Damage Award |

133.    The practitioner may be asked to assist counsel in evaluating the tax impact of potential damage awards to the plaintiff and/or the defendant under alternative damage theories or settlement scenarios.

*43*

KDM000173

EXHIBIT 44
Page 465

KDM000174

EXHIBIT 44
Page 466

# CHAPTER 15: MITIGATION OF DAMAGES

134.   The plaintiff has an obligation to mitigate its damages. The duty of mitigation requires that the plaintiff take appropriate actions to overcome the damage purportedly caused by the defendant. This principle of mitigation of damages is summarized in the *Restatement (Second) of Contracts*, Section 350 comment (1981) quoted below:

> Avoidability as a Limitation on Damages. (1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation. (2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss.[5]

135.   Plaintiff's failure to mitigate damages is an affirmative defense that can be utilized by the defendant. The defendant, as the party breaching the contract, has the burden to prove that plaintiff's losses could have been avoided through mitigation of damages.

136.   The plaintiff is generally not permitted to recover damages that were foreseeable and could have been avoided by the reasonable efforts of the plaintiff without causing undue expense or risk. In other words, the amount of earnings lost as a result of the plaintiff's failure to mitigate its own damages would likely not be recoverable. The plaintiff also cannot recover lost profits that an income-producing asset would have produced beyond the reasonable period of time it should have taken the plaintiff to replace the asset.

137.   Reasonable expenses incurred in an effort to mitigate damages, even if plaintiff's efforts are unsuccessful, are typically recoverable as damages. The period of recovery for lost profits must be reasonable and may be influenced by the plaintiff's actions to mitigate.

138.   It is important that the practitioner understand what steps, if any, were taken by the plaintiff to mitigate its losses so the financial impact of such mitigation can be measured and a determination can be made by the practitioner as to what steps could or should have been taken by plaintiff.

139.   The plaintiff's ability to mitigate is dependent upon several factors, which may include but are not limited to the following:

• *Plaintiff's financial ability to mitigate.* Mitigation of damages may not be possible if the plaintiff is financially unable to accomplish it.

• *The cost to mitigate as compared to the economic damages suffered by the plaintiff.* If the cost to mitigate is greater than the economic damage suffered as a result of the defendant's breach, it may not be possible for the plaintiff to mitigate the damages.

---

[5] Robert L. Dunn, <u>Recovery of Damages for Lost Profits</u> § 6.33, page 570 (6th ed. 2005).

*45*

KDM000175

EXHIBIT 44
Page 467

*Calculating Lost Profits*

- *Technical barriers to mitigation.* The plaintiff's ability to mitigate may be affected by technology constraints or opportunities.

- *Market barriers to mitigation.* The plaintiff's marketing capabilities, taking into account its reputation, product quality, and product features, may have been affected by defendant's breach and affect its ability to mitigate damages.

- *Supply-oriented barriers to mitigation.* The defendant's breach may also have affected the plaintiff's ability to obtain goods and services from its suppliers necessary for production in order to mitigate its losses.

- *Timing issues impacting the mitigation of damages.* The plaintiff's knowledge of the event causing economic harm and the time required to implement a mitigation strategy may also affect mitigation.

140.    The practitioner should consider whether revenues and/or profits earned subsequent to the breach are a mitigation of the economic damages caused by the defendant, thereby reducing damages, or are profits that would have been earned regardless of the breach and, therefore, would not offset damages claimed by plaintiff.[6]

---

[6] Ibid., § 6.35, page 574.

*46*

KDM000176

EXHIBIT 44
Page 468

# CHAPTER 16: OTHER ISSUES AFFECTING LOST PROFITS ANALYSES

141.   The practitioner will need to consider other issues when performing a lost profits analysis. Among the issues that need to be considered are:

- Distinguishing between violative and nonviolative acts
- Distinguishing various violative acts
- The impact of subsequent unexpected events
- Changes in the economic environment

## DISTINGUISHING BETWEEN VIOLATIVE AND NONVIOLATIVE ACTS

142.   The practitioner should be aware that not all acts may be violative (i.e., result in damages). The practitioner should consider only those acts which would have an impact upon the damage analysis. Nonviolative acts typically lack the requisite causal link between the act and damages.

## DISTINGUISHING VARIOUS VIOLATIVE ACTS

143.   In some instances, there may be multiple violative acts that result in damage. In the damage analysis, the practitioner should attempt to separately quantify the damage resulting from each act. If the acts are not "disaggregated," findings may be challenged or the rejection of a claim for one act may result in refutation of the entire analysis. Practitioners should also ensure that damages computed for separate acts do not have an additive effect. In other words, damages may be common to both acts and cannot simply be added together to compute the total damages.

## IMPACT OF SUBSEQUENT EVENTS

144.   The practitioner should also consider the impact of events subsequent to the act causing damage. Such events may suspend the loss period, either temporarily or permanently, or may cause additional damage. Such intervening events may or may not be caused by the defendant, and the impact of those intervening events must be determined separately. See the discussion of ex ante and ex post methodologies in paragraphs 106 to 109.

*47*

KDM000177

EXHIBIT 44
Page 469

*Calculating Lost Profits*

## CHANGES IN THE ECONOMIC ENVIRONMENT

145.   The practitioner should also consider the impact of changes in the economic environment. Those changes may be general changes in the economy, such as inflation, general price erosion, or changes in demand, or they may be the result of actions taken by the defendant, such as price cutting or changing distribution methods. The impact of these events upon the analysis should be separately quantified, if possible.

*48*

KDM000178

EXHIBIT 44
Page 470

# CHAPTER 17: ALTERNATIVE DAMAGE MEASURES OTHER THAN LOST PROFITS

146.   The practitioner should be aware that there are alternative measures of damages other than lost profits. Throughout this discussion, it is assumed that the plaintiff has been harmed and is entitled to damages resulting from the defendant's wrongful actions.

147.   Alternative measures of damages other than lost profits will depend upon the facts and circumstances of the case. Consultation with legal counsel regarding the established legal framework and the applicable law may be necessary to determine the alternative damage measures.

## OUT-OF-POCKET COSTS

148.   A relatively straightforward method of calculating damages is based upon the out-of-pocket costs or investment the plaintiff has incurred in the project. Under this method, the out-of-pocket costs incurred related to the project are aggregated and become the measure of damages.

149.   The practitioner needs to be diligent in obtaining appropriate back-up documentation pertaining to the costs involved including verifying that the costs incurred actually pertain to the project.

## DECREASE IN VALUE CAUSED BY THE DEFENDANT'S MISCONDUCT

150.   Damages under this approach are based upon the decrease in value caused by the defendant's misconduct. This approach to calculating damages is measured by the decrease in value as measured by the value prior to and subsequent to the defendant's misconduct. A business valuation or an appraisal of the underlying asset may be necessary in order to calculate this measure of damages. Additionally, some states may limit this measure of damages to only tort actions.

*49*

KDM000179

EXHIBIT 44
Page 471

KDM000180

EXHIBIT 44
Page 472

# CHAPTER 18: SPECIALIZED DAMAGES AREAS

## NEWLY ESTABLISHED BUSINESSES

151.   For many years, court decisions adhered to the *new business rule*, which is that claims for lost profits of a newly established business are inherently speculative and, therefore, cannot be recovered. More recently, courts have been moving away from this general rule and have looked instead to the quality of the evidence submitted to determine whether or not the plaintiff has provided an adequate basis for a reasonable estimate of its damages. At least in part, this has been the result of the courts concluding that the former rule was unduly harsh and that a plaintiff should not be precluded from recovering its lost profits where the defendant's action has prevented the plaintiff from establishing a track record.

152.   A plaintiff still has to show with reasonable certainty that, but for the actions of the defendant, it would have made a profit. Some of the factors that the practitioner should consider in assessing the likelihood of the plaintiff's success are as follows:

- The plaintiff's business plan
- The availability of the required capital for the business
- The plaintiff's prior experience in the area
- The plaintiff's level of expertise
- The plaintiff's subsequent experience
- Barriers to entry in the industry
- The quality of the available records
- The economy in which the business operates
- The experience of other similarly situated businesses

153.   If it is possible to meet the legal requirements with respect to the fact of loss, the practitioner will also need to consider these factors, along with whatever other information is available, in preparing an estimate of the amount of the lost profits.

154.   Although the general approach to the calculation of damages is the same as that discussed earlier with respect to an established business, less data are likely to be available. The practitioner may, therefore, need to make more assumptions. As in other areas, the practitioner needs to ensure that there is an adequate basis for the assumptions made.

*51*

KDM000181

EXHIBIT 44
Page 473

## INTELLECTUAL PROPERTY INFRINGEMENT DAMAGES

155.   Intellectual property is a broad term encompassing a number of different types of property, including patents, copyrights, trademarks, and trade secrets. The scope of this practice aid does not include a detailed discussion of these types of damages. For a more in-depth discussion of this area, the practitioner should refer to AICPA Practice Aid 06-01, *Calculating Intellectual Property Infringement Damages.*

156.   The measurement of damages in intellectual property cases can vary according to the particular type of intellectual property at issue.

157.   In some instances, a plaintiff may elect to base its damage claims on the lost profits resulting from the infringement or misappropriation of intellectual property.

158.   In patent infringement actions, the amount of damages awarded to the plaintiff should be sufficient to compensate for the infringement, but not less than the amount of a reasonable royalty. Lost profits are an alternative measure of damages to the reasonable royalty calculation. In the case of design patents, the award can include damages for unjust enrichment.

159.   In copyright infringement cases, the measurement of damages may be based on various approaches, including lost profits. Other possible measurement approaches include royalty rates used for other transactions, the terms of other contracts for use of the copyrighted material, or a calculation of the decline in the market value of the copyrighted material as a result of the infringement.

160.   In trademark cases, the alternative measurements of damages include lost profits, a reasonable royalty, and statutory damages. In addition, the Lanham Act explicitly authorizes a trademark owner to recover both the infringer's profits and its own damages sustained to the extent they are not duplicative.[7]

161.   In trade secrets cases, the plaintiff's damages may also be measured in various ways, including lost profits, a reasonable royalty, and the unjust enrichment of the infringer. The Uniform Trade Secrets Act expressly provides that, in addition to recovering its actual loss, a trade secret owner may recover the "unjust enrichment" caused by the misappropriation to the extent the enrichment is not taken into account in calculating the owner's actual loss.[8]

---

[7] AICPA Practice Aid 06-01, *Calculating Intellectual Property Infringement Damages*, page 22.
[8] Ibid.

52

KDM000182

EXHIBIT 44
Page 474

## ANTITRUST VIOLATION DAMAGES

162.   Antitrust law generally prohibits various forms of conduct that are considered to be anti-competitive. The Federal Trade Commission (FTC) is the government agency charged with enforcement of federal antitrust laws.

163.   The statutes governing this area of law address such issues as monopolies, price discrimination, mergers, and unfair competition.

164.   Plaintiffs in antitrust actions have to prove that the defendant's actions caused lost profits and that this resulted from the anticompetitive effect of an antitrust violation. The general standard for proving damages is a "just and reasonable estimate of the damage based on relevant data." (See *Bigelow v. RKO Radio*, 327 U.S. 251 [1946].) An antitrust plaintiff, however, must also prove antitrust injury in addition to the other common elements in a damages case, requiring the plaintiff to not only show that its injury is proximately caused by the defendant's wrongful conduct, but that the injury is "of the type the antitrust laws were intended to prevent." (See *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477 [1977].) Because the focus of antitrust law is on the consumer, the plaintiff must be able to prove that competition was injured as a result of the defendant's conduct.

165.   In claims involving the monopolization of, or attempts to monopolize, a market, it is necessary to address concepts such as the definition of the market, both in geographic and product terms, the substitutability of other products, and the level of potential competition.

166.   In a case involving price-fixing, damages are normally computed based on an analysis of the higher prices paid by purchasers of the products or services in question. This may involve a comparison of pricing or profit levels before or after the time period during which the price-fixing occurred.

## SECURITIES FRAUD DAMAGES

167.   Claims by investors for damages resulting from the failure to disclose information that adversely affects the price at which a company's securities trade generally seek to recover the difference between the price at which the investors purchased the securities and the price which they would have paid had the information been disclosed.

168.   Although this difference may be measured by the decline in the price of the securities when the adverse information was disclosed, it is necessary to consider the impact of other factors on the price of the securities.

*53*

KDM000183

EXHIBIT 44
Page 475

*Calculating Lost Profits*

## E-BUSINESS IMPACT ON DAMAGES

169.   Practitioners should also consider the impact of the new business models that may be associated with the expansion of e-business on traditional measures of lost profits. These include the availability and nature of data relating to those business models and the impact on the definition of markets and the impact on competition and market barriers, among others. The models developed by the practitioner to measure lost profits will need to account for these factors.

*54*

KDM000184

EXHIBIT 44
Page 476

# APPENDIX A: COMPARISON OF AICPA PROFESSIONAL STANDARDS AND FEDERAL RULE OF EVIDENCE 702

| *CP Professo al ta ar s* | *Fe eral le of e e* |
|---|---|
| *CP o e of x ert se* | *o e* |
| • Accounting, auditing, tax, consulting, and other services | • Scientific nowledge |
| | • Technical nowledge |
| | • Speciali ed nowledge |
| *CP alf at o s* | *alf at o s* |
| • Education | • Education |
| • Examination | • Knowledge |
| • Experience | • Experience |
| • Ethics  AICPA Code of Professional Conduct | • Training |
| | • S ill |
| *CP Co e of Professo al Co t* | *ass of est o* |
| • Rule 102, *te rt a e t t* (AICPA, *Professo al ta ar s*, vol. 2, ET sec. 102.01) | • Product of reliable principles and methods |
| • Rule 201, *e eral ta ar s* (AICPA, *Professo al ta ar s*, vol. 2, ET sec. 201.01) | • Applied the principles and methods reliably to facts of the case |
| • Professional competence | • Sufficient facts or data |
| • Due professional care | |
| • Planning and supervision | |
| • Sufficient relevant data | |
| • Rule 202, *Co la e th ta ar s* (AICPA, *Professo al ta ar s*, vol. 2, ET sec. 202.01) | |

*55*

KDM000185

EXHIBIT 44
Page 477

KDM000186

EXHIBIT 44
Page 478

# APPENDIX B: TESTIMONY PYRAMID

Consistent with AICPA *Professional Standards*, Rule 702 of the Federal Rules of Evidence re-
quires expert testimony be based upon sufficient facts or data, be the product of reliable princi-
ples and methods, and that the principles and methods be reliably applied to the facts of the case.
Graphically presented, the testimony pyramid might be as follows:



KDM000187

EXHIBIT 44
Page 479

KDM000188

EXHIBIT 44
Page 480

# APPENDIX C: TYPICAL LITIGATION SERVICES

Practitioners may provide various types of services or functions in litigation engagements. Some of the more common include:

- Computation of economic damages:
  - o Lost profits
  - o Lost value
  - o Extra costs
  - o Lost cash flow
  - o Mitigation
  - o Restitution
  - o Punitive damage studies
- Professional standards analysis
- Valuation of the following:
  - o Business
  - o Pensions
  - o Intangibles
- Fraud prevention, detection, and investigation
- Bankruptcy consultant, trustee, and examiner
- Tax analysis, including the following:
  - o Tax basis
  - o Cost allocation
  - o Treatment of specific transactions
- Marital dissolution assessment and analysis
- Contract cost and claims analysis
- Historical results analysis
- Special accountings, tracing, reconstructions, and cash-flow analyses
- Antitrust analysis, including the following:
  - o Price fixing
  - o Market share
  - o Market definition

*59*

KDM000189

EXHIBIT 44
Page 481

*Calculating Lost Profits*

- o Predatory conduct
- o Dumping
- o Price discrimination
- Business interruption and other insurance claims and assessments
- Attest services, if specifically engaged to perform them in connection with litigation services

Any of the following functions may be performed:

- Issue identification
- Locating other experts
- Fact finding, including the following:
  - o Asset searches
  - o Market studies
  - o Systems reviews
  - o Interviewing of witnesses
  - o Due diligence
  - o Research
- Analysis
  - o Investigative accounting
  - o Computer modeling
  - o Statistical
  - o Actuarial
- Discovery assistance
- Document management
- Settlement assistance
- Expert testimony
- Trial and deposition assistance
- Posttrial support (such as bookkeeping services and funds administration)
- Negotiations
- Arbitration
- Mediation
- Training
- Case evaluation

*60*

KDM000190

EXHIBIT 44
Page 482

# APPENDIX D: EX ANTE VERSUS EX POST



KDM000191

KDM000192

EXHIBIT 44
Page 484

# APPENDIX E: LIST OF CASES CITED

*Cases Cited*

*American List Corp v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 550 N.Y.2d 590 (1989)

*Bigelow v. RKO Radio*, 327 U.S. 251 (1946)

*Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477 (1977)

*Burger King Corp. v. Barnes*, 1 F. Supp.2d 1367 (S.D. Fla 1998)

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)

*Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820 (Fed. 8th Cir., 2005)

*DSC Communications v. Next Level Communications*, 107 F.3d 322, 329 (5th Cir. 1997)

*Energy Capital v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)

*Fairmont Supply Company v. Hooks Industrial, Inc.*, No. 01-03-01129-CV (T   8/4/2005)

*Hadley v. Baxendale*, 156 Eng. Rep. 145, 151 (Ex. 1854))

*Hampton v. Federal Express Corp.*, 917 F. 2d 1119, 1125-26 (8th Cir. 1990)

*Holt Atherton Ind., Inc. v. Heine*, 835 S.W.2d 80 (Tex. 1992)

*Knox v. Taylor*, 992 S.W.2d 40 (Texas 1999)

*Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340 (3d Cir. 2002)

*Kumho Tire Company, Ltd. v. Patrick Carmichael*, 526 U.S. 137 (1999)

*Olson v. Nieman's Inc.*, 579 N.W.2d 299 (Iowa 1998)

*Schonfeld v. Hilliard*, 62 F. Supp 2d 1062, 1074 n. 6 (S.D.N.Y. 1999)

*Universal Commodities, Inc. v. Weed* (449 S.W. 2d 106 (Tex. Civ. App. 1969))

KDM000193

EXHIBIT 44
Page 485

KDM000194

EXHIBIT 44
Page 486

# APPENDIX F: LOST PROFITS RESOURCES (NONEXHAUSTIVE LIST)

## APPLICABLE SPECIAL REPORT AND PRACTICE AID

Consulting Services Special Report 03-1, *Litigation Services and Applicable Professional Standards*

Practice Aid 04-1, *Engagement Letters for Litigation Services*

Practice Aid 93-4, *Providing Litigation Services*

Practice Aid 96-3, *Communicating in Litigation Services: Reports*

## BOOKS

Dunn, Robert L., *Recovery of Damages for Lost Profits*, 6th ed. Alameda, CA: Lawpress Corporation, 2005 (800) 622-1181 (www.lawpresscorp.com)

Weil, Roman L., Michael J. Wagner, and Peter B. Frank, *Litigation Services Handbook  The Role of the Financial Expert*, 3rd ed. Hoboken: John Wiley  Sons, 2001 (201) 748-6011 (www.wiley.com)

Cerillo, William A., *Proving Business Damages*, 2nd ed. Hoboken: John Wiley  Sons, 1991, (201) 748-6011 (www.wiley.com)

Hitchner, James R., *Financial Valuation, Applications and Methods*. Hoboken: John Wiley  Sons, 2003, (201) 748-6011 (www.wiley.com)

Trugman, Gary R., *Understanding Business Valuation*, 2nd ed. New York: American Institute of Certified Public Accountants, 2002, (201) 938-3245 (www.aicpa.org)

Pratt, Shannon P., Reilly, Robert F., Schweihs, Robert P., *Valuing a Business, The Analysis and Appraisal of Closely Held Companies*, 4th ed. New York: McGraw-Hill, 2000.

*PPC's Guide to Litigation Support Services*, 10th ed. Dallas: Practitioners Publishing Company, 2005, (800) 323-8724 (www.ppc.thomson.com)

*65*

KDM000195

EXHIBIT 44
Page 487

*Calculating Lost Profits*

## OTHER

Dunn, Robert and Everett P. Harry, "Modeling and Discounting Future Damages," *Journal of Accountancy*, January 2002, pages 49  55

*CPA Expert*, American Institute of Certified Public Accountants, (888) 777-7077 (www. cpa2biz.com)

Business Valuation and Forensic and Litigation Services Special Reports, Practice Aids,
Other Publications and Software

| tle | er es      er | Pro   t      er |
|-----|---------------|-----------------|
| **Special Reports** | | |
| t ato   er  es a      l  a le Professo al  ta  ar s | 03-1 | 05529 |
| Co  fl ts of   terest    t  at o er   es     a  e  e ts | 93-2 | 048563 |
| **Practice Aids** | | |
| Cal  lat    a  a es | 06-1 | 055300 |
| CP  s     e to Fa  l   aw | 05-1 | 055299 |
| a  e  e  t  etters for  t  at o er   es | 04-1 | 055298 |
| s  ess al at o     a   r   t | 02-1 | 055296 |
| Cal  lat o s of   a  a es Fro Perso  al    r   ro  f l  eath a     lo   e t s r   at o | 98-2 | 055293 |
| Pro         a   r  t   a eor a   at o     er   es | 98-1 | 055162 |
| Fra      est  at o s     t  at o  a s  te  esol to    er   es  o a thor tat  e       e | 9 -1 | 055001 |
| Co        at     t  at o    er   es e  orts   o a thor tat  e       e | 96-3 | 055000 |
| al     F  a   al  at os | 06-3 | 055302 |
| Pro       t  at o    er   es | 93-4 | 055145 |
| Pre  ar   F  a   al  o  els | 06-2 | 055301 |

*66*

KDM000196

EXHIBIT 44
Page 488

*Appendix F: Lost Profits Resources (Nonexhaustive List)*

| tle | er es    er | Pro   t    er |
|-----|-------------|---------------|
| Other Consulting Practice Aids | | |
| ss st    a F  a  all  ro  le s  ess | 92-8 | 055140 |
| Other Publications | | |
| CP  s    e to  al    a Closel el    s  ess | | 056601 |
| Software (running on Word) | | |
| all   s  ess Co  s  lt    ool a   ost    e  ew Che   l st for ax    Prof ts | | 055010 |
| Co  s  lt    a  e  e t  etters a Che   l sts | | 055011 |

To obtain any of these publications, call the AICPA Order Department at 1-888-777-7077, op-
tion 1 or order via fax at 800-362-5066 or on-line at http://www.cpa2biz.com/store.

*67*

KDM000197

EXHIBIT 44
Page 489