Jenner & Block LLP
Rick Richmond (Cal. Bar No. 194962)
rrichmond@jenner.com
Brent Caslin (Cal. Bar No. 198682)
bcaslin@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone:   (213) 239-5100
Facsimile :   (213) 239-5199

Melissa A. Cox (*pro hac vice*)
melissacox@jenner.com
1099 New York Ave, NW, Suite 900
Washington, DC 20001
Telephone:   (202) 639-6000
Facsimile:   (202) 639-6066

Attorneys for Defendant and Counterclaim
Plaintiff National Air Cargo, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| GLOBAL BTG LLC,<br><br>Plaintiff,<br><br>v.<br><br>NAC AIR CARGO, INC.,<br><br>Defendant-<br>Counterclaim Plaintiff,<br><br>v.<br><br>GLOBAL BTG LLC, JACOB<br>HODGES and DOES 1-5,<br><br>Counterclaim Defendants. | Case No. 2:11-cv-01657 MMM (JCGx)<br><br>The Honorable Margaret M. Morrow<br><br>**NATIONAL AIR CARGO, INC.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO GLOBAL BTG LL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[National's Opposition to Global's Motion, Objections to Evidence Submitted by Global, Declaration of Christopher C. Chiou, Declaration of Glen Joerger, and Proposed Order filed concurrently herewith]<br><br>Discovery Cutoff:      June 5, 2012<br>Pretrial Conference:  Jan. 28, 2013<br>Trial Date:               Feb. 19, 2013<br><br>Hearing Date:        December 10, 2012<br>Hearing Time:        10:00 am<br>Hearing Location:   Courtroom 780 |

Defendant and Counterclaim Plaintiff National Air Cargo, Inc. ("National") submits the following response to Plaintiff and Counterclaim Defendant Global BTG LLC's ("Global's") Separate Statement of Undisputed Facts, together with references to supporting evidence, in opposition to Global's motion for partial summary judgment. Global has failed to set forth undisputed facts sufficient to warrant judgment in its favor as a matter of law. Based on the disputed material facts described below, National is entitled to present its case at trial to a finder of fact for a determination of all of defenses and counterclaims at issue here.

## I.    RESPONSE TO STATEMENT OF UNCONTROVERTED FACTS

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| 1. | The Civil Reserve Air Fleet is a fleet of commercial aircraft that are "pledged" each year by their owners to the DOD. Congress and the DOD, concerned with the age and reliability of the CRAF, offered incentives, beginning in Fiscal Year 2011, to program participants pledging more modern aircraft with better fuel efficiency and greater cargo carrying capacity. Declaration of Nathan Smith ("Smith Decl."), Exh. 9. | **Undisputed.** |
| 2. | As of early 2010, NAC's fleet consisted of four outdated DC-8s, two Jetstream, and one 757-200. Smith Decl., Exh. 9. | **Objection (misleading).** National objects to the characterization of National's fleet as "outdated," which is not supported by any evidence.<br><br>Subject to that objection, **undisputed** that National's fleet included four DC-8, two Jetstream, and one 757-200 aircraft. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| 3. | NAC decided to acquire newer, larger and more efficient aircraft to participate in CRAF and entered into a purchase agreement for three Air France 747's and entered into a "Letter of Intent" to purchase five 747's from Japan Airlines. Smith Decl., Exh. 10 & 11. | **Objection (misleading).** Global's sentence gives the misimpression that National was not previously an active contractor with the CRAF program. When National entered into agreements to acquire three Air France 747 aircraft for $120.5 million and five Japan Airlines 747 aircraft for $192.5 million, National was already involved with the CRAF program. National decided to purchase the eight aircraft in order to take advantage of the new CRAF incentive program referenced in Global's Statement No. 1. Smith Decl., Ex. 60 at 575-76; Chiou Decl. Ex. 1 (Joerger Dep. Tr.) at 10:3-11:17. <br><br> Subject to that objection, **undisputed** that NAC decided to acquire additional aircraft in part because of CRAF incentives. |
| 4. | Ultimately, the CRAF incentives were scaled back. Smith Decl., Exh. 12. | **Undisputed.** |
| 5. | Jacob Hodges has over seven years of experience in the aircraft financing business. Smith Decl., Exh. 2. | **Undisputed.** |
| 6. | In December 2004, Hodges began a six year tenure with BCI Aircraft Leasing ("BCI"), a relatively small aircraft lessor. During Hodges's tenure, BCI grew from a company | **Objection (misleading).** Statement No. 6 and ¶ 2 of Mr. Hodges' Declaration are misleading to the extent they imply Mr. Hodges was responsible for the growth at BCI, |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | with $384 million in aircraft assets to over $1.1 billion in aircraft assets under operating lease. Declaration of Jacob Hodges ("Hodges Decl."), at ¶ 2. | which is not supported by any evidence.<br><br>Subject to that objection, **undisputed** that Mr. Hodges worked at BCI for about six years, beginning in December 2004. |
| 7. | While employed at BCI as a Director and then Managing Director, Head of Debt Capital Markets, Hodges raised, originated, solicited, and obtained proposals and commitments from multiple lenders around the world, including lines of credit that exceeded $1 billion dollars. Smith Decl., Exh. 2 [Hodges Depo. at 40:18-41:4]. | **Disputed** to the extent that Statement No. 7 and Mr. Hodges' testimony suggest that Mr. Hodges has actually raised over $1 billion in financing.  Mr. Hodges testified that the $1 billion dollar figure includes any expression of interest of from a possible lender and is not limited to transactions that actually closed.  *See* Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 64:3-9 ("Q: If the money never flowed at the end of the day, do you count that in your definition of raising debt financing. A: I think raising debt financing is a process of doing all of the above.  Receiving a commitment letter is to have raised financing.  A term sheet, a proposal, I raised that financing, yes.").<br><br>**Undisputed** that Mr. Hodges worked as a Director and a Managing Director, Head of Debt Capital Markets, while employed at BCI and that his job responsibilities included raising, originating, soliciting, and obtaining proposals and commitments from lenders. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| **8.** | Hodges was "one of the cornerstones" of BCI. Smith Decl., Exh. 5 [Shamsai Depo. at 48:18-49:1]. | **Objection (improper evidentiary support and misleading).**<br><br>Subject to that objection, **undisputed** that Steve Shamsai, technical manager of the BCI fleet, personally believes that Hodges was "one of the cornerstones" of BCI.<br><br>**Disputed** to the extent Mr. Shamsai's statement implies that anyone else (other than Mr. Shamsai himself) considers Mr. Hodges to have been one of BCI's "cornerstones." |
| **9.** | BCI bought over 118 aircraft, and during Hodges's tenure with BCI he financed most of those purchases and was involved in every one. Hodges Decl., at ¶ 2. | **Undisputed.** |
| **10.** | In the spring of 2007, BCI came under scrutiny for its principal's accounting practices.  Hodges resigned from BCI in May 2010. Smith Decl., Exh. 2 [Hodges Depo. at 93:18-21; 220:25-221:16]. | **Undisputed.** |
| **11.** | Upon leaving BCI Hodges decided to open his own firm. Hodges Decl., at ¶ 4. | **Objection (improper evidentiary support).**  Statement No. 11 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos* |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|-----|------------------------------------------------------------------|----------------------------------------------------|
| | | *Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).<br><br>Subject to that objection, **undisputed** that Mr. Hodges sought to open his own firm at some point after leaving BCI.<br><br>**Disputed** that Mr. Hodges' "firm" was always intended to be an independent entity, rather than an entity affiliated with Pearl Aircraft Corporation, Ltd. ("Pearl Aircraft"). Between January and July 2010, Mr. Hodges was actively seeking employment with Pearl Aircraft. *See* Chiou Decl., Exs. 3 & 4. Mr. Hodges did not decide to work independently of Pearl Aircraft until July 28, 2010, thirteen days after the Letter of Intent was signed and five days after National terminated its relationship with Global. Chiou Decl., Ex. 5. |
| **12.** | Although Hodges considered joining a new entity called Pearl Aviation being formed by former BCI principals, he ultimately declined a lucrative offer to join Pearl, and instead started Global. Hodges Decl., at ¶ 20. | **Objection (misleading).** Statement No. 12 and ¶ 20 of Mr. Hodges' Declaration are misleading to the extent that they fail to specify the timing of this offer from Pearl Aircraft and Mr. Hodges' rejection of the offer. Pearl Aircraft extended its formal offer of employment to Mr. Hodges on July 15, 2010, three days before the Letter of Intent at issue in this case was signed. *See* |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | Chiou Decl., Ex. 5.  Mr. Hodges rejected the offer to join Pearl Aircraft on July 28, 2010, ten days after the Letter of Intent was signed. *Id.* |
| | | **Objection (improper evidentiary support).**  Statement No. 12 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). |
| | | Subject to those objections, **undisputed** that Pearl Aircraft extended Mr. Hodges an offer of employment and that Mr. Hodges rejected the offer. |
| | | **Disputed** that the offer from Pearl Aircraft was "lucrative."  In rejecting the offer, Mr. Hodges told Pearl Aircraft, among other things, that the "salary and bonus structure is below market and the equity vesting period is inappropriate [.]"  Chiou Decl., Ex. 5. |
| 13. | NAC employed Donald Stukes as its agent to raise funds for the purchase of the eight aircraft. Smith Decl., Exh. 13. | **Undisputed** that National engaged Donald Stukes, Senior Managing Director of ASI Advisors, to raise funds for the purchase of the eight |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | aircraft.<br><br>**Disputed** that Mr. Stukes was employed as National's "agent." Mr. Stukes was hired as an independent contractor. *See* Smith Decl., Ex. 13 at 156 ("[Y]our [*i.e.*, National's] engagement of ASI [*i.e.*, Mr. Stukes] is an independent contractor, and not in any other capacity including as a fiduciary."). |
| 14. | On June 17, 2010, Stukes contacted Hodges to get Hodges's "thoughts and input" on the NAC deal. Smith Decl., Exh. 14. | **Undisputed.** |
| 15. | Stukes knew that Hodges left BCI earlier in 2010 and that he was a "free agent."  Smith Decl., Exh. 6. | **Objection (misleading).**  Global's selective quotations from Mr. Stukes' deposition testimony result in the misimpression that Mr. Stukes was always under the belief that Mr. Hodges was a "free agent" who was unaffiliated with Pearl Aircraft.  Mr. Stukes' testimony is limited to his understanding at the time of his email dated June 19, 2010. *See* Chiou Decl., Ex. 6 (Stukes Dep. Tr.) at 134:6-140:12.<br><br>Subject to that objection, **undisputed** that, on June 19, 2010, Mr. Stukes believed Mr. Hodges was "free agent."<br><br>**Disputed** that Mr. Stukes believed Mr. Hodges to be a "free agent," at |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | all relevant times.  On June 20, 2010, Mr. Stukes sent Mr. Hodges an email asking the name of the company under which he was proceeding.  Chiou Decl., Ex. 7.  Thereafter, Mr. Stukes began referring to Mr. Hodges as "Pearl."  *See*, *e.g.*, Chiou Decl., Ex. 6 (Stukes Dep. Tr.) at 143:12-144:15; *id.*, Ex. 8; *id.*, Ex. 9. |
| **16.** | Knowing Hodges's reputation, Stukes asked Hodges if he was interested.  Hodges told Stukes he was interested in the NAC opportunity. Smith Decl., Exh. 14. | **Objection (misleading).**  The document supporting Statement No. 16 makes no mention of Mr. Hodges' "reputation."<br><br>Subject to that objection, **undisputed** that Mr. Stukes contacted Mr. Hodges on June 17, 2010, regarding National's need for financing. |
| **17.** | NAC and Global's negotiations culminated on Sunday, July 18, 2010, when Hodges received an executed copy of the Letter of Intent from NAC.  The Agreement states, in relevant part, that:<br><br>"This Letter of Intent is intended as a binding agreement between the Lessor and Lessee who will act in good faith to implement the provisions hereof, to complete the contemplated transactions and to negotiate, execute and deliver all necessary and appropriate leases and other agreements in form and | **Objection (misleading).**  Statement No. 17 selectively quotes from the Letter of Intent in a manner that creates the impression that the quoted provision, and no others, are "relevant."<br><br>**Objection (legal argument).**  Statement No. 17 characterizes the selectively quoted provision as the "relevant part," which is a legal argument, not fact.<br><br>Subject to those objections, **undisputed** that the Letter of Intent was signed on July 18, 2010 and |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | substance consistent with industry standards and in a timely manner." Smith Decl., Exh. 15. | contained the quoted provision. |
| **18.** | The Agreement committed NAC to sell to and leaseback from Global as many of the eight aircraft that Global would finance. Smith Decl., Exh. 15. | **Objection (legal argument).** Statement No. 18's characterization of what the Letter of Intent supposedly "committed" National to do is a legal argument, not a fact.<br><br>Subject to that objection, **disputed.** At the time the Letter of Intent was signed, National understood the Letter of Intent to be a non-exclusive mandate for Global to raise financing on certain specified terms. Chiou Decl. Ex. 1 (Joerger Dep. Tr.) at 51:8-52:3. Internal emails show that Global similarly understood the Letter of Intent to be a "mandate" to "structure and obtain financing for the fleet." Chiou Decl., Ex. 10; *see also* Smith Decl., Ex. 51 at 405; *id.*, Ex. 52 at 434; *id.*, Ex.53 at 463; *id.*, Ex. 54 at 492; *id.*, Ex. 55 at 521. |
| **19.** | The Agreement identified each aircraft by serial number. Smith Decl., Exh. 15. | **Undisputed.** |
| **20.** | The Agreement set out agreed price terms for each aircraft and type of lease; and provided flexibility to Global in pricing. Smith Decl., Exh. 15. | **Objection (misleading).** Statement No. 20 is misleading to the extent that it suggests the "type of lease" was specified for each aircraft. The Letter of Intent did not specify what type of lease any particular aircraft would be under; rather, the Letter |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | specified that "for each Aircraft, Lessee [i.e., National] will have the option to select an operating lease or a finance lease structure."  Smith Decl., Ex. 15 at 199.<br><br>Subject to that objection, **undisputed** that the Letter specifies the terms according to which Global was to raise financing. |
| **21.** | The Agreement at Page 2 set a closing date "[a]s soon as reasonably possible and in accord with the estimated delivery schedule as provided by Lessee."  The Agreement also provides that it "will be governed by the laws of the State of New York."  Smith Decl., Exh. 15. | **Undisputed.** |
| **22.** | First, the Letter of Intent is an agreement for the sale and leaseback of the JAL and AF planes.  Thus, NAC promises to sell, Global pledged to buy, and NAC agreed to lease back the aircraft.  Smith Decl., Exh. 15. | **Objection (legal argument).** Statement No. 22 characterizes the Letter of Intent as "an agreement for the sale and leaseback of the JAL and AF planes," which is a legal argument, not a fact.  Similarly, Statement No. 22 characterizes what National supposedly "promise[d]" and "agreed" to do in signing the Letter, which is also a legal argument, not a fact.<br><br>Subject to that objection, **disputed.** National incorporates its response to Statement No. 18. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| 23. | As a corollary, the parties agreed to act in good faith to complete the transaction.  Smith Decl., Exh. 15. | **Objection (misleading).**  Statement No. 23 fails to articulate the full scope of the parties' "good faith" commitment in the Letter of Intent and mischaracterizes the scope of the agreement.  The parties agreed to "act in good faith to implement the provisions hereof, to complete the contemplated transactions and to negotiate, execute and delivery all necessary and appropriate leases and other agreements in form and substance consistent with industry standards and in a timely manner." *See* Smith Decl., Ex. 15 at 204.<br><br>**Objection (legal argument).**  Statement No. 23 characterizes what the parties supposedly "agreed" to in the Letter, which is a legal argument, not a fact.<br><br>Subject to these objections, **undisputed** that the Letter of Intent states the parties will act in good faith to timely complete financing arrangements, among other things. |
| 24. | The eleventh hour "Other" section contained a promise by Global to use its "best efforts" to deliver to NAC a "MOU" from a lender within four days of signing the agreement.  Smith Decl., Exh. 15. | **Objection (misleading).**  Statement No. 24 characterizes the "Other" section as an "eleventh hour" provision, creating the misleading impression that the parties had not discussed National's need for a written commitment for funding from a qualified lender.  Throughout the negotiations, National informed Global that a written commitment |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|-----|------------------------------------------------------------------|---------------------------------------------------|
|     |                                                                  | from a qualified lender was needed as soon as possible in order to save the JAL deal.  Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 36:2-37:11; Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 83:2-7; Joerger Decl. ¶ 3 ("National repeatedly informed Mr. Hodges that — in order to satisfy the bankruptcy trustee of Japan Air Lines — we needed to quickly line up financing and obtain a commitment letter from a qualified lender by July 22, 2010.")<br><br>**Objection (legal argument).**  Statement No. 24 characterizes what the "best efforts" clause required of Global, which is a legal argument, not a fact.<br><br>Subject to these objections, **disputed.**  Based on Mr. Hodges' representations prior to signing the Letter of Intent, National understood that Global had been discussing financing with lenders for approximately one month prior to signing the Letter of Intent, and that Global had a number of "soft commitments" from potential lenders who were "in committee."  Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 27:22-29:17; 32:20-34:9.  Global's own industry expert testified that "it would not be unreasonable for the process to have started 30 days prior."  Chiou Decl., Ex. 11 (Weinroth Dep. Tr.) at 168:16- |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | 170:10.  Accordingly, National did not think that Global was starting from scratch and only had four days to secure the required MOU, as Global contends.  Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 214:9-215:12.  Rather, based on Mr. Hodges' representations, National believed that Mr. Hodges was using his best efforts to "firm up soft commitments," and turn these "soft commitments" into the MOU by July 22, 2010.  Smith Decl. Ex. 37; Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 32:20-34:9; Joerger Decl. ¶ 4 ("National entered the letter of intent on July 18, 2010 because Mr. Hodges claimed that he had already arranged soft commitments for financing, so there was a high probability that he would be able to provide the firm commitment from a qualified lender by July 22, 2010.") |
| 25. | Third, the same "Other" section had a promise from National to accept an operating lease from Global on the contracted terms.  Smith Decl., Exh. 15. | **Objection (misleading).**  Statement No. 25 does not quote the second sentence of the Letter of Intent's "Other" provision and instead summarizes it in a misleading manner, suggesting that the Letter of Intent required National to accept an operating lease from Global.

**Objection (legal conclusion).** Statement No. 25 contends that the second sentence of the Letter of Intent's "Other" clause required National "to accept an operating |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | lease from Global," which is a legal conclusion, not a fact.<br><br>Subject to these objections, **disputed.** The second page of the Letter of Intent provides that "for each Aircraft, Lessee [i.e., National] will have the option to select an operating lease or a finance lease structure." Thus, in context, it is clear that National had the "option" to select an operating lease, but was not required to do so. Moreover, the clause in the "Option" section does not require National to "accept" any proposed operating lease. Smith Decl., Ex. 15 at 203. |
| 26. | While the Agreement was being negotiated, NAC proposed specific language in a draft that stated the Agreement would be "non-exclusive" and NAC could continue to seek financing from sources other than Global. Smith Decl., Exh. 16. | **Objection (misleading).** Statement No. 26 creates the misimpression that, at some point, National would not be permitted "to seek financing from sources other than Global."<br><br>Subject to this objection, **undisputed** that National proposed language pertaining to exclusivity in a draft of the Letter of Intent. |
| 27. | Global told Stukes, who told NAC as late as the day before the agreement was executed, that it would" not proceed on a non-exclusive basis." Smith Decl., Exh. 17 & 18. | **Undisputed** that Mr. Stukes communicated to National that Global did not desire a non-exclusive arrangement.<br><br>**Disputed** that Global's declaration that "it would not proceed on a non-exclusive basis" represented the |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|-----|---------------------------------------------------------------|---------------------------------------------------|
|  |  | parties' ultimate agreement on the exclusivity issue.  Importantly, the Letter of Intent does not contain any language providing Global with any form of exclusive rights or prohibiting National from dealing with financing sources aside from Global.  Smith Decl., Ex. 15, *passim*; Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 70:15-71:1.  Jacob Hodges admitted that National never promised Global any form of exclusivity.  Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 73:16-25.<br><br>Moreover, on July 15, 2010, Global's own counsel made clear to Mr. Hodges that National "will want a right to cancel if nothing happens within a time frame[.]"  Chiou Decl., Ex. 13.  One day later, after reviewing a draft of the Letter of Intent sent by Mr. Hodges, National again informed its financial advisor (Mr. Stukes) that the agreement "can't be [] exclusive as we need to keep working goldman and db [Deutsche Bank] in case they [Global] don't come through."  Chiou Decl., Ex. 14.  And when Mr. Stukes explained that Global was concerned about being turned away even if it obtained firm lending commitments by July 22, 2010, National reiterated that "[a]t the end we will see where goldman db [Deutsche Bank] and pearl[] chips fall. . . . and if they can deliver we |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | will kick the others to the curb," Chiou Decl., Ex. 15, and only agreed to take its "foot off the gas[.]" Chiou Decl., Ex. 1 (Joerger Dep. Tr) at 57:19-58:14; Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 200:21-201:11 . |
| 28. | NAC knew that Global needed a minimum of 60 days to complete the sale-leaseback of the aircraft. Smith Decl., Exh. 19. | **Objection (misleading).** Statement No. 28 is misleading to the extent it provides the false impression that National agreed that Global would have a minimum of 60 days from the signing of the Letter of Intent to close on all eight aircraft.<br><br>**Disputed** that National agreed that Global would have a minimum of 60 days to raise financing for all eight aircraft. The Letter of Intent incorporated closing dates based on the scheduled delivery dates for the aircraft. Smith Decl., Ex. 15 at 199. For at least three of the aircraft, the delivery dates required financing be secured in less than 60 days from the signing of the Letter of Intent, a fact which National communicated clearly to Global. *See* Smith Decl. Ex. 19 at 229. Furthermore, Mr. Hodges represented to National that he had begun soliciting funding from banks for approximately one month prior to the signing of the Letter of Intent and had "soft" commitments from lenders who were already "in committee." Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 27:22-29:17, 32:20-34:9; Chiou Decl., Ex. 12 (Alf |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | Dep. Tr.) at 214:9-215:12; Joerger Decl. ¶¶ 3-4. |
| 29. | The drafts (and final) Agreement explicitly set a closing date "[a]s soon as reasonably possible and in accord with the estimated delivery schedule as provided by Lessee." Smith Decl., Exh. 15. | **Undisputed.** |
| 30. | JAL set staggered closing dates with the last one closing on November 26, 2010.  Smith Decl., Exh. 20. | **Objection (misleading).**  Statement No. 30 mentions only the *last* closing date for the JAL aircraft, giving the false impression that Global had much more time under the Letter of Intent than it actually had to raise financing.  When the Letter of Intent was signed on July 18, 2010, the earliest JAL delivery date was set for August 30, 2010.  Chiou Decl., Ex. 16 at 244; Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 195:9-196:13.

Subject to that objection, **undisputed** that the JAL deal set staggered closing dates. |
| 31. | On the last day of the negotiations NAC requested and approved the promise under "Other" that Global "use its best efforts to deliver up to [NAC] on or before Thursday July 22, 2010 an MOU from a qualified lender to provide capital to purchase Aircraft under a loan/and or finance lease."  Smith Decl., Exh. 15. | **Objection (misleading).**  Statement No. 31 suggests that National did not discuss with Global the need for a lending commitment to satisfy JAL's demands until the day before the Letter of Intent was signed.  To the contrary, National communicated this need to Global from the very beginning.  Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 33:2-34:9; |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | Joerger Decl. ¶¶ 3-4.  Furthermore, Statement No. 31's use of the word "requested" misleadingly suggests that National is responsible for the wording of the best efforts clause.  In fact, Mr. Hodges drafted the best efforts clause with assistance from his counsel.  Chiou Decl., Ex. 2 (Hodges Dep. Tr) at 79:3-80:9.<br><br>Subject to that objection, **undisputed** that the "Other" section of the Letter of Intent contains the following "best efforts" clause: "The parties agree that Global will use its best efforts to deliver up to National on or before July 22, 2010 an MOU from a qualified lender to provide capital to purchase Aircraft under a loan/and or finance lease." Smith Decl., Ex. 15 at 203. |
| 32. | Global informed NAC that it would be virtually impossible to obtain a firm commitment from a lender by then.  Hodges Decl., at ¶ 13. | **Objection (improper evidentiary support).**  Statement No. 32 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).<br><br>Subject to that objection, **disputed.** Mr. Hodges repeatedly led National |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | to believe that he would be able to deliver the required commitment from a qualified lender by July 22, 2010.  On a July 17, 2010 conference call, Mr. Hodges represented to National that he already had soft commitments from lenders and that he would be able to turn those into a firm commitment by July 22, 2010, if National were to sign the Letter of Intent.  Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 47:18-50:3.  National signed the Letter of Intent based on Mr. Hodges' representations that he would be able to provide bank letters by July 22, 2010.  Smith Decl., Ex. 37; Joerger Decl. ¶ 4 ("National entered the letter of intent on July 18, 2010 because Mr. Hodges claimed that he had already arranged soft commitments for financing, so there was a high probability that he would be able to provide the firm commitment from a qualified lender by July 22, 2010.") |
| 33. | Stukes told NAC virtually the same thing.  Smith Decl., Exh. 21. | **Objection (misleading).**  The support cited by Global for Statement No. 33 is an email that post-dates the signing of the Letter of Intent on July 18.  *See* Smith Decl., Ex. 21.  <br><br> Subject to that objection, **disputed** that Mr. Hodges was excused from using his best efforts to provide a commitment letter due to timing issues.  *See* Chiou Decl.,  Ex. 1 |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
|  |  | (Joerger Dep. Tr.) at 33:4-34:9 and 47:18-50:3.  When National terminated its relationship with Global, Mr. Stukes explained to Mr. Hodges that National was doing so because Mr. Hodges had represented he could provide bank letters by July 22, 2010, and he had previously claimed to understand the exigency of doing so.  Smith Decl., Ex. 37; Joerger Decl. ¶ 4. |
| 34. | NAC insisted, explaining that some form of an MOU would help NAC demonstrate process to JAL.  Hodges Decl., at ¶ 13. | **Objection (improper evidentiary support).**  Statement No. 34 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). <br><br> Subject to that objection, **undisputed** that National insisted that Mr. Hodges use best efforts to provide a firm lending commitment by July 22, 2010 to show the JAL Trustee. <br><br> **Disputed** that the MOU was to "demonstrate process to JAL."  As Mr. Hodges knew, the MOU was needed to show JAL that National had secured a firm lending commitment, or else the JAL deal |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | would fall apart.  Chiou Decl, Ex. 1 (Joerger Dep. Tr.) at 33:4-34:9 and 47:18-50:3; Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 199:19-206:16 ("it was all understood on the call that he had to make it happen by that date or we're not going to buy an airplane"); Joerger Decl. ¶ 3.  Mr. Hodges had represented that he understood the JAL deal would fail without a letter from a qualified lender.  Chiou Decl., Ex. 17; Smith Decl. Ex. 37; Joerger Decl. ¶¶ 3-4.. |
| 35. | Global understood that including the language in the "Other" section of the Agreement was an accommodation for NAC.  Smith Decl., Exh. 2 [Hodges Depo. at 266:10-267:1]. | **Objection (misleading).**  Statement No. 35 is misleading to the extent it suggests the "best efforts" clause was anything less than an integral part of the Letter agreement.  Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 199:19-206:16.

Subject to that objection, **disputed** that the "Other" section was anything less than an integral part of the Letter agreement.  Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 199:19-200:20.  National informed Global of the urgent need for the MOU.  Chiou Decl, Ex. 1 (Joerger Dep. Tr.) at 33:4-34:9 and 47:18-50:3; Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 199:19-206:16; Joerger Decl. ¶¶ 3-4.  Global's own internal communications show that it understood that a firm lending commitment was required by the best efforts clause.  Smith Decl., Ex. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | 37; Chiou Decl., Exs. 17 & 18. |
| 36. | At no point did NAC suggest that the rest of the deal turned on whether Global could provide an MOU. Hodges Decl., at ¶ 14. | **Objection (improper evidentiary support).** Statement No. 36 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). <br><br> Subject to that objection, **disputed.** National was under intense pressure from the JAL Trustee to provide firm evidence of a financing commitment. Chiou Decl. Ex. 1 (Joerger Dep. Tr.) at 23:10-24:1 and 36:2-37:11; Chiou Decl. Ex. 12 (Alf Dep. Tr.) at 200:8-203:22; Joerger Decl. ¶ 3; *see also* Smith Decl. Ex. 31 at 301.  National informed Global that the MOU specified in the Letter of Intent was necessary if the JAL deal was to go forward.  Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 199:19-206:16; Joerger Decl. ¶¶ 3-4. |
| 37. | During negotiations, NAC deleted all references to operating leases in the Agreement.  Smith Decl., Exh. 22. | **Undisputed.** |
| 38. | Hodges responded, insisting that Global would not proceed further | **Undisputed** that Global requested that National agree to at least one |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|-----|-----------------------------------------------------------------|---------------------------------------------------|
|     | unless at least one aircraft lease was structured as an operating lease — as was originally discussed and agreed. Smith Decl., Exh. 23. | operating lease. **Disputed** that Mr. Hodges' request for an operating lease represented the parties' ultimate agreement.  In response to Mr. Hodges' request, National repeatedly informed him that it was not interested in an operating lease.  Chiou Decl., Exs. 19 & 20.  The Letter of Intent expressly gives National the "option" of choosing between finance and operating lease structures for each aircraft contemplated in the document.  Smith Decl. Ex. 15 at 199.  Tellingly, the Letter of Intent contains no requirement that National choose at least one operating lease.  *Id.*  Global admits that no one at National ever promised to choose at least one operating lease.  Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 76:5-21. |
| 39. | Neither Stukes nor NAC told Hodges that it would not commit to at least one operating lease.  Hodges Decl., at ¶ 12. | **Objection (misleading).**  The double-negative construction of Statement No. 39 creates the false impression that National misled Global about its intentions with respect to its choice of lease structures.  Rather, National repeatedly informed Global that it had no interest in operating leases.  Chiou Decl., Exs. 19 & 20.  Subject to those objections, **disputed.**  National repeatedly |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
|  |  | informed Global that it would not commit to an operating lease.  Chiou Decl., Exs. 19 & 20.  Moreover, Global admits that no one at National ever promised to choose at least one operating lease.  Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 76:5-21. |
| 40. | Global would have walked away if the Agreement did not require at least one operating lease.  Smith Decl., Exh. 2 [Hodges Depo. at 248:6-13]. | **Objection (legal conclusion).** Statement No. 40 makes a legal conclusion to the extent it suggests that the Letter of Intent "required" that National chose at least one operating lease, even though the Letter of Intent expressly provides National the "option" of choosing an operating lease.  Smith Decl., Ex. 15 at 199.<br><br>**Disputed.**  Mr. Hodges did not give the impression that he would "walk[] away" from any arrangement.  *See* Chiou Decl., Ex. 1 (Joerger Dep. Tr) at 43:5-44:8.  Indeed, rather than "walk[] away," Mr. Hodges drafted and entered into the Letter of Intent, which does not contain a provision requiring that National accept at least one operating lease.  Further, Global admits that National never promised to accept at least one operating lease, and National repeatedly informed Global that it would not commit to an operating lease.  Smith Decl., Ex. 15, *passim*;  Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 76:5-21; Chiou Decl., Exs. 19 & 20. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
|  |  |  |
| 41. | NAC told Global it would not continue to negotiate with others, yet NAC held a conference call with Goldman Sachs the day after it signed the Agreement with Global. Smith Decl., Exh. 24. | **Objection (misleading.)** The document cited as supporting Statement No. 41 does not mention anything about what National allegedly told Global about its negotiations with other lending sources. <br><br> Subject to that objection, **undisputed** that National continued to discuss financing with Goldman Sachs after signing the Letter of Intent. <br><br> **Disputed** that National ever told Mr. Hodges that it would cease discussing financing with other lenders. Rather, National informed Global that it needed to "keep working goldman [Sachs] and db [i.e., Deutsche Bank] in case they [Global] don't come through." Chiou Decl. Ex. 14. |
| 42. | On July 21, 2010, NAC met with Deutsche Bank and Goldman Sachs to discuss the financing of the exact same aircraft it agreed to sell and leaseback from Global. Smith Decl., Exh. 25 & 26. | **Undisputed.** |
| 43. | NAC's discussions internally and with Stukes also show that NAC always intended to terminate the Agreement four days after its execution regardless of whether | **Disputed.** National repeatedly informed Mr. Hodges that National needed to maintain the possibility of other financing sources in case Global proved unable to deliver a |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | Global used its best efforts to deliver up an MOU from a qualified lender in those four days.  Smith Decl., Exh. 27. | lending commitment by July 22, 2010, as contemplated by the Letter of Intent.  Chiou Decl., Exs. 14 & 15.  The document cited in support of Statement No. 43 is consistent with National's position.  Chiou Decl., Exs. 14 & 15.  National would commit to obtaining financing through Global under the assumption that Global would use its best efforts to deliver a firm commitment letter from a qualified lender by July 22, 2010.  "At the end we will see where goldman db [Deutsche Bank] and pearl[] chips fall. . . . and if [pearl] can deliver we will kick the others to the curb."  Chiou Decl., Ex. 15. |
| 44. | On July 17, 2010, Joerger sent an internal email stating that "if they [Global] can't get it done by Thurs [July 22], we may have to go to DB [Deutsche Bank]." Smith Decl., Exh. 28. | **Undisputed.** |
| 45. | NAC told Global its prior contacts were limited to two or three lenders.  Hodges Decl., at ¶ 18. | **Disputed.** National did not make such representations to Mr. Hodges or anyone else at Global.  Joerger Decl. ¶ 5 ("Before the letter of intent was executed, neither I (nor anyone else at National) told Global that National's prior contacts with possible sources of financing were limited to two or three lenders."). |
| 46. | NAC contacted more than a dozen lenders.  Smith Decl., Exh. 29 & 30. | **Undisputed.** |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | |
| 47. | This caused confusion and made Global's job even harder. Hodges Decl., at ¶ 18; Smith Decl., Exh. 31. | **Disputed.**  Global's First Amended Complaint contends that National "used Global to 'prime the market' by spreading the word to potential lenders that NAC was seeking to finance aircraft acquisitions."  ECF No. 23 at ¶ 42.  Thus, according to Global's own theory of the case, National's contacts of potential lenders actually made Global's job easier, not "even harder." |
| 48. | NAC also told Global that it was committed to the purchase of the JAL aircraft. Hodges Decl., at ¶ 13. | **Objection (improper evidentiary support).**  Statement No. 48 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). <br><br> Subject to that objection, **undisputed** that National was committed to doing what it was required to purchase the JAL aircraft. <br><br> **Disputed** that National's commitment meant the deal would not be jeopardized if National was unable to provide the JAL Trustee with a firm lending commitment by |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | July 22.  National incorporates its response to Statement No. 36. |
| 49. | Before signing the Agreement Global conducted due diligence on the aircraft's technical condition, prepared marketing materials, including credit write-ups and requests for proposals, and was soliciting general lender interest to determine what pricing was achievable. Hodges Decl., at ¶ 16. | **Objection (improper evidentiary support).**  Statement No. 49 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).<br><br>Subject to that objection, **disputed.** Global has not produced any documents supporting its claims in Statement No. 49.  *See* Chiou Decl. ¶ 2.  In particular, there is no evidence that Global contacted any lenders about the leases contemplated in the Letter of Intent prior to July 18.  *Id.* To the contrary, Global's internal emails demonstrate that Global did not begin to "hit the phones hard" to secure lending until after the Letter of Intent was signed. Chiou Decl., Ex. 10.  Moreover, Mr. Hodges acknowledged that the request for proposal that Global had sent to lenders was incomplete.  Chiou Decl., Ex. 21. Internal emails produced by Global also show that its credit write-up was not completed until July 27, 2010.  Chiou Decl., Exs. 22 & 23. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|-----|---|---|
|  |  |  |
| 50. | Upon finalizing the Agreement, Global's effort and time commitment to the deal multiplied. Hodges Decl., at ¶ 17. | **Objection (improper evidentiary support).** Statement No. 50 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). <br><br> Subject to that objection, **undisputed** that Global's efforts on National's behalf may have increased after signing the Letter of Intent. <br><br> **Disputed** that Global's efforts and time commitment constituted "best efforts" under the Letter of Intent. Mr. Hodges spent time and effort organizing Global BTG LLC in the days after signing the agreement. Smith Decl., Ex. 41; Chiou Decl., Exs. 24, 25 & 26.  Mr. Hodges also spent this critical time attempting to organize an advisory board.  Chiou Decl., Exs. 27 & 28.  Mr. Hodges acknowledged that the request for proposal that Global had sent to lenders was incomplete.  Chiou Decl., Ex. 21.  Internal emails produced by Global show that its credit write-up was not completed until July 27, 2010.  Chiou Decl., |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | Exs. 22 & 23. |
| 51. | In the week following the execution of the Agreement, Global contacted and distributed requests for proposals to financing sources from around the world. Hodges Decl., at ¶ 17. | **Objection (improper evidentiary support).** Statement No. 51 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).<br><br>Subject to that objection, **undisputed** that Global contacted possible sources of financing in the days following signing the Letter of Intent.<br><br>**Disputed** that Global's efforts in the days following the signing of the Letter of Intent constituted "best efforts" under the Letter of Intent. National incorporates its response to Statement No. 50. |
| 52. | By July 20, 2010, less than two days after Global received the executed Agreement, Global had received a strong expression of interest from Perot Investments to finance up to two of the 747s. Smith Decl., Exh. 32. | **Disputed.** Emails between Mr. Hodges and Perot Investments show that Perot was not interested in financing the deal on the terms outlined in the Letter of Intent. Chiou Decl., Ex. 29. Perot testified that it was not willing to write a commitment letter on July 23, 2010. Chiou Decl., Ex. 30 (Perot Dep. Tr.) |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
|  |  | at 314:1-5.  After litigation in this case commenced, Mr. Hodges drafted and sent Perot Investments a declaration attempting to secure testimony regarding Perot's interest in the deal.  Chiou Decl., Ex. 31. Perot refused to provide Global with its requested declaration and testified at its deposition that many of the declaration's representations were inaccurate.  Chiou Decl, Ex.30 (Perot Dep. Tr.) at 317:12-327:22. |
| 53. | Global updated NAC on the morning of July 22nd with a draft MOU showing lender interest.  Smith Decl., Exh. 33. | **Undisputed** that Global provided National with a document it called a "MOU" on July 22, 2010.<br><br>**Disputed** that that the MOU contained or reflected firm commitments from qualified lenders. *See* Smith Decl., Ex. 33. |
| 54. | Global also thought that Citibank was interested.  Smith Decl., Exh. 34. | **Undisputed** that Global represented that Citibank was interested.<br><br>**Disputed** that Global had any basis for making this representation to National.  Internal emails produced by Citibank state that it had "zero interest" in the deal.  Chiou Decl., Ex. 32; Chiou Decl., Ex. 33 (Citibank Dep. Tr.) at 339:10-14. |
| 55. | Hodges spoke with David Silvers at Citibank.  Smith Decl., Exh. 34. | **Undisputed.** |
| 56. | Mr. Silvers did not provide | **Objection (legal conclusion).** |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | deposition testimony. Mr. Silver's manager, Gary Rothschild, testified that Citibank was not interested in the transaction. Mr. Rothschild did not testify to Mr. Silver's communications with Hodges. Smith Decl., Exh. 4 [Rothschild Depo. at 39:10-22;65: 8-14; 109:25-110:14]. | Statement No. 56 suggests that the deposition testimony of Citibank's 30(b)(6) witness is not relevant, which is a legal conclusion, not a fact.<br><br>Subject to that objection, **undisputed** that Mr. Rothschild testified in his capacity as Citibank's designated corporate representative. |
| 57. | Hodges updated Stukes on the morning of July 23. Hodges told Stukes that Global expected to obtain financing from Citibank and Perot Investments; and that Global was making significant progress with other lenders, around the globe. Global was "truly working around the clock on this." Smith Decl., Exh. 34. | **Undisputed** that Mr. Hodges sent Mr. Stukes an update on July 23, 2010.<br><br>**Disputed** that Mr. Hodges' update was accurate. National incorporates its response to Statement Nos. 50, 52, and 54. |
| 58. | Within hours of Hodges's July 23rd update, NAC, through Stukes, emailed Hodges and said that although NAC appreciated Global's hard work, Global's "mandate to represent NAC has been terminated effective immediately." Smith Decl., Exh. 36 [Global004219]. | **Undisputed.** |
| 59. | Hodges quickly responded to NAC's statement. Hodges wrote that the purported "termination" was a breach of the agreement. Smith Decl., Exh. 36. | **Undisputed.** |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| **60.** | Hodges requested that NAC and Stukes discuss a reasonable resolution.  Smith Decl., Exh. 36. | **Undisputed** that, shortly after receiving National's termination notice, Global began sending National emails attempting to secure either an "upfront cash payment" or an "outright sale … with no lease back" of some of the aircraft.  Smith Decl., Ex. 59 at 565.<br><br>**Disputed** that the "resolution" proposed by Global was "reasonable."  Global initially requested either an "upfront cash payment" or an "outright sale … with no lease back" of some of the aircraft.  *Id.*  Later it became clear that Global was seeking "a minimum breakage fee [of] $1.5 million plus a fee with respect to any financial firms contacted by us who participates in a transaction structure by Goldman or anyone else in the next year."  Chiou Decl., Ex. 34.  Eventually, Global was demanding that Global pay the $1.5 million "breakage fee" *and* one aircraft under an operating lease with Global.  Chiou Decl., Ex. 35.  National disputes that a settlement of at least $1.5 million is reasonable. |
| **61.** | Stukes and NAC denied any wrongdoing and refused to discuss any accommodations with Hodges.  Smith Decl., Exh. 37. | **Undisputed.** |
| **62.** | Global had rights to lease the Air | **Disputed**.  The Letter of Intent did |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | France aircraft.  Smith Decl., Exh. 15. | not grant Global the rights to lease the Air France aircraft.  Smith Decl., Ex. 15, *passim.* |
| 63. | NAC signed an exclusive agreement with Goldman Sachs the same day it terminated the LOI with Global.  Smith Decl., Exh. 38. | **Undisputed.** |
| 64. | Ultimately, Goldman Sachs found financing for NAC from BlackRock Management LLC.  The financing closed in two parts, the first on September 2, 2010, and the second October 8, 2010.  Smith Decl., Exh. 39; & 40. | **Undisputed.** |
| 65. | This Court ruled, on October 13, 2011, that:<br><br>"Although Plaintiff did not exist as a legal entity at the time the contract was entered into, Plaintiff has pled sufficient facts showing its authority to enforce the contract. The Court finds that Plaintiff has pled sufficient facts showing its ability to enforce the contract through the doctrine of LLC by estoppel." Order on Motion to Dismiss Amended Complaint, Dkt No. 35 at 4:23-5:1. | **Objection (legal conclusion).**  The Court's October 13, 2011 ruling speaks for itself and is not a "fact."<br><br>Subject to that objection, **undisputed** that Statement No. 65 is an excerpt from the Court's October 13, 2011 order**.** |
| 66. | Global filed its articles of organization with the Nevada Secretary of State on July 20, 2010.  Smith Decl., Exh. 41. | **Undisputed.** |

National's Statement of Genuine Disputes of Material Fact

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| **67.** | Hodges contemplated forming Global as a Nevada limited liability company as far back as December 11, 2008, when Stuart Warren reserved the name Global BTG LLC with the Nevada Secretary of State. Hodges Decl., at ¶ 3. | **Undisputed** that Mr. Hodges reserved the name Global BTG LLC with the Nevada Secretary of State on December 11, 2008.<br><br>**Disputed** that the "Global" entity purportedly contemplated by Mr. Hodges in December 11, 2008 represented the same entity formed on July 20, 2010.  For example, according to Global's own documents, the entity contemplated in December 11, 2008 was not a single-member LLC, but considered including Bill Lindsey and Mike Grella as principals.  Chiou Decl., Exs. 36 & 37. |
| **68.** | On May 9, 2010, Hodges purchased and registered the domain name www. Globalbtg.com on behalf of Global.  Smith Decl., Exh. 42; Hodges Decl., at ¶ 5. | **Undisputed.** |
| **69.** | Neither NAC nor NAC agent Don Stukes ever asked Hodges or anyone associated with Global any questions about Global's organizational status. Hodges Decl., at ¶ 11. | **Objection (misleading).**  Statement No. 69 creates the false impression that, assuming *arguendo* National did not ask Mr. Hodges "any questions about Global's organizational status," this meant that National knew that Global did not exist when the Letter of Intent was executed on July 18, 2010.<br><br>**Objection (improper evidentiary support).**  Statement No. 69 is supported only by a "conclusory, |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). |
| | | Subject to these objections, **disputed**.  Mr. Hodges did not inform National that Global BTG had not yet legally organized.  Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 67:23-68:1; Chiou Decl. Ex. 38 at 356-57 (Global's Responses to National's First Set of Interrogatories); *see also* Chiou Decl., Ex. 39 at ¶ 5.  Neither was National independently aware of Global BTG's organizational status at that time.  Chiou Decl., Ex. 40 at 14-16 (National's Supplemental Responses to First Set of Interrogatories from Jacob Hodges); Chiou Decl., Ex. 39 at ¶ 6.  National did not inquire into Global's organizational status because it believed Mr. Hodges when he falsely claimed to be the "Managing Director" of a corporation called "Global BTG, Inc."  Mr. Hodges had represented that Global was a corporation in the Letter of Intent.  Smith Decl., Ex. 15 at 204. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| 70. | Neither Stukes nor anyone from NAC ever showed any interest whatsoever in Global's organizational status. Hodges Decl., at ¶ 11. | **Objection (improper evidentiary support).** Statement No. 70 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).<br><br>Subject to those objections, National incorporates its response to Statement No. 69. |
| 71. | Hodges always intended that Global BTG LLC be bound and benefited by the Agreement with NAC. Hodges Decl., at ¶ 10. | **Objection (improper evidentiary support).** Statement No. 71 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).<br><br>Subject to that objection, **disputed.** Mr. Hodges signed the Letter of Intent purportedly as the "managing director" of "Global BTG, Inc." Smith Decl., Ex. 15 at 204. |
| 72. | Hodges acted as the sole member of Global. Hodges Decl., at ¶ 10. | **Objection (improper evidentiary support).** Statement No. 72 is |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). **Objection (misleading).** Global filed its articles of organization naming Mr. Hodges as the sole member of Global with the Nevada Secretary of State on July 20, 2010. Mr. Hodges was not the sole member of Global prior to that time, as Global did not exist. |
| 73. | Hodges executed a lawful assignment on July 15, 2011, assigning all rights and interests retained in the LOI with NAC to Global. Smith Decl., Exh. 43. | **Objection (legal conclusion).** Statement No. 73 characterizes the July 15, 2011 document as a "lawful assignment . . . assigning all rights and interests retained in the LOI with NAC to Global," which is a legal conclusion, not a fact. Subject to that objection, **undisputed** that Mr. Hodges signed a document on July 1, 2011 that purported to assign all his rights and interests in the Letter of Intent to Global. |
| 74. | NAC dealt with Hodges as the sole member of Global, referring in writing to Global BTG LLC as the | **Disputed.** National signed a Letter of Intent with "Global BTG, Inc." Smith Decl., Ex. 15 at 204. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | organization NAC contracted with and who NAC expected to perform. Smith Decl., Exh. 44 [Joerger Depo. at 278:8-279:3]; Exh. 45, 46,47 & 15. | Moreover, the evidence cited by Global does not indicate that National was dealing with Mr. Hodges in his capacity "as the sole member of Global," but rather National was dealing with Mr. Hodges as an individual. *See* Smith Decl. Ex. 44 [Joerger Depo. at 278:8-279:3]; Exhs. 45, 46,47 & 15. Further, National could not have dealt with Mr. Hodges in his capacity "as the sole member of Global" until after July 20, 2010, the day after Global was legally formed. Smith Decl., Ex. 41. |
| 75. | On July 8, 2010, Hodges instructed Stuart Warren to reserve the name Global BTG LLC and prepare organizational papers for registering Global as a Nevada limited liability company. Smith Decl., Exh. 48. | **Undisputed.** |
| 76. | On July 12, 2010, Hodges sent an email to a relative asking him to serve as Global's Nevada agent for service of process. Smith Decl., Exh. 49. | **Undisputed.** |
| 77. | A typographical or ministerial error caused Global BTG, Inc. to be named under Hodges's signature on the LOI.  This error was present in the first draft Global sent to NAC's agent Stukes on July 15, 2010. Hodges did not notice the error when he signed the LOI. Hodges Decl., | **Disputed.**  The fact that the term "Global BTG, Inc." was present in multiple drafts of the Letter of Intent prepared by Global over several days suggests that it was not simply the result of a mere typographical or ministerial error.  *See*, *e.g.*, Smith Decl., Ex. 15 at 204; *id.*, Ex. 16 at |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | at ¶ 15; Smith Decl., Exh. 15 & 45. | 213; *id.*, Ex. 45 at 367. |
| 78. | Hodges intended that his signature on the LOI was in his capacity as the sole member of Global. Hodges Decl. at, ¶ 15. | **Objection (improper evidentiary support).**  Statement No. 78 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).<br><br>Subject to that objection, **disputed.** Mr. Hodges' purported intentions are belied by the fact that he did not file articles of organization with the Nevada Secretary of State until July 20, 2010 — after he signed the Letter of Intent.  *See* Smith Decl., Ex. 41. |
| 79. | Hodges intended that Global assume all obligations and received all benefits from the Agreement. Hodges Decl. at ¶ 15. | **Objection (improper evidentiary support).**  Statement No. 79 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | Subject to that objection, National incorporates its response to Statement No. 78. |
| 80. | On July 15, 2010 Stukes told NAC that Global was not affiliated with Pearl. Smith Decl., Exh. 35. | **Objection (misleading).**  Statement No. 80 is misleading to the extent that it suggests the supporting document states that "Global was not affiliated with Pearl."  Instead, the document says, "Direct JAL to Green Rock Capital's website and not Pearl.  Jacob is now doing this deal through Green Rock."  *See* Smith Decl., Ex. 35.<br><br>Subject to that objection, **undisputed** that Mr. Stukes told National on July 15, 2010, would now involve an entity called "Green Rock Capital."<br><br>**Disputed** that National understood Pearl Aircraft would have no part whatsoever in the transaction**.**  In the evidence cited by Global, Mr. Stukes told National that Mr. Hodges was "doing this deal through Green Rock," but Mr. Stukes did not inform National that Global or Mr. Hodges was not affiliated with Pearl. *See* Smith Decl., Ex. 35.<br><br>To the contrary, Mr. Hodges claimed to be a principal of Bermuda-based Pearl Aircraft Corporation, a financing company with significant investment capital at its disposal. Chiou Decl., Ex. 1 (Joerger Dep. Tr.) |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | at 16:7-12; Chiou Decl., Exs. 9 & 41. On June 20, 2010, Mr. Stukes had sent an email to Mr. Hodges, asking the name of the company he would be doing the deal under.  Chiou Decl., Ex. 7.  Afterwards, National prepared a non-disclosure agreement for "Pearl Aviation Corporation," using Pearl Aircraft's official address in Bermuda, and emailed Mr. Hodges log-in information to its secured proprietary electronic database with the username "PearlAviation."  Chiou Decl., Exs. 8 & 43.  And Mr. Stukes began referring to Jacob Hodges as "Pearl." *See*, *e.g.*, Chiou Decl., Ex. 6 (Stukes Dep. Tr.) at 143:12-144:15; Chiou Decl., Ex. 9. Based on these and other representations, National believed that both Global BTG and Green Rock were "special purpose entities" affiliated with Pearl Aircraft and created for the purpose of the contemplated transaction with National.  *See* Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 15:15-16:6 and 40:12-18. |
| 81. | Hodges was unaware of all the internal communications between NAC executives and Stukes referring to "Pearl."  In fact, he did not learn that NAC referred to Global as Pearl until discovery. Hodges Decl., | **Objection (improper evidentiary support).**  Statement No. 81 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
|  | at ¶ 20. | create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).<br><br>Subjection to that objection, **disputed**.  National incorporates its response to Statement No. 80. |
| 82. | NAC admits it did not know that Global was officially organized two days after the LOI was signed until the lawsuit was filed.  Answer & Counterclaim, Dkt No. 37 at p. 15 ¶ 36. | **Undisputed.** |
| 83. | NAC argued in its first motion to dismiss that the Letter of Intent is "not an enforceable agreement because Global did not exist at the time of the contract."  Defendant's Motion to Dismiss, Dkt No. 9 at p. 9:17-19. | **Objection (legal conclusion).** National's motion to dismiss, ECF No. 9, speaks for itself and is not a "fact."<br><br>Subject to that objection, **undisputed** that National moved to dismiss Global's initial complaint because Global was not legally organized when Mr. Hodges signed the Letter of Intent on July 18, 2010. |
| 84. | Judge Lew ruled in NAC's favor but also concluded that Global pleaded sufficient facts to "establish that Plaintiff has standing to bring this current Action."  Order re: Defendant's Motion to Dismiss Case, Dkt No. 19 at p. 2:25-27. | **Objection (legal conclusion).**  The Court's June 29, 2011 Order speaks for itself and is not a "fact."<br><br>Subject to that objection, **undisputed** that the excerpt is an accurate quote from the Court's June |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | 29, 2011 Order. |
| 85. | Global repleaded its allegations on the capacity issue.  NAC moved to dismiss again, on the same grounds, contending that the "meagerness of the additional facts in the Amended Complaint only makes clear there is no exception in the law that will allow this plaintiff to bring a claim on a contract that was purportedly executed before it even existed and was signed on behalf of an entirely different entity that still does not exist." Motion to Dismiss Amended Complaint, Dkt No. 27 at p. 1:11-16. | **Objection (legal conclusion).** National's motion to dismiss, ECF No. 27, speaks for itself and is not a "fact."<br><br>Subject to that objection, **undisputed** that National moved to dismiss Global's claims because Global lacked the capacity to enter into or enforce the Letter of Intent. |
| 86. | Judge Lew ruled on October 13, 2010, that Global pleaded adequate facts which, if proven true, showed that Global had the capacity to sue – '[t]hough Plaintiff was not a validly formed LLC at the time of contracting, the Court finds that the First Amended Complaint alleges facts necessary to support a LLC by estoppel theory." Order Denying Motion to Dismiss Amended Complaint, Dkt No. 35 at p. 5:21-25. | **Objection (legal conclusion).**  The Court's October 13, 2011 Order speaks for itself and is not a "fact."<br><br>**Objection (misleading and incomplete).**  Judge Lew ruled that Global must show National "had actual knowledge that Plaintiff was not an LLC but chose to deal with Plaintiff as an LLC regardless" to claim the limited LLC-by-estoppel exception.  ECF No. 19 at 6.<br><br>Subjection to these objections, **undisputed** that the excerpt is an accurate quote from the Court's October 13, 2011 Order. |
| 87. | Immediately following execution of the Agreement, "Global focused all | **Undisputed** that after signing the Letter of Intent, Global made some |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | its efforts on fulfilling its obligations under the Agreement." Smith Decl., Exh. 50, 51, 52, 53, 54 & 55. | efforts to secure financing for the contemplated deal.<br><br>**Disputed** that Global "focused all its efforts" to raising financing for National.  National incorporates its response to Statement No. 50. |
| 88. | Global, not Hodges or any other entity, distributed requests for proposals and contacted financing sources around the world. Smith Decl.,  Exh. 50, 51, 52, 53, 54 & 55. | **Disputed** that Global "distributed requests for proposals and contacted financing sources around the world."  Global was legally formed on July 20, 2010 at about 11:53 a.m.  *See* Smith Decl., Ex. 41.  Global could not have taken any actions before that date and time.  The evidence relied on by Global shows that certain contacts were made by Hodges before Global was formed.  Accordingly, these contacts were made by Hodges in his individual capacity.  *See* Smith Decl., Exs. 50, 51, 52 (July 19, 2010 contacts); Exs. 53, 54, 55 (July 20, 2010 contacts at approximately 3:00 a.m., before Global was legally formed). |
| 89. | Global updated NAC on its progress in finding financing on short notice. Smith Decl., Exh. 34. | National incorporates its response to Statement No. 57. |
| 90. | Global claimed its rights under the Agreement when NAC terminated the agreement—sending demand letters and making efforts to save the deal. Smith Decl., Exh. 56, 57, 58 & 59. | National incorporates its response to Statement No. 60. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|-----|-----------------------------------------------------------------|---------------------------------------------------|
| | | |
| 91. | In the face of NAC's allegation that the Agreement was a revocable mandate, Global, not Hodges, asserted that it had entered into a binding contract. Smith Decl., Exh. 56, 57, 58 & 59. | **Objection (legal conclusion).** Statement No. 91 characterizes the Letter of Intent as a "binding contract" as opposed to a "revocable mandate," which is a legal conclusion, not a fact.<br><br>Subject to that objection, **undisputed** that Global began to refer to the Letter of Intent as a binding agreement for the sale and lease of the aircraft after National ended its relationship with Global.<br><br>**Disputed** that "Global asserted it had entered into a binding contract." When the Letter of Intent was executed, the parties agreed that it was a non-exclusive mandate. National incorporates its response to Statement No. 18. |
| 92. | Glen Joerger testified that "[w]e did not agree in any way, shape or form that he had past Thursday July 22nd to say well, I've done my best and I just need a few more days." Smith Decl., Exh. 44 [Joerger Depo. at 283:14-284:11]. | **Undisputed.** |
| 93. | Hodges's testimony about drafting the "Other" section in the LOI explains that the "best efforts" promise in that section was separate and apart from the sale leaseback commitments NAC made. Smith | **Objection (legal conclusion).** Statement No. 93 characterizes the best efforts clause of the "Letter of Intent" as "separate and apart" from the rest of the agreement, which is a legal conclusion, not a fact. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | Decl., Exh. 2 [Hodges Depo. at 264:2-270:22]. | **Objection (misleading).** Mr. Hodges' testimony cited in support of Statement No. 93 does not state that the best efforts clause was understood to be "separate and apart from the sale leaseback commitments." Subject to that objection, **disputed**. National understood that the best efforts clause was an integral part of the parties' obligations and agreement. National incorporates its response to Statement Nos. 34, 35, and 36. |
| 94. | Mr. Warren also testified that Global understood that this obligation was not a prerequisite to the sale and leaseback. Smith Decl., Exh. 7 [Warren Depo. at 150:20- 152:10]. | **Disputed**. National incorporates its response to Statement Nos. 34, 35, and 36. |
| 95. | Global's experts, and even NAC's own expert, uniformly testified that an agreement to arrange the sale and leaseback of aircraft such as this could be expected to have an implied term of thirty to ninety days. Smith Decl., Exh. 8[Weinroth Depo at 64:13-64:23; 1]; Exh. 1 [Cox Depo at 115:9-23]. | **Objection (misleading).** Statement No. 95 suggests that National's expert testified that the Letter of Intent could be expected to have an implied term of thirty to ninety days, but it does not cite any evidence from National's experts to support this claim. Furthermore, Global's expert Michael Cox testimony stated that financing of the sort contemplated by the Letter of Intent is typically raised in 30 to 60 days, |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | measured from first going to market to closing.  Smith Decl., Ex. 8 (Weinroth Dep. Tr.) at 64:13- 64:23; Smith Decl., Ex. 1 (Cox Dep. Tr.) at 115:9-20.<br><br>**Objection (legal conclusion).** Statement No. 95 characterizes the Letter of Intent agreement as a "sale and leaseback" of aircraft, which is a legal conclusion, not a fact. Furthermore, Statement No. 95 draws a legal conclusion based upon testimony regarding industry custom, which is a legal argument, not a fact.<br><br>Subject to those objections, **disputed** that the parties intended the Letter of Intent to have an implied term of thirty to ninety days, regardless of the best efforts requirement. National incorporates its response to Statement Nos. 21, 24, 28, and 30. |
| 96. | No industry expert would expect this agreement to require a financing commitment from Global within days of signing the agreement. Smith Decl., Exh. 3 [McFarlane Depo. at 152:16-154:19]. | **Objection (misleading).**  Statement No. 96 is misleading because it suggests that the cited testimony addressed when the parties expected Global to obtain financing.  Instead, the cited testimony pertains to a hypothetical situation about the differences in interest rates that National would have obtained under different timing scenarios.  *See* Smith Decl., Ex. 3 at 152:16-153:7.<br><br>**Undisputed** that securing financing within a few days is not typical. |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | **Disputed** that National expected Global to secure financing in a matter of days, since Global had represented to National that Global had been discussing the deal with lenders for approximately a month prior to the signing of the Letter of Intent.  National incorporates its response to Statement No. 24. |
| 97. | On July 16, 2010, NAC proposed that Page 1 read: "If acceptable financing is not available to permit Aircraft to be purchased, leased, or financed at projected price and rates, plus or minus 10% *or if [NAC] receives a firm commitment from another financial institution*, then the number of aircraft may be reduced." Smith Decl., Exh. 15. | **Undisputed.** |
| 98. | Global, through Stukes, told NAC that Global would "not proceed on a non-exclusive basis.  That's a non-starter for [Global]." Smith Decl., Exh. 17. | **Disputed.**  National incorporates its response to Statement No. 27. |
| 99. | On July 17, 2010, Stukes again told NAC "they are not going to proceed on a non-exclusive basis and I understand why."  Smith Decl., Exh. 18. | **Disputed.**  National incorporates its response to Statement No. 27. |
| 100. | NAC's expert, Kevin McFarlane, | **Undisputed.** |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | opined that NAC lost (a) a small portion of its deposit with JAL as a result of choosing not to complete the transaction ($154,000); (b) $7.5 million because the Air France financing was purportedly worse than NAC should have obtained; (c) profits from the use of the five aircraft in NAC's fleet  ($55.3 to $75 million);  and (d) profits from the loss of economies of scale from the purchase of only three aircraft instead of all eight. Smith Decl., Exh. 60 [McFarlane Report at 7]. | |
| 101. | Global received assurances throughout that the JAL aircraft sale was not at risk. Hodges Decl., at ¶ 13. | **Objection (improper evidentiary support).**  Statement No. 101 is supported only by a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence [which is] insufficient to create a genuine issue of material fact."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).  Subject to that objection, **disputed.**  National incorporates its response to Statement Nos. 34, 48. |
| 102. | Global's expert, Stuart Weinroth, identified numerous wildly optimistic and speculative assumptions on which McFarlane relies, such as:<br>    •    The assumption that | **Objection (misleading).**  Statement No. 102 contends that Mr. McFarlane's report assumed that flights under the CRAF program would increase, when McFarlane |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
|  | U.S. DOD contracted flying will increase in the future;<br>    • The assumption that NAC could have bid competitively against FedEx and UPS for contracts;<br>    • The assumption that NAC captured 16% of the CRAF market and held it for the entire twenty year damages calculation;<br>    • The assumption that NAC could profitably operate non-CRAF charter contracts, known as ACMI contracts;<br>• The assumption that NAC's CRAF and ACMI program revenues, costs and direct contributions would equal or exceed that of the only outside data point consulted by McFarlane, Atlas Air. Smith Decl., Exh. 61 [Weinroth Rebuttal Report to McFarlane, Section 5]. | assumes that they will remain constant. *See* Smith Decl., Ex. 60 at 578.<br><br>**Objection (legal conclusion).** Statement No. 102 characterizes Mr. McFarlane's lost profits calculations as "speculative," which is a legal conclusion, not a fact.<br><br>**Disputed.** Mr. McFarlane's report assumed the level of contracted flying would remain constant, based on National's own projections and those of comparable cargo freighters. *See* Smith Decl. Ex. 60. Global's expert agreed that this was a reasonable approach. *See* Chiou Decl., Ex. 11 (Weinroth Dep. Tr.) at 175:20-176:11. Global's expert also testified that his rebuttal report did not challenge National's assumptions or projections. *Id.* at 173:19-22. ("Q: You think your rebuttal report does not attack National's business plan or its assumptions or projections. A: Yes."). National's expert adjusted the discount rate to accommodate uncertainties in the projections, which Global's expert testified was reasonable. *Id.* at 182:6-183:8. |
| 103. | McFarlane himself, when deposed about his report, conceded that the AICPA guidance he professed to follow set a limit of six years on this lost profits calculation, not twenty. | **Objection (misleading).** Statement No. 103 mischaracterizes Mr. McFarlane's testimony, which did not concede that the six year limit was appropriate in this instance. *See* |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | Smith Decl., Exh. 3 [McFarlane Depo. at 140:2-146:11]. | Smith Decl., Ex. 3 at 145:1-146:8.<br><br>**Objection (legal conclusion).** Statement No. 103 makes a conclusion about how the AICPA guidelines should be applied to the facts of this case, which is a legal conclusion.<br><br>Subject to those objections, **undisputed** that the AICPA guidelines state, as a general rule, that lost profits "will be computed through the earlier of the return of the business to customary levels or the end of the term of the contract." Chiou Decl., Ex.44.<br><br>**Disputed** that the length of the contract is the appropriate measure of lost profits in this case, rather than the life-expectancy of the aircraft, where the length of the contract has no bearing on National's profits from the use of the aircraft.<br><br>**Disputed** to the extent that Global argues that Mr. McFarlane did not follow AICPA guidelines.  Chiou Decl., Ex. 45 at 492:22-494:9 (Mr. McFarlane testified that his expert report followed AICPA standards and that he generally adheres to AICPA standards). |
| 104. | McFarlane admitted his report made no assumptions about NAC mitigating damages.  Smith Decl., | **Objection (misleading).**  Global's Motion cites to Statement No. 104 for the contention that "McFarlane |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | Exh. 3 [McFarlane Depo. at 158:6-161:2]. | admitted his report was unreliable because it made no assumptions about NAC mitigating damages." Mot. at 24:25-26.  Mr. McFarlane, however, never "admitted" that his report was "unreliable" because it did not account for mitigation.  *See* Smith Decl., Ex. 3 at 158:6-161:2.<br><br>Subject to that objection, **undisputed** that Mr. McFarlane did not make assumptions regarding mitigation of damages. |
| 105. | McFarlane admitted to drawing all his conclusions about lost profits based on data fed him by NAC management and limited public data available about one potential competitor – Atlas Air. Smith Decl., Exh. 3 [McFarlane Depo. at 201:25-205:16]. | **Undisputed** that Mr. McFarlane's report relies on projections provided by National and makes a comparison with one competitor.<br><br>**Disputed** that it was unreasonable for National's expert to rely on data provided by National and to use Atlas Air as a comparable business. Global's expert testified that it was reasonable for National's expert to rely on projections provided by National.  Chiou Decl., Ex. 11 (Weinroth Dep. Tr.) at 175:20-176:11.  Furthermore, Global's expert also testified that his rebuttal report did not challenge National's assumptions or projections.  *Id.* at 173:19-22 ("Q: You think your rebuttal report does not attack National's business plan or its assumptions or projections.  A: Yes.").  Global's expert also testified that Atlas Air was the only |

| No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| | | comparable company which was publically traded and whose data is readily available. *See id.* at 176:12-180:9. |

## II.    ADDITIONAL FACTS IN OPPOSITION TO GLOBAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT

| No. | National's Additional Facts in Opposition to Global's Summary Judgment Motion | Supporting Evidence |
|---|---|---|
| 106. | National is a global freight services company. | Chiou Decl., Ex. 12 at 189:9-12 (Alf Dep. Tr.). |
| 107. | National was scheduled to take delivery of the first Air France aircraft on July 30, 2010. | Smith Decl. Ex. 20. |
| 108. | The JAL aircraft were being sold in the midst of Japanese bankruptcy proceedings, which required JAL's bankruptcy trustee to operate under tight deadlines. | Chiou Decl., Ex. 12 at 192:4-15 and 209:22-211:13 (Alf Dep. Tr.). |
| 109. | Donald Stukes contacted Goldman Sachs Group, Citibank, Deutsche Bank AG, and others as possible sources of funding for the purchase of the eight Air France and JAL aircraft. | Chiou Decl., Ex. 46 (6/14/2010 email); Chiou Decl. Ex. 47 (6/17/2010 email). |
| 110. | Donald Stukes contacted Jacob Hodges as a possible funding source and told him that "time is of the essence" and he "must act fast." | Chiou Decl., Ex. 48 (6/19/2010 email). |

| No. | National's Additional Facts in Opposition to Global's Summary Judgment Motion | Supporting Evidence |
|---|---|---|
| | | |
| 111. | National was told that Mr. Hodges, with his purported connections, would be able to put together a financing deal quickly and on good terms for National. | Chiou Decl., Ex. 1 at 17:11-22 (Joerger Dep. Tr.). |
| 112. | Jacob Hodges sent an email on May 13, 2010 in which he claimed to be a "managing director" of Pearl Aircraft Corporation. | Chiou Decl., Ex. 42 at 403 (6/7/2010 email). |
| 113. | On May 27, 2010, Jacob Hodges sent an email to Clive Bowen with the signature line: "Jacob Hodges Pearl Aircraft Corporation Ltd. Los Angeles, CA Mobile + 1 805-405-9211 Email: Jacob@pearlaircraft.com." | Chiou Decl., Ex. 41 (5/27/2010 email). |
| 114. | National reviewed the website for Pearl Aircraft Corporation, which showed that Pearl Aircraft was an established company with substantial capital for airline financing projects. | Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 19:12-20:10; *see also* Chiou Decl., Ex. 51 (Pearl website, 7/24/2010). |
| 115. | Donald Stukes added "Pearl — by which he meant Jacob Hodges — to National's internal list of potential investors. | Chiou Decl., Ex. 9 (6/21/2010 email); *see also* Chiou Decl. Ex. 6 (Stukes Dep. Tr.) at 143:23-144:15. |
| 116. | National communicated to Mr. Hodges that JAL's bankruptcy trustee was applying pressure to finalize the deal quickly. | Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 36:2-37:11; Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 83:2-7 . |

| No. | National's Additional Facts in Opposition to Global's Summary Judgment Motion | Supporting Evidence |
|---|---|---|
| 117. | National and JAL were scheduled to meet in Japan during the week of July 26, 2010. | Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 23:15-24:1. |
| 118. | National needed to have in hand a firm commitment letter from a qualified lending institution before its meeting with JAL scheduled for the week of July 26, 2010. | Chiou Decl., Ex. 12 (Alf. Dep. Tr.) at 200:8-20; Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 23:15-24:1. |
| 119. | JAL was going to terminate the deal with National if National could not provide the required commitment letter at the meeting scheduled for the July 26, 2010. | Chiou Decl., Ex. 12 (Alf. Dep. Tr.) at 200:8-20; Chiou Decl. Ex. 1 (Joerger Dep. Tr.) at 23:15-24:1. |
| 120. | On July 7, 2010, National was told that Mr. Hodges "had approval to do the deal" and was sent a draft letter of intent from "Pearl." | Chiou Decl., Ex. 54 (7/7/2010 email with attachment). |
| 121. | The July 7, 2010 draft of the Letter of Intent had a placeholder for an entity "xxx Aircraft, Inc., a SPE, an affiliate or assignee," through which the financing would be arranged. | Chiou Decl., Ex. 54 at 545 (7/7/2010 email with attachment). |
| 122. | National believed that the placeholder was either: (a) Pearl Aircraft subsidiaries; or (b) special purpose entities set up by other sophisticated financing firms. | Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 15:15-16:6; 40:12-18. |
| 123. | On July 15, 2010, Mr. Hodges filled in the missing special purpose entity name with "Global BTG" and | Chiou Decl., Ex. 55 (7/15/2010 email with attachment). |

National's Statement of Genuine Disputes of Material Fact

| No. | National's Additional Facts in Opposition to Global's Summary Judgment Motion | Supporting Evidence |
|---|---|---|
| | revealed the potential involvement of another entity named "Greenrock." | |
| 124. | Mr. Hodges has never been associated with Pearl in any capacity. | Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 65(A):13-19; 65(F):13-15; 65(G):14-22; 65(H):17-21; 65(I):24-65(J):13 |
| 125. | Mr. Hodges has never been the Managing Director of Pearl. | Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 65(F):13-15. |
| 126. | National did not learn that Mr. Hodges was not affiliated with Pearl until long after the Letter of Intent was signed. | Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 15:15-16:6 (Mr. Joerger was "very shocked to find out later that Mr. Hodges had no affiliation with Pearl"); 19:12-20:12 (National was "under the impression" that Global "was some conglomeration of Pearl and Greenrock" and only realized that Hodges was unaffiliated with Pearl "after the fact"); 18:20-19:2 (Joerger was only told that Hodges was not affiliated with Pearl after Letter of Intent was terminated); Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 193(A):9-13 ("In this time period, you weren't focused on the difference between Pearl and Global?  A. No, no.  If anything, I thought Global was a part of Pearl or related to Pearl or an entity doing the deal with Pearl."); 197(A):8-20; 207(A):13-207(B):8 (Hodges was "introduced as being with Pearl" and having "a team with Pearl" and Alf assumed that Hodges "was still affiliated with Pearl all the way through this thing"). |

| No. | National's Additional Facts in Opposition to Global's Summary Judgment Motion | Supporting Evidence |
|---|---|---|
| | | |
| 127. | The 5482 Wilshire Boulevard, Los Angeles address that Mr. Hodges gave to National was a P.O. Box. | Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 65(C):7-10 |
| 128. | Mr. Hodges and Global operate out of Mr. Hodges' home in Camarillo, Ventura County. | Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 65(B):11-65(C):17; 65(E):8-15. |
| 129. | Global was capitalized with less than $25,000. | Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 65(D):12-65(E):14 |
| 130. | The Letter of Intent "outlines the basic commercial terms" for National to lease "up to eight" aircraft. | Smith Decl. Ex. 15 at 198 (Letter of Intent). |
| 131. | Many key material terms in the Letter of Intent were left open for future negotiations between Global and National, including the finance terms and the contents of any future lease agreement. | Smith Decl. Ex. 15 at 198, 203, 204 (Letter of Intent). |
| 132. | The entire potential arrangement between National and Global was conditioned on "satisfactory lease or financing documentation" that would later be negotiated by the parties. | Smith Decl. Ex. 15 at 204 (Letter of Intent). |
| 133. | On July 22, 2010, Jacob Hodges sent National a document titled "Memorandum of Understanding." | Chiou Decl., Ex. 56 (7/22/2010 email with attachment). |
| 134. | The July 22, 2010 "Memorandum of Understanding" drafted by Jacob | *Compare* Smith Decl. Ex. 15 (Letter of Intent) and Chiou Decl., Ex. 56 |

| No. | National's Additional Facts in Opposition to Global's Summary Judgment Motion | Supporting Evidence |
|---|---|---|
| | Hodges was a slightly revised version of the July 18, 2010 Letter of Intent between the parties. | (Memorandum of Understanding). |
| 135. | The July 22, 2010 "Memorandum of Understanding" drafted by Jacob Hodges refers to itself as a "Letter of Intent." | Chiou Decl., Ex. 56 at 568. |
| 136. | The July 22, 2010 "Memorandum of Understanding" drafted by Jacob Hodges was insufficient to satisfy the demands of the JAL bankruptcy trustee. | Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 56:14-56(A):20; *see also* Chiou Decl., Ex. 56, 57. |
| 137. | The July 22, 2010 "Memorandum of Understanding" revealed that Mr. Hodges did not have any lending institutions "in committee" ready to provide funding and that, on or about July 18, 2010, Mr. Hodges started a search to obtain financing from scratch. | *See* Chiou Decl., Ex. 56 (Memorandum of Understanding); Smith Decl. Exs. 50-56 (Mr. Hodges first initiated contacts with potential lenders on July 19 and 20, 2010). |
| 138. | On July 23, 2010, after receiving the "Memorandum of Understanding" drafted by Mr. Hodges, National terminated its relationship with Global. | Smith Decl. Ex. 36 (7/23/2010 email). |
| 139. | National then focused its energy on salvaging the purchase agreements for the JAL and Air France aircraft, and was able to secure financing from Goldman Sachs for the three Air France aircraft. | Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 54:16-22. |

| No. | National's Additional Facts in Opposition to Global's Summary Judgment Motion | Supporting Evidence |
|---|---|---|
| **140.** | Ultimately National was unable to complete the purchase of the JAL aircraft and had to forfeit $100,000 of its deposit to JAL. | Chiou Decl., Ex. 56 (8/10/2010 letter). |
| **141.** | Jacob Hodges admits that "Goldman Sachs doesn't need Global to prime the market to raise financing." | Chiou Decl., Ex. 2 (Hodges Dep. Tr.) at 86:18-21. |
| **142.** | National would not have worked with Global or Hodges if National knew that Global and Hodges were unaffiliated with Pearl. | Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 190(A):8-14 (National would not have commenced relationship with Global if it was aware that it was unaffiliated with Pearl); *see also* 192(A):9-13 ("In this time period, you weren't focused on the difference between Pearl and Global?  A. No, no.  If anything, I thought Global was a part of Pearl or related to Pearl or an entity doing the deal with Pearl."); 197(A):8-20; 207(A):13-207(B):8 (Hodges was "introduced as being with Pearl" and having "a team with Pearl" and Alf assumed that Hodges "was still affiliated with Pearl all the way through this thing"); Chiou Decl., Ex. 1 (Joerger Dep. Tr.) at 15:15-16:6 (Joerger was "very shocked to find out later that Mr. Hodges had no affiliation with Pearl"); 19:12-20:12 (National was "under the impression" that Global "was some conglomeration of Pearl and Greenrock" and only realized that Hodges was unaffiliated with Pearl "after the fact"); 18:20-19:2 (Joerger |

| No. | National's Additional Facts in Opposition to Global's Summary Judgment Motion | Supporting Evidence |
|---|---|---|
| | | was only told that Hodges was not affiliated with Pearl after Letter of Intent was terminated). |
| 143. | The "best efforts" clause in the Letter of Intent does not set forth how Global was supposed to undertake "best efforts" from July 18 to July 22, 2010. | Smith Decl., Ex. 15. |
| 144. | National was scheduled to take delivery of the first JAL aircraft on August 30, 2010. | Chiou Decl., Ex. 16 at 244; Chiou Decl., Ex. 12 (Alf Dep. Tr.) at 195:9-196:13. |

## III.    RESPONSE TO PROPOSED CONCLUSIONS OF LAW

| Proposed Conclusion of Law | National's Response |
|---|---|
| When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.<br><br>*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 8816, 108 S. Ct. 2166 (1988) | "[T]he law-of-the-case doctrine merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.  A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance."  *Christianson v. Colt Indus. Operating Corp.*,  486 U.S. 800, 816-17 (1988) (internal citations omitted). |
| An unformed entity can enforce a contract made on its behalf before it was formed.<br><br>*O2 Development, LLC v. 607 South Park, LLC*, 159 Cal. App. 4th 609, 612 (2008);<br><br>*722 W. 43rd St. LLC v. Ali*, No. B211263, 2009 WL 3020001 (Cal. App. Sep. 23, | Global's citation to unpublished California decisions is improper and should not be considered by the Court.  *H. Salt, Inc. v. Wen Lung Yu*, 1993 U.S. App. LEXIS 20636, at *5 (9th Cir. Aug. 11, 1993) (citing *Elwood v. Aid Ins. Co.*, 880 F.2d 204, 208 n.4 (9th Cir. 1989) (refusing to consider unpublished California |

| Proposed Conclusion of Law | National's Response |
|---|---|
| 2009) (unpublished). | decision). |
| | It is essential to the existence of a contract that there be parties capable of contracting.  Cal. Civ. Code § 1550(1). |
| | California courts have never recognized the existence of a limited liability company under the "LLC-by-estoppel or "de facto LLC" exceptions. |
| | An unformed entity can only enforce a contract made on its behalf before it was formed pursuant to the "corporation-by-estoppel" exception when both parties to the contract know that the contracting entity was unformed and the counter-signing party benefits from the contract. *Timberline Equipment Co., Inc. v. Davenport*, 514 P.2d 1109, 1112 (Or. 1973); *Van Landingham v. United Tuna Packers*, 189 Cal. 353, 372-373 (1922); *Lusardi Constr. Co. v. Aubry*, 1 Cal. 4th 976, 994 (1992); 8 *Fletcher Cyclopedia of the Law of Corporations* § 3905. |
| | An unformed entity can only enforce a contract made on its behalf before it was formed pursuant to the "adoption/ratification" exception when the counter-signing party received an unjust benefit and the counter-signing party knows that the entity is unformed.  *See Stickel v. Harris*, 196 Cal. App. 3d 575, 586 (1987) (party seeking to disavow contract "knowingly accept[ed] its benefits"); *Monteleone v. Southern California Vending Corp.*, 264 Cal. App. 2d 798, 807 (1968) (party seeking to disavow contract "retained the benefits and cannot now successfully urge that it is [not] bound"); *Abbott v. Limited Mut. Compensation Ins. Co.*, 30 Cal. App. 2d 157, 162-63 (1938) (individual disclosed beforehand that his corporation had not yet been formed); |

| Proposed Conclusion of Law | National's Response |
|---|---|
| | Brief for Appellant, *02Development, LLC v. 607 South Park, LLC*, 2007 WL 31697, at *24 (explaining that in *02Development* case cited by Global, the defendant knew in advance that the plaintiff had not formed the entity executing the contract at issue, but nevertheless decided to accept a $200,000 deposit).<br><br>An unformed entity can only enforce a contract made on its behalf before it was formed pursuant to the "*de facto corporation*" exception when the putative corporation "colorably complied" with the relevant entity formation statute. *City of Colton v. City of Rialto*, 230 Cal. App. 2d 174, 183 (1964); *see also San Diego Gas Co. v. Frame*, 137 Cal. 441, 444-45 (1902). |
| The individual signing on behalf of an unformed entity is both liable on and may enforce the contract.<br><br>*BJRM, LLC v. Output Systems, Inc.*, 917 A.2d 605, 612 (Conn. App. 2007);<br><br>*Banker's Trust Co. of W. N.Y. v. Zecher*, 103 Misc. 2d 777, 780 (N.Y. Sup. 1980);<br><br>*VGY Development, LLC v. 376A South Colony Realty Corp.*, No. CV065002733, 2007 WL 1675090 (Conn. Super. May 22, 2007) (unpublished);<br><br>*Allen v. Scott, Hewitt & Mize, LLC*, 186 S.W. 3d 782, 784 (Mo. App. 2006). | The adoption/ratification doctrine was intended to protect creditors of corporations that had not yet been formed. The doctrine was first discussed in *Brisacher v. Baier*, 67 Cal. App. 96 (1924), where the California Court of Appeal held that "those dealing with promoters should be left with the double security of the promoter and the company when one is formed[.]" *Id.* at 101-02. The California Supreme Court has never expanded the adoption/ratification exception to allow every company to enforce all pre-formation contracts. With respect to whether an individual may enforce a contract signed on behalf of an unformed entity, National incorporates its previous response above. |
| A party that bargains with a counterparty as if it was officially formed is estopped to deny its existence. | If a party knows that a counterparty has not been legally organized, and chooses to contract with the counterparty regardless, then the |

| Proposed Conclusion of Law | National's Response |
|---|---|
| 8 William Meade Fletcher, Fletcher Cyclopedia of the Law of corporations § 3910 (2010);<br><br>Dkt. Nos. 11, 29. | party is stopped from denying the counterparty's existence. 6/29/1011 Order, ECF No. 19 at 5 (citing *Peacock Hill Ass'n v. Peacock Lagoon Const. Co.*, 24 Cal. App. 3d 193 (1972)). |
| Principles of corporation by estoppel apply equally to LLCs.<br><br>*Home Owners' Loan Corp. v. Gordon*, 36 Cal. App. 2d 189, 192 (1939);<br><br>Order denying Motion to Dismiss Amended Complaint, Dkt. No. 35 at p. 4:23-5:18;<br><br>Dkt. Nos. 11, 29. | California courts have never recognized the existence of a limited liability company under the "LLC-by-estoppel exception. Notably, the 1939 *Home Owners* case does not reference LLCs.<br><br>In addition, Global overstates the scope of Judge Lew's previous orders. Judge Lew, for example, did not address whether National received an unjust benefit from Global, which is an element of both the LLC-by-estoppel and adoption exceptions. *See* ECF 11, 29. |
| LLC by estoppel protects the parties bargain.<br><br>Ragazzo & Moll at 291-292;<br><br>Duruigbo, 12 U. Pa. J. Bus. L. at 1030;<br><br>*Timberline Equipment Co. v. Davenport*, 514 P.2d 1109, 1112 (Or. 1973); 8 Fletcher Cyc. Corp. § 3889;<br><br>18A Am. Jur. 2d Corporations § 213, fn4;<br><br>Edward H. Warren, *Collateral Attack on Incorporation*, 21 Harv. L. Rev. 305, 313 (1909). | California courts have never recognized the existence of a limited liability company under the "LLC-by-estoppel exception.<br><br>An unformed entity can only enforce a contract made on its behalf before it was formed pursuant to the "corporation-by-estoppel" exception if: (1) both parties to the contract knew that the contracting entity was unformed; and (2) the counter-signing party unjustly benefits from the contract. *Timberline Equipment Co., Inc. v. Davenport*, 514 P.2d 1109, 1112 (Or. 1973); *Van Landingham v. United Tuna Packers*, 189 Cal. 353, 372-373 (1922); *Lusardi Constr. Co. v. Aubry*, 1 Cal. 4th 976, 994 (1992); 8 *Fletcher Cyclopedia of the Law of Corporations* § 3905. |

| Proposed Conclusion of Law | National's Response |
|---|---|
| An LLC may adopt an agreement made on its behalf before it is formed.<br><br>Dkt. No. 29. | The adoption/ratification doctrine was intended to protect creditors of corporations that had not yet been formed. The doctrine was first discussed in *Brisacher v. Baier*, 67 Cal. App. 96 (1924), where the California Court of Appeal held that "those dealing with promoters should be left with the double security of the promoter and the company when one is formed[.]" *Id.* at 101-02. The California Supreme Court has never expanded the adoption/ratification exception to allow every company to enforce all pre-formation contracts. With respect to whether an individual may enforce a contract signed on behalf of an unformed entity, National incorporates its previous responses above. |
| Under New York law, the interpretation of a contract is a matter of law. The court must first look at the four corners of the contract to determine whether an ambiguity exists.<br><br>*1550 Fifth Ave. Bay Shore, LLC v. 1550 Fifth Ave., LLC*, 748 N.Y.S.2d 601, 603 (N.Y.App.Div. 2002). | The interpretation of a contract is generally a matter of law under New York law. A "best efforts" clause, however, must always be read in context, considering the performing party's reasonable ability and the means at its disposal and the other party's justifiable expectations. *Arledge v. Stratmar Sys.*, 948 F.2d 845, 848 (2d. Cir. 1991); *Sedona Corp. v. Ladenburg Thalmann & Co.*, 2011 U.S. Dist. LEXIS 105320, at *6 (S.D.N.Y. Sept. 15, 2011); *McDarren v. Marvel Ent. Grp.*, 1995 U.S. Dist. LEXIS 4649, at *12 (S.D.N.Y. Apr. 7, 1995); *In re Cellular Information Sys.*, 171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994). |
| A contract is unambiguous if the language it uses has a definite and precise meaning for which there is no reasonable basis for a difference of opinion.<br><br>*Telerep, LLC v. U.S. Intern. Media, LLC,* | |

| Proposed Conclusion of Law | National's Response |
|---|---|
| 903 N.Y.S.2d 14, 15 (N.Y.A.D. 1 Dept. 2010);<br><br>*Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987). | |
| If the court determines that a particular clause is unambiguous, it may grant summary judgment without considering extrinsic evidence.<br><br>*1550 Fifth Ave. Bay Shore, LLC*, 748 N.Y.S.2d at 603. | |
| If the court determines that a certain clause is ambiguous, however, it may consider extrinsic evidence.  If the evidence is so one-sided that no reasonable person could decide to the contrary, then the court may grant summary judgment.<br><br>*3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999). | |
| A written agreement may not be contradicted by evidence of any prior or contemporaneous oral agreement.  Parol, however, is admissible to explain or supplement the terms of the agreement with course of dealing or usage of trade and with evidence of consistent additional terms.<br><br>N.Y. U. Com. Code § 2-202. | If a written agreement is covered by the UCC, then it may not be contradicted by evidence of any prior or contemporaneous oral agreement (other than parol evidence to explain or supplement the terms of the agreement).<br><br>The UCC, however, only applies to "transactions in goods."  N.Y. U.C.C. § 2-102; *see, e.g.*, *Manes Organization, Inc. v. Standard Dyeing & Finishing Co.*, 472 F. Supp. 687, 692 n.3 (S.D.N.Y. 1979) (a contract does not fall within the UCC if "service predominates over any sale aspect"). |

| Proposed Conclusion of Law | National's Response |
|---|---|
| Evidence outside of the writing should be excluded if, in the view of the court, it relates to a condition that would have been included in the writing.<br><br>*Tropical Leasing, Inc. v. Fiermonte Chevrolet, Inc.*, 439 N.Y.S.2d 566, 567 - 568 (N.Y.A.D. 1981). | |
| New York law defines "best efforts" as a duty greater than good faith but short of an obligation to succeed.<br><br>*Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir. 1979);<br><br>*Kroboth v. Brent*, 215 A.D.2d 813, 814 (N.Y. App. Div. 1995). | National agrees with this black-letter definition of the phrase "best efforts." To be clear, however, "best efforts" requires a party "to make such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations." *In re Cellular Information Sys.*, 171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994). |
| Best efforts does not mean that a party must accomplish the task.<br><br>*TPTCC NY, Inc. v. Radiation Therapy Services, Inc.*, 784 F.Supp.2d 485, 507 (S.D.N.Y. 2011). | National agrees that "best efforts" is not equivalent to "success." To be clear, however, "best efforts" requires a party "to make such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations." *In re Cellular Information Sys.*, 171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994). |
| Summary judgment is appropriate where the unambiguous, plain terms, of a contract establish that an exclusive relationship existed between the parties, even when the contract does not contain an "exclusivity" clause.<br><br>*Headwell v. Sandler*, 46 A.D.2d 584, 587, 364 N.Y.S.2d 218, 221 - 222 (N.Y.A.D. 1975). | If a written agreement "makes no mention of exclusivity," then the black letter default rule under New York law is that the agreement does not support "any contractual right" to exclusivity. *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 217 (S.D.N.Y. 2007). |

| Proposed Conclusion of Law | National's Response |
|---|---|
| When determining exclusivity, the court must construe a contract to give effect to all of its terms, avoiding an interpretation which would render a critical portion of the document meaningless.<br><br>*PNC Capital Recovery v. Mechanical Parking Systems, Inc.*, 283 A.D.2d 268, 271, 726 N.Y.S.2d 394, 397 (N.Y.A.D. 2001);<br><br>*Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465 (1984);<br><br>*Yoi–Lee Realty Corp. v. 177th Street Realty Assocs.*, 208 A.D.2d 185, 190, 626 N.Y.S.2d 61 (N.Y.A.D. 1995);<br><br>*Wyndham Co. v. Wyndham Hotel Co.*, 596 N.Y.S.2d 655, 661 (N.Y.Supp. 1992). | "[T]he courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Rowe v.Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 72, 385 N.E.2d 566, 572 (1978).<br><br>If a written agreement "makes no mention of exclusivity," then the black letter default rule under New York law is that the agreement does not support "any contractual right" to exclusivity. *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 217 (S.D.N.Y. 2007). |
| Anticipatory repudiation occurs when the obligor commits a voluntary and affirmative act that makes it actually or apparently impossible for him to perform.<br><br>*In re Asia Global Crossing, Ltd.*, 332 B.R. 520, 525 (Bkrtcy. S.D.N.Y. 2005);<br><br>*James v. Burchell*, 82 N.Y. 108, 114 (1880);<br><br>Rest. 2d Contracts § 250, illus. 5 (1981). | |
| A party commits anticipatory repudiation when it enters into a second contract before the time of performance arrives that 'puts it out of his power to keep his contract.<br><br>*In re Asia Global Crossing, Ltd.* 332 B.R. 520, 525; | |

National's Statement of Genuine Disputes of Material Fact

| Proposed Conclusion of Law | National's Response |
|---|---|
| *Goodman Mfg. Co., L.P. v. Raytheon Co.*, No. 98 Civ. 2774(LAP), 1999 WL 681382, at *8 (S.D.N.Y. Aug.31, 1999). | |
| New York law and the U.C.C. severely restrict the circumstances under which a party may recover lost profits.<br><br>*Kenford Co. v. Erie,*,493 N.E.2d 234 (N.Y. 1986) | Lost future profits may be recovered when: (1) it is certain that the loss was caused by the breach; (2) the amount of loss is established with reasonable certainty, i.e., is not left to speculation; and (3) the particular damages were fairly within the contemplation of the parties at the time of contract. *Kenford Co., Inc. v Erie County*, 67 NY2d 257, 502 NYS2d 131, 493 NE2d 234 (N.Y. 1986). |
| Lost profits may only be recovered where the loss was caused by the seller's breach, the allocation of the risk of loss was contemplated by the parties, the loss is not speculative, and the amount can be fixed with reasonable certainty.<br><br>*Kenford Co. v. Erie,*,493 N.E.2d 234 (N.Y. 1986);<br><br>N.Y. U. Com. Code §§ 2-714, 2-715;<br><br>*Conservancy Holdings, Ltd. v. Perma-Treat Corp.*, 126 A.D.2d 114, 513 N.Y.S.2d 266 (3d Dept. 1987). | |

DATED: November 13, 2012

JENNER & BLOCK LLP

By: /s/Brent Caslin
    Brent Caslin

    Attorneys for National Air Cargo, Inc.

National's Statement of Genuine Disputes of Material Fact